**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE PFIZER INC. SHAREHOLDER
DERIVATIVE LITIGATION

Master File No. 09-CV-7822 (JSR)

**JURY TRIAL DEMANDED**

**ECF CASE**

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED, AMENDED AND VERIFIED
SHAREHOLDER DERIVATIVE COMPLAINT**

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

Gerald H. Silk
Mark Lebovitch
Noam Mandel
Jeroen van Kwawegen
1285 Sixth Avenue
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Lead Plaintiff Amalgamated Bank
and Court-Appointed Lead Derivative Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

FACTUAL ALLEGATIONS ...................................................................................5

    I.    ILLEGAL MARKETING OF DRUGS WAS INTEGRAL TO PFIZER'S
        BUSINESS MODEL .................................................................................5

        A. Pfizer's Extensively Regulated Business .....................................5

        B. Company-wide Illegal Efforts To Market Drugs Off-Label ........5

    II.    THE FEDERAL GOVERNMENT REPEATEDLY TRIES TO FORCE
        THE BOARD TO CONTROL AND STOP ILLEGAL CONDUCT ....................8

        A. 2002 – Pfizer Enters Into The First Corporate Integrity Agreement
           And Pays A Multimillion Dollar Settlement For Violations
           Regarding Lipitor ......................................................................8

        B. 2004 – Pfizer Enters Into The Second Corporate Integrity Agreement
           And Pays The Second Largest Criminal Healthcare Fine Ever
           Imposed ....................................................................................9

        C. 2007 – Pfizer Pays A Multimillion Dollar Criminal Fine For
           Healthcare Violations Regarding Genotropin ...........................10

    III.    DEFENDANTS' KNOWING APPROVAL OF PFIZER'S ILLEGAL
        MARKETING RESULTED IN THE LARGEST CRIMINAL FINE AND
        THE LARGEST CIVIL HEALTHCARE FINE EVER .......................................11

        A. For Almost Eight Years, Defendants Consciously Condoned
           Widespread Illegality ...............................................................11

        B. The Government Imposes On Pfizer The Largest Criminal Fine Ever
           And The Largest Civil Fine For Any Healthcare Fraud ............12

        C. The Government Takes Control Of Pfizer's Marketing Oversight By
           Imposing An Even Stricter Corporate Integrity Agreement ......13

    IV.    THE MATERIAL MISREPRESENTATIONS IN PFIZER'S PROXY
        STATEMENTS .........................................................................................14

ARGUMENT .......................................................................................................15

    I.    DEMAND ON THE DIRECTOR DEFENDANTS IS EXCUSED ....................15

        A. The Legal Standard for Demand Futility .................................15

i

B. Demand is Excused Because The Board's Adopting Or Condoning Illegal Business Strategies Is Not a Valid Exercise of Business Judgment ....................................................................................16

C. Demand Is Also Excused Because A Majority Of The Director Defendants Face A Substantial Likelihood Of Liability...........................21

D. Defendants Mischaracterize The Allegations In The Complaint And Cite Inapposite Authority..........................................................................23

II. THE COMPLAINT STATES CLAIMS AS TO ALL COUNTS ........................26

A. The Complaint Adequately Pleads Violations of Section 14(a) ...............26

1. The Legal Standard for Section 14(a) Claims ...................................26

2. Pfizer's Proxies Were False And Misleading Because They Omitted Material Information ...........................................................29

3. The Complaint Adequately Pleads An Essential Link Between The Proxy Statements And Increased Executive Compensation And Reelection Of The Director Defendants ....................................34

4. Plaintiffs' Section 14(a) Claims Are Not Moot.................................35

B. The Complaint Adequately Pleads Breach Of The Fiduciary Duty Of Disclosure ................................................................................................35

C. The Complaint Adequately Pleads Fiduciary Breach Claims As To All Defendants ............................................................................................36

D. The Complaint Adequately Pleads Unjust Enrichment Claims.................37

III. DEFENDANTS' EFFORTS TO EVADE LIABILITY ON THE BASIS OF PFIZER'S CERTIFICATE OF INCORPORATION ARE UNAVAILING .........38

IV. DEFENDANTS' ARGUMENTS CONCERNING AMALGAMATED BANK'S STANDING ARE MERITLESS .........................................................39

CONCLUSION .....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ............................................................................................ *passim*

*Beck v. Dobrowski,*
    559 F.3d 680 (7th Cir. 2009) ....................................................................................27

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) ...................................................................................39, 40

*Brinckerhoff v. Texas Eastern Prods. Pipeline Co.,*
    No. 2427-VCL, 2008 WL 4991281 (Del. Ch. Nov. 25, 2008) .................................35

*Cantor Fitzgerald, L.P. v. Cantor,*
    724 A.2d 571 (Del. Ch. 1998).................................................................................38

*Cinerama, Inc. v. Technicolor, Inc.,*
    663 A.2d 1156 (Del. 1995) .....................................................................................36

*DCML LLC v. Danka Bus. Sys. PLC,*
    No. 08 Civ. 5829 (SAS), 2008 WL 5069528 (S.D.N.Y. Nov. 26, 2008) ...............27

*Desimone v. Barrows,*
    924 A.2d 908 (Del. Ch. 2007)................................................................................17

*Gerstle v. Gamble-Skogmo, Inc.,*
    478 F.2d 1281 (2d Cir. 1973).................................................................................27

*Guttman v. Huang,*
    823 A.2d 492 (Del. Ch. 2003)...........................................................................24, 25

*Halpert Enters. v. Harrison,*
    362 F. Supp. 2d 426 (S.D.N.Y. 2005).....................................................................5

*Heller v. Kiernan,*
    No. 1484-K, 2002 WL 385545 (Del. Ch. Feb. 27, 2002) ......................................36

*In re Abbott Labs. Deriv. S'holders Litig.,*
    325 F.3d 795 (7th Cir. 2003) ...............................................................18, 19, 21, 37

*In re Amgen, Inc. Sec. Litig.,*
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) .................................................................31

*In re Anderson, Clayton S'holders Litig.,*
    519 A.2d 669 (Del. Ch. 1986).................................................................................35

*In re Atmel Corp. Deriv. Litig.*,
    No. C 06-4592 JF (HRL), 2008 WL 2561957 (N.D. Cal. June 25, 2008).............................36

*In re Caremark Int'l Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996).........................................................................................16, 23

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...............................................................20, 21, 22, 37

*In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*,
    495 F. Supp. 2d 477 (D.N.J. 2007) ........................................................................................19

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005).....................................................................................................20

*In re Trump Hotels S'holder Deriv. Litig.*,
    No. 96-CV-7820 (DAB), 2000 WL 1371317 (S.D.N.Y. Sept. 21, 2000) ..................15, 26, 27

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
    919 A.2d 563 (Del. Ch. 2007)..............................................................................................4, 39

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005).....................................................................................31

*In re Veeco Instr. Inc. Sec. Litig.*,
    434 F. Supp. 2d 267 (S.D.N.Y. 2006)...................................................................15, 20, 21, 37

*Kelley v. Rambus, Inc.*,
    No. C-07-1238, 2008 WL 5170598 (N.D. Cal. Dec. 8, 2008)................................................34

*King v. Baldino*,
    648 F. Supp. 2d 609 (D. Del. 2009).........................................................................................24

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ............................................................................................................36

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*,
    854 A.2d 121 (Del. Ch. 2004)..................................................................................................17

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)..................................................................................................................26

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ................................................................................................ *passim*

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007)..................................................................................................17

*Ryan v. Lyondell Chem. Co.*,
    C.A. No. 3176-VCN, 2008 WL 4174038 (Del. Ch. Aug. 29, 2008) ...............................22, 38

*Sampson v. Robinson*,
    No. 07-CV-6890 (PAC), 2008 WL 3884386 (S.D.N.Y. Aug. 20, 2008) ...............................15

*Sanders v. Wang*,
    C.A. No. 16640, 1999 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 1999) ....................................17

*Schock v. Nash*,
    732 A. 2d 217 (Del. 1999) .........................................................................................37, 38

*Stone ex rel. AmSouth Bancorp. v. Ritter*,
    911 A.2d 362 (Del. 2006) ...........................................................................................23

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................................................26

*Vides v. Amelio*,
    265 F. Supp. 2d 273 (S.D.N.Y. 2003)..........................................................................28

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)........................................................................................39

*Wall St. Sys. v. Lemence*,
    No. 04-CV-5299 (JSR), 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005).....................................29

*Weisberg v. Coastal States Gas Corp.*,
    609 F.2d 650 (2d Cir. 1979)........................................................................................34

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988)........................................................................................27

STATUTES

8 Del. C. § 141(a).........................................................................................................36

21 U.S.C. §301 ..............................................................................................................5

Del. Gen. Corp. Law § 102(b)(7)................................................................................38, 39

OTHER AUTHORITIES

17 C.F.R. 240.14a-101 ...................................................................................................33

17 C.F.R. § 229.401(f)(3) ...........................................................................................31, 32

17 C.F.R. § 240.14a-101 ................................................................................................31

Fed. R. Civ. P. 8(a) ....................................................................................................27, 35

Fed. R. Civ. P. 9(b) ...........................................................................................................29

Fed. R. Civ. P. 10b-5 .........................................................................................................31

Fed. R. Civ. P. 14a-9 ...................................................................................................26, 30

Fed. R. Civ. P. 23.1 ...........................................................................................................15

Dennis J. Block, Nancy E. Barton & Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors,* 41-42 (4th ed. 1995) .............................................17

S. Samuel Arsht, *The Business Judgment Rule Revisited*, 8 Hofstra L. Rev. 93, 129 (1979) ..................................................................................................................................18

Lead Plaintiff Amalgamated Bank and additional named plaintiffs (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to the Motion to Dismiss the Consolidated, Amended and Verified Shareholder Derivative Complaint (the "Complaint") of nominal defendant Pfizer Inc. ("Pfizer" or the "Company") and the other defendants identified therein (collectively "Defendants").

