**Ex. G**

```
                                                              1
       9b4rklec
1      UNITED STATES DISTRICT COURT
1      SOUTHERN DISTRICT OF NEW YORK
2      ------------------------------x
2
3      HENRIETTA KLEIN,
3
4                    Plaintiff,
4
5           v.                            09 Civ. 7822 (JSR)
5
6      DENNIS AUSIELLO, et al.,
6                                         Conference
7                    Defendant.
7
8      and consolidated cases.
8
9      ------------------------------x
9
10                                        New York, N.Y.
10                                        November 4, 2009
11                                        2:15 p.m.
11     Before:
12
12             HON. JED S. RAKOFF
13
13                                        District Judge
14
14
15
15             APPEARANCES
16
16
17     BERNSTEIN LITOWITZ BERGER & GROSSMAN
17          Attorneys for Amalgamated Bank as trustee for the Longview
18          funds
18     BY:  GERALD SILK
19          MARK LEBOVITCH
19          MICHAEL D. BLATCHLEY
20
20
21
21     CADWALADER WICKERSHAM & TAFT LLP
22          Attorneys for Defendants
22     BY:  DENNIS J. BLOCK
23          RYAN J. ANDREOLI
23
24
24
25
```

9b4rklec

```
 1              (Case called)
 2              THE COURT:  Counsel please identify themselves for the
 3  record.
 4              MR. SILK:  My name is Gerald Silk from the law firm of
 5  Bernstein Litowitz, here today on behalf of Amalgamated Bank as
 6  trustee for the Longview funds.  I am pleased to introduce to
 7  the Court a representative of the Amalgamated Bank, Scott
 8  Zdrazil, who is a senior vice president and director of
 9  corporate governance at the bank.
10              THE COURT:  Good afternoon.
11              MR. LEBOVITCH:  Mark Lebovitch, also at Bernstein
12  Litowitz, and this is also Michael Blatchley of the firm.
13              MR. BLOCK:  Dennis Block from Cadwalader Wickersham &
14  Taft, my colleague Ryan Andreoli, and we represent the
15  defendants.
16              THE COURT:  Originally there was a contest over who
17  should be the lead plaintiff in this case, but the Klein
18  plaintiff withdrew his opposition notwithstanding having raised
19  some interesting issues.  My question first for Amalgamate's
20  counsel is, was that the result of an arrangement reached
21  between your firm, or your client, and that client?
22              MR. SILK:  Your Honor, Gerald Silk again.  There were
23  in fact several motions made for lead plaintiff, including Ms.
24  Klein, as well as another one made by Scott Scandia.
25              THE COURT:  Oh, yes.
```

9b4rklec
```
 1           MR. SILK:  Following the opposition briefs that were
 2   filed, at least from Amalgamate's end, counsel, my firm, was
 3   authorized to explore and discuss the arguments that were
 4   raised there.  There was some back and forth in terms of emails
 5   and letters trying to deal with some of the substance of the
 6   arguments.
 7           Ultimately, there was an agreement that the clients
 8   reached whereby Scandia as well as Ms. Klein and their counsel
 9   would be involved in the prosecution of the case.  They would
10   be included in a consolidated amended complaint as additional
11   plaintiffs or the named plaintiff, and they would work under
12   the direction of Amalgamated Bank if the Court determines they
13   are a suitable lead, as well as my firm if you determine we are
14   suitable lead counsel.  So there would be a somewhat unified
15   structure under the direction of a lead plaintiff and a lead
16   counsel and everybody could work towards the goal on the merits
17   of the case.
18           THE COURT:  If I understand what you were just saying,
19   the agreement hypothesizes that this Court will approve all
20   three as co-lead counsel, in effect?
21           MR. SILK:  No, your Honor.  The agreement that was
22   reached subject to your approval would be that Amalgamated,
23   because of their holdings in the case and certain other things
24   that we intend to proffer to the Court today through Mr.
25   Zdrazil's testimony, was the most adequate lead plaintiff.
```

4

9b4rklec

```
 1              Recognizing some of your prior decisions as well as
 2    case law, there would be one lead plaintiff, and that lead
 3    plaintiff would be charged with the ultimate responsibility
 4    that a lead plaintiff ordinarily has under that model of the
 5    Private Securities Litigation Reform Act, even though this is a
 6    derivative case, as being the principal person, principal
 7    entity for selecting counsel that would serve as lead and would
 8    have the primary responsibility of presenting arguments to the
 9    Court, resolving issues in the case, and addressing all
10    critical measures in the case, such as potentially resolution
11    or trial, and responsibility for actually ensuring there is no
12    duplication of work, dividing work accordingly among these
13    other plaintiffs.  The agreement as envisioned was that there
14    would only be one lead plaintiff and one lead counsel.
15              THE COURT:  But lead counsel would, if I understand
16    what you are saying, divide the work with the law firms
17    representing the other previously prospective lead plaintiffs?
18              MR. SILK:  Lead counsel would divide the work subject
19    to their client's, Amalgamated Bank's, approval, that is
20    correct, your Honor.  Without waiving any attorney-client
21    privilege, there is a retainer --
22              THE COURT:  I don't believe there is any applicable to
23    what we're talking about now.
24              MR. SILK:  I was just going to add one thing that
25    maybe you do think is attorney-client privilege.  It is a
```

9b4rklec

1    retainer agreement that was entered into between Amalgamated
2    Bank and our firm, which we are prepared to provide to the
3    Court in camera and which provides that Amalgamated Bank as the
4    lead plaintiff, if that's what you decide, has responsibility
5    for these types of or ultimate responsibility for ensuring that
6    the litigation is handled efficiently, that the work is divided
7    up appropriately, and that they would have ultimate say in
8    strategic matters such as who to name as defendants and whether
9    to resolve the case, and if so, how.
10             THE COURT:  I'm not sure that agreement is subject to
11   any privilege, but I'll take a look at it right now if you have
12   it.
13             MR. SILK:  I do, your Honor.
14             THE COURT:  Very good.
15             I don't think any portion of this agreement is subject
16   to attorney-client privilege.  I think portions of it arguably
17   are subject to work product protection.  There are two
18   questions that are not covered by this agreement that I need to
19   know the answer to.  The first one, you say in paragraph 1,
20   "This representation has been undertaken on a contingent fee
21   basis."  What is the contingent fee?
22             MR. SILK:  The contingent fee would be a fee based
23   upon any recovery for shareholders --
24             THE COURT:  I understand.  I mean what's the
25   percentage?

