UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
IN RE:                               :
                                     :     Master File No.:
PFIZER INC. SHAREHOLDER DERIVATIVE   :     09 Civ. 7822 (JSR)
LITIGATION                           :
----------------------------------- x      OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.


        On September 2, 2009, the United States Department of Justice

announced that Pfizer, Inc. had agreed to pay $2.3 billion in fines

and penalties arising from the illegal "off-label" marketing by

Pfizer and one of its subsidiaries of various regulated drugs.

Immediately thereafter, several derivative actions were commenced,

mostly by institutional investors, seeking recovery on behalf of the

company from various senior executives and present and former board

members who were alleged to be responsible for the misconduct that

resulted in these vary large fines and penalties.  The cases were

consolidated, and on November 18, 2009, the plaintiffs jointly filed

a 93-page, five-count Consolidated, Amended, and Verified Shareholder

Derivative Complaint (the "Complaint").  On December 16, 2009, the

defendants moved to dismiss the Complaint in its entirety.  Following

extensive briefing and oral argument, the Court, by Order dated March

17, 2010, (a) granted the motion to dismiss Count I (which alleged

that the present and former directors caused Pfizer to disseminate

materially inaccurate and misleading proxy statements in violation of

the federal securities laws); (b) granted the motion to dismiss Count

II (which alleged that all defendants violated their fiduciary duties

under Delaware law by allowing Pfizer to disseminate these

statements); (c) granted the motion to dismiss Count V (which alleged that the defendants were unjustly enriched at Pfizer's expense); (d) granted the motion to dismiss all claims asserted against defendant Allen P. Waxman (on the unopposed representation that he had never been served); and (e) denied the motion in all other respects, thus leaving in place Count III (which alleged that the director defendants, in violation of their fiduciary duties under Delaware law, intentionally approved or deliberately disregarded Pfizer's alleged promotion of off-label drugs and its payment of alleged illegal kickbacks to health care professionals) and Count IV (which alleged similar breaches of duty by the executive defendants).  This Opinion and Order explains the reasons for these rulings and specifies that the dismissals are with prejudice except as to Mr. Waxman.

    The Complaint alleges, in pertinent part, the following: Pfizer's core business rests on the marketing of its drugs, not just to consumers, but also, importantly, to physicians and other health care professionals.  Compl. ¶¶ 54-56.  The Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301 et seq., prohibits pharmaceutical companies from marketing or promoting their drugs for "off label" uses or dosages -- i.e., uses or dosages that have not specifically been approved by the Food and Drug Administration.  Compl. ¶¶ 59-60. Various federal laws also prohibit paying "kickbacks" (i.e., concealed commercial bribes) to health care professionals to get them to prescribe or promote a company's drugs.  Id. ¶ 61.

Pfizer was acutely aware of the need to prevent such illegal practices on the part of itself and its subsidiaries because of prior settlements with the Government attributing just such misconduct to various Pfizer subsidiaries shortly prior to their acquisition by Pfizer. For example, in 2002, Pfizer subsidiary Warner-Lambert settled charges brought by the Government under the False Claims Act alleging that Warner-Lambert, prior to its acquisition by Pfizer, had given concealed kickbacks to a managed care organization in exchange for that organization's agreement to give preferred status to Lipitor, an anti-cholesterol drug. Id. ¶ 89. Pursuant to this settlement, Pfizer paid $49 million in fines and entered into a five-year corporate integrity agreement (the "2002 CIA") to guarantee that Pfizer and Warner-Lambert would not pay illegal kickbacks in the future. Id. ¶ 90. The 2002 CIA required, among other things, that Pfizer's board would create and implement a compliance mechanism that would bring information about illegal marketing activities to the board's attention. Id. ¶¶ 90, 110-113.

Similarly, in 2004, Pfizer entered into a settlement with the Government regarding Warner-Lambert's illegal off-label marketing (prior to Warner-Lambert's acquisition by Pfizer[1]) of Neurontin, an anticonvulsant medication with dangerous side effects. Id. ¶¶ 92-93,

---

[1] Although the Complaint fails to specify whether any of Warner-Lambert's alleged wrongdoing took place after its acquisition by Pfizer in 2000, the Government's sentencing memorandum, which is cited in the Complaint (at ¶ 99), unmistakably states that its charges related only to pre-acquisition conduct. See Decl. of Jason M. Halper, 12/16/09 ("Halper Decl."), Ex. E, at 12.

100.  In connection with this settlement, Warner-Lambert pleaded guilty to criminal and civil charges that it fraudulently promoted Neurontin for unapproved uses.  The Government's sentencing memorandum noted that the marketing scheme, implemented "with knowledge and approval of senior management," included a variety of tactics to promote off-label use, ranging from direct solicitations by Warner-Lambert's sales representatives to sponsoring promotional meetings and "independent" medical education events to encourage off-label prescriptions.  Id. ¶ 99.  To settle these charges, Pfizer paid a $240 million criminal fine and an additional $190 million penalty. Id. ¶ 100.  Additionally, Pfizer entered into another, more extensive CIA (the "2004 CIA") that required even more stringent steps to bring any such misconduct to the Board's attention.  Id. ¶¶ 101, 114-20.

