UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PFIZER INC. SHAREHOLDER DERIVATIVE LITIGATION | No. 09-CV-7822 (JSR)<br><br>ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE LITIGATION SETTLEMENT**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Mark Lebovitch, Esq.
David Wales, Esq.
Beata Farber, Esq.
Jeroen van Kwawegen, Esq.
Jonathan D. Uslaner, Esq.
Kristin Ann Meister, Esq.
1285 Avenue of the Americas
New York, NY  10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Court-Appointed Lead Derivative Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ..................................................................................................... 1

II. HISTORY OF THE LITIGATION ......................................................................... 4

    A.  Events Leading to the Filing of the Action and the Motion to Dismiss ................. 4
    B.  The Vigorously Contested Discovery Phase of the Action ................................... 6
    C.  Summary Judgment and the Settlement Negotiations ........................................... 9

III. THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL ............... 10

    A.  The Preliminary Approval Standard .................................................................... 10

    B.  The Proposed Settlement Serves the Interests of Pfizer and Its Shareholders ....... 11

        1.  Creation of a New, Independently Funded Regulatory Committee with
            Far-Reaching Responsibilities and Corresponding Authority .................. 12
        2.  Comprehensive Review and Adjustment of Financial Incentives
            Concerning Pfizer's Promotional Activities ............................................. 13
        3.  Creation of Ombudsman Program to Hear and Understand Work-
            Related Concerns ..................................................................................... 14

    C.  The Proposed Settlement Is The Result Of Intense, Arms-Length
        Negotiations By Experienced Counsel .................................................................. 15

IV. THE PROPOSED NOTICE IS ADEQUATE AND REASONABLE ............................ 16

V.  CONCLUSION ......................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*City of Pontiac Gen. Emps' Ret. Sys. v. Langone, derivatively on behalf of The Home Depot, Inc.*, 2006 Civ. 122302, slip op. at 4 (Ga. Super. Ct. June 10, 2008) .........................16

*In re AOL Time Warner S'holder Derivative Litig.*,
No. 02 Civ. 6302 (SWK), 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) .........................12, 16

*In re Caremark Int'l Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996).................................................................................................4

*In re Comverse Tech., Inc. Derivative Litig.*,
06 Civ. 1849, slip op. (E.D.N.Y. Apr. 2, 2010) ...................................................................16

*In re Marvell Tech. Group Ltd. Derivative Litig.*,
No. C-06-3894-RMW, slip op. at 2 (N.D. Cal. May 21, 2009)..............................................16

*In re Metro. Life Derivative Litig.*,
935 F. Supp. 286 (S.D.N.Y. 1996)........................................................................................17

*In re MoneyGram Int'l, Inc. Deriv. Litig.*,
09 Civ. 3208 (DSD) (D. Minn. Apr. 1, 2010).......................................................................16

*In re Nasdaq Market-Makers Antitrust Litig.*,
No. 94 CIV. 3996 (RWS), 1997 WL 805062 (S.D.N.Y. Dec. 31, 1997) ...............................11

*In re NVIDIA Corp. Derivative Litig.*,
No. C-06-06110, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)............................................11

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ..........................................................................................11

*In re Rambus Inc. Derivative Litig.*,
No. C 06-3513, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ................................................16

*In re State Street Bank & Trust Co. ERISA Litig.*,
No 07 Civ. 8488 (RJH), 2009 WL 3458705 (S.D.N.Y. Oct. 28, 2009)...................................11

OTHER AUTHORITIES

7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1839, at 199 (2007) ...................................................11

MANUAL FOR COMPLEX LITIGATION ("MCL") § 30.41, AT 237 (WEST 1995) ...............................11

Lead Plaintiffs Louisiana Sheriffs' Pension and Relief Fund ("LSPRF") and Skandia Life

Insurance Company Ltd. ("Skandia" and, together with LSPRF, "Lead Plaintiffs") and

Additional Plaintiffs Port Authority of Allegheny County Retirement and Disability Allowance

Plan for Employees represented by Local 85 of Amalgamated Transit Union and Ms. Henrietta

Klein (together with Lead Plaintiffs, "Plaintiffs") respectfully submit this memorandum of law in

support of their unopposed Motion for Preliminary Approval of Derivative Litigation Settlement

pursuant to Federal Rule of Civil Procedure 23.1.