## PRELIMINARY STATEMENT

This derivative action seeks relief for harm that Pfizer's directors and executives caused by sanctioning, implementing, and failing to disclose a long-term Company-wide business plan that violated criminal and civil drug marketing laws. The misconduct at issue remained pervasive despite repeated criminal fines and government reprimands. Shareholders could not put a stop to this misconduct because the Company's federal proxy filings did not disclose the material facts. The misconduct continued even after federal prosecutors – realizing they could not rely on Pfizer's management to fulfill their legal (and fiduciary) obligations – repeatedly imposed on Pfizer's board of directors (the "Board") unique corporate integrity agreements ("CIAs") making the Board itself accountable to oversee and ensure the Company's compliance with drug marketing laws. ¶¶88-101, 109-120, 151.[1]

A majority of the Board knew about Pfizer's criminal business strategy by virtue of the regular compliance reports imposed through the CIAs, specific duties imposed on the Board through Pfizer's formal corporate documents and a multitude of other "red flags" – including numerous warning letters from the Food and Drug Administration ("FDA") and internal employee complaints. ¶¶151-153, 173-195. A majority of Pfizer's Board effectively adopted

---

[1] In this memorandum, "¶" refers to the corresponding paragraph in the Complaint. Capitalized terms have the same meaning as in the Complaint. Certain defined terms are also listed in Exhibit A to the Declaration of Mark Lebovitch ("Lebovitch Decl."), submitted herewith.

violation of law as a commercial strategy (and gambled with stockholder money that the consequences would be minor).  Ultimately, in September 2009, the U.S. Attorney for the District of Massachusetts lambasted Defendants' "recidivism" while imposing the largest criminal fine ever imposed on any corporation and the largest civil fine ever imposed on a pharmaceutical company.

Under Delaware law, no pre-suit demand is required of a derivative plaintiff where there is doubt that "the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993).  Based on the unique facts alleged in the Complaint (and the unprecedented harm to the Company and its stockholders resulting from Defendants' actions), it strains credulity to believe the Board could dispassionately and disinterestedly consider a pre-suit demand.  Directors who consciously condone widespread illegal conduct are not engaging in a valid exercise of business judgment.  Directors who consciously allow illegal conduct to continue despite years of stern governmental warnings – and despite the specific duties imposed by the CIAs that set this case apart from any precedent Defendants cite – cannot impartially consider a shareholder demand for action to correct harms resulting from the Board's own acts and omissions.

Recognizing that the specific allegations of the Complaint doom any dismissal motion, Defendants systematically rewrite the allegations into a complaint they can attack.  For example, Defendants re-characterize the Complaint as alleging a lack of internal controls.  Plaintiffs never argue that the Board remained ignorant about the Company's criminal conduct because of a lack of internal reporting mechanisms at Pfizer.  To the contrary, the CIAs, the Board's committee structure, and the Company's core corporate governance documents each ensured that the Board *knew* about Pfizer's improper and illegal business strategies.  The essence of Defendants'

argument is that the mere existence of the Board's committee structure and internal reporting mechanisms requires dismissal. *See* Def. Br. at 22. Defendants champion bad policy that would render a court powerless to "second-guess" a corporate board's "business judgment" to violate criminal law. Def. Br. at 22. This is not and should never be the law.

Further, ignoring detailed allegations of the Board's knowledge and willful blindness, Defendants argue that the Complaint fails to state a due care claim. The plain language and import of the Complaint is that a majority of the current Board was fully aware of Pfizer's extensive legal violations and made the conscious decision to condone the illegal activities in violation of their duties of loyalty and good faith. This is no due care claim.

Defendants also ask the Court to impose an impossibly high pleading standard, effectively demanding dismissal unless shareholders can offer a criminal conviction of each defendant director (or at least written confessions of their breaches of duty). That is also not the law. Taking the particularized factual allegations as true and drawing reasonable inferences in favor of Plaintiffs, the only reasonable conclusion to be drawn is that Defendants were aware of Pfizer's far-reaching criminal misconduct but chose to perpetuate it. If Defendants have justifications for their conduct, they can present those explanations at trial. They cannot prevent judicial inquiry by seeking unreasonable inferences in their favor.

Pfizer's 2007 through 2009 proxy statements contained no disclosures regarding the existence of the CIAs, the way the CIAs shaped and affected the Board's duties and responsibilities, the way the Board implemented its obligations under the CIAs, and the waivers by the Board of specific provisions of the Company's Code of Conduct. In seeking dismissal of claims brought pursuant to Section 14(a) of the Exchange Act of 1934, Defendants rewrite both the theory of liability articulated in, and the relief sought by, the Complaint. Defendants say the

2007 and 2008 proxy claims are moot because the directors whose elections were procured with a misleading proxy have since been re-elected. Defendants ignore that misleading proxies justify (and the Complaint seeks) monetary damages and equitable relief having nothing to do with invalidating the prior elections. The Complaint seeks invalidation of *only* the 2009 election.

Defendants also claim that the investing public was told the truth about Pfizer's disastrous foray into off-label marketing and that these disclosure claims require pleading of scienter because they "sound in fraud." Neither argument has merit. No fair reading of Pfizer's vague references in the Proxy Statements to narrow government investigations suggest, much less disclose, the truth about Pfizer's problems with the Justice Department. Further, Plaintiffs never attribute (even by implication) the material misstatements and omissions in Pfizer's proxies to fraudulent intent. In any event, the Complaint more than amply particularizes the allegations under Section 14(a) under any standard.

Finally, Defendants assert that Amalgamated Bank lacks standing to serve as a derivative plaintiff because it is the trustee for its LongView investment funds. This argument is meritless. Chancellor Chandler has expressly acknowledged Amalgamated Bank's standing to bring a derivative action as a trustee for its LongView investment fund. *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 571, n.4 (Del. Ch. 2007) (noting that "Amalgamated's shareholder standing derives from its trusteeship of the LongView MidCap 400 Index Fund").

## FACTUAL ALLEGATIONS

The well-pleaded allegations of the complaint must be accepted as true for purposes of this motion. *See Halpert Enters. v. Harrison*, 362 F. Supp. 2d 426, 430 (S.D.N.Y. 2005).

## I.    ILLEGAL MARKETING OF DRUGS WAS INTEGRAL TO PFIZER'S BUSINESS MODEL

### A.    Pfizer's Extensively Regulated Business

Pfizer's core business, the worldwide marketing of prescription drugs, is heavily regulated under the Federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §301, *et seq*, and includes oversight by the U.S. Food and Drug Administration ("FDA"). ¶¶54, 57. The FDA will only approve a drug for a specific use and maximum dosage, which must be described on the drug's official, FDA-approved label. ¶¶58, 59. The FDCA prohibits drug companies from marketing or promoting drugs for unapproved or "off-label" uses and dosages. *Id.*

Proving that a drug's specific use and dosage are safe and effective is very expensive. ¶61. Drug companies derive immediate and substantial profits, however, from off-label prescriptions. *Id.* Drug companies also have a short-term incentive to give gifts, money and other things of value to doctors to encourage off-label prescription of their drugs, which violates the Federal anti-kickback statute. *Id.* Because the resulting improper prescriptions are frequently reimbursed by federal healthcare programs, including Medicare and Medicaid, violations of the FDCA and the Federal anti-kickback statute often involve violations of the Federal False Claims Act. *Id.* Repeated violations place a drug company at risk of incurring massive criminal and civil fines, and disqualification from federal healthcare programs. ¶4.

### B.    Company-wide Illegal Efforts To Market Drugs Off-Label

Pfizer's business is conducted primarily through its subsidiaries, such as Warner Lambert and Pharmacia. ¶23. During the Relevant Period, Pfizer's core products included Bextra,

Celebrex, Geodon, Lipitor, Lyrica, Norvasc, Viagra, and Zyvox. ¶¶53, 141. Each of these drugs were "blockbusters" – *i.e.,* each generated over $1 billion in revenue. ¶141. In 2008, Pfizer's nine biggest blockbuster drugs generated 60% of Pfizer's total revenue. *Id.* To promote the Company's drugs, Pfizer personnel collect nationwide information regarding the prescribing behavior of doctors in order to identify doctors who may be incentivized to prescribe more Pfizer drugs and to train sales representatives to persuade doctors to prescribe Pfizer's drugs. ¶54-55. Pfizer's multi-billion dollar marketing and promotion budgets and strategic plans, including the practices at issue here, were approved by the highest levels of management, including defendants D'Amelio, Feczko, Kindler, Read and Waxman. ¶¶45-46, 56.

Defendants implemented and allowed a Company-wide, multifaceted strategy to illegally promote off-label prescriptions of numerous drugs. ¶¶76-87, 121-145, 150-153. These illegal practices involved seven out of Pfizer's nine blockbuster drugs. ¶141. Each was material to Pfizer's overall revenue. *Id.* For example, off-label prescriptions of only one of Pfizer's drugs – Bextra – generated more than $1 billion in sales ($1,021,000,000), including an estimated $664,000,000 that was directly attributable to Pfizer's illegal sales and marketing practices. ¶86.

Despite affecting at least 13 different drugs during a period of almost eight years, the illegal promotion practices at Pfizer were remarkably consistent and similar, reflecting a conscious Company-wide business strategy that was implemented with Defendants' knowledge and support. ¶¶78-87, 142, 151-153. For example, from January 1, 2001 through February 28, 2008, Defendants caused Pfizer to illegally promote off-label prescriptions of Zyvox by making and disseminating unsubstantiated and false representations about Zyvox's safety and efficacy, and by paying illegal kickbacks to doctors to promote and prescribe Zyvox. ¶142. Pfizer personnel used the same practices with respect to Geodon (January 1, 2001 through December

31, 2007), Lyrica (September 1, 2005 through October 31, 2008) and Bextra (February 1, 2002 through April 30, 2005). *Id.* Moreover, Defendants supported such misleading statements by commissioning articles in medical journals and by distributing misleading articles to Pfizer's sales force.[2] ¶¶82-83.

Defendants also caused Pfizer to pay illegal remuneration and gifts (entertainment, cash, travel and meals) to doctors to induce them into improperly promoting and prescribing eight more drugs (Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax, Zoloft and Zyrtec) from January 2001 through December 2004. ¶¶84-85, 142, 151-153. The detailed allegations in the Complaint show that Defendants used specialized accounting software to track Pfizer's investment in encouraging off-label prescriptions, and that the illegal promotion activities with respect to Bextra and Zyvox were particularly pernicious, as short-term profits were purposefully placed ahead of patient safety. ¶¶86, 124-137, 144, 145, 151.