6

9b4rklec

```
 1          MR. SILK:  The percentage pursuant to this agreement,
 2   the fund itself, I believe in paragraph -- there are two points
 3   to answer your question, your Honor.  There is one provision --
 4   let me find it.  One says in paragraph 9, "Unless written
 5   agreement to the contrary."  Do you see that, your Honor?
 6          THE COURT:  That really raises my second question.  At
 7   the end of paragraph 9 in the copy you gave me has "The" as
 8   first word of a sentence.  But if you turn the page, in the
 9   copy you gave me, the next thing is paragraph 10.
10          MR. SILK:  I believe that is a typo.  I could confer
11   with my colleagues, but I've seen that.  This is a signed
12   document.  I believe the sentence that would govern is that the
13   parties agree that the Court will set the fee to be paid to the
14   firm.
15          THE COURT:  Let me make sure I understand.  Is the
16   sentence that must at one point have existed that begins with
17   the word "the" at the end of page 2 no longer part of this
18   agreement?
19          MR. SILK:  That is correct.  This is the signed
20   agreement.
21          THE COURT:  So the parties are in agreement that the
22   word "the" is now strikable?
23          MR. SILK:  Correct.
24          THE COURT:  Going to the point you just raised, it
25   says in what is now paragraph 9 in its entirety, "Unless a
```

7

9b4rklec

1  written agreement to the contrary is entered into by the
2  parties, the parties agree that the Court will set the fee to
3  be paid to the firm in this litigation.  The firm will notify
4  the Court that the funds will defer to the Court on the
5  attorney fee application."
6          I'm not sure what the first phrase means, "Unless
7  written agreement to the contrary is entered into by the
8  parties."  The sentence that then follows, "the parties agree
9  that the Court will set the fee to be paid to the firm in this
10 litigation."That sounds like, if one were to apply ordinary
11 rules of grammar, the parties are reserving themselves to set a
12 fee other than that set by the Court.
13         MR. SILK:  First, your Honor, there is, as I stand
14 here today, no written agreement to the contrary.
15         THE COURT:  I understand that.  But you're of
16 preserving the right to have one.
17         MR. SILK:  We are in a derivative litigation context.
18 I sometimes in this regard look to the PSLRA as helpful
19 framework, but --
20         THE COURT:  The PSLRA would make this whole paragraph
21 irrelevant because the court sets the fees in any event.  But
22 this is not the PSLRA.  Therefore, what I need to know is are
23 you saying, we agree the Court will set the fees, or are you
24 saying, we agree the Court will set the fees unless later on by
25 written agreement we change our mind?

8

9b4rklec

1          MR. SILK:  If I may, your Honor, I believe under Rule
2     23.1 and jurisprudence relating to that, as well as in the
3     PSLRA context under Rule 23, your Honor always has the ultimate
4     say on setting the fee, whether there is a written agreement or
5     not.  This was an agreement that involved some negotiation and
6     back and forth.  Amalgamated has served in other derivative
7     litigations and class actions and has utilized an agreement
8     that was very similar to this.  There was no intent about or
9     any plan that we would someday set a fee agreement, something
10    like that.
11         THE COURT:  I think what needs to happen is, if you
12    want the Court's approval of this arrangement, including the
13    arrangement that led me to look at this, which is your dividing
14    the work in some fashion with the other counsel for the
15    putative now withdrawn lead plaintiffs, you need to revise
16    paragraph 9 to delete the clause that reads "unless a written
17    agreement to the contrary is entered into by the parties," and
18    to also remove that typographical error at the end of the
19    paragraph.  If that is done and I receive a copy signed by
20    counsel for all three involved parties, I will approve this.
21    All right?
22         MR. SILK:  Yes, your Honor.
23         THE COURT:  Very good.
24         MR. BLOCK:  Your Honor, may I be heard on that?
25         THE COURT:  Yes.

9

9b4rklec

 1            MR. BLOCK:  Obviously, I have not see the document and
 2     don't wish to interfere with the Court's --
 3            THE COURT:  There are parts of this document that you
 4     can't see, because it includes work product.
 5            MR. BLOCK:  We are sort of putting the cart before the
 6     horse here.  This is not a case governed, as the Court said, by
 7     the PSLRA.  This is a derivative litigation.  We are only here
 8     because these parties got together and agreed that somebody
 9     would be a lead something or other.
10            THE COURT:  Which is not unusual in this context.
11            MR. BLOCK:  No.  It's helpful because we will get the
12     consolidated complaint.  The problem is they are asking the
13     Court to approve that, and by doing that they are asking the
14     Court, in essence, to put the cart before horse.  In a
15     derivative lawsuit, as your Honor well knows and as briefed by
16     the client plaintiffs, a plaintiff has to have standing in
17     order to be the lead plaintiff.
18            We haven't had a chance yet to see the complaint
19     that's going to say who this plaintiff really is.  Indeed, the
20     Court on its own could reject this plaintiff today based upon
21     what's been admitted here already because they don't satisfy
22     Rule 23.1's requirements.
23            We would be briefing at some point in time, obviously,
24     the adequacy of this bank to serve in this capacity.  If the
25     Court wishes to move forward for procedural reasons and