Finally, in 2007, Pfizer paid another $34.6 million in criminal fines relating to the illegal off-label marketing by Pharmacia & Upjohn Company, Inc. ("Pharmacia"), another of Pfizer's wholly-owned subsidiaries, of Genotropin, a human growth hormone with dangerous side effects that were promoted by Pharmacia (prior to its acquisition by Pfizer[2]) for its alleged use as an anti-aging agent. To settle these charges, Pharmacia pleaded guilty to illegally

---

[2] Again, although the Complaint refers to Pharmacia as a "Pfizer subsidiary" throughout its discussion of the 2007 settlement, the deferred prosecution agreement entered into by Pharmacia and the Government, which is cited in the Complaint (at ¶ 108), makes clear that all alleged wrongdoing took place prior to Pfizer's acquisition of Pharmacia in April 2003.  See Halper Decl., Ex. F.

promoting and selling Genotropin and to intentionally violating the federal anti-kickback statute.  Id. ¶¶ 102-08.

In the face of all these prior violations by its subsequently-acquired subsidiaries, and despite its promises to take significant steps to monitor and prevent any further violations, Pfizer itself engaged in the same misconduct.  Using sophisticated "prescription data mining" and "influence mapping" analyses, Pfizer targeted specific physicians for visits by Pfizer sales representatives to promote off-label uses of Pfizer drugs.  Id. ¶ 77. Sales representatives were given financial incentives and assigned quotas to encourage such off-label promotion, and these representatives were urged to make false claims regarding the safety and efficacy of off-label uses of Pfizer drugs.  Id. ¶¶ 77, 81. Pfizer also developed a "Scientific Ambassador Program" that used medical liaisons to promote off-label uses.  Id. ¶ 79.  Further, Pfizer commissioned articles published in medical journals that promoted certain off-label uses for "blockbuster" drugs based on skewed and inaccurate data, and then instructed its sales representatives and medical liaisons to use these studies to market the drugs to physicians.  Id. ¶¶ 82-83.  Doctors who were identified as marketing targets would be invited to "consultant meetings" in luxury hotels, where they were encouraged to make off-label prescriptions.  Id. ¶ 84.  Pfizer also designated certain doctors as "opinion leaders" and paid them to promote off-label prescriptions at purportedly independent continuing medical education meetings.  Id. ¶ 85.

Pfizer kept careful track of how well their illegal activities were succeeding.  For example, according to the Government, Pfizer's own records showed that such activities generated an estimated $664 million in off-label prescriptions for the Pfizer drug Bextra (discussed below).  Id. ¶ 86.  And, as alleged (among other places) in recently unsealed qui tam complaints filed by Pfizer employees, Pfizer's board and senior management, rather than attempting to stop this off-label promotional activity, retaliated against employees who reported internally that Pfizer's marketing practices were illegal.  Id. ¶ 87.

It was thus activity by Pfizer itself, as well as by its subsidiary Pharmacia, that gave rise to the 2009 settlement.  Id. ¶¶ 79-87, 121-53.  Among other things, Pfizer and Pharmacia engaged in the illegal marketing of Bextra, a painkiller known as a "COX-2 inhibitor."  Id. ¶ 121.  Beginning in October 2001, Pfizer entered into an alliance with Pharmacia to market Bextra jointly with Celebrex, a similar drug.  Pharmacia applied for FDA approval of Bextra with respect to certain specific uses, but the FDA denied that application in several respects because of concerns about serious adverse health consequences.  Id. ¶¶ 123-24.  Nonetheless, Pfizer and Pharmacia immediately created plans to market Bextra for unapproved uses by, among other things, promoting the drug with false and misleading safety indications, distributing samples to doctors who had no FDA-approved use for the drug, creating sham doctor requests for information about unapproved uses, and funding purportedly independent continuing educational programs to promote the drug for

off-label purposes.  Id. ¶ 128.  This marketing continued after
Pfizer's acquisition of Pharmacia was completed in 2003 and after the
2002 and 2004 CIAs went into effect.  Id. ¶¶ 130-31.

The 2009 settlement, however, covered not only the marketing
of Bextra, but also a variety of other illegal marking activities
undertaken by Pfizer between January 1, 2001 and October 31, 2008
with respect to thirteen different drugs, including seven of Pfizer's
nine so-called "blockbuster" drugs, which generated over $1 billion
of revenue per year.  Id. ¶¶ 140-42.  In the settlement agreement,
Pfizer not only admitted that the illegal promotion of Bextra
continued beyond 2003, when Pfizer's acquisition of Pharmacia was
completed, id. ¶ 142, but also that the illegal marketing of Zyvox,
an antibacterial agent, continued past the time when the 2004 CIA
went into effect and even after the FDA issued a warning letter with
respect to Pfizer's misbranding of that drug in 2005, id. ¶ 144.