## I.    INTRODUCTION

The proposed settlement of this derivative action provides substantial benefits to Pfizer,

Inc. ("Pfizer" or the "Company") and its shareholders, was achieved only after litigating this

matter through summary judgment briefing, and is the product of tough, arms-length negotiation.

As set forth below, the proposed settlement provides for the creation of a $75 million fund,

representing one of the largest cash recoveries ever in a derivative suit.  The fund will be put in

escrow and dedicated to support extensive corporate governance changes that are closely tailored

to the alleged board and executive level failings, and will create significant value going forward.

Because the proposed settlement meets the standard for preliminary approval, the proposed

Preliminary Approval Order should be entered, notifying Pfizer shareholders of the proposed

settlement and scheduling a final approval hearing.

In September 2009, in order to resolve investigations into alleged improper marketing

practices with respect to numerous drugs over the course of many years, Pfizer agreed to have a

subsidiary plead guilty, and to pay the largest criminal fine in U.S. history and the largest civil

fraud settlement involving any pharmaceutical company.  This action arose because Plaintiffs

alleged that the Company's board of directors (the "Board") and certain senior officers (the

"Executive Defendants") breached their fiduciary duties by disregarding, if not fostering, widespread unlawful promotional practices for some of Pfizer's most important drugs.

As alleged in the complaint, Plaintiffs were concerned that future violations of drug promotion laws could result in federal debarment of Pfizer.  This would wipe out a substantial percentage of Pfizer's revenues and would be ruinous for Pfizer's shareholders.  One of Plaintiffs' core objectives in this litigation was to ensure that the Defendants (and future Pfizer directors and officers) would never consider Pfizer's payment of the largest criminal fine in history as a mere cost of doing business but, instead, would take the appropriate steps to prevent similar drug marketing violations from occurring in the future.  The settlement of this derivative action is designed to address this core concern by creating a new Regulatory Committee of the Board (the "Regulatory Committee" or "Committee") with a broad mandate to review the positioning of Pfizer drugs and related promotional strategies, and dedicated funding to encourage and support its activities.  The Regulatory Committee will report to the full Board, thereby ensuring that both the Committee and the Board will be informed and educated about, and required to engage in direct oversight of, the specific drug marketing activities that led to the Company's prior problems.

The settlement was intensely negotiated among the Parties, and Plaintiffs' Counsel consulted during the negotiations with a leading corporate governance expert – Professor Jeffrey N. Gordon.  A majority of the members of the Regulatory Committee will be independent directors.  The chair will be an independent director who first joined the Board after January 1, 2007.  In order to ensure that the Regulatory Committee is active, engaged, truly independent, and takes responsibility over Pfizer's drug marketing policies, the settlement requires Defendants (through their insurance) to create a separate $75 million fund that, after the payment of any

award of fees and expenses to Plaintiffs' Counsel, will be used for the sole purpose of funding the Committee's activities.  This includes hiring outside consultants and experts as the Committee sees fit.  If the fund is exhausted during the Committee's initial five-year term, additional funding will be provided by Pfizer upon the Committee's request.

The settlement also requires Pfizer to evaluate its compensation policies for its employees, as well as speakers and advisory board members, to determine whether they are consistent with Pfizer's compliance incentives.  If there are future violations by Pfizer of drug marketing laws or any government regulatory action against the Company, the settlement requires the Regulatory Committee to determine whether incentive compensation of certain executives, senior managers, compliance officers or attorneys should be reduced or extinguished.

The proposed settlement also provides for the creation of a neutral ombudsman to hear work-related concerns, including concerns about retaliation or pressure from supervisors to engage in unlawful promotion of Pfizer drugs.  Like the Regulatory Committee, these features of the settlement closely correlate to Plaintiffs' underlying allegations and concerns about preventing systemic unlawful promotional activities.

Plaintiffs believe that the benefits of the Regulatory Committee and of a new ombudsman program could only be achieved in the context of a settlement.  A post-trial jury verdict could result in the infusion of some amount of cash to Pfizer, but likely could not impose affirmative obligations to create specific corporate governance structures that would enhance Pfizer's compliance efforts going forward.