Numerous Pfizer employees reported the widespread illegal promotion practices to Pfizer's senior management and the compliance department. ¶87. Rather than intervening, Defendants caused Pfizer to retaliate against these employees, thereby actively permitting and encouraging the lawbreaking employees to continue their illegal behavior. ¶153. Retaliation at Pfizer's upper levels against reporters of wrongdoing was so common that Pfizer personnel commonly referred to internal reports of wrongdoing as a "CLM" or "Career Limiting Move." ¶87. Numerous Pfizer employees who suffered retaliation after reporting illegal behavior filed whistleblower complaints describing the widespread illegal marketing and kickback practices

---

[2]    A November 12, 2009 article in the *New England Journal of Medicine* reviewed Pfizer's abuse and misreporting of clinical trials. The director for the University of Pennsylvania's Center for Bioethics told the *Associated Press* that it was "***one of the most ethically disturbing papers I've read in some time***." ¶82. Throughout this opposition brief, emphasis is added unless otherwise indicated.

utilized at the Company.[3]  ¶¶76-87.

## II.    THE FEDERAL GOVERNMENT REPEATEDLY TRIES TO FORCE THE BOARD TO CONTROL AND STOP ILLEGAL CONDUCT

### A.    2002 – Pfizer Enters Into The First Corporate Integrity Agreement And Pays A Multimillion Dollar Settlement For Violations Regarding Lipitor

In 2002, Warner Lambert settled charges of improperly overcharging Medicaid by concealing cash discounts that it gave to a managed care organization.  ¶89.  This misconduct took place under the auspices of a Lipitor marketing agreement between Pfizer and its soon-to-be subsidiary.  *Id.*  Besides paying $49 million to settle these charges, Pfizer entered into a corporate integrity agreement (the "2002 CIA") with the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG HHS") to ensure, among other things, "promotional practices that conform with applicable Federal health care program requirements." ¶¶90, 111.

The 2002 CIA required the Board to be actively involved in policing Pfizer's compliance with the FDCA and the Federal anti-kickback statute, and required Pfizer to implement a compliance mechanism to elevate information about illegal promotional practices directly to the Board.  ¶¶90-91.  Pfizer's Compliance Officer was required to "make periodic (at least semi-annual) reports regarding compliance matters directly to the Board of Directors of Pfizer" and was "authorized to report on such matters to the Board of Directors any time."  ¶112.  Pfizer's Compliance Officer regularly brought compliance matters to the attention of the Director Defendants.  As defendant Lankler explained in a June 9, 2003 presentation: "***Make sure everyone knows about the CIA and understands its impact***," "***Frequent reminders***," "***Involve***

---

[3]    Defendants assert that some of these whistleblower complaints were only recently unsealed.  *See* Def. Br. at 24.  Defendants' memorandum is wholly silent about the detailed allegations in the Complaint explaining that those whistleblowers reported the illegal behavior to Defendants and only filed their complaints after suffering from retaliation and being forced out of the Company.  ¶¶10, 77-85, 95, 201.

*Board; keep them involved*," and "*Document everything*."  ¶¶110, 113.

**B.    2004 – Pfizer Enters Into The Second Corporate Integrity Agreement And Pays The Second Largest Criminal Healthcare Fine Ever Imposed**

In 2004, Warner Lambert pled guilty to criminal and civil charges that it fraudulently promoted Neurontin, a drug with dangerous side-effects, for a wide array of uses not approved by the FDA.  ¶¶93, 98.  The Government's June 2, 2004 sentencing memorandum identified and summarized key tactics that were used to illegally increase Neurontin prescriptions, including: (i) encouraging sales representatives to provide one-on-one sales pitches to physicians about off-label uses; (ii) utilizing medical liaisons, who often held themselves out as "neutral scientific experts," to work in tandem with sales representatives to promote off-label uses; (iii) paying illegal kickbacks to doctors for prescribing Neurontin off-label, including by giving cash and trips; and (iv) sponsoring ostensibly independent medical education events on off-label uses. ¶99.  According to the Government, this illegal marketing scheme was implemented with senior management's knowledge and approval as "part of a widespread coordinated national effort to implement an off-label marketing plan." *Id.*

Pfizer's subsidiary pled guilty to two felony counts of violating the FDCA, and Pfizer agreed to pay a $240 million criminal fine, an additional $190 million to settle claims under the Federal anti-kickback statute and the False Claims Act, and to enter into yet another, more extensive, corporate integrity agreement with OIG HHS (the "2004 CIA").[4]  ¶¶100, 101.  The 2004 CIA imposed an internal disclosure program enabling Pfizer employees to report FDCA

---

[4]    Defendants ask the Court to take judicial notice of the June 2, 2004 sentencing memorandum and the 2004 CIA and have submitted certain excerpts of these documents as Exhibits E and G, respectively, to the December 16, 2009 declaration of Jason M. Halper.  *See* Def. Br. at 10.  Plaintiff has no objection, except to request that should the Court take such notice, the Court should review the entire sentencing memorandum and 2004 CIA, true and correct copies of which are attached as Exhibits B and C, respectively, to the Lebovitch Decl.

violations to the compliance department to prevent similar illegal promotional practices in the future. ¶114. The Compliance Officer was required to maintain a log to record every complaint, the status of any review and any corrective action, and to "make periodic (at least semi-annual) reports regarding compliance matters directly to the Board." ¶115. The 2004 CIA authorized the Compliance Officer and the Deputy Compliance Officer to bypass senior management, including the CEO, to report "on such matters to the Board of Directors at any time," thereby emphasizing the government's unique reliance on the Board to directly govern Pfizer's promotional activities. *Id.* The Board also agreed to abide by Pfizer's Code of Conduct and Ethics (the "Code of Conduct"), which expressly required the Board to "oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company." ¶¶67, 68, 116. The Government expected that the Board's direct oversight would ensure that "any future off-label marketing conduct is detected and corrected on a timely basis." ¶101.

Despite the 2004 CIA, Defendants' Company-wide strategy to violate the FDCA and the Federal anti-kickback statute continued unabated with respect to at least 13 other drugs. ¶¶121-145, 150-153. As the U.S. Attorney would later explain, "at the very same time Pfizer was in our office negotiating and resolving [prior] allegations of misconduct … Pfizer was itself in its other operations violating those very same laws." ¶¶1, 139.

**C.    2007 – Pfizer Pays A Multimillion Dollar Criminal Fine For Healthcare Violations Regarding Genotropin**

In March 2007, Pfizer's wholly-owned subsidiary Pharmacia entered a criminal guilty plea for illegally promoting human growth hormone Genotropin in violation of the FDCA and pleaded guilty to intentionally violating the Federal anti-kickback statute. ¶106-07. Pfizer entered into a deferred prosecution agreement with the Government and agreed to pay $34.6

million in criminal fines.  ¶108.  While the admitted illegal conduct occurred before Pfizer acquired Pharmacia, under Defendants' direction, Pfizer continued to derive substantial profits from this strategy thereafter.  ¶105.

## III.  DEFENDANTS' KNOWING APPROVAL OF PFIZER'S ILLEGAL MARKETING RESULTED IN THE LARGEST CRIMINAL FINE AND THE LARGEST CIVIL HEALTHCARE FINE EVER

### A.  For Almost Eight Years, Defendants Consciously Condoned Widespread Illegality

Throughout the Relevant Period, Defendants had actual notice of repeated "red flags" about ongoing, widespread illegal practices at Pfizer, as detailed on pages 61-65 of the Complaint.  The reported red flags included numerous internal reports about ongoing violations with respect to different Pfizer drugs under the CIA disclosure program, numerous FDA violation notices and warning letters, and multimillion dollar payments to settle past wrongdoing, including:

- In 2002, Pfizer received FDA violation notices regarding the illegal marketing of Neurontin, Lipitor, and Geodon.

- In 2003, Pfizer received FDA violation notices regarding the illegal marketing of Covera-HS and Camptosar.  Pfizer also received anti-kickback statute violation reports by Pfizer employee Blair Collins regarding Lipitor, Viagra, Zyrtec, Norvasc, Zithromax, Zoloft and Glucotrol, and by Glenn DeMott about the illegal use of unreliable and flawed studies to promote the efficacy of Geodon, Bextra, Celebrex, Relpax and Lyrica.

- In 2004, Pfizer paid the second highest criminal healthcare fine ever imposed until then in the U.S. and entered into the 2004 CIA regarding the illegal marketing of Neurontin.  Pfizer also received FDA violation notices regarding the illegal marketing of Zyrtec-D and Viagra.

- In 2005, Pfizer received two separate FDA Warning Letters sent directly to Pfizer's CEO regarding the illegal marketing of Zyrtec-D and Zyvox.  Pfizer also received FDA violation notices regarding the illegal marketing of Bextra, Celebrex, and Zoloft.

- In 2006 and 2007, Pfizer received illegal marketing reports by Pfizer employee Robert Liter and by Pfizer employees David Farber and Casey Schildhauer regarding

the illegal marketing of Lyrica, and by Pfizer employee Mark Westlock regarding the illegal marketing of Geodon.

- In 2007, Pfizer entered into a deferred prosecution agreement and paid a multimillion dollar fine regarding the illegal marketing of Genotropin. Pfizer also received an FDA violation notice regarding the illegal marketing of Geodon.

- In 2008, Pfizer received an FDA Warning Letter sent directly to Pfizer's CEO, defendant Kindler, regarding the illegal marketing of Viagra.

- In 2009, Pfizer received FDA violation notices regarding the illegal marketing of Aromasin, Caduet, Chantix, Detrol, Lyrica and Celebrex. ¶151.

Pfizer's Chief Compliance Officer and Deputy Compliance Officer informed the Board, and the Audit Committee repeatedly of those red flags, pursuant to the reporting requirements of the 2002 and 2004 CIAs. *Id.* Defendants, however, decided not to interfere, thereby consciously violating their fiduciary duties of good faith and loyalty under Delaware law, as well as their duties under Pfizer's formal Corporate Governance Principles, Pfizer's nondiscretionary Code of Conduct and Ethics and the committee charters of the Board's audit and corporate governance committees. ¶¶63, 152-153, 209-211, 215. Defendants' deliberate misconduct facilitated the illegal sales and marketing practices and the retaliation against employees who reported such illegal practices to management. ¶¶153, 217.