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

9b4rklec
1   designate somebody, it really has to be with the provision that
2   that somebody designated by the Court may not actually be able
3   to serve as a plaintiff.
4           THE COURT:  You're absolutely right.  I didn't mean to
5   imply otherwise.  This is just for now so we can move forward.
6   The Klein plaintiff, for example, raised in her objections that
7   have now been withdrawn the notion that Amalgamated, because
8   its claim is based on 14(a), might get knocked out early on
9   even if other plaintiffs survive.  Obviously, that would render
10  this entire arrangement defunct at that point.  Of course,
11  there are numerous other possibilities, including the ones that
12  you are alluding to.  But this is to get the matter going right
13  now.
14          MR. BLOCK:  Since this isn't a private securities
15  lawsuit governed by rules, wouldn't it be a better way to let
16  the plaintiffs do whatever they want to do without the
17  imprimatur of the Court on the concept of lead plaintiff?  Let
18  them file a consolidated amended complaint.  We have a schedule
19  for dealing with it, and we won't be in the embarrassing
20  position of having who we dealt with, who we have designated as
21  lead plaintiff, with a lead counsel who may not be in the case
22  by the time the motion is done.  Let the motions go forward as
23  to whether or not this particular plaintiff has standing or is
24  adequate to serve in the capacity that we are talking about?
25          THE COURT:  I am not adopting in haec verba this

11

9b4rklec
1   agreement.  What I am agreeing to is, and it was my reason for
2   looking at this, to make sure that, number one, whatever
3   private deal had been worked out between three law firms here
4   was one that the Court did not find ab initio unacceptable,
5   and, number two, that there was never any misimpression on the
6   part of anyone that it would be anyone other the Court that
7   would set plaintiffs attorney's fees in this case.  That's
8   really all the Court is signing off on here.  So I think that
9   is appropriate to do at this point.
10          With all those qualifications and reservations, why
11  don't you go ahead and get me a new signed copy.
12          MR. SILK:  We will do that, your Honor.  Your Honor,
13  I'm not sure if you want me to address any of Mr. Block's
14  comments or if you have other questions on the matter merits.
15          THE COURT:  His points I thought were well taken but
16  not points that should prevent the Court from approving what I
17  just approved, which was for immediate purposes the arrangement
18  that's been worked out between the plaintiffs' attorneys and
19  their clients and (b) the clear recognition that the Court sets
20  the fees.  I don't want to hear anymore argument by anyone on
21  this point.
22          MR. BLOCK:  Just a question, your Honor, if I might,
23  if I can beg your indulgence.
24          THE COURT:  A question?
25          MR. BLOCK:  You do not designate someone as a lead
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

12

9b4rklec
1   plaintiff or as a lead counsel at this point in time, because
2   we may, as I see it, find ourselves with the underlying
3   plaintiff not in the case and the underlying plaintiff's lawyer
4   being the lead lawyer but not in the case.  That's all I was
5   trying to say.
6           THE COURT:  If Amalgamated gets knocked out of the
7   case, their lawyers go with them, as far as this Court is
8   concerned.  They might be entitled to some payment for the
9   period they were in the case, I don't know.  If that's your
10  question --
11          MR. BLOCK:  Yes, your Honor.  I appreciate the answer.
12          THE COURT:  I completely agree with that.  It doesn't
13  sound like a question, but it's a statement I can agree with.
14          MR. BLOCK:  Thank you, Judge.
15          MR. SILK:  Your Honor --
16          THE COURT:  I'm not going to allow Bernstein Litowitz
17  to remain as lead counsel if your client gets knocked out of
18  the case.  If you think otherwise, then we are at odds here.
19          MR. SILK:  The only point I'd offer for that, your
20  Honor, on that point is that my firm, prior to being retained
21  by Amalgamated Bank, was retained by a public pension system
22  that likewise, as with Scandia and Ms. Klein, supported
23  Amalgamated --
24          THE COURT:  You may have a client who is still in the
25  case.  We'll deal with that then.  But today you are here
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13

9b4rklec
1   because I want to make sure that Amalgamated is the proper lead
2   plaintiff and adequate to take this leadership role.  If
3   Amalgamated ultimately gets knocked out of the case and someone
4   else, and there are many possibilities that can occur at that
5   point, someone else then becomes the lead plaintiff,
6   so-called -- and of course, as Mr. Block points out, this is
7   language really borrowed from a different context but has some
8   appropriateness here anyway -- the Court will then have to
9   reconsider who is the appropriate lawyer for that new lead
10  plaintiff.  It may not be your firm.
11          MR. SILK:  I understand, your Honor.
12          THE COURT:  OK.  Let's get the representative from the
13  bank here up on the stand.
14   SCOTT ZDRAZIL,
14
15       called as a witness by the Court,
15
16       having been duly sworn, testified as follows:
16
17  EXAMINATION
18  BY THE COURT:
19  Q.  State your full name and spell your last name.
20  A.  My name is Scott Zdrazil, Z-D-R-A-Z-I-L.
21  Q.  What is your financial background, so to speak?
22  A.  I'm first vice president and director of corporate
23  governance at Amalgamated Bank, trustees to the Longview family
24  of funds.
25  Q.  How long have you been in that position?
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