The $2.3 billion amount of the 2009 settlement consisted of a
criminal fine of $1.195 billion (the largest criminal fine ever
imposed in the United States); criminal forfeitures of $105 million;
and a $1 billion civil settlement -- "the largest civil fraud
settlement in history against a pharmaceutical company" -- with
respect to violations of the False Claims Act and the federal anti-
kickback statute.  Id. ¶¶ 138-40.  Additionally, the settlement
required Pfizer to enter into yet another CIA (the "2009 CIA") with
still further compliance requirements.  Id. ¶¶ 146-49.

In short, the Complaint, seemingly corroborated in material
respects by the Government's own charges that led to the 2009

settlement, alleges a rather blatant pattern of misconduct by Pfizer, undertaken with the knowledge, approval, or, at the very least, conscious disregard, of Pfizer's board and senior management.

Based on these allegations, as noted, plaintiffs assert five derivative causes of action against the various defendants, specifically, claims alleging that the defendants published false and misleading proxy statements and financial statements in violation of federal and state law (Counts I and II); claims alleging that the defendants breached their fiduciary duties to Pfizer by causing or consciously disregarding the illegal marketing activity (Counts III and IV); and a claim for unjust enrichment (Count V). Defendants, in turn, have moved to dismiss the Complaint, both on grounds relating to all claims and on grounds relating to specific claims.

The Court turns first to the argument made by all defendants -- including nominal defendant Pfizer -- that the Complaint must be dismissed, in its entirety, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, because plaintiffs have failed to plead with particularity facts that would warrant excusing plaintiffs' failure to issue a demand upon Pfizer's board of directors. Plaintiffs concede that they issued no such demand on the board, but assert that such a demand is excused, both because the directors' misconduct here alleged could not have been a valid exercise of business judgment and also because a majority of the current board is charged with the alleged misconduct and therefore would be conflicted from assessing the demand. Id. ¶¶ 170-95.

It is, of course, axiomatic under both state and federal law that a shareholder bringing a derivative action on behalf of the company in which he owns stock is required to either first demand that the corporation's board of directors pursue the action or else show why such demand would be futile.  The purpose of this demand requirement in a derivative suit is to implement "the basic principle of corporate governance that the decisions of a corporation -- including the decision to initiate litigation -- should be made by the board of directors or the majority of shareholders."  <u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 101 (1991) (internal quotation marks omitted).  Federal Rule of Civil Procedure 23.1 requires, as a procedural matter, that plaintiffs plead with particularity the reasons why they believe demand is excused.  <u>See</u> Compl. ¶¶ 170-95.  However, the law of the state of incorporation (here, Delaware) governs the substance of the demand requirement.  <u>Kamen</u>, 500 U.S. at 108-09.

Delaware law provides alternative tests for determining whether demand would have been futile, one applicable to situations where the board's business judgment is being challenged and one where it is not.  Under either test, however, the Court, in evaluating a motion to dismiss for failure to make a demand, is required to accept the truth of all facts pleaded in the Complaint, and "plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged."  <u>In re Veeco Instruments, Inc. Sec. Litig.</u>, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006).

The test for futility that applies where a business decision is being challenged by the plaintiffs is the test set forth in Aronson v. Lewis, 473 A.2d 805 (Del. 1984). To meet that test, the plaintiff must allege particularized facts sufficient to create "a reason to doubt that '(1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" Wood v. Baum, 953 A.2d 136, 140 (Del. 2008) (alteration in original) (quoting Aronson, 473 A.2d at 814). The test for futility that applies when the plaintiff is not challenging a business decision by the directors (and hence the business judgment rule is not applicable), is that set forth in Rales v. Blasband, 634 A.2d 927 (Del. 1993), which provides that demand is not excused unless the "particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand," id. at 934. This test can be met if the complaint's particularized allegations raise a "substantial likelihood" of personal liability by a majority of the board, id. at 933, 936-37.[3]

---

[3] Although in situations where the directors are "exculpated from liability for certain conduct, . . . a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim," Wood, 953 A.2d at 141 (internal quotation mark omitted), the relevant claims alleged here are not subject to exculpation. Specifically, while Pfizer's certificate of incorporation exculpates directors for personal liability to the fullest extent permitted by Delaware law, see Halper Decl., Ex. C, such provisions cannot eliminate liability "for conduct that is not in good faith or a breach of the duty of loyalty," Stone