Plaintiffs achieved the proposed settlement only after fully and aggressively litigating this case, on a highly truncated schedule, through service of Plaintiffs' opposition to Defendants' motion for summary judgment.  After the Court denied in part and granted in part the

Defendants' motions to dismiss in late March 2010, Defendants produced and Plaintiffs reviewed over 12 million pages of documents, the parties took and defended over 30 fact depositions, served and opposed hundreds of pages of expert reports (including from some of the most renowned corporate governance experts in the world), deposed Defendants' four experts, and served detailed and extensive summary judgment papers.  Plaintiffs fought hard to build the leverage necessary to extract this settlement despite pursuing a legal theory that has been described as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

The question before the Court on this Motion is discrete – is the settlement sufficient to warrant preliminary approval, the dissemination of notice to Pfizer shareholders, and scheduling a time for a final approval hearing?  The settlement and creation of a new, independently funded Regulatory Committee, an ombudsman, compensation clawback procedures, and requirements to analyze compensation incentives convey immediate and long-lasting structural benefits to Pfizer and its shareholders.  As such, Plaintiffs respectfully submit that the answer to the simple question posed by this Motion is unequivocally "yes."

## II.      HISTORY OF THE LITIGATION

### A.      Events Leading to the Filing of the Action and the Motion to Dismiss

In September 2009, Pfizer agreed to have a subsidiary plead guilty and to pay $2.3 billion to resolve criminal and civil investigations into Pfizer's promotional practices of a number of drugs, including Bextra, Zyvox, Geodon, and Lyrica.  According to the government, Pfizer engaged in widespread illegal conduct over a period of years by employing marketing methods that were similar to illegal marketing methods for which Pfizer subsidiaries Warner Lambert and Pharmacia had previously pled guilty.  Pfizer admitted that members of its sales force had

improperly marketed Bextra, but denied that this misconduct was widespread or similar to prior misconduct that Pfizer's subsidiaries had engaged in before they were acquired by Pfizer.  Pfizer also insisted that it had made good faith efforts to implement a state of the art compliance function in response to these "legacy matters."

Following the announcement of the September 2009 settlement and guilty plea, a number of Pfizer shareholders filed derivative complaints in the United States District Court for the Southern District of New York.  On November 4, 2009, the Court consolidated these complaints and appointed Amalgamated Bank as "Lead Plaintiff" and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as "Lead Counsel."

On November 18, 2009, Plaintiffs filed a Consolidated, Amended and Verified Shareholder Derivative Complaint (the "Complaint").  Docket No. 34.  The Complaint alleged that Pfizer's senior management and Board breached their fiduciary duties to Pfizer by, among other things, allowing unlawful promotion of drugs to continue after receiving a flood of "red flags" putting them on notice that Pfizer's improper drug marketing was systemic and widespread.  The Complaint also asserted an unjust enrichment claim and that the Board had violated Section 14(a) of the Securities Exchange Act (the "Proxy Claims").

Defendants moved to dismiss the derivative action on December 16, 2009.  Docket Nos. 36-38.  Plaintiffs opposed Defendants' motion on January 8, 2010, and Defendants replied on January 22, 2010.  Docket Nos. 41-43.  Following oral argument, the Court issued an Order on March 18, 2010, dismissing the Proxy Claims and unjust enrichment claims, but denying the motion to dismiss with respect to the breach of fiduciary duty claims.  Docket No. 50.  The Court subsequently explained that demand was excused because the Complaint alleged "misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own

express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board [was] entirely reasonable." Docket No. 71.

Amalgamated Bank and some of the Defendants are New York citizens.  To ensure that the Court would continue to have diversity jurisdiction following dismissal of the federal Proxy Claims, Lead Counsel submitted a Proposed Order to substitute Amalgamated with plaintiffs LSPRF and Skandia, neither of which are New York citizens.  The Court exercised supplemental jurisdiction to hear this proposal and, on April 6, 2010, appointed LSPRF and Skandia as Lead Plaintiffs and reappointed BLB&G as Lead Counsel.  Docket Nos. 52 and 59.