### B.     The Government Imposes On Pfizer The Largest Criminal Fine Ever And The Largest Civil Fine For Any Healthcare Fraud

In 2009, Defendants lost their bet that the government would never impose meaningful consequences for their violations of the law. In October 2009, Pfizer subsidiary Pharmacia pleaded guilty to a criminal felony charge for violating the FDCA, admitting that it intentionally, and with intent to deceive and defraud, marketed Bextra for uses and dosages that were not approved by the FDA from February 2002 through April 2005. ¶137. During this time, Defendants knew that Bextra was dangerous to human life. ¶¶132-137, 143. As the Government noted on September 2, 2009, "***Pfizer promoted the sale of Bextra for several uses and dosages***

12

***that the FDA specifically declined to approve due to safety concerns.***" ¶137.

Pfizer paid the largest criminal fine ever imposed in the United States for any matter – $1.195 billion in fines and $105 million in forfeitures for a total criminal payment of $1.3 billion. ¶138. The fine included an upward departure under the U.S. sentencing guidelines because "the organization had 5,000 or more employees, ***and an individual within the high level of personnel of the unit participated in or condoned the offense and/or tolerance of the offense by substantial authority personnel was pervasive throughout the organization***." *Id.* The prosecutor noted that "Pfizer violated the law over an extensive time period" and that "[t]oday's enormous fine demonstrates that such blatant and continued disregard of the law will not be tolerated." ¶139.

Pfizer also paid $1 billion to settle civil claims by the Government that it had violated the Federal anti-kickback statute and the False Claims Act with respect to the 13 different drugs discussed above. ¶¶140-141. According to the Government, this is "the largest civil fraud settlement in history against a pharmaceutical company." ¶140.

A September 4, 2009 *Bloomberg* article noted that "[g]iven the scope of the alleged misconduct, potential harm to the public, mistreatment of employees who insisted on following the law and its history as a repeat offender … ***it got off lightly***." ¶154. The article added that "if Pfizer were convicted of a crime, it would face debarment from federal programs" resulting in ruinous consequences for Medicaid and Medicare patients who "would have to either somehow pay [out of] pocket for vital medicines the company produces or go without." ¶155.

### C.    The Government Takes Control Of Pfizer's Marketing Oversight By Imposing An Even Stricter Corporate Integrity Agreement

In addition to paying $2.3 billion for its illegal conduct, Pfizer entered into another corporate integrity agreement (the "2009 CIA"). ¶146. The 2009 CIA reflects an unprecedented

government takeover of compliance at Pfizer because of the repeated refusal of senior management and the Board to do so. *Id.* The Audit Committee must in the future meet quarterly to review and discuss the Company's compliance activities, to adopt a resolution summarizing its inquiry into Pfizer's compliance with the FDCA and the 2009 CIA, and to affirm through a signature of each member that Pfizer's compliance program has been effective. ¶147. The 2009 CIA also requires Pfizer's pharmaceutical sales unit presidents and finance directors to certify that they have taken appropriate steps to ensure compliance, that the business unit's leadership has not directly or indirectly encouraged a policy violation, and that controls are operating effectively. ¶148. The Chief Compliance Officer must now directly report to the CEO and submit quarterly reports to the Audit Committee. ¶149.

## IV.   THE MATERIAL MISREPRESENTATIONS IN PFIZER'S PROXY STATEMENTS

Pfizer's annual proxy statements filed with the SEC on March 15, 2007 ("2007 Proxy"), March 14, 2008 ("2008 Proxy") and March 13, 2009 ("2009 Proxy") failed to disclose: (i) the nature of the Board's responsibilities under the 2004 CIA; (ii) the extent to which the Company's financial performance depended on off-label prescriptions; (iii) the numerous instances in which the Board was informed of compliance violations regarding Pfizer's illegal marketing and sales practices with regard to its drugs; (iv) the circumstances surrounding the Board's waiver of requirements of Pfizer's Code of Conduct and Ethics; and (v) the nature of the Board member's adherence to the charters of the Audit and Corporate Governance Committees. ¶¶165, 197-198.

Each of these omissions was highly material to investors. Provided with accurate disclosures, Pfizer shareholders would have declined to increase the compensation of the Company's executives and outside directors by $425,000,000, and taken other action to avoid substantial harm to the Company. ¶¶166, 199-201. The members of the Board would not have

been elected (or reelected), which has caused significant harm to Pfizer as well. ¶¶166-168. By ostensibly taking control of Pfizer's legal compliance mechanisms established under the CIAs while, in reality, refusing to actually perform the associated affirmative legal and compliance obligations, the Director Defendants caused Pfizer's continued violations, exposing the Company to historic fines and potentially catastrophic healthcare program debarment. *Id.*

## ARGUMENT

## I.     DEMAND ON THE DIRECTOR DEFENDANTS IS EXCUSED

### A.     The Legal Standard for Demand Futility

Under Delaware law, a plaintiff in a derivative suit who did not make a demand on the corporation's board of directors must state with particularity the reasons why demand is futile and therefore excused. *See In re Trump Hotels S'holder Deriv. Litig.*, No. 96-CV-7820 (DAB), 2000 WL 1371317, *5 n.2 (S.D.N.Y. Sept. 21, 2000). "As is the case with all motions to dismiss, plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged." *In re Veeco Instr. Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (denying motion to dismiss under Rule 23.1).

Delaware law provides multiple tests for determining whether demand was futile before commencing a derivative action. *See generally Sampson v. Robinson*, No. 07-CV-6890 (PAC), 2008 WL 3884386, at *3-5 (S.D.N.Y. Aug. 20, 2008). At their core, each of these tests simply asks whether "the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993). For example, "when a board has **consciously decided** whether or not to act in a given circumstance," *Sampson*, 2008 WL 3884386, at *3, demand is futile and excused under the *Aronson* test if a complaint alleges particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent" or that "(2) the challenged transaction was otherwise the product of a valid exercise

15

of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984). The *Rales* test applies "where there is no conscious decision by directors to act or refrain from acting" and excuses demand if a complaint raises a "substantial likelihood" of liability as to a majority of the current board. *Rales,* 634 A.2d at 933, 936. Similarly, under *In re Caremark International Derivative Litigation.*, 698 A.2d 959 (Del. Ch. 1996), demand is excused with respect to "sustained or systematic failure of the board to exercise oversight" over corporate activities. *Id.* at 972. Here, the label of which test to apply is immaterial. Under any standard, the alleged facts raise a reasonable doubt that the Director Defendants were capable of making an impartial decision regarding this litigation.

### B.    Demand is Excused Because The Board's Adopting Or Condoning Illegal Business Strategies Is Not a Valid Exercise of Business Judgment

The gravamen of the Complaint is that Defendants consciously caused and allowed Pfizer to engage in illegal activity, which caused harm to Pfizer and its shareholders. This is not a protected business judgment, excusing demand. Defendants nevertheless argue that this action should be dismissed for lack of pre-suit demand because Pfizer had "monitoring and compliance systems in place and Delaware law does not allow shareholders to second guess the directors' business judgment about the types of controls needed." Def. Br. at 22. This argument is part red herring and all wrong as a matter of law. Initially, the Complaint does not seek to second-guess the types of controls the Government imposed on Pfizer for past pervasive criminal conduct. Rather, the Complaint insists that those reporting systems ensured that the Board was regularly informed of continuing violations throughout the Company of the FDCA and the Federal anti-kickback statute with respect to Pfizer's most important drugs. ¶¶68, 112-120.

Moreover, an informed judgment to consciously allow and not intervene in ongoing violation of the law is simply not protected under the business judgment rule. Both law and logic

support this rule. *See Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully" and "the knowing use of illegal means to pursue profit for the corporation is director misconduct."); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.,* 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").[5] Corporate directors do not have the discretion to act beyond their lawful powers and their conscious decision to do so is not a "valid exercise of business judgment" because it is not a business judgment at all. *Aronson*, 473 A.2d at 814; *see also Ryan v. Gifford*, 918 A.2d 341, 354 (Del. Ch. 2007) (holding that demand is excused because "[t]he board had no discretion to contravene the terms of the stock option plans."); *Sanders v. Wang*, C.A. No. 16640, 1999 Del. Ch. LEXIS 203, at *14-15 (Del. Ch. Nov. 8, 1999) (same). As one treatise has explained:

> The business judgment rule does not protect decisions by directors that constitute … illegality, or ultra vires conduct. Therefore … a decision by directors that a violation of law or fraudulent or ultra vires conduct would serve the best interests of the corporation is not protected by the business judgment rule.

Dennis J. Block, Nancy E. Barton & Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 41-42 (4th ed. 1995); *see also* S. Samuel Arsht, *The Business*

---

[5]    *See also Kahn v. Roberts,* 679 A.2d 460, 465 (Del. 1996) ("The business judgment rule normally protects all **lawful** actions of the board, provided they were taken in good faith."); *International Ins. Co. v. Johns,* 874 F.2d 1447, 1461 (11th Cir. 1989) ("A court will not call upon a director to account for his action in the absence of a showing of abuse of discretion, fraud, bad faith, or illegality."); *Miller v. AT&T Co.*, 507 F.2d 759, 762 (3d Cir. 1974) (business judgment does not insulate directors from liability for willful violation of federal statute; "directors must be restrained from engaging in activities which are against public policy") (applying New York law).

*Judgment Rule Revisited*, 8 Hofstra L. Rev. 93, 129 (1979) ("Bad faith may preclude application of the business judgment defense where directors knowingly violate a statute or comparable expression of public policy, even if such a violation is undertaken in the corporation's best interests.").

Because directors cannot exercise a "business judgment" to consciously allow company-wide illegal conduct, it is no surprise that Defendants cite cases for generic legal propositions without discussing or analyzing the actual facts underlying those actions. None of these cases is factually on point. By contrast, cases with comparable facts illustrate the clear rule of law that a board's conscious abandonment of duty evidences bad faith and is not protected by the business judgment rule, excusing demand.

The decision in *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003) ("*Abbott Labs*") is instructive. There, derivative plaintiffs alleged that the directors ignored red flags raised by the FDA about violations of healthcare regulations over a six year period, and consciously took no action to remedy those problems or exercise reasonable oversight. *See id.* at 802-803. Plaintiffs argued that the board:

> [K]new of the continuing pattern of noncompliance with FDA regulations and knew that the continued failure to comply with FDA regulations would result in severe penalties and yet ignored repeated red flags raised by the FDA and in media reports ***and chose not to bring a prompt halt to the improper conduct causing the noncompliance, nor to reprimand those persons involved, nor to seek redress for Abbott for the serious damages it has sustained***.