14

9b4rklec
1   A.  For two years.
2   Q.  What did you do previously?
3   A.  Economic and financial analysis for several trade unions
4   and economic development initiatives.
5   Q.  What does that mean?  Did you work for some entity?
6   A.  I worked for academic institutions, at the University of
7   Wisconsin and the University of Witswatersrand.
8   Q.  In South Africa?
9   A.  Yes.
10  Q.  Which one was the immediate predecessor to your Amalgamated
11  position?
12  A.  Immediately prior to the Amalgamated position, I was
13  research director at the Writers Gild.
14  Q.  What is the Writers Gild?
15  A.  The Writers Gild is a labor union representing
16  screenwriters and television writers.
17  Q.  How long were you there?
18  A.  For a year and a half.
19  Q.  What was your position there?
20  A.  Research director.
21  Q.  Before that?
22  A.  I spent five years at Unite Here as a senior research
23  analyst.
24  Q.  Before that?
25  A.  Previously at the University of Witswatersrand.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

9b4rklec
1    Q.  And before that?
2    A.  University of Wisconsin.
3    Q.  Before that?
4    A.  I was an undergraduate student.
5    Q.  Where?
6    A.  At the University of Wisconsin in Madison.
7    Q.  So you went straight from getting your degree at Wisconsin,
8    your bachelor's degree, to work, what, in their development
9    office?
10   A.  At a research center, yes.  It advises local governments on
11   economic development initiatives and develops field projects
12   partially focused on field development and work for training
13   initiatives.  From that I received a fellowship to South
14   Africa, where I both studied for a Master's and worked on
15   economic development initiatives in South Africa under the new
16   government, and was hired in New York with Unite Here to advise
17   various projects and provide economic and financial research.
18   Q.  Have you previously had any experience overseeing any kind
19   of shareholder derivative litigation or shareholder class
20   action?
21   A.  Yes, your Honor.  The Longview funds were established in
22   the early '90s.
23   Q.  Remember, I'm not interested in we.  I'm interested in you.
24   A.  OK.  In my capacity as a director of the governance program
25   at Amalgamated Bank, we have overseen settlement discussions in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9b4rklec
```
 1   previously initiated derivative lawsuits.
 2   Q.  Meaning you oversee?
 3   A.  Yes.  When I began at the bank, we were lead plaintiff in
 4   the Tyson derivative case regarding stock options backdating,
 5   and through the negotiation settlements we were able to resolve
 6   the case as well as introduce a number of governance reforms
 7   that we believed and hoped would preserve shareholders'
 8   investments going forward.
 9   Q.  Are you the person assigned by the bank to oversee this
10   litigation?
11   A.  The ultimate authority for overseeing the litigation lies
12   with the committee of our board of directors, the trust
13   committee.
14   Q.  Yeah, yeah, yeah.  Who is the day-to-day person?
15   A.  The day-to-day person is myself in conjunction with outside
16   counsel and internal counsel at the bank.
17   Q.  When were you brought in to play that role in terms of the
18   date?
19   A.  On this specific case, your Honor?
20   Q.  Yes.
21   A.  I have been involved with this case since we first reviewed
22   it, which it would have been early September.
23   Q.  Does Amalgamated have a longstanding relationship with
24   Bernstein Litowitz?
25   A.  We have worked with Bernstein Litowitz on other cases.
```

9b4rklec
```
 1   They are part of a number of firms which we are in contact with
 2   for litigation cases.
 3   Q.  Did they bring this case to your attention or did you bring
 4   it to their attention or what?
 5   A.  This case was brought to the attention of the outside
 6   counsel to Longview funds, which was Schulte Roth & Zabel.
 7   Schulte Roth & Zabel then introduces the case to our full trust
 8   committee as well as staff of the bank, and that triggers an
 9   internal process of review to consider whether or not it's
10   appropriate for us to pursue that litigation.
11   Q.  After it was determined it was appropriate for you to
12   pursue the litigation, what happened next?
13   A.  Once we reviewed the case, including a full presentation
14   and discussion at our trust committee, the case was approved
15   provisionally upon the agreement and further discussion with
16   one of the trustees who was absent from that discussion.  From
17   that point, once that conversation took place and it was
18   approved, we proceeded to further assess the case and enter
19   into a retainer agreement with the law firm so that we would
20   remain in charge of the case going forward and be able to fully
21   supervise the case.
22   Q.  A retainer agreement with Bernstein Litowitz?
23   A.  That's correct.
24   Q.  How did you come about to choose Bernstein Litowitz?
25   A.  Bernstein Litowitz had presented what we believed to be a
```

9b4rklec
```
 1   thorough analysis of the case and, from our internal
 2   discussions the case, fit the profile of our concerns to
 3   monitor our funds and to take action when we believe that
 4   shareholder value has been at threat and when the future
 5   actions would enable shareholder value to continue to be at
 6   risk, your Honor.
 7   Q.  You said you entered then into a retainer agreement with
 8   Bernstein Litowitz?
 9   A.  Yes, your Honor.
10           THE COURT:  Does someone have a copy of that?
11           MR. SILK:  Your Honor, the retainer agreement was the
12   document we provided to your Honor.
13   Q.  So this is the only retainer agreement?
14   A.  Yes.
15   Q.  This is dated October 7, 2009.  But Bernstein Litowitz and
16   Amalgamated served this prior to that, yes?
17           THE COURT:  When was the complaint filed in this case?
18           MR. SILK:  The complaint for Amalgamated is dated
19   October 2nd.
20   Q.  Did you review that complaint?
21   A.  Yes, your Honor.
22   Q.  The complaint was filed before you had a retainer
23   agreement?
24   A.  According to the dates, that would be the case.  But we did
25   fully review the case prior to its being filed.
```