The parties here differ as to whether the <u>Aronson</u> or <u>Rales</u> standard applies. Although the Complaint states that the defendants intentionally authorized the improper marketing practices, defendants argue that the <u>Rales</u> test nonetheless applies because the Complaint, they argue, lacks particularized allegations from which this may be inferred. Rather, in defendants' view, the particularized allegations of the Complaint allege only a failure of oversight, which, in defendants' view, implicates the holding in <u>In re Caremark International Inc. Derivative Litigation</u>, 698 A.2d 959 (Del. Ch. 1996), that "only a sustained or systematic failure of the board to exercise oversight -- such as an utter failure to attempt to assure a reasonable information and reporting system exists -- will establish the lack of good faith that is a necessary condition to liability." <u>Stone ex rel. AmSouth Bancorporation v. Ritter</u>, 911 A.2d 362, 369 (Del. 2006) (quoting <u>Caremark</u>, 698 A.2d at 971). Defendants argue that the Complaint fails to plead demand futility under this standard because there is no question that Pfizer had a reporting system in place and the only particularized allegations of disregard of that system are insufficient, in defendants' view, to meet the <u>Caremark</u> standard.

According to plaintiffs, however, while the Complaint, in their view, adequately alleges that defendants "consciously failed to monitor or oversee" the reporting system, <u>Stone</u>, 911 A.2d at 370, the

_____

<u>ex rel. AmSouth Bancorporation v. Ritter</u>, 911 A.2d 362, 367 (Del. 2006), which is the kind of misconduct for which plaintiffs here are seeking redress, <u>see</u> Pls' Opp., 1/8/10, at 38-39.

true "gravamen of the Complaint" is not the disregard of oversight
procedures, but rather that "Defendants consciously caused and
allowed Pfizer to engage in illegal activity," Pls' Opp., 1/8/10, at
16. Plaintiffs read their Complaint to aver, with particularity,
that the defendants well knew that Pfizer was continuing its unlawful
practices and simply viewed the pre-2009 CIAs as camouflage.
Plaintiffs cite the Seventh Circuit's decision in In re Abbott
Laboratories Derivative Shareholders Litigation ("Abbott Labs"), 325
F.3d 795 (7th Cir. 2003),[4] as exemplifying this sort of liability.
The derivative plaintiffs in Abbott Labs alleged that the company's
directors knew of but disregarded numerous FDA warning letters and
other alerts that the company was disobeying FDA regulations. The
court in that case held that Aronson, not Rales, provided the
applicable test for demand futility, because plaintiffs alleged that
the directors "knowingly," and in an "intentional breach and/or
reckless disregard" of their fiduciary duties, "'chose' not to
address the FDA problems in a timely manner." Id. at 806. By
pleading that the directors were aware of the noncompliance, Abbott
Labs distinguished the plaintiffs' claim from the typical Caremark
theory, which is predicated on the directors' ignorance of the
illegality. Id. Applying Aronson, and citing factors quite similar
to what plaintiffs here allege, the Abbott Labs court found that the

---

[4] The court in Abbott Labs applied Illinois law, "which
follows Delaware law in establishing demand futility
requirements." 325 F.3d at 803.

plaintiffs had pleaded a breach of the duty of good faith

sufficiently to establish that demand was futile:

> Given the extensive paper trail . . . concerning the
> violations and the inferred awareness of the problems, the
> facts support a reasonable assumption that there was a
> "sustained and systematic failure of the board to exercise
> oversight," in this case intentional in that the directors
> knew of the violations of law, took no steps in an effort to
> prevent or remedy the situation, and that failure to take any
> action for such an inordinate amount of time resulted in
> substantial corporate losses, establishing a lack of good
> faith.  We find that six years of noncompliance, inspections
> . . . , [FDA] Warning Letters, and notice in the press, all
> of which then resulted in the largest civil fine ever imposed
> by the FDA and the destruction and suspension of products
> which accounted for approximately $250 million in corporate
> assets, indicate that the directors' decision to not act was
> not made in good faith and was contrary to the best interests
> of the company.

Id. at 809 (citing Aronson, 473 A.2d at 812).

Other cases involving similar allegations that the directors

knowingly or recklessly disregarded illegal activity have likewise

held demand to be futile, especially when the alleged wrongdoing is

of substantial "magnitude and duration."  See id. (quoting McCall v.

Scott, 239 F.3d 808, 823 (6th Cir. 2001)); In re Veeco Instruments,

Inc. Sec. Litig., 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006) (finding

that demand would have been futile under Delaware law with respect to

complaint alleging that directors "conscientiously permitted a known

violation of law by the corporation to occur," when plaintiffs

pleaded that a whistleblower reported violations of export control

laws that "threatened to jeopardize the future viability" of the

company); In re Oxford Health Plans, Inc., 192 F.R.D. 111, 117

(S.D.N.Y. 2000) ("In numerous cases where liability is based upon a

failure to supervise and monitor, and to keep adequate supervisory

controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors.").