**B.**     **The Vigorously Contested Discovery Phase of the Action**

Promptly following the Court's denial of Defendants' motion to dismiss with respect to the breach of fiduciary duty claims, Lead Counsel served targeted document requests on Defendants.  Defendants objected to the production of many of the requested documents. Between April 2010 and the end of May 2010, the Parties engaged in extensive "meet-and-confer" conferences and in-person meetings to determine the proper scope of discovery and the appropriate redactions in this action.  Plaintiffs (mindful of the benefit to Defendants of delay in light of the compressed discovery schedule) sought judicial intervention.

On June 2, 2010 and June 11, 2010, the Court heard oral argument about the parties' various discovery disputes, including a closed hearing with live testimony by Pfizer's Chief Compliance Officer to determine the propriety of Defendants' redactions of certain information on the basis of the attorney-client privilege.  At the end of the hearing, the Court determined that it was satisfied that Defendants were carefully determining whether documents were subject to an applicable privilege and largely granted Plaintiffs' requests for further discovery to prove

their case.  The Court approved a modified civil case management plan with new deadlines for

Defendants and certain of Pfizer's outside advisors to produce documents.  Docket No. 67.

From May 2010 through November 2010, Defendants produced approximately 12

million pages of documents.  Pfizer's outside auditor KPMG and an independent review

organization, PWC, produced an additional 24,000 pages of documents.  Using an electronic

document review system and a team of over 25 attorneys, working day and night to organize,

analyze, and understand the evidence within the tight schedule, Plaintiffs' counsel reviewed the

documents produced in the litigation.  During this time, Plaintiffs also served extensive

interrogatories and requests for admission, responded to Defendants' document requests and

prepared detailed substantive responses to contention interrogatories.  Plaintiffs took 27 fact

depositions, including 15 depositions of Pfizer Board members, including Pfizer's current

Chairman and CEO, Jeffrey Kindler, and Pfizer's former Chairmen and CEOs, Henry A.

McKinnell and William C. Steere.  Plaintiffs also took the depositions of, among others, Pfizer's

Chief Compliance Officer, Douglas Lankler, its head of Internal Audit, Hugh Donnelly, Pfizer's

current and former Presidents of the Worldwide Pharmaceutical Organization, Ian Read and

Karen Katen, and a senior partner at Pfizer's outside auditor, KPMG.

Plaintiffs served three expert reports:

1. Richard Guarino, a former clinical research director and medical director of
   various pharmaceutical companies and current chief executive officer of a
   consulting firm providing clinical and regulatory services to pharmaceutical
   companies, described the Food and Drug Administration ("FDA") drug approval
   and labeling process, and the approved and unapproved uses of various Pfizer
   drugs.

2. John Abramson, M.D., a Harvard lecturer who has written peer reviewed articles
   in medical journals and a leading book about drug company marketing practices,
   analyzed Pfizer's pertinent drug operating plans and training materials and opined
   that Pfizer's unlawful promotional activities were widespread and the result of a

deliberate strategy to position Pfizer drugs in ways not limited to FDA approved indications.

3. <u>Bernard M. Black</u>, a corporate law, securities and finance Professor at Northwestern University School of Law and Kellogg School of Management, described the expectations of a corporate board and opined that the Pfizer Board's conduct in the face of numerous allegations that the Company was deliberately engaged in widespread unlawful promotion practices did not meet such expectations.

In response, Defendants served four expert reports.

1. <u>Lori S. Pelliccioni</u>, a former Assistant U.S. Attorney and current President of a healthcare compliance consulting firm, described Pfizer's compliance function and its evolution over time.

2. <u>Harvey Pitt</u>, a former Chairman of the Securities and Exchange Commission ("SEC"), described the function of boards of directors and opined that the Pfizer Board and Audit Committee acted reasonably and consistently with corporate practice in the exercise of their oversight responsibilities with respect to Pfizer's compliance with the 2004 Corporate Integrity Agreement.

3. <u>Richard C. Breeden</u>, a former SEC Chairman, reviewed the evidence and opined that the Pfizer Board acted in good faith and consistent with what it believed to be the best interests of Pfizer.

4. <u>Lucian A. Bebchuk</u>, William J. Friedman and Alicia Townsend Friedman Professor of Law, Economics and Finance at Harvard Law School, reviewed the evidence and opined that the Defendants had strong incentives to avoid, rather than encourage, compliance-related violations.