*Id*. The Seventh Circuit reversed the district court's dismissal, holding:

> The facts support a reasonable assumption that there was a 'sustained and systematic failure of the board to exercise oversight', in this case intentional in that ***the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith***. [...]

18

> *With respect to demand futility based on the directors' conscious inaction, we*
> *find that the plaintiffs have sufficiently pleaded allegations, if true, of a breach*
> *of the duty of good faith to reasonably conclude that the directors' actions fell*
> *outside the protections of the business judgment rule.*

*Id.* at 809; s*ee also In re SFBC Int'l, Inc. Sec. & Deriv. Litig.,* 495 F. Supp. 2d 477, 486 (D.N.J.

2007) (excusing demand because "the alleged misconduct related to the core of PDG's business"

and the directors ignored "particularly flagrant and reprehensible wrongdoing, which

unquestionably resulted in a 'potentially life-threatening situation' more immediately to the

trials' participants and in the longer-run to public consumers").

The Complaint here alleges that the Director Defendants, for many years, consciously

disregarded their fiduciary duties of loyalty and good faith, their duties under the 2004 CIA,

Pfizer's Code of Conduct, Pfizer's formal Corporate Governance Principles and the Audit and

Corporate Governance Committee Charters, by deliberately allowing ongoing illegal misconduct

related to the core of Pfizer's business.  ¶¶142-145, 151-153, 174-183, 185, 189-193.  As in

*Abbott Labs,* this is *not* a case where a Board was justifiably unaware of a discreet illicit scheme

that happened to hurt the corporation.[6]    The allegations here are significantly stronger than

those of *Abbott Labs*.  Here, the Director Defendants assumed direct oversight over Pfizer's

compliance with Federal healthcare regulations under the CIAs (in response to prior violations

and payment by Pfizer of more than $500 million in fines and settlements), were informed of

ongoing widespread violations pursuant to the reporting requirements that were imposed on

Pfizer by the Government in the CIAs, and, in a conscious dereliction of duty, jeopardized the

---

[6]    Even if this were a case where an illicit scheme went undetected (and it is not), this court
has held that "where liability is based upon a failure to supervise and monitor, and to keep
adequate supervisory controls in place, *demand futility is ordinarily found, especially where the*
*failure involves a scheme of significant magnitude and duration which went undiscovered by*
*the directors*."  *In re Oxford Health Plans, Inc*., 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (applying
Delaware law).

public health by putting short term profits ahead of Pfizer's legal compliance obligations.  ¶¶115, 143, 151-153, 164, 209; *see also In re Tower Air, Inc.*, 416 F.3d 229, 239 (3d Cir. 2005) ("Lives are on the line…[t]he officers' alleged passivity in the face of negative maintenance reports seems so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.").[7]

In *In re Veeco Instruments, Inc. Sec. Litig.* 434 F. Supp. 2d 267 (S.D.N.Y. 2006), the derivative plaintiffs alleged that board members were aware of a pattern of violations of the federal export laws due to, among other things, multiple internal reports of these violations.  *Id.* at 272.  Plaintiffs asserted that pre-suit demand upon the members of the board's audit committee would have been futile because, *inter alia*, it "abdicated its responsibility to monitor legal compliance and investigate whistleblower claims relating to the Company's allegedly flagrant, systematic and repeated violations of export control laws."  *Id.* at 277-78.  The court agreed because *Veeco* was "not a case where the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability'," but rather a situation where the complaint adequately alleged that "the director-Committee members 'conscientiously permitted a known violation of law by the corporation to occur'."  *Id.* at 278 (citation omitted). The same is true here.  The Director Defendants were regularly informed of red flags indicating Company-wide violations of federal healthcare regulations.  ¶¶151-153.

*In re Countrywide Financial Corporation Derivative Litigation* strongly supports a finding that demand was futile.  *See* 554 F. Supp. 2d 1044 (C.D. Cal. 2008).  *Countrywide* arose from allegations concerning excessive risk exposures caused by non-adherence to loan

---

[7]      Although *Tower Air* was not a derivative action, the Third Circuit nevertheless conducted an expansive analysis of the protections afforded directors by Delaware's business judgment rule.  *Id.* at 238-242.

underwriting standards—matters that, as here, "implicate a fundamental part of the Company's business" and were "at the very core of [the] business model." *Id*. at 1081, 1082 n.42. Further, the complaint cited evidence reflecting "a widespread Company culture that encouraged employees" to perpetuate the problem. *Id*. at 1081-82. Similarly, the Complaint here details "Career Limiting Moves" within Pfizer, and the extensive retaliation that took place against employees who tried to speak out against the misconduct. ¶¶ 87, 151. Also as here, the complaint in *Countrywide* alleged the existence of significant red flags and that a majority of the board held positions on committees with relevant responsibilities. *Id*. The *Countrywide* court held demand excused, explaining that:

> It defies reason, given the entirety of the allegations, that these Committee members could be blind to widespread deviations from the underwriting policies and standards being committed by employees at all levels. At the same time, it does not appear that the Committees took corrective action.

*Id*. at 1082.

The holdings in *Abbott Labs*, *Veeco*, and *Countrywide* excusing demand strongly support demand excusal here, especially in light of the requirements of the 2004 CIA, which are unique to this case, and the more pervasive and prolonged wrongdoing alleged in the Complaint.[8]

## C.    Demand Is Also Excused Because A Majority Of The Director Defendants Face A Substantial Likelihood Of Liability

Even if permitting illegal conduct was subject to the business judgment rule (and it is not), demand was not required because, on the facts alleged, a majority of the Director Defendants were not disinterested and could not properly consider demand. *Aronson*, 473 A.2d at 814; *Rales*, 634 A.2d at 936. First, demand was futile because nine of the fourteen members

---

[8]    Indeed, to find otherwise the Court would have to draw the implausible inference that a majority of Pfizer's Board was somehow kept entirely in the dark about unlawful drug marketing practices that were sufficiently widespread to warrant the largest fine in U.S. history. Defendants are not entitled to that inference. *See, e.g., In re Am. Int'l Group, Inc.*, 965 A.2d 763, 777 (Del. Ch. 2009).

of the Board when this action was initiated – defendants Brown, Burns, Burt, Cornwell, Gray, Hoerner, Lorch, Mead and Steere – served since at least 2002. ¶¶173, 179, 183. Each of these nine Director Defendants therefore knew of both CIAs, the misconduct leading to those agreements, the internal reporting system elevating information directly to the Board, the Board's direct oversight responsibilities, and all of the red flags reported from 2002 through the time of the Complaint. ¶¶180-183. Their actions and inactions constituted an "intentional dereliction of duty" and "a conscious disregard for one's responsibilities," each of which is "properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith." *Ryan v. Lyondell Chem. Co.*, C.A. No. 3176-VCN, 2008 WL 4174038, at *2-3 (Del. Ch. Aug. 29, 2008) (citation omitted). Because the Complaint adequately alleges that a majority of the Board breached fiduciary duties to act in good faith, a majority faces a substantial likelihood of liability and demand was futile. *See, e.g., Rales,* 634 A.2d at 936; *Countrywide*, 554 F. Supp. 2d at 1082.

Demand was also excused because a majority of Board members undertook special oversight responsibilities independent of the CIAs pursuant to the charters of the Board committees on which they chose to serve. ¶¶71-75, 188-193. Specifically, four Director Defendants – defendants Burns, Burt, Cornwell and Johnson – served on the Audit Committee during the Relevant Period and undertook to:

> Review: (a) the status of compliance with laws, regulations, and internal procedures; and (b) the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures, through review of reports from management, legal counsel and third parties as determined by the Audit Committee.

¶¶71, 189. Five Director Defendants – defendants Brown, Gray, Horner, Ausiello, and Steere – served on the Corporate Governance Committee during the Relevant Period. ¶¶37, 191. They undertook to ensure that the members of the Board and the Company's senior executives were

complying with Pfizer's formal Corporate Governance Principles, and to "monitor emerging issues potentially affecting the reputation of the pharmaceutical industry and the Company." ¶¶74, 191. The case for excusing demand is particularly strong for the seven Board members who have served since at least 2002 *and* who also served on either the Audit Committee or the Corporate Governance Committee – defendants Brown, Burns, Burt, Cornwell, Gray, Horner, and Steere. If they are added to defendant Kindler, the current CEO and former general counsel and chief compliance officer charged with implementing the 2004 CIA and ensuring that illegal conduct be reported to the Board, a majority of defendants with deep knowledge of Pfizer's operations and illegal conduct plainly has a conflict in assessing demand. ¶¶181, 190, 193.

### D. Defendants Mischaracterize The Allegations In The Complaint And Cite Inapposite Authority

Defendants' motion papers reflect a fundamental disconnect with the Complaint. The core theory of the Complaint rests on conscious and deliberate acts of misconduct by the Board. Defendants' brief attacks a very different theory of the case. Defendants pretend that Plaintiffs merely allege negligent failure of oversight claims, or so-called "*Caremark*" claims. *See* Def Br. at 3-4, 13, 18-25. But Plaintiffs are not asserting that the Board was "blamelessly unaware" of Pfizer's ongoing violations and no fair reading of the Complaint supports that conclusion. *Caremark*, 698 A.2d at 969; *see also id.* at 972 (the *Caremark* action "presents no occasion to apply a principle to the effect that knowingly causing the corporation to violate a criminal statute constitutes a breach of a director's fiduciary duty.")

Indeed, if Defendants' argument were accepted, the mere act of creating committees and implementing monitoring mechanisms would absolutely immunize directors from liability or even the prospect of demand futility. That is not the law in Delaware. The language of the *AmSouth* opinion that Defendants quote extensively proves this very point:

23

> *Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith*.

Def. Br. at 20 (quoting *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

Despite the detailed allegations of the Director Defendants' conscious disregard for their duties, Defendants rely heavily on cases involving passive failures to monitor. However, none of the cited cases involved allegations of (i) Company-wide illegal conduct during almost eight years, (ii) payment of more than half a billion dollars in fines and settlements regarding prior allegations of identical illegal conduct; and (iii) Government dictated oversight and reporting mechanisms to ensure that the Board would be informed of any violations in the future. ¶¶76-120, 142, 151-153.