19

9b4rklec

1   Q.  How could you bring litigation without having a retainer
2   agreement in place?
3               MR. SILK:  Your Honor, do you mind?
4               THE COURT:  Go ahead.
5               MR. SILK:  There were discussions on this.  There was
6   agreement reached with both assistant general counsel at
7   Amalgamated Bank as well as Schulte Roth, who serves in an
8   advisory capacity for Amalgamated Bank on these matters, on
9   these securities and derivative matters, where there was an
10  agreement.  It was memorialized in this writing on October 7th,
11  but there was an agreement to retain our firm prior to the
12  filing of that complaint.
13              THE COURT:  I'm not going to make a big point out of
14  this, but my recollection, I could be wrong, of the ethical
15  rules of the State of New York, which are binding in the
16  Southern District of New York as well, is that you have to have
17  a written retainer agreement before you bring a lawsuit.
18              MR. SILK:  Your Honor, I'm not going to sit here and
19  respond.  I think there are conflicting rules on that.  But we
20  had an agreement.
21              THE COURT:  I don't think so.  In any event.
22              MR. SILK:  I might have emails on this.
23              THE COURT:  We are talking about at most a week.
24              MR. SILK:  Your Honor, really if you want me to search
25  emails, I might even have email writings on this.  It's just
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

9b4rklec
```
 1   the final agreement is reflected in this document that you
 2   have.  But I can tell you there was a lot of discussions,
 3   dozens of discussions, about the merits of the case.  We
 4   received comments on the complaint from the client, from
 5   Schulte Roth, and we have also prepared memos from the client
 6   on this case, all of which are dated throughout September and
 7   early October, before the final complaint was filed.
 8            THE COURT:  All right.  Now let me go back to the
 9   witness.
10   BY THE COURT:
11   Q.  How do you propose to go about monitoring this litigation?
12   A.  We have been in the past in previous cases and we fully
13   intend to be fully in charge of the litigation moving forward.
14   Q.  I'm going to repeat what I said before.  I'm not interested
15   in we, I'm interested in you.
16   A.  As part of my obligations for the bank, I regularly receive
17   updates from counsel, including about developments in the case.
18   Those developments are presented to both me as well as internal
19   counsel at the bank and our outside counsel to all of the
20   Longview funds.  Our committee of our board of representatives
21   which exercises oversight for the funds meets on a monthly
22   basis and reviews the present status of each and every case
23   that we might be involved with.
24            Through staff counsel as well as our outside counsel,
25   we make determinations on any key strategic or tactical event
```

21

9b4rklec
1   that might come up in the litigation.  If a decision needs to
2   be made in the interim, in between trust committee meetings, we
3   are able to convene conference calls and have a full, thorough
4   discussion of the elements, what is happening in the case, and
5   what decision needs to be made.
6   Q.  When you reviewed the complaint, did you read it?
7   A.  Yes, your Honor.
8   Q.  Did you ask counsel any questions about it?
9   A.  We did, your Honor.
10  Q.  I'm talking about you.
11  A.  Yes.
12  Q.  What do you understand?  I'm not treating this as an
13  admission of a party or as binding in any way, but simply just
14  to assess the witness's knowledge.  What do you understand to
15  be the gist of your complaint here?
16  A.  The core question here is this case fits within a broader
17  program of corporate governance that we pursued through
18  resolutions in litigation and other dialogue with companies,
19  your Honor.  In this case we have a significant stake in the
20  company, about 3.2 million shares.  We have held a significant
21  stake since at least before 2000.
22          We are concerned about a repeated history of
23  violations of regulatory structures within the U.S. that
24  imposed fines on the costs of the company.  It is particularly
25  concerning those fines if anything has gotten worse.  The fines
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

22

9b4rklec

1   have coincided with what is clearly a lack of compliance
2   through the internal structures at the company.
3           Ultimately, the board of directors is responsible for
4   oversight of compliance and for operations of the company
5   itself.  As shareholders, we rely on the board of directors to
6   exercise that oversight.  If there hasn't been oversight, we
7   ultimately are looking to hold the directors accountable for
8   their actions and for the lack of oversight both to recover
9   losses for the company which they have endured from these
10  fines, as well as to preserve our investment going forward.
11          It remains a significantly large company.  It's the
12  largest company within its sector, which is a heavy presence in
13  any index fund.  So we have an eye particularly to preserving
14  our investment moving forward and hoping to have better
15  structures that would prevent such fines in the future.
16  Q.  Who is Thomas B. O'Donnell?
17  A.  Thomas O'Donnell is first vice president and director of
18  public equities of the Longview funds.
19  Q.  Do you report to him?
20  A.  Tom O'Donnell and I are both first vice presidents, your
21  Honor.  He exercises oversight of the portfolio, and I work on
22  our corporate governance initiative.
23  Q.  Why did he sign the complaint instead of you?
24  A.  He signed the complaint as a representative of the
25  investments, and I will be working with the complaint in terms

23

9b4rklec
1   of our governance program.  We both report directly every month
2   to our trust committee.
3           THE COURT:  I am satisfied that Amalgamated is the
4   appropriate party to proceed at this point as the lead
5   plaintiff in this case, subject to all the caveats that have
6   been already raised about what might or might not happen in the
7   future.  I'm also satisfied that Bernstein Litowitz, which is
8   well known to this Court for its expertise in securities
9   litigation, is an appropriate counsel to act as counsel for the
10  lead plaintiff as well as, in effect, lead counsel in the case,
11  again subject to all the qualifications as to what may happen
12  subsequently.
13          You may step down.
14          (Witness excused)
15          THE COURT:  Anything else anyone wants to raise with
16  the Court?  Very good.
17          MR. BLOCK:  Your Honor, if I might?
18          THE COURT:  Yes.  Do you have a question or a
19  statement?
20          MR. BLOCK:  It's a question, probably will sound like
21  a statement.  No, it is a question.  In connection with the
22  motion that might be made responding to a complaint --
23          THE COURT:  We set a schedule for this already.
24          MR. BLOCK:  We set a schedule.  I'm assuming we will
25  make a motion to dismiss for a whole bunch of reasons which
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