While the Court agrees with plaintiff that a fair reading of the particularized allegations of the Complaint is that the defendants, at a minimum, knew of a high probability that Pfizer was continuing to purposely promote off-label marketing and deliberately decided to let it continue by blinding themselves to that knowledge -- thus implicating the Aronson test -- the Court also concludes that, in any event, the Rales test, let alone the alternative prong of the Aronson test, is met here by the Complaint's particularized allegations that a majority of the directors face a substantial threat of personal liability arising from their alleged breach of their non-exculpated fiduciary duties. Aronson, 473 A.2d at 815; Rales, 634 A.2d at 936; cf. Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003) (observing that the "singular [Rales] inquiry makes germane all of the concerns relevant to both the first and second prongs of Aronson").

Specifically, the Complaint details at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it. These include, for example, the reports to the board of the Neurontin and Genotropin settlements, a large number of FDA violation notices and warning letters, several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing, and the allegations of

the qui tam lawsuits.  Compl. ¶ 151.  Many of these disturbing
reports were received during the same time that the board was
obligated by the 2002 and 2004 CIAs to pay special attention to these
very problems.  Moreover, plaintiffs allege that a majority of the
director defendants served on the board for a period that covers the
dates of every "red flag" alleged to have been brought to the Board's
attention.  Id. ¶ 152.[5]

Defendants maintain that these purported "red flags" cannot
sustain plaintiffs' burden of proving futility under the Rales test
because the Complaint fails to detail what each individual director
knew and did in response to such information.  See, e.g., La. Mun.
Police Empls. Ret. Sys. v. Pandit, 2009 WL 2902587, at *8 (S.D.N.Y.
Sept. 10, 2009) ("[E]ven if Plaintiff had adequately alleged 'red
flags,' Plaintiff has failed to proffer specific factual allegations
regarding the individual directors' conduct in response to these
alleged 'red flags.'"); In re Intel Corp. Deriv. Litig., 621 F. Supp.
2d 165, 174 (D. Del. 2009) ("Plaintiff fails to identify what the
Directors actually knew about the 'red flags' and how they responded
to them.").  As the cited cases suggest, there may be situations
where the absence of particularized allegations as to what each
director knew and what he or she did about that knowledge would not

---

[5] Several director defendants, however, served for
significantly shorter periods: defendant Dennis Ausiello became a
director in December 2006, and defendants James Kilts and Suzanne
Johnson became directors in September 2007.  Similarly, among the
executive defendants, defendant Frank D'Amelio became Chief
Financial Officer in September 2007 and defendant Joseph Feczko
became Chief Medical Officer in 2006.  See Compl. ¶¶ 25, 32, 35,
46-47.

support excusing demand.  However, demand futility is to be evaluated based on the facts of each particular case rather than through the invocation of rigid rules.  See Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988) (stating that "[r]easonable doubt" for demand futility purposes "must be decided by the trial court on a case-by-case basis employing an objective analysis," and not by "rote and inelastic" criteria), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  Under the unique facts of this case, defendants have demonstrated a substantial likelihood that a majority of the board faces personal liability.

     As illustrated by the sheer size of the 2009 fines, the wrongdoing here alleged was not only pervasive throughout Pfizer but also was committed in the face of the board's repeated promises to closely monitor and prevent such misconduct, as required by the 2002 and 2004 CIAs.  These CIAs, which were part of larger settlements approved by the Pfizer board, imposed affirmative obligations on Pfizer's board that went well beyond the basic fiduciary duties required by Delaware law. Among other things, these agreements obligated Pfizer's chief Compliance Officer[6] to report directly to the board the allegations of misconduct here at issue so that the board could deal with them directly, rather than relying on management.  There is no reason to believe this reporting requirement was not fully complied with, thus guaranteeing that each member of

---

     [6] Defendant Jeffrey Kindler, Pfizer's current CEO, served as General Counsel and Compliance Officer until 2006, at which point he was replaced by Allen Waxman.  Compl. ¶ 120.

the board was bombarded with allegations of continuing misconduct of the very kind that the prior settlements looked to the board to prevent. Cf. Abbott Labs, 325 F.3d at 806 ("Where there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required."). In such circumstances, nothing in either federal or Delaware law holds it insufficient for individual directors' knowledge and liability to be pleaded inferentially. See, e.g., id. at 809; McCall, 239 F.3d at 824 (holding that demand was excused based on directors' intentional or reckless disregard of "red flags" suggesting that company was committing health care fraud, based on allegations relating to directors' prior experience in the health care industry, audit information, improper acquisition practices, a qui tam action, a federal investigation, and a New York Times investigation); Veeco Instruments, 434 F. Supp. 2d at 278; cf. In re Biopure Corp. Deriv. Litig., 424 F. Supp. 2d 305, 307-08 (D. Mass. 2006) (permitting plaintiffs to "rely on an inference that the defendant officers and directors had knowledge of the FDA's clinical hold" on the company's principal product for purposes of pleading demand futility). To put it bluntly, the allegations of the Complaint evidence misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and

prevent such misconduct, that the inference of deliberate disregard by each and every member of the board is entirely reasonable.[7]

For the foregoing reasons, the Court finds that plaintiffs have pleaded with sufficient particularity[8] that a majority of directors face a substantial likelihood of personal liability because they deliberately disregarded reports of the illegal marketing practices eventually resulting in the 2009 settlement.