In sum, there can be no doubt that both sides took this case very seriously. Defendants' approach to this suit was also evidenced by the fact that senior lawyers at the top of their fields, including Robert B. Fiske, Jr. of the Davis Polk firm and Dennis J. Block of the Cadwalader firm, personally defended or attended many of the depositions and engaged in every aspect of the case, including meet-and-confer conferences to resolve various discovery disputes (which in many complex cases are handled by more junior defense attorneys). Indeed, senior in-house lawyers from Pfizer, several times including the Company's general counsel herself, attended virtually all of the depositions.

C.      **Summary Judgment and the Settlement Negotiations**

On October 22, 2010, the Defendants served a motion for summary judgment, arguing in effect that the evidence showed that they responded in good faith to warnings of potential wrongdoing, investigating and addressing each instance of misconduct that was brought to their attention.  Docket Nos. 81-84.  According to Defendants, "[t]he question was not whether their response was ideal, but whether it was undertaken in good faith."  Docket No. 82, at p. 30-31.

Plaintiffs prepared opposition papers to Defendants' motion for summary judgment, asserting, among other things, that Defendants had fostered Pfizer's misconduct by approving operating plans that positioned some of Pfizer's most important drugs beyond the FDA-approved label, and by turning a blind eye to reports suggesting systemic unlawful promotion practices that resulted from the implementation of those operating plans.  Plaintiffs countered Defendants' argument that Pfizer's misconduct was limited to a few bad apples and legacy matters, asserting that Defendants' views on this score constituted a case of willful disregard of evidence to the contrary.   Moreover, Plaintiffs argued that Defendants' state of mind was, at a minimum, a question for the trier of fact.

Lead Counsel and Defendants' counsel had engaged in periodic settlement discussions between the end of fact discovery and Defendants' filing of their summary judgment brief.  In late October, senior partners of the law firms representing the Parties met to discuss a settlement demand.  However, the Parties' views of the case were too far apart and the meeting was unsuccessful.  Following this meeting, Plaintiffs continued to prepare their opposition papers.  In early November, the Parties restarted settlement negotiations, but the differences remained very significant.

On Friday, November 12, 2010, Plaintiffs served their opposition papers to Defendants' motion for summary judgment.  Defendants' requested and were granted to the end of the day

Monday, November 15, 2010, to review and redact portions of Plaintiffs' opposition papers before filing them with the Court.  Over the weekend of November 13 and 14, the Parties engaged in further intense settlement negotiations and were finally able to finalize a term sheet including creation of a cash fund and adoption of corporate governance changes that were acceptable to all Parties.  On November 15, 2010, the Parties provided the Court with the term sheet and a request to adjourn the remaining dates of the case management plan.  Docket No. 87.

## III.    THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

The affidavit of Professor Jeffrey N. Gordon discusses the key elements of the proposed settlement.  *See* Affidavit of Jeffrey N. Gordon, dated December 1, 2010 ("Gordon Aff.").  Professor Gordon assisted Plaintiffs with designing corporate governance changes that would address Plaintiffs' core allegations and concerns, and he is intimately familiar with the terms of the proposed settlement.  Professor Gordon will submit a more detailed analysis in connection with any future final settlement approval hearing.  Gordon Aff. at ¶¶4, 18.

The proposed settlement creates significant benefits for Pfizer, is the result of intense, arms-length negotiations by experienced counsel, and merits preliminary approval.  *See* Stipulation and Agreement of Settlement dated December 2, 2010 (the "Stipulation").  If finally approved by the Court, Plaintiffs will voluntarily dismiss with prejudice their claims against Defendants in return for the significant structural corporate governance changes, related funding commitments of $75 million, and compliance changes achieved for the benefit of Pfizer and its shareholders.

### A.    The Preliminary Approval Standard

Plaintiffs filed this action pursuant to Rule 23.1, which provides that "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23.1(c).  The "general practice" in shareholder derivative suits is that the parties

submit the settlement to the Court for its approval together with a request for a hearing on its propriety.  *See* 7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1839, at 199 (2007).  In determining the standards applicable to approval of a derivative settlement, "cases involving dismissal or compromise under Rule 23(e) of nonderivative class actions . . . are relevant by analogy."  *Id*. at 195.