In *King v. Baldino*, 648 F. Supp. 2d 609 (D. Del. 2009), the court dismissed for failure to make a demand because the "plaintiff fail[ed] to plead particularized facts demonstrating that the Board was aware of the actions of the alleged 'principal wrongdoers' and consciously failed to act in light of that knowledge." *Id.* at 626. A comparison of the Complaint here to the complaint dismissed in *King*—which was a 21-page document consisting largely of multi-page quotations from newspapers strung together with boilerplate allegations—makes clear the significant distinctions between the two cases. *See* Lebovitch Decl. Ex. D. Similarly, in *Guttman v. Huang*, the court dismissed a derivative complaint for failure to make a demand, but only after finding that "[e]ntirely absent from the complaint are well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have

24

perceived the accounting irregularities" underlying the action.  823 A.2d 492, 503 (Del. Ch. 2003).[9]

Defendants absurdly argue that the Complaint does not plead that the Board received red flags.  Def. Br. at 23.  Any fair reading of the Complaint shows detailed allegations about the specific, direct oversight role of the Board concerning Pfizer's marketing operations, the unusual control mechanisms in place to elevate information regarding those practices to the Board because of past violations, and the numerous red flags that were brought to the Board's attention pursuant to that mechanism.  ¶¶114-117, 63-75, 151.  The Complaint also alleges the systemic retaliation against employees who made internal reports of the ongoing Company-wide misconduct.  ¶¶87, 151, 153.[10]

---

[9]    *Cf. In re Pfizer Deriv. Sec. Litig.*, 307 Fed. Appx. 590 (2d Cir. 2009) (duty of care claims involving negative third-party drug studies where non-particularized allegations of board knowledge of the studies were insufficient; conduct at issue not implicated by any specific internal reporting requirements); *Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) (futility allegations rested solely on potential liability in related securities action and where board had appointed a special litigation committee); *Fink v. Weill*, No. 02-CV-10250 (LTS), 2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005) (allegations did not involve specific duties requiring internal reporting); *Wood v. Baum*, 953 A.2d 136 (Del. 2008) (limited liability company with directors exempted from liability barring fraud or illegality; no allegations involving internal reporting requirements; court found allegations sufficient as to management but not board members).

[10]    *Cf. In re E.F. Hutton Banking Practices. Litig.* 634 F. Supp. 265 (S.D.N.Y. 1986) (no allegations of internal reporting requirements); *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125 (Del. 1963) (pre-*Caremark* decision holding that there was no duty to monitor, but assumes that board knowledge of wrongdoing is a basis for liability); *Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426 (S.D.N.Y. 2005) (no allegations reflecting board knowledge, such as internal reporting requirements in this case); *Louisiana Mun. Pol. Empls. Ret. Sys. v. Pandit*, No. 08-CV-7389 (LTS), 2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009) (no allegations of any improper conduct by the board or otherwise; "red flags" were merely signs of deteriorating financial markets); *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165 (D. Del. 2009) (no allegations tying "red flags" to knowledge by the board, especially where majority of board joined after most of alleged "red flags"); *McSparran ex rel. Career Educ. Corp. v. Larson*, No. 04-C-0041, 2007 WL 684123 (N.D. Ill. Feb. 28, 2007) (insider stock sales where there were no allegations of knowledge of misconduct by directors).

## II.    THE COMPLAINT STATES CLAIMS AS TO ALL COUNTS

### A.    The Complaint Adequately Pleads Violations of Section 14(a)

Plaintiffs' claims for violations of Section 14(a) of the 1934 Securities Exchange Act ("Section 14(a) claims") arise from Defendants' misstatements and omission of specific material information from the 2007, 2008, and 2009 proxy statements (the "Proxy Statements"). Specifically, in the Proxy Statements, Defendants failed to disclose the existence of the CIAs, the restrictions placed upon the Board and senior management under the CIAs, the effect on Pfizer's business of the CIAs, the importance of off-label prescriptions on Pfizer's financial results, or the risks posed by Pfizer's continuing non-compliance with the CIAs and related drug marketing laws.  ¶165.  This omitted information was material to investors because "a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Defendants used these materially inaccurate Proxy Statements to procure shareholder approval of $425 million in additional stock option compensation for themselves, as well as to secure the repeated reelection of the Company's Board members, including to their current terms.  These allegations are sufficient under well-settled case law to adequately plead a Section 14(a) claim.

### 1.    The Legal Standard for Section 14(a) Claims

Proxy materials violate Section 14(a) and Rule 14a-9 promulgated thereunder if: (a) they omit a material fact necessary in order to make the statement made not false or misleading or that were required to be disclosed by SEC regulations; (b) the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (c) the proxy solicitation was an essential link in effecting corporate action.  *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970); *see also In re Trump Hotels S'holder Deriv. Litig.*, No. 96-CV-77820 (DAB), 2000 WL 1371317, at *11 (S.D.N.Y. Sept. 21, 2000) ("To state a claim under Section 14(a) and Rule

14a-9, a shareholder must allege that (1) his proxy was solicited for authorization of a corporate action; and (2) the proxy solicitation was materially false or misleading."). "Material information is information that, if disclosed in a proxy statement, would likely be viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." *In re Trump*, 2000 WL 1371317, at *11 (quoting *TSC Industries*, 426 U.S. at 449) (internal quotation marks omitted).

Section 14(a) claims are negligence claims subject to the pleading standards of Fed. R. Civ. P. 8(a). *See Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301 (2d Cir. 1973) (Friendly, J.) (holding that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts"). Indeed, the mere "preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard." *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988). Where, as here, the Complaint does not attribute the material omissions from the Proxy Statements to fraudulent intent or similar state of mind (*see, e.g.,* ¶¶157-169), nothing more is required to state a claim for violation of Section 14(a). *See DCML LLC v. Danka Bus. Sys. PLC*, No. 08 Civ. 5829 (SAS), 2008 WL 5069528, at *1 (S.D.N.Y. Nov. 26, 2008); *see also Beck v. Dobrowski*, 559 F.3d 680, 681-82 (7th Cir. 2009) (Posner, J.) (explaining that "negligence is not a state of mind").

Despite these standards, Defendants attempt to impose heightened pleading requirements on Plaintiffs' Section 14(a) claims. In so doing, Defendants assert that the rules concerning pre-suit demand must be read into the elements of a Section 14(a) claim so that the Complaint must also plead a "substantial likelihood" of liability. Def. Br. at 26-28. Defendants also argue that heightened pleading requirements apply because Plaintiffs' Section 14(a) claims purportedly

"sound in fraud." Def. Br. 32. These arguments fail not only because they exceed the relevant legal standards, but also because the particularized allegations of the Complaint satisfy these heightened pleading requirements in all events.

First, derivative plaintiffs need not show a "substantial likelihood" of liability in pleading a Section 14(a) claim because whether or not to comply with proxy rules is ***not a matter of business judgment*** (and the *Aronson* test detailed *supra*, therefore, applies). *See, e.g., Vides v. Amelio*, 265 F. Supp. 2d 273, 275 (S.D.N.Y. 2003) ("Whether a proxy statement properly omitted an item is regarded as a question of materiality, not one protected by the business judgment rule.").[11] Even if Defendants were correct that Plaintiffs are required to plead a substantial likelihood of liability with respect to the Section 14(a) claims (and they are not), the Complaint satisfies this requirement. *See* ¶¶157-169.

Defendants' "sounds in fraud" argument rests on the Defendants' cherry-picking a single phrase from the Complaint describing Pfizer's ***underlying conduct*** vis-à-vis the government and patients as "fraudulent and criminal." Def. Br. 28. Defendants' strained interpretation conflates the conduct giving rise to the government prosecutions with the conduct giving rise to the Section 14(a) violation. While the underlying and undisclosed conduct at Pfizer was illegal (and fraudulent as to the government and patients), the nature of that conduct is not the basis for Plaintiffs' Section 14(a) claims. Defendants failed to disclose material information related to this

---

[11]    *See also Galef v. Alexander*, 615 F.2d 51, 63-64 (2d Cir. 1980) ("Obviously the goal of § 14(a) that communications from management be accurate and complete as to all material facts is a vital one. Its achievement would be quite clearly frustrated if a director who was made a defendant in a derivative action for providing inadequate information in connection with a proxy solicitation were permitted to cause the dismissal of that action simply on the basis of his judgment that its pursuit was not in the best interests of the corporation. The very premises which give life to a derivative right of action to enforce § 14(a) must save it from a premature death. In short, we conclude that to the extent that a complaint states claims against directors under § 14(a) upon which relief may be granted, federal policy prevents the summary dismissal of those claims pursuant to the business judgment of those defendant directors.").

conduct, such as the nature of the restrictions placed on Pfizer's operations pursuant to the CIAs or the impact on Pfizer's financial results of off-label marketing.

Moreover, even if Plaintiffs' Section 14(a) claims were subject to heightened particularity requirements, the Complaint amply satisfies those standards. Under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wall St. Sys. v. Lemence*, No. 04-CV-5299 (JSR), 2005 WL 292744, at *1 (S.D.N.Y. Feb. 8, 2005) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). As illustrated below with respect to each aspect of Defendants' material omissions from the Proxy Statements, the Complaint satisfies every element of the particularity requirement.

### 2. Pfizer's Proxies Were False And Misleading Because They Omitted Material Information

The Proxy Statements sought shareholder approval with respect to the election and reelection of directors and, in the case of the 2009 proxy, an increase in the compensation of Pfizer's executives and outside directors by $425 million. In doing so, the Proxy Statements omitted material information that required disclosure, including:

- The extent to which the financial and operational results incorporated into the Proxy Statements were dependent on off-label prescriptions and the extent of any related exposure to regulatory, reputational, and other risks;

- The existence of the CIAs and the nature of the Board's direct oversight responsibilities thereunder, including the Board's precise compliance duties imposed by the CIAs, the procedures implemented to comply with the CIAs, the required disclosure program, and the nature and content of reports the Board received pursuant to the CIAs; and

- The facts and and circumstances of the Board's waiver or other failure to carry out the requirements of the Code of Conduct, including with respect to the explicit duties to ensure legal compliance, ensure reporting of non-compliance, and to themselves report any suspected non-compliance. ¶165.