24

9b4rklec

1      your Honor will hear some argument on on Monday of next week.
2              THE COURT:  Actually, because I forgot to bring that
3      order with me, remind me of the dates.
4              MR. BLOCK:  I have it, your Honor.  We're on a pretty
5      fast track, which is why I raise the issue.
6              THE COURT:  No, no, we're on a modest and reasonable
7      track.
8              MR. BLOCK:  November 18th will be the amended
9      consolidated complaint, and then any motion directed needs to
10     be filed by December 16th.  Then responsive papers January 8th
11     and 22nd, with the Christmas holidays.
12             THE COURT:  Did we set a time for oral argument?
13             MR. BLOCK:  Yes, we did, your Honor.  February 4th --
14             MR. SILK:  February 5th.
15             MR. BLOCK:  February 5th at 11:30.
16             THE COURT:  Good.  Go ahead.
17             MR. BLOCK:  Anticipating that this issue of the role
18     of the bank is going to come up because there is an issue as to
19     whether they fit the proper description, it might make sense to
20     schedule prior to any motion the deposition of the witness who
21     just testified so we all understand what their role is and we
22     can understand whether they can be adequate or have standing to
23     be a plaintiff in this case.
24             MR. SILK:  May I respond to that, your Honor?
25             THE COURT:  Sure.

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

9b4rklec

```
 1          MR. SILK:  Mr. Block is referring to some issue in a
 2   vague way.  I want to be careful so I respond on point.  Are
 3   you referring to the issue that was raised by Ms. Klein
 4   relating to the 14(a) issue or are you referring to some other
 5   issue?
 6          MR. BLOCK:  In order to be a plaintiff, you have to
 7   have the same interests as all those in your class, in essence,
 8   even though it is a derivative suit.  So you would have to be
 9   an owner of stock both at the time of the alleged violation and
10   through it up till today and be of good judgment.  On 14(a),
11   that's a claim for violation of the proxy rules.  You would
12   have to have been defrauded in connection with any votes you
13   may have had regarding something.  I'm not sure what that
14   something is.
15          If in fact this is not the ownership of the stock, if
16   they are not in a similarly situated --
17          THE COURT:  Yes, I understand the point, because it
18   was raised in those papers.  Are you saying that in your view
19   neither Amalgamated nor Henrietta Klein nor Scandia can
20   properly proceed as plaintiff in this case?
21          MR. BLOCK:  I haven't reached any conclusions
22   regarding anybody other than Amalgamated.  Based upon what I
23   read in the briefs that were submitted to your Honor regarding
24   the lead counsel issue, I do believe there is a serious
25   question as to whether Amalgamated can serve as a plaintiff.
```

26
9b4rklec
1          THE COURT:  My understanding, and I know you haven't
2    seen this agreement that I just looked at, but from what was
3    stated here in open court, is that the consolidated amended
4    complaint is going to name all three as plaintiffs.  That
5    doesn't mean we don't have to address the issue you're raising.
6    We will.
7          But I want to know, before I start looking at whether
8    discovery is provident and how much and when and all the rest
9    of it on that issue, whether you're saying we think we can
10   knock out all the plaintiffs -- I'm not talking on a 12(b)(6)
11   basis but on a standing basis or the like -- or whether you're
12   only contending this as to Amalgamated.  If you're only
13   contending it as to Amalgamated, it seems to me that's a
14   different posture from the alternative.
15         MR. BLOCK:  I can't at this moment, your Honor, answer
16   that question.  Clearly we have issues regarding the adequacy
17   and standing of Amalgamated to serve as a representative
18   plaintiff in this action.  Your Honor for the moment has
19   designated them as lead plaintiff.
20         THE COURT:  Let me hear you.
21         MR. SILK:  Thank you, your Honor.  There are several
22   points to explain.  I'm not sure why Mr. Block says they
23   clearly have issues with the standing.  Amalgamated's claims
24   includes claims under the securities laws as well as breach of
25   duty and unjust enrichment claims that this Court has
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

27

9b4rklec

1  jurisdiction over as supplemental claims with the 14(a) claim.
2  All of the plaintiffs have the same claims.  All of the
3  shareholders are complaining of the same conduct.
4          I have yet to hear Mr. Block articulate the argument.
5  If he is trying to articulate the argument that Ms. Klein made
6  regarding standing and this argument under the Second Circuit's
7  decision in Huff, I'm happy to address that.  It's not an
8  argument.  Huff specifically says that trustees have Article 3
9  standing, and Amalgamated Bank is a trustee for the Longview
10 funds.
11         If Mr. Block would like discovery and wants to go down
12 that road, I would submit let's engage in discovery.  This is
13 not a PSLRA case, as Mr. Block made clear and we all know, and
14 there is no prohibition or stay on discovery.  I am happy to
15 engage and my client is happy to engage in mutual discovery and
16 get to the bottom of the facts of the case.  But I don't see
17 how --
18         THE COURT:  All right, OK.  The counteroffer on the
19 table, Mr. Block, is that you can take the discovery of whom-
20 ever you wish and they will take the discovery of whomever they
21 wish, and discovery will mutually start promptly, meaning long
22 before February.
23         MR. BLOCK:  Tonight I wish the Yankees succeed in
24 winning and closing out the World Series.  However, there is
25 some law involved here.  This case is governed by Delaware law,