Turning to the defendants' arguments addressed to particular counts, the arguments directed at the counts alleging breach of

---

[7] The allegations here dwarf by several orders of magnitude such cases as In re Pfizer Inc. Derivative Securities Litigation, 503 F. Supp. 2d 680, 685 (S.D.N.Y. 2007) (finding that plaintiffs failed to plead demand futility with respect to allegations regarding Pfizer's continued marketing of COX-2 inhibitors, including Bextra, despite presence of studies indicating the cardiovascular risks of these drugs, when plaintiffs pleaded "nothing to show the director defendants knew [of these risks] or that the studies, in fact, revealed material risks or raised material questions about the drugs' safety profiles or sales potential"), aff'd, 307 F. App'x 590, 593 (2d Cir. 2009) (summary order), and King v. Baldino, 648 F. Supp. 2d 609, 623-26 (D. Del. 2009) (plaintiffs failed to plead demand futility with respect to allegations arising from pharmaceutical company's $425 million settlement for illegal off-label marketing, where plaintiffs pleaded no facts supporting inference that the board was aware of, inter alia, certain audit reports, data indicating the frequency of off-label prescriptions, or reports of increased sales of illegally promoted drugs).

[8] Because the Court finds that the Complaint in its current form pleads demand futility with particularity, there is no need to consider the Delaware courts' "repeated admonitions . . . for derivative plaintiffs to proceed deliberately and to use the books and records device [under Delaware law] to gather the materials necessary to prepare a solid complaint." Guttman, 823 A.2d at 504. The Court takes judicial notice, however, that at least one Pfizer shareholder recently reported having been "twice stonewalled" by defendants in response to his books and records demand with respect to the 2009 settlement. James Groen Mem. of Law Opp. Mot. of Michael D. Wolin To Intervene, 3/4/10, at 5.

fiduciary duty by members of the board and management for failing to stop the practices that eventually led to the 2009 settlement -- i.e., Counts III and IV -- are essentially variations on the arguments made in the discussion of futility.  "Because the standard under Rule 12(b)(6) is less stringent than that under Rule 23.1, a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim." McPadden v. Sidhu, 964 A.2d 1262, 1270 (Del. Ch. 2008) (footnote omitted).  For reasons similar to those establishing that a majority of the directors face a substantial likelihood of personal liability, thus excusing demand, the Court also finds that the Complaint states a claim for breach of fiduciary duty against each of the directors and senior executive defendants named in Counts III and IV.  Each of these defendants served at Pfizer during part or all of the period relevant to the 2009 settlement and, more significantly, at times contemporaneous with the "red flags" alleged in the Complaint. Accordingly, the Court denies defendants' motion to dismiss Counts III and IV of the Complaint, with the exception of the claims against defendant Allen Waxman (discussed infra).

The other counts are, however, a different story.  Counts I and II allege various defendants' responsibility for the company's failure to disclose certain information in its 2007, 2008, and 2009 proxy statements (the "Proxies") and accompanying financial reports, in violation of the federal securities laws (Count I) and Delaware fiduciary law (Count II).  Each of these proxy solicitations resulted

in director defendants' election or re-election, and plaintiffs
allege that the election of the directors harmed the company by
perpetuating the false impression that the board was acting to ensure
legal compliance when in fact the company was engaged in the
systematic violations that eventually resulted in the 2009
settlement.  Id. ¶¶ 159, 167.  In terms of actionable omissions,
plaintiffs assert that each of the Proxies here in issue should have
disclosed: (1) the extent to which Pfizer's financial performance
depended on its off-label marketing; (2) the nature of the 2002 and
2004 CIAs; (3) the circumstances of the board's actual or implied
waiver of the Code of Conduct and Ethics, which required defendants
to ensure legal compliance; (4) the reason that the directors decided
to allow off-label marketing to persist; and (5) the instances in
which the Board was informed of compliance violations.  Id. ¶ 165.
According to plaintiffs, had the shareholders been provided complete
information, they would not have reelected the directors or, in the
case of the 2009 proxy statement, approved the issuance of additional
stock as compensation for the board and management.  Id. ¶¶ 166-68.

    In Count I, plaintiffs allege that these omissions violate
Section 14(a) of the Securities Exchange Act of 1934 and the rules
promulgated thereunder.  "To state a claim under Section 14(a), a
plaintiff must allege that: (1) the proxy statement contained a
material misstatement or omission, which (2) caused plaintiff's
injury, and (3) that the proxy solicitation itself, rather than the
particular defect in the solicitation materials, was an essential
link in the accomplishment of the transaction."  In re AOL Time

Warner Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 241 (S.D.N.Y.