In order to grant preliminary approval, the Court "need only conclude that the settlement of the claims on the agreed upon terms is 'within the range of possible approval'."  *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (citing MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41 (1995)); *see also In re Nasdaq Market-Makers Antitrust Litig.*, No. 94 CIV. 3996 (RWS), 1997 WL 805062, at *8 (S.D.N.Y. Dec. 31, 1997) (finding that "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies . . . and falls within the range of possible approval, preliminary approval should be granted") (citation omitted). Thus, the Court's function for purposes of preliminary approval is "at most a determination that there is what might be termed 'probable cause' to submit the [settlement] proposal to class members and to hold a full-scale hearing as to its fairness."  *In re State Street Bank & Trust Co. ERISA Litig.*, No 07 Civ. 8488 (RJH), 2009 WL 3458705, at *1 (S.D.N.Y. Oct. 28, 2009) (alteration in original).  Put differently, the Court is asked to "ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (citation omitted).

**B.     The Proposed Settlement Serves the Interests of Pfizer and Its Shareholders**

The substantive factors that courts in this District consider to determine whether to grant approval of a proposed derivative action settlement all support a finding that this settlement

merits preliminary approval.  *See*, *e.g.*, *In re AOL Time Warner S'holder Derivative Litig*., No.
02 Civ. 6302 (SWK), 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006).  Specifically, the
proposed settlement merits approval by the Court because it "fairly and adequately serves the
interests of the corporation on whose behalf the derivative action was instituted."  *Id.* at *2
(citations omitted).

> 1.   Creation of a New, Independently Funded Regulatory Committee with Far-
> Reaching Responsibilities and Corresponding Authority

If the settlement is approved, Defendants will create a new "Regulatory and Compliance
Committee of the Board of Directors" that will operate for a term of at least five years – and to
be continued thereafter following a decision of the Board upon the Committee's recommendation
– with a broad mandate to oversee and monitor Pfizer's compliance and promotion practices.
The Committee will meet quarterly and provide a full report to the Board at least annually, and is
specifically charged with evaluating whether there are patterns of improper promotional
activities that suggest widespread misconduct or improper positioning of Pfizer drugs.  Gordon
Aff. ¶¶26-27, 36; Stipulation Exhibit A at I.

The Regulatory Committee will receive extensive and detailed information related to
potential drug marketing issues, and enjoys substantial authority to act and follow up on the
information and issues that come to its attention.  The proposed settlement also ensures that the
Regulatory Committee will have adequate expertise and authority to effectively engage in its
oversight responsibilities.  The Committee has the authority to meet privately with any Pfizer
employee, to compel management to conduct special healthcare compliance audits, and to retain
outside experts, consultants and counsel independent of the Company and management to assist
it in evaluating Pfizer's drug promotional activities.  Gordon Aff. ¶¶28-32; Stipulation Exhibit A
at I (Committee Charter).

The Regulatory Committee will be truly independent from management.  As part of the settlement, Defendants are causing their insurers to finance a $75 million fund that, after the payment of any award of fees and expenses to Plaintiffs' Counsel, will be used for the sole purpose of funding the Committee's activities.  If any funds are remaining after the five-year term, they will be returned to the insurance carriers; if the fund is exhausted during the Committee's initial five-year term, additional funding will be provided by Pfizer upon the Committee's request.  Gordon Aff. ¶¶33-35; Stipulation ¶ 2(b)(i).

Plaintiffs submit that creating the Regulatory Committee significantly benefits Pfizer and its shareholders by addressing the gravamen of Plaintiffs' allegations concerning a disengaged Board refusing to understand Pfizer's promotional strategies and thereby putting the Company's existence at risk.  Importantly, it is not clear that the Court or a jury could order the creation and funding of this new Board committee following a full trial on the merits (assuming Plaintiffs would have prevailed).

2.       Comprehensive Review and Adjustment of Financial Incentives Concerning Pfizer's Promotional Activities

If the proposed settlement is approved, the Regulatory Committee is required to evaluate and discuss with management whether Pfizer's compensation policies and sales incentives for its employees are aligned with Pfizer's compliance incentives.  The Regulatory Committee will also address whether compensation practices for Pfizer-paid speakers and advisory boards are consistent with Pfizer's compliance incentives.  Gordon Aff. ¶¶43-45, 49; Stipulation Exhibit A at IV.