This omitted information would have been viewed by a reasonable investor as significantly altering the total mix of available information because, among other things, the CIAs are an integral and ***unusual*** aspect of the scope of the Board's power and responsibilities. Defendants' duty to disclose this material information derived from at least three sources: (i) the requirement under SEC Rule 14a-9 that the Proxy Statements "state any material fact necessary in order to make the statements therein not false or misleading;" (ii) the requirement under Item 401 of SEC Regulation S-K to specifically disclose the existence of any court order or judgment imposing any limitations on the conduct of Pfizer's business; and (iii) the specific requirement in the Board's own Code of Conduct that the Board disclose any waiver of or deviation from its other enumerated obligations, such as the Board members' obligation to ensure legal compliance and report any suspicions of non-compliance.

### a.    Defendants' Failure To Disclose The Material Impact Of Off-Label Prescriptions On Pfizer's Financial Results

Each of the Proxy Statements incorporated Pfizer's "Financial Reports" for the previous year, which set forth, *inter allia*, specific annual sales figures for each Pfizer drug (including every drug for which Pfizer was later revealed to have engaged in unlawful marketing), as well as the Company's consolidated financial statements.    ¶158.    None of the Proxy Statements disclosed the restrictions imposed by the CIAs or that Pfizer's financial results were materially dependent on off-label prescriptions, thereby subjecting Pfizer to a heightened risk of government investigations or litigation for illegal marketing practices. ¶¶165.    In fact, approximately $664 million in Bextra sales alone resulted from these illegal practices.   ¶86. Defendants' omission rendered the disclosures in the Proxy Statements materially inaccurate and incomplete because it created the impression that Pfizer's financial success—the core reason for

reelecting directors and authorizing $425 million in new compensation to them—resulted from entirely lawful business practices that posed no risks to the Company.

This information was material to shareholders deciding whether to approve the election or reelection of directors and the requested increase in executive compensation. *See e.g., In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (holding that failing to disclose that sales resulting from unlawful off-label marketing rendered otherwise accurate financial results misleading, and explaining that "Defendants misled investors by implicitly and falsely warranting that there were no illegal practices contributing to that success" of the drug's sales); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) ("although a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success.") (citation and internal quotation marks omitted). Defendants' failure to do so violated Section 14(a).

### b. Defendants' Failure To Disclose Restrictions On Pfizer's Business Practices

Item 401 of Regulation S-K required Defendants to disclose in the Proxy Statements whether any director or executive of the Company "was the subject of any order judgment or decree … enjoining him from, or otherwise limiting, the following activities: … (ii) Engaging in any type of business practice." 17 C.F.R. § 229.401(f)(3)(ii); *see also* Schedule 14A Item 7, 17 C.F.R. § 240.14a-101 (requiring disclosure of items pursuant to 17 C.F.R. § 229.401). The 2004 CIA limited how each of Pfizer's executives and directors could engage in Pfizer's business practices, and required that they abide by the Code of Conduct. ¶¶63, 68, 210. Both the 2004 CIA and the Code of Conduct contained specific restrictions on Pfizer's executives and directors with respect to Pfizer's marketing practices, including requirements of direct Board oversight

over those practices, internal disclosure requirements allowing employees to report illegal marketing practices, and internal reporting requirements elevating such information to the Board. The 2004 CIA was directly incorporated into a federal court order.[12]   Although required to do so pursuant to 17 C.F.R. § 229.401(f)(3), the Proxy Statements never disclosed the mandatory court-ordered limitations on Pfizer's and the Board's business practices.

Omitting the mandatory restrictions on Pfizer's marketing practices gave the inaccurate impression that Pfizer operated free of heightened government scrutiny for past violations of federal healthcare regulations.   ¶¶165, 166.   For example, in the 2007 and 2008 proxy statements, Defendants' disclosed that the Department of Justice was investigating Pfizer for illegally promoting Bextra and Celebrex.   However, Defendants did not disclose the requirements of the 2004 CIA, including the mandatory direct oversight responsibilities of the Board over Pfizer's marketing practices that were being investigated.   Defendants' partial disclosure in the 2009 proxy statement that Pfizer had reserved $2.3 billion in connection with "an agreement in principle" with the Government only referred to illegal marketing practices of Bextra, and was similarly incomplete.[13]   These allegations are sufficient to state a claim for a violation of Section 14(a).   *See, e.g., Allyn Corp. v. Hartford Nat'l Corp.*, No. H-81-912, 1982

---

[12]     Specifically, as stated in the 2004 CIA, "Pfizer is entering into a Settlement Agreement with the United States, and this CIA is incorporated by reference into the Settlement Agreement."   Lebovitch Decl. at C.   In turn, that Settlement Agreement was incorporated into the Order of Dismissal entered by the Honorable Patti B. Saris.   *See* Lebovitch Decl. at E, F.

[13]     This case is wholly different from *In re Marsh & McLennan Cos., Inc. Securities. Litigation*, where the court found that the proxy statements disclosed the alleged misconduct over eleven pages, thereby allowing "an investor to factor the alleged wrongdoing into his decisions concerning director elections."   536 F. Supp. 2d 313, 323-24 (S.D.N.Y. 2007).

WL 1301, at *25 n.9, *25-26 (D. Conn. Mar. 30, 1982) (Cabranes, J.) (holding that failing to disclose information specified in 17 C.F.R. 240.14a-101 stated claim under Section 14(a)).[14]

**c.**      **Defendants' Failure To Disclose Deviations from the Code of Conduct**

Pfizer's directors were subject to heightened disclosure obligations under the Code of Conduct, which imposed numerous duties on Board members regarding legal compliance within Pfizer.  ¶¶ 67-69, 161. The Code of Conduct also stated: "Any waiver of this Code may be made *only* by the Board of Directors and must be promptly disclosed to the Company's shareholders." ¶¶ 69, 161 (emphasis in original).

At no point did the Board disclose any waiver or constructive waiver of any provision of the Code of Conduct.  ¶165.  As also alleged in the Complaint, despite this non-disclosure, the Board in fact waived (whether actually or constructively) many of these provisions.  ¶¶69, 87, 153.  Thus, Defendants also failed to comply with the specific disclosure obligations set forth in their binding and publicly disclosed Code of Conduct.  Their failures to set forth these required disclosures in the Proxy Statements constitute additional independent violations of Section 14(a).

---

[14]      Contrary to Defendants' arguments, full disclosure of past criminal activities and the resulting restrictions on Defendants' conduct of Pfizer's marketing would not have involved "self-flagellation" and was plainly required under  17 C.F.R. § 240.14a-101.  *See, e.g.,  In re Donna Karan Intern. Sec. Litig.*, No. 97-CV-2011 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998) ("[T]he mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement."); *Westinghouse Elec. Corp. v. Franklin*, 789 F. Supp. 1313, 1320 (D.N.J. 1992) (holding that "allegations of failure to disclose illegal and deceptive practices will survive a motion to dismiss" a Section 14(a) claim).

3. The Complaint Adequately Pleads An Essential Link Between The Proxy Statements And Increased Executive Compensation And Reelection Of The Director Defendants

The Complaint also satisfies the "essential link" element of a Section 14(a) claim because shareholder approval was necessary to accomplish the challenged transactions—*i.e.*, the increase in executive compensation by $425 million and the reelection of the Director Defendants. *See, e.g., Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979) (holding that "the challenged transaction is the election of the directors, and we have no doubt that the proxy solicitation itself … was an essential link in the accomplishment of that transaction") (internal quotation marks omitted). Indeed, Defendants do not appear to challenge the "essential link" element of the Section 14(a) claim pertaining to the authorization of $425 million in additional compensation. Def. Br. at 31. Nor could they. Plaintiffs' Section 14(a) claims can proceed on this basis alone.

Defendants argue, however, that the "essential link" element is absent with respect to the reelection of the Director Defendants pursuant to the Proxy Statements and their misconduct. Def. Br. at 31. Not so. As set forth in the Complaint, the material omissions from the Proxy Statements **directly** harmed the Company by keeping the Board's longstanding non-compliance with the law in place. *See, e.g.,* ¶167. Moreover, the Complaint plainly alleges that the Proxy Statements omitted to disclose material restrictions on Pfizer's marketing activities and the material impact of off-label prescriptions on Pfizer's financial results. Indeed, Defendants' own authority recognizes that financial damages flowing from the acts of directors who were elected pursuant to a misleading proxy satisfy the essential link element of Section 14(a). *See Kelley v. Rambus, Inc.*, No. C-07-1238, 2008 WL 5170598, at *8 (N.D. Cal. Dec. 8, 2008) ("the

involvement of directors authorized by the proxy vote in some future wrongdoing, has been critical in every case that has found an essential link.”[15]

### 4.    Plaintiffs’ Section 14(a) Claims Are Not Moot

The Complaint does not assert any moot Section 14(a) claims.  The Complaint seeks invalidation of the Directors’ *current* terms and the $425 million in additional compensation, both of which were procured pursuant to the 2009 Proxy Statement.  *See* Complaint at 90, Relief Requested (d), (e).  Defendants’ argument that the Section 14(a) claims concerning the 2007 and 2008 Proxy Statements are moot because the terms of office of the Directors elected pursuant to those particular Proxy Statements have expired is thus irrelevant.[16]  Def. Br. at 28-29.

### B.    The Complaint Adequately Pleads Breach Of The Fiduciary Duty Of Disclosure

Under Delaware law, Plaintiffs have satisfied their pleading burden with respect to claims asserting breaches of the fiduciary duty of disclosure.  The Delaware Supreme Court has held that the Rule 8(a) notice pleading standard applies such claims.  *See Brinckerhoff v. Texas Eastern Prods. Pipeline Co.,* No. 2427-VCL, 2008 WL 4991281, at *4 (Del. Ch. Nov. 25, 2008) (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 141 (Del. 1997)); *In re Anderson,*

---

[15]    *See also In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1016 (N.D.Cal. 2007) (“If defendants had not falsely stated in Zoran’s proxy statements that stock options were being granted properly under the plans, and that directors were complying with the terms of the plans that the shareholders approved, shareholders would have voted those board members out, and the board members would no longer have had the means to grant more backdated stock options.”); *In re iBasis, Inc. Deriv. Litig.*, 532 F. Supp. 2d 214, 223 (D. Mass. 2007) (finding an essential link between proxy electing directors and continuance of scheme to back-date options); *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961 (D. Or. Mar. 13, 2008) (same).