28

9b4rklec

1  and Delaware law as a matter of substantive law, not procedural
2  23.1 but Delaware substantive law, says if there is going to be
3  a motion to dismiss, there is no discovery that they are
4  entitled to until they survive the motion to dismiss.
5           THE COURT:  Does that apply to the Section 14 claim?
6           MR. BLOCK:  That's a very good question.  I don't
7  believe Delaware law has anything to do with the Section 14(a)
8  claim.
9           THE COURT:  I agree.  So discovery could proceed.
10          MR. BLOCK:  But it would be discovery piecemeal and
11 would make no sense.
12          THE COURT:  Maybe, or maybe the two claims are so
13 overlapping that it would be substantially the same.  But
14 that's all right.
15          Here's what I think.  This Court, if it had its
16 druthers, would like discovery to start tomorrow, because I
17 always think it's helpful for cases to get to the facts and not
18 get mired in abstract legal issues before anyone knows the
19 facts.  Nevertheless, I think the analogy to the PSA is
20 appropriate in this case with respect to the Section 14 claim.
21 We don't even have to reach the Delaware issue.  So I think
22 discovery will await determination, at least will await the
23 oral argument on February 5th.
24          Although, I would think at that time I will expect the
25 parties to come to the Court with a case management plan that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

29

9b4rklec

1   contemplates that the Court will take no more than three weeks
2   to decide any motion and that therefore, assuming the case then
3   goes forward, we will have discovery commencing at the
4   beginning of March and concluding no later than five months
5   later.
6           But I think until then discovery should be stayed.
7   Although I admire the tactical cleverness of plaintiffs'
8   counsel in countering Mr. Block's request for one modest little
9   deposition with a request for dozens of depositions, I think it
10  is an apples and oranges situation.  If there is a specific
11  problem with the adequacy of Amalgamated, that's something we
12  ought to get determined sooner rather than later.
13          On what I have seen so far, but it's really just been
14  the papers between the Klein plaintiff and Amalgamated, I don't
15  see there being a problem, which is why I also felt comfortable
16  about going forward today.  But that is very different from
17  anything like a final decision on that issue.
18          It seems to me that a short, very narrowly cabined
19  deposition of the Amalgamated representative would be an
20  appropriate thing to have at this time.  I think it ought to be
21  limited to three hours.  I think it ought to occur in --
22  Amalgamated is in Chicago?
23          MR. SILK:  New York.
24          THE COURT:  Shows how much I know.  So it should occur
25  in New York.  Yes?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9b4rklec

1          MR. SILK:  Your Honor, putting aside the response to
2  discovery of defendants, which I understand you denied, I just
3  want to go back to a point you raised when Mr. Block made his
4  initial request, which is a point worth focusing on.  The
5  complaint will include not just Amalgamated as the lead
6  pursuant to your Honor's order today, but it will also include
7  plaintiff Scandia, Ms. Klein, my client that I had filed the
8  other claim for, which is the Louisiana Sheriffs and another
9  Taft-Hartley fund I believe that filed a complaint.  We have a
10  consolidated case here.  Your Honor consolidated these cases.
11          THE COURT:  Yes.
12          MR. SILK:  So this is a clever attempt really.  This
13  doesn't change the case.  The case is going to go forward or
14  not based upon your Honor's ruling on a 12(b)(6) motion.
15          THE COURT:  I think that is extremely likely to be the
16  case, and that's why I'm trying to cabin this within fairly
17  narrow limits.  But if there is a special problem with
18  Amalgamated, why shouldn't we get that resolved sooner rather
19  than later?
20          MR. SILK:  Our view is it's in our papers and Mr.
21  Block has not articulated any special problem.  At first he
22  said, when I pressed him, that there was a question on
23  standing, did they hold the shares.  That's in evidence
24  already.  The evidence is they have held, under a sworn
25  declaration, at least a million shares through the entire

9b4rklec
```
 1   period and currently own 2.3 million shares.
 2           The question of whether they will maintain standing,
 3   which was the second point Mr. Block raised, that's in the
 4   retainer agreement, which says they will maintain standing in
 5   this case.
 6           As far as the 14(a) claim, that is a question for your
 7   Honor on the merits.  I do not agree with Mr. Block that
 8   Delaware law governs whether this Court in the Southern
 9   District of New York can stay discovery or not.  I think your
10   Honor governs that.  I think that is a procedural matter.
11   Delaware law does not govern, you govern that, and I believe
12   that there is no basis at this time.  It is only a tactic to
13   delay the case.
14           I would prefer to focus on the merits of this case,
15   because this case will go forward or not go forward not based
16   upon Amalgamated's deposition but based upon your Honor's
17   ruling on a relatively expedited schedule on the merits.  I
18   think it is just a tactic.
19           For this plaintiff, there is a fairly liberal standard
20   for adequacy and suitability to be met at the outset.
21           THE COURT:  There are two different points here.  I
22   may well agree with you that Delaware law in terms of any stay
23   is irrelevant.  As I said before, I don't even have to reach
24   that, because I could have discovery go forward right now on
25   the basis of the Section 14 claim.  I'm choosing not to with
```

32

9b4rklec

1  some reluctance, because I take the policy embodied in the
2  PSLRA to be really also applicable here.
3          Congress, rightly or wrongly, is of the view that
4  securities cases of this magnitude, or cases of this magnitude,
5  period, should be subject to resolution one way or the other on
6  a motion to dismiss before costly discovery is undertaken.
7  That may be a wise policy or a dumb policy, but it's really
8  applying that policy that leads me to my decision to put off
9  discovery until after the motion.
10         At the same time, what I indicated to you is we're
11 going to proceed very swiftly.  You're going to get an answer
12 from me in three weeks, and then we are going to have discovery
13 in five months.
14         So we are down to the much more narrow question.  What
15 you are saying is that you think really all that's going on
16 here, since the case is going to move.  So far as having some
17 plaintiff who can move this case forward, there is bound to be
18 one among that crowd.  You think this is just either a
19 diversionary tactic or a fishing expedition or both by your
20 adversary, and what you argue is his inability to define with
21 particularity exactly what he wants to take this deposition
22 about.
23         Let me hear from Mr. Block on that.
24         MR. BLOCK:  Very simply, your Honor, the co-plaintiff
25 in the case, Ms. Klein, has said that they are not the owner of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