2004). "In the context of a proxy statement, a fact is material 'if

there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to vote.'" Resnik v. Swartz,

303 F.3d 147, 151 (2d Cir. 2002). "[O]mission of information from a

proxy statement will violate these provisions if either the SEC

regulations specifically require disclosure of the omitted

information in a proxy statement, or the omission makes other

statements in the proxy statement materially false or misleading."

Id. at 152.

Although defendants challenge Count I on a variety of

grounds, the Court need not reach most of these issues, because of

the fundamental fact that plaintiffs have failed to identify any

actionable omission in the 2007, 2008, or 2009 Proxies and

accompanying financial reports.

With respect to the claim that omission of information about

the off-label marketing rendered the financial statements misleading,

the Court finds that this omission is not actionable because the

financial reports attached to the relevant Proxies contain adequate

disclosures to this effect. Thus, for example, the financial report

states attached to the 2009 Proxy states:

> In January 2009, we entered into an agreement in
> principle with the U.S. Department of Justice to resolve the
> previously reported investigation regarding allegations of
> past off-label promotional practices concerning Bextra, as
> well as certain other open investigations. In connection
> with these actions, in the fourth quarter of 2008, we
> recorded a charge of $2.3 billion, pre-tax and after-tax
> . . . .

Halper Decl., Ex. B, at 56.  This disclosure of a $2.3 billion charge
was certainly sufficient to put shareholders on notice that the
company's revenues might have included amounts attributable to off-
label promotion.  Similarly, the financial reports attached to the
2007 and 2008 Proxies also disclosed that the Government was
investigating Pfizer's promotional practices for certain drugs.  Id.
Ex. I, at 73; id. Ex. J, at 76-77.  Thus, plaintiffs' claim cannot be
one of failure to disclose the investigation and settlement, but is
rather "a claim that the defendants illegally failed to disclose the
directors' mismanagement in failing to detect and halt the wrongdoing
of other employees."  In re Marsh & McLennan Cos. Sec. Litig., 536 F.
Supp. 2d 313, 322 (S.D.N.Y. 2007).  Although a nondisclosure of this
sort might be actionable if plaintiffs specifically identified any
other statements that are rendered false or misleading because of the
omission, see id. at 323, here, plaintiffs have failed to do so.  In
the absence of such allegations, failure to disclose "uncharged,
unadjudicated charges of mismanagement" or "information regarding a
breach of fiduciary duty" cannot support an alleged proxy violation,
even if it might be considered relevant to the shareholders' vote.
See, e.g., In re Am. Express Co. S'holder Litig., 840 F. Supp. 260,
269-70 (S.D.N.Y. 1993); see also Field v. Trump, 850 F.2d 938, 948
(2d Cir. 1988) ("Allegations that a defendant failed to disclose
facts material only to support an action for breach of state-law
fiduciary duties ordinarily do not state a claim under the federal
securities laws.").

Next, as to the failure to disclose the existence of the CIAs, plaintiffs concede that the 2004 CIA was "directly incorporated into a court order" adopting the settlement agreement.  Pls' Opp. at 32 & n.12.  This agreement was, therefore, publicly available, and there is no indication that its existence was not widely reported.  See Press Release, U.S. Dep't of Justice, Warner-Lambert To Pay $430 Million To Resolve Criminal & Civil Health Care Liability Relating to Off-Label Promotion (May 13, 2004), available at http://www.justice.gov/opa/pr/2004/May/04_civ_322.htm; cf. United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) ("The 'total mix' of information may also include 'information already in the public domain and facts known or reasonably available to the shareholders.'").  But assuming arguendo that shareholders should not be charged with knowledge of these agreements, plaintiffs still identify no applicable duty to make such disclosures in the Proxy.  Although plaintiffs assert that disclosure is required by 17 C.F.R. § 229.401(f)(3)(ii), this provision merely requires, in relevant part, disclosure as to any director or officer "subject of any order, judgment, or decree . . . permanently or temporarily enjoining him from, or otherwise limiting . . . [e]ngaging in any type of business practice."  At least with respect to the 2004 CIA, this provision is inapplicable on its face, as that agreement, which was between Pfizer and the Government, imposed no restrictions on individual directors' ability to engage in "business practices."  And as to the 2002 CIA, this agreement, according to

plaintiffs' own allegations, would have expired in 2007. Compl. ¶ 90.

Finally, the allegations regarding the nondisclosure of waivers or violations of the Code of Conduct call for defendants to engage in precisely the sort of self-flagellation that courts have held is not required unless its absence renders any particular statement false or misleading. See, e.g., GAF Corp. v. Heyman, 724 F.2d 727, 740 (2d Cir. 1983) ("proxy rules simply do not require management to accuse itself of antisocial or illegal policies" (internal quotation marks omitted)); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."); In re Donna Karan Int'l Sec. Litigation, 1998 WL 637547, at *10 n.9 (E.D.N.Y. Aug. 14, 1998) (stating the "accepted view that the securities laws do not require corporate management 'to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner'").