Furthermore, the Regulatory Committee must make a written recommendation to the Compensation Committee stating whether Pfizer should reduce the incentive compensation of any executive, senior management, compliance personnel or attorney involved in misconduct, or

a supervisor of an employee involved, in case of: (i) future criminal convictions or civil settlements with the Department of Justice; (ii) *qui tam* actions in which the government intervenes; or (iii) other government or regulatory action that, in the judgment of the Board, has caused Pfizer to suffer significant regulatory, financial or reputation damage.  This requirement to make a written recommendation as to whether incentive compensation should be retroactively reduced does not foreclose more severe sanctions, including and up to termination, if warranted. Indeed, it empowers the Board while requiring the Regulatory Committee to assess the issues and make a specific determination.  Gordon Aff. ¶¶50-53; Stipulation Exhibit A at V.

Requiring a prospective review of Pfizer's compensation policies and a retroactive review of awarded incentive compensation following allegations of misconduct benefits Pfizer and its shareholders by addressing Plaintiffs' allegations that Defendants failed to address an incentive compensation system for Pfizer employees that may have created financial incentives for sales of Pfizer drugs, regardless if the sales were on or off label.

3.    Creation of Ombudsman Program to Hear and Understand Work-Related Concerns

The proposed settlement requires Defendants to create an ombudsman program, under the direction of Pfizer's Chief Compliance Officer, that will be a neutral party and will provide Pfizer employees with an alternative channel to voice work-related concerns, including, for example, pressure from supervisors to engage in improper promotional activities.  Gordon Aff. ¶¶40-41; Stipulation Exhibit A at III.

The creation of an impartial ombudsman benefits Pfizer by addressing Plaintiffs' allegations about retaliation at Pfizer.  Moreover, an Ombudsman will be in a position to detect a pattern of retaliation in specific sales districts or regions (if any such patterns exist), and inform

the Chief Compliance Officer and Regulatory Committee of such patterns to allow the Company to undertake appropriate action.

**C.      The Proposed Settlement Is The Result Of Intense, Arms-Length Negotiations By Experienced Counsel**

The proposed settlement resulted from intense (*i.e.,* professional and mutually respectful, while at the same time zealous and appropriately hostile) arms-length negotiation, following extensive discovery in a vigorously litigated action.  At the time the proposed settlement was reached, a motion to dismiss the amended complaint had been decided, millions of pages of documents had been produced and reviewed by Plaintiffs' counsel, and over 30 depositions had taken place.  The Parties' counsel thoroughly tested each other's factual and legal positions during every stage of the litigation.  There was certainly no collusion here.

Lead Counsel has significant experience in derivative litigation, and has negotiated substantial derivative settlements.  For example, BLB&G represented the company's and shareholders' interests in *In re UnitedHealth Group, Inc. Shareholder Derivative Litig.*, No. 06-cv-1216 (D. Minn.), a derivative action that, like this case, resulted in significant corporate governance reforms.  BLB&G also represented the company's and shareholders' interests in *McCall v. Scott (Columbia HCA Derivative Litig.)*, No. 97-cv-838 (M.D. Tenn.), a derivative action that, like this case, arose out of allegations of healthcare fraud and resulted in far-reaching corporate governance changes to ensure that any future lawbreaking by HCA employees would not go undetected.

Based upon their investigation into the claims and the underlying events alleged in this action, legal research, and extensive consultations with experts, Plaintiffs and their counsel have concluded that the terms and conditions of the proposed settlement are fair, reasonable and adequate and in the best interests of the Company.  In this regard, Plaintiffs and their counsel

have taken into account the risks and uncertainties of proceeding with litigation, including the risks of prevailing on the merits in light of a legal standard under Delaware law that is exceptionally demanding.  This is consistent with the policy of Courts in this Circuit to favor settlement of shareholder derivative actions in recognition of the fact that such suits are "notoriously difficult and unpredictable."  *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *3 (citation omitted).