[16]    As set forth in the Complaint, the relief requested with respect to the 2007 and 2008 Proxy Statements is limited to restitution and/or disgorgement of profits, benefits, or other compensation obtained by Defendants, as well as the request for an Order directing Pfizer to take all necessary actions to reform and improve the Company’s corporate governance and internal procedures to comply with Pfizer’s existing obligations and all applicable laws to avoid recurrence of the damaging events described in the Complaint.  *See* Complaint at 90, Relief Requested (c), (f).

*Clayton S'holders Litig.*, 519 A.2d 669, 675 (Del. Ch. 1986) ("[W]hether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made, is not a decision concerning the management of business and affairs of the enterprise (8 Del. C. § 141(a)) of the kind the business judgment rule is intended to protect.").

Defendants argue that the complaint "fails to plead that any material misstatement or omission in the Proxy Statements, and Plaintiffs' disclosure claim therefore should be dismissed as a matter of law." Def. Br. 39. However, as stated above, Defendants' omissions were indeed materially misleading. *See supra* 26-33.

### C.    The Complaint Adequately Pleads Fiduciary Breach Claims As To All Defendants

In order to adequately allege a claim for breach of fiduciary duty under Delaware law, a plaintiff must plead that: (i) a fiduciary duty exists; and (ii) a fiduciary breached that duty. *See, e.g., Heller v. Kiernan*, No. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002) (*aff'd*, 806 A.2d 164 (Del. 2002)); *In re Atmel Corp. Deriv. Litig.*, No. C 06-4592 JF (HRL), 2008 WL 2561957, at *11 (N.D. Cal. June 25, 2008). The Delaware Supreme Court has repeatedly stated that Delaware officers and directors owe the duties of care, good faith, and loyalty to their corporations and the stockholders they serve. *See, e.g., Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995).

Throughout the Complaint, the Executive Defendants are identified as violating their fiduciary duties of good faith and loyalty, including repeatedly by name. *See*, *e.g.*, ¶¶76-86 (implicating defendants Kindler, Waxman, D'Amelio, Feczko, Read in various aspects of Pfizer's multifaceted illegal drug marketing scheme); ¶87 (alleging that at least one Pfizer employee personally informed defendant Read of illegal marketing activities before suffering

36

from retaliation); ¶¶109-120 (discussing reporting role of defendants Kindler and Lankler under the CIAs); ¶137 (alleging that Defendants promoted the sale of Bextra off-label knowing that it was dangerous for human life to do so); and ¶¶151-153 (discussing the red flags that senior management was informed of and alleging that Defendants retaliated against a number of employees who made reports of ongoing illegal behavior).

Similarly, the Complaint contains particularized allegations implicating all Director Defendants. *See*, *e.g.*, ¶¶76, 87  (alleging that Defendants knowingly causes and/or permitted a Company-wide illegal marketing strategy and retaliated against employees who reported the illegal practices to management); ¶¶134-137 (discussing that Pfizer has admitted to intentionally, and with the intent to deceive and defraud marketed Bextra in violation of the FDCA, and that during this time  the Director Defendants knew that Bextra was dangerous to human life); ¶¶151-153 (discussing the numerous red flags that the Director Defendants were informed of during their tenure on the Pfizer Board and their conscious disregard of those red flags and their known duty to intervene); ¶¶160-167 (discussing the Director Defendants' role in preparing and disseminating false and misleading proxy statements).  These allegations plainly satisfy the notice pleading standards for alleging a breach of fiduciary duty.  *See, e.g., Abbott Labs*, 325 F.3d at 803-04; *Veeco*, 434 F. Supp. 2d at 278; and *Countrywide*, 554 F. Supp. 2d at 1076-77.

### D.    The Complaint Adequately Pleads Unjust Enrichment Claims

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Schock v. Nash*, 732 A. 2d 217, 232-33 (Del. 1999) (internal quotation marks omitted).  The Complaint adequately pleads a claim for unjust enrichment under Delaware law against all Defendants by alleging that there was "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and

(5) the absence of a remedy provided by law." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) (citation omitted).

Here, Defendants knowingly caused and permitted the Company to engage in nearly a decade of off-label marketing and promotion of powerful pharmaceuticals. Defendants have wrongfully retained bonuses, benefits and other compensation at the expense of Pfizer and its shareholders. Because these benefits were not obtained "justifiably," but rather were obtained against "the fundamental principles of equity and good conscience," Defendants were unjustly enriched. *Schock*, 732 A.2d at 732.[17]

## III. DEFENDANTS' EFFORTS TO EVADE LIABILITY ON THE BASIS OF PFIZER'S CERTIFICATE OF INCORPORATION ARE UNAVAILING

Defendants' reference to a provision in Pfizer's Certificate of Incorporation eliminating personal director liability with respect to claims for breaches of the duty of good care is a red herring. As Defendants themselves recognize, the liability bar of § 102(b)(7) of the Delaware General Corporation Law ("DGCL") does not extend to "acts or omissions not in good faith" or that "involve intentional misconduct or a knowing violation of law." Def. Br. at 34. Indeed, § 102(b)(7) does not act to shield Defendants from liability where, as here, the Complaint alleges repeated and pervasive violations of criminal laws that subjected the Company to record billion dollar fines, because such conduct evidences non-exculpable bad faith. ¶¶8, 182. *See Ryan v. Lyondell Chem. Co.*, C.A. No. 3176-VCN, 2008 WL 4174039, at *2-3 (Del. Ch. Aug. 29, 2008) ("a conscious disregard of one's responsibilities" is "properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith").

---

[17]  *See also Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A.2d 377, 394 (Del. Ch. 1999) ("Having pleaded sufficiently the allegations [of] breach of fiduciary duty . . . it is axiomatic that Plaintiffs have likewise pleaded sufficiently the allegations that Defendants were enriched by their actions [and it is therefore] likely they will also be able to prove that neither [defendant] can retain any benefit resulting from the disputed transaction.").

Plaintiffs have adequately alleged that the Defendants' breaches are not violations of the duty of care alone, but that their conduct here was not in "good faith" under § 102(b)(7)(ii). Defendants ignored repeated and ongoing warnings to the detriment of the Company and its shareholders, and their failure to act could not have been in good faith or have involved unintentional conduct. Because Defendants' liability is premised on their violation of the duty of good faith, their reliance on § 102(b)(7) is misplaced and, the motion to dismiss on this ground should be denied.

## IV. DEFENDANTS' ARGUMENTS CONCERNING AMALGAMATED BANK'S STANDING ARE MERITLESS

Defendants conclude by arguing that the Lead Plaintiff lacks standing in this action. Def Br. at 40. According to Defendants, because Amalgamated Bank "merely serves as a 'trustee'" for its LongView funds, Amalgamated Bank cannot satisfy the "continuous ownership" and "contemporaneous ownership" requirements for derivative standing. *Id*. This argument is baseless. In *In re Tyson Foods*, Chancellor Chandler expressly acknowledged that Amalgamated Bank properly acted as derivative plaintiff because "Amalgamated's shareholder standing derives from its trusteeship of the LongView MidCap 400 Index Fund." 919 A.2d 563, 571 n.4. Further, as the Second Circuit observed in *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, "courts historically have permitted trustees to bring suits to benefit their trusts." 549 F.3d 100, 109-10 (2d Cir. 2008) (*quoting Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 128 S.Ct. 2531, 2543 (2008) (quotation marks omitted.) Trustees also routinely act as derivative plaintiffs, iin some of the most important derivative actions under Delaware law. For example, in *Brehm v. Eisner*, trustees acted as derivative plaintiffs on behalf of the Walt Disney Company

39

in a very contentious dispute about a former president's severance package that was heavily litigated up to the Delaware Supreme Court. *See* 746 A.2d 244 (Del. 2000).[18]

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that the Court should deny in its entirety Defendants' motions to dismiss the Complaint.

Dated: January 8, 2010

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

   s/Mark Lebovitch
Gerald H. Silk
Mark Lebovitch
Noam Mandel
Jeroen van Kwawegen
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel: 212-554-1400
Fax: 212-554-1444

*Counsel for Court-appointed lead plaintiff*
*Amalgamated Bank and additional plaintiff*
*Louisiana Sheriffs' Pension and Relief Fund and*
*Court-appointed Lead Derivative Counsel*

---

[18]    Defendants' actions speak volumes about their argument. At the November 4, 2009 hearing, counsel for Defendants made much of the need to obtain discovery from Amalgamated Bank to determine its standing. Hearing Tr. at 36.1-2, Lebovitch Decl. Ex. G ("We want to have the facts to give you *so we can argue the legal points.*"). The Court accepted Defendants' unusual request and instructed counsel to submit a confidentiality agreement and for Amalgamated Bank to produce limited documentation addressing standing. *See id.* at 35.6-36.22. On November 9, 2009, counsel for Amalgamated Bank sent a draft confidentiality agreement based on the Court's form order to counsel for Defendants. Defendants did not respond for over three weeks, when they suggested revisions. Once again, after only three business days, counsel for Amalgamated Bank responded, seeking only to conform the language to the Court's form of order. Defendants provided no further comment before filing their motion on December 16, 2009. Defendants thus chose to "argue the legal points" (Hearing Tr. at 36.1-2) without obtaining the facts they demanded.

**KIRBY McINERENY LLP**

Ira M. Press
David E. Kovel
Edward M. Varga, III
825 Third Avenue
New York, New York 10022
Tel:  212-371-6600
Fax:  212-751-2540

*Counsel for additional plaintiff Skandia Life
Insurance Company Ltd.*

**STURMAN LLC**

Deborah Sturman
275 Seventh Avenue, 2d Floor
New York, NY 10001
Tel:  212-367-7017
Fax:  917-546-2544

*Counsel for additional plaintiff Skandia Life
Insurance Company Ltd.*

**BARRACK RODOS & BACINE**

Daniel E. Bacine
A.  Arnold Gershon
1350 Broadway, Suite 1001
New York, New York 10018
Tel:  212-688-0782
Fax:  212-688-0783

*Counsel for additional plaintiffs Port Authority of
Allegheny County Retirement and Disability
Allowance Plan for Employees represented by Local
85 of Amalgamated Transit Union, LIUNA Staff &
Affiliates Pension Fund, and Laborers'
International Union of North America National
(Industrial) Pension Fund*

**THE WEISER LAW FIRM, P.C.**

Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto

41

121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Tel:  610-225-2677
Fax:  610-225-2678

*Counsel for additional plaintiff Henrietta Klein*