33

9b4rklec
1    the shares now or were ever before, and indeed that the problem
2    with their not being the owner, being a trustee for somebody
3    else, creates the fact that they are not similarly situated.
4            THE COURT:  What do you need discovery for?
5            MR. BLOCK:  If they want to concede that, I'm fine.
6            MR. SILK:  Your Honor, can I address that?
7            THE COURT:  Whoa.  Gentlemen, please.
8            MR. SILK:  I can address that, your Honor.
9            THE COURT:  Let Mr. Block finish, and then I'll here
10   from you.
11           MR. BLOCK:  If they want to concede the fact as set
12   forth in the Klein response for purposes of our motion, fine,
13   I'm happy to take that.  I don't want them to contest it and
14   not have a deposition.
15           THE COURT:  I understand.
16           MR. SILK:  We are not willing to concede that.  That
17   argument that Ms. Klein raised is not correct.
18           THE COURT:  What is it you're not conceding?  Does
19   Amalgamated own shares in Pfizer other than in its trustee
20   capacity?
21           MR. SILK:  No, your Honor.  Amalgamated buys shares
22   through its Longview funds.  It is the trustee for those funds.
23   I have the plan documents that are confidential.  We don't
24   believe the Court should require them to be produced.  But I am
25   willing to hand up to the Court the actual documents that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

34

9b4rklec

1    create the Longview funds and give rise to the trustee
2    relationship.
3            THE COURT:  This I say not just with respect to those
4    documents but more generally.  I am not happy to take documents
5    in camera without the other side having a chance to see them or
6    for that matter the public a chance to see them.  I made an
7    exception with respect to this three-page agreement even though
8    I don't believe it contains anything governed by the attorney-
9    client privilege, because it did contain work product.  But I
10    don't want to be in the position, because I don't think it is
11    healthy to the adversary system, for the Court to see stuff
12    that one side proffers and the other side doesn't see.
13            MR. SILK:  If I could address all of this?
14            THE COURT:  Yes.
15            MR. SILK:  Taking a step back, the argument that Mr.
16    Block is echoing is an argument made by Ms. Klein relating to
17    standing.  Since we are looking to the PSLRA for guidance, it's
18    Amalgamated's burden to make a showing to your Honor that they
19    have standing, that they are adequate and they are going to be
20    an involved plaintiff.  Your Honor, as is your practice in
21    prior cases that we know well, takes that one step further and
22    provides for an evidentiary hearing, which we have now complied
23    with.
24            We believe that for purposes of the liberal standard,
25    looking at the PSLRA, the only way to rebut the adequacy or the

35

9b4rklec
```
 1   standing issue on one of these plaintiffs who makes the
 2   decision to come forward and take an activist approach in this
 3   case is to demonstrate proof.  The process and diligence that
 4   your Honor goes through makes that requirement in my view even
 5   more difficult.  One cannot simply quote the papers --
 6          THE COURT:  Forgive me for interrupting.  Let me ask
 7   Mr. Block, what are the specific facts that you want to know to
 8   be able to raise this standing issue?
 9          MR. BLOCK:  Who owns the shares, how did they get
10   ownership of the shares, who has a right to vote the shares,
11   how did they get that right to vote those shares?
12          THE COURT:  Is that not information that plaintiff is
13   willing to provide?
14          MR. SILK:  We are willing to say right now on the
15   record as per Mr. Zdrazil, who could approach the stand or I
16   could state what he has told me, which is Amalgamated has all
17   of the rights of ownership, including proxy voting and the
18   other things that Mr. Block just mentioned.
19          THE COURT:  How did they obtain the shares?
20          MR. SILK:  They are purchased through the index funds,
21   the Longview funds.
22          THE COURT:  What were the other two questions?
23          MR. BLOCK:  That's a mutual fund, your Honor.  They
24   are not the owner.  The owners are the underlying investors.
25          THE COURT:  That's a purely legal issue.
```

9b4rklec

```
 1          MR. BLOCK:  OK.  That's what we want to have.  We want
 2  to have the facts to give you so we can argue the legal points.
 3          THE COURT:  I'm trying to get right now, to save
 4  everyone some time, the facts, and then you can make your
 5  arguments.
 6          MR. BLOCK:  He said the facts are that the bank owns
 7  it, but that's not true.  We need a piece of paper that shows
 8  they own it and how they own it or someone to testify to that
 9  effect.
10          MR. SILK:  In response to the concern your Honor had
11  about me providing this in camera, I assume that if your Honor
12  sustains our complaint, Mr. Block will contact us and ask for a
13  confidentiality agreement in this case governing the production
14  of his client's documents.
15          THE COURT:  In that regard, please look at my standard
16  form confidentiality agreement, because that is probably the
17  only one I'm going to sign, which is available on the website.
18          MR. SILK:  If Mr. Block is willing to sign that
19  agreement that your Honor has used in other cases and we would
20  be willing to sign that and we can produce these documents to
21  him under that --
22          THE COURT:  That may be the easy way to solve it.
23          MR. BLOCK:  Fine with us.
24          THE COURT:  Why don't you work on that.  If there is
25  still an issue here, get back to me telephonically, say, by the
```

37

9b4rklec
1    end of the week.
2            MR. SILK:  When he has these documents, he can make
3    the legal arguments he wants to make in his brief.
4            THE COURT:  Yes, I understand.  It sounds to me like
5    that will be an expeditious way of resolving this.
6            MR. BLOCK:  Fine with us.
7            THE COURT:  Anything else?
8            MR. SILK:  No, your Honor.
9            THE COURT:  Thank you very much.
10            (Adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25