For these reasons, the Court grants defendants' motion to dismiss as to Count I. Because the applicable fiduciary duty of candor under Delaware law mirrors the above-cited federal law in all relevant respects, the state-law claims in Count II must be dismissed as well. See, e.g. Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 141, 143 (Del. 1997) (recognizing duty "to disclose fully and fairly all material information within the board's control when it seeks shareholder action," holding that a plaintiff "must allege that facts are missing from the proxy statement, identify those facts,

24

state why they meet the materiality standard and how the omission

caused injury," defining an omitted fact as material "if there is a

substantial likelihood that a reasonable stockholder would consider

it important in deciding how to vote," and reiterating that a board

is "not required to engage in 'self-flagellation' and draw legal

conclusions implicating itself in a breach of fiduciary duty from

surrounding facts and circumstances prior to a formal adjudication of

the matter").

As there is no indication that an amended complaint would or

could cure these deficiencies, and because plaintiffs have not sought

leave to replead their disclosure claims, the dismissals of Counts I

and II are with prejudice. Cf. Oliver Schs., Inc. v. Foley, 930 F.2d

248, 252-53 (2d Cir. 1991).

In Count V of the Complaint, plaintiffs assert that the

defendants have been unjustly enriched, and seek disgorgement of all

amounts obtained by these defendants through their allegedly wrongful

conduct. "Unjust enrichment is defined as 'the unjust retention of a

benefit to the loss of another, or the retention of money or property

of another against the fundamental principles of justice or equity

and good conscience.'" Schock v. Nash, 732 A.2d 217, 232 (Del. 1999)

(internal quotation marks omitted). Under Delaware law, a claim of

unjust enrichment requires showing "(1) an enrichment, (2) an

impoverishment, (3) a relation between the enrichment and

impoverishment, (4) the absence of justification and (5) the absence

of a remedy provided by law." Cantor Fitzgerald, L.P. v. Cantor, 724

A.2d 571, 585 (Del. Ch. 1998). Here, the only enrichment alleged by

plaintiffs consists of defendants' salaries, benefits, and
unspecified bonuses.  Plaintiffs have not pleaded that defendants'
compensation during this period was of extraordinary magnitude, and
have not cited any legal authority supporting the proposition that
the mere retention of directors' and officers' ordinary compensation
can sustain an unjust enrichment claim predicated on allegations that
these defendants breached their fiduciary duties.  In view, moreover,
of this Court's dismissal of plaintiffs' proxy claims, there are no
facts pleaded that indicate any causal relationship between the
illegal marketing activities and defendants' ordinary compensation.
Given the lack of non-conclusory allegations that defendants'
compensation was profligate or paid for an improper purpose, the
allegations of unjust enrichment fail to "state a claim to relief
that is plausible on its face," Iqbal v. Ashcroft, 129 S. Ct. 1937,
1949 (2009) (internal quotation marks omitted), and accordingly must
be dismissed with prejudice.[9]

 Finally, defendant Allen P. Waxman has separately moved to
dismiss all claims against him on the ground that he has not been
properly served with the Complaint, an allegation that plaintiffs
have not challenged.  Accordingly, the Complaint is dismissed in its

---

[9] The jurisdictional consequences of the dismissals of
Counts I, II, and V have been addressed in this Court's Orders
dated March 17 and April 5, 2010.  Given Amalgamated Bank's
withdrawal as lead plaintiff, defendants' argument that
Amalgamated Bank lacks standing is moot.  The new lead plaintiffs
are Louisiana Sheriffs' Pension and Relief Fund and Skandia Life
Insurance Company Ltd.

entirety as to defendant Waxman, but, as to him, the dismissal is without prejudice.

For the foregoing reasons, the Court confirms its Order dated March 17, 2010 and specifies that the dismissals of Counts I, II, and V are with prejudice.  Because these dismissals eliminate all counts pleaded against the former director defendants (William Howell, Henry McKinnell, Stanley Ikenberry, and Ruth Simmons) and defendant Stephen Sanger (a current director who is not named in Counts III or IV, see Compl. ¶ 38), these defendants are hereby dismissed from the case. The defendants remaining in this case are directors Dennis Ausiello, Michael Brown, M. Anthony Burns, Robert Burt, W. Don Cornwell, William H. Gray, III, Constance Horner, James Kilts, Jeffrey Kindler, George Lorch, Suzanne Nora Johnson, Dana Mead, and William Steere, Jr.; senior executives Frank D'Amelio, Joseph Feczko, Douglas Lankler, and Ian Read; and nominal defendant Pfizer.

Counsel are reminded that a final pretrial conference (as well as oral argument on any summary judgment motion) will be held on October 25, 2010 at 4:00 p.m.  Meanwhile, counsel are directed to jointly call Chambers on July 15, 2010, at 11:00 a.m. to fix a trial date as to the remaining counts and defendants.

SO ORDERED.

Dated: New York, NY
       July 13, 2010

JED S. RAKOFF, U.S.D.J.

27