## IV.      THE PROPOSED NOTICE IS ADEQUATE AND REASONABLE

If the Court grants preliminary approval, Pfizer will notify current Pfizer shareholders pursuant to the Preliminary Approval Order of the Settlement by (1) issuing a Form 8-K enclosing the full Notice of Pendency and Proposed Settlement of Shareholder Derivative Litigation (the "Notice") and the Stipulation; (2) posting the Notice and a copy of the Stipulation on its website (while Lead Counsel will make the same posting on its dedicated "Pfizer Derivative Litigation" webpage) and (3) arranging for publication of a Summary Notice once each in the national edition of *The Wall Street Journal* and *USA Today* and over the *Business Wire*.

The Form 8-K and publication notice will advise Pfizer's shareholders of the essential terms of the settlement and of information regarding Plaintiffs' counsel's fee application.[1]  It also will set forth the procedure for objecting to the Settlement or to the request for an award of attorneys' fees and reimbursement of litigation expenses, and will provide specifics on the date,

---

[1] Use of a Form 8-K to advise shareholders of the terms of the proposed settlement, together with publication notice, has become common practice in derivative actions.  *See, e.g.*, *In re Rambus Inc. Derivative Litig.*, No. C 06-3513, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (discussing notice by Form 8-K, Business Wire press release and publication on the company website); *In re Converse Tech., Inc. Derivative Litig.*, 06 Civ. 1849, slip op. at 3 (E.D.N.Y. Apr. 2, 2010); *In re MoneyGram Int'l., Inc. Deriv. Litig.*, 09 Civ. 3208 (DSD) (D. Minn. Apr. 1, 2010); *In re Marvell Tech. Group Ltd. Derivative Litig.*, No. C-06-3894-RMW, slip op. at 2 (N.D. Cal. May 21, 2009); *City of Pontiac Gen. Emps' Ret. Sys. v. Langone, derivatively on behalf of The Home Depot, Inc.*, 2006 Civ. 122302, slip op. at 4 (Ga. Super. Ct. June 10, 2008).

time and place of the Settlement Hearing, thereby satisfying the requirements of Rule 23.1.  *See*, *e.g.*, *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 294 n. 10 (S.D.N.Y. 1996) (approving publication notice of derivative settlement in light of MetLife's "millions of policyholders").

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to grant preliminary approval of the settlement; approve the form, substance, and requirements of the proposed form of Notice to the Pfizer shareholders; approve the publication of the Notice; and set forth a schedule for the events described herein.

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Dated: New York, New York
          December 2, 2010

By:   /s/ Mark Lebovitch
          Mark Lebovitch, Esq.
          David Wales, Esq.
          Beata Farber, Esq.
          Jeroen van Kwawegen, Esq.
          Jonathan D. Uslaner, Esq.
          Kristin Ann Meister, Esq.

          1285 Avenue of the Americas
          New York, New York 10019
          Tel:  212-554-1400
          Fax:  212-554-1444

*Court-Appointed Lead Derivative Counsel and Counsel for Co-Lead Plaintiff Louisiana Sheriffs' Pension and Relief Fund*

**KIRBY McINERNEY LLP**

David E. Kovel, Esq.
Edward M. Varga, Esq.
Surya Palaniappan, Esq.
825 Third Avenue
New York, New York 10022
Tel:  212-371-6600
*Counsel for Co-Lead Plaintiff Skandia Life Insurance Company Ltd.*

**KLAUSNER & KAUFMAN, P.A.**

Robert D. Klausner, Esq.

10059 N.W. 1st Court
Plantation, FL  33324
Tel:  (954) 916-1202

*Counsel for Co-Lead Plaintiff Louisiana Sheriffs' Pension and Relief Fund*

**THE WEISER LAW FIRM, P.C.**

Robert B. Weiser, Esq.
Brett D. Stecker, Esq.

121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Tel:  610-225-2677

*Counsel for Additional Plaintiff Henrietta Klein*

**POMERANTZ HAUDEK GROSSMAN
   & GROSS LLP**

Jason S. Cowart, Esq.
Marie L. Oliver, Esq.

100 Park Avenue, 26th Floor
New York, NY  10017
Tel:  (212) 661-1100

**BARRACK RODOS & BACINE**

Daniel E. Bacine, Esq.
Julie B. Palley, Esq.

Two Commerce Square
2001 Market Street – Suite 3300
Philadelphia, PA 19103
Tel:  (215) 963-0600

*Counsel for Additional Plaintiff Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees represented by Local 85 of Amalgamated Transit Union*