**UNITED STATES DISTRICT COURT**
**Southern District of New York**

|  |  |
|---|---|
| In re Pfizer Inc. | |
| Shareholder Derivative Litigation | No. 09-CV-7822 |

**AFFIDAVIT OF JEFFREY N. GORDON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE ACTION SETTLEMENT**

**Introduction**

1.      This affidavit provides my opinion and a preliminary account of my reasoning regarding the Corporate Governance Reforms ("the Reforms") agreed to by the board of directors ("the Board") of Pfizer Inc. ("Pfizer" or "the Company") in connection with the proposed settlement of the above-captioned litigation  ("the Litigation"), as reflected in the Settlement Stipulation ("the Proposed Settlement").

2.      In my opinion, the Reforms embodied in the Proposed Settlement will significantly strengthen Board oversight of Pfizer's compliance with the FDA's drug marketing regime and related compliance mandates and will produce other improvements to internal compliance and accountability.  The result will be to reduce the possibility of recurrent wrongful corporate conduct by Pfizer as alleged in the Litigation.  Because of the financial and franchise

1

risks to the Company from further violations of the FDA regulatory regime, these Reforms will thus provide significant value for Pfizer and it shareholders.

3.     Moreover, Pfizer's creation of a "Regulatory and Compliance Committee," as called for in the Proposed Settlement, could well provide a model for a new board committee that other firms with significant compliance obligation will emulate.

4.     This affidavit describes my involvement in the negotiation of these Corporate Governance Reforms, briefly describes the Reforms, and states in a preliminary way the basis for my opinion that each Reform will produce benefits for the shareholders of Pfizer, whose interests this Litigation aims to further.   This affidavit is submitted solely in connection with plaintiffs' motion for preliminary approval of the Proposed Settlement, and therefore represents only a summary of the substance of my opinion and the bases thereof.  I expect to prepare and submit with the Court a more detailed affidavit in connection with the future motion for final approval of the Proposed Settlement.

## Qualifications

5.     I have been retained in this matter as an expert on corporate law and governance and directors' fiduciary duties.

6.      I am the Alfred W. Bressler Professor of Law at Columbia Law School, Co-Director of the Columbia University Center for Law and Economic Studies, and a Fellow of the European Corporate Governance Institute.   I have been a law professor for more than 25 years, starting at NYU Law School in 1982 and moving to Columbia in 1988.  In the fall of 2002, I was the Bruce W. Nichols Visiting Professor of Law at Harvard Law School.  Most of my teaching and scholarship have been in the corporate and securities area, broadly defined.  I have become a specialist in corporate law (including the fiduciary duties of boards and directors), corporate

governance, corporate finance, and mergers and acquisitions.  I have taught Corporations or Advanced Corporate Law: Mergers and Acquisitions on a yearly basis throughout my career. Recently, I have taught courses that focus on various aspects of corporate governance on a yearly basis.  I also regularly participate in continuing legal education panels on corporate law and governance and mergers and acquisitions topics.

7.     I am a member of the bars of the State of New York and the District of Columbia (inactive) and have also been admitted to various federal courts.  I have a B.A. from Yale (1971) and a J.D. from Harvard Law School (1975).  Before entering law teaching, I clerked for the Honorable William E. Doyle of the Tenth Circuit of the United States Court of Appeals in Denver, Colorado (1975-1976), was an associate at Cleary Gottlieb Steen Hamilton (1976-1979), and then became special assistant to the General Counsel of the U.S. Treasury, later an attorney-advisor (GS-15) in the office of the assistant general counsel for domestic finance (1979-1981). At Cleary Gottlieb, I did corporate and securities work, both litigation and transactional, principally in the mergers and acquisitions area.   At the Treasury, I was part of a team that worked on loan guarantees for the Chrysler Corporation and for synthetic fuels projects, as well as various regulatory matters.

8.     As indicated in the c.v. attached hereto as Exhibit 1, I have published many articles in professional journals and chapters in books on issues of corporate and securities law, corporate governance, and mergers and acquisitions.   I also speak extensively on these topics at academic conferences, workshops, and professional meetings.  I have served as Chair of the Section on Business Associations and the Section on Law and Economics of the American Association of Law Schools.   Additionally, I have served terms on the Securities Regulation

Committee and the Corporate Law Committee of the Association of the Bar of the City of New York and have been secretary of an Ad Hoc Committee on Corporate Takeover Legislation.

       9.      I have written extensively on the board's role in corporate governance.  A recent article on the role of boards and independent directors in corporate governance, *The Rise of Independent Directors in the United States: 1950-2005,* 59 Stan. L. Rev. 1465 (2007), was selected by a vote of business law academics as one of the 10 best articles on business law published in the United States during 2007 and was awarded the European Corporate Governance Institute's Egon Zehnder International Prize for the best working paper in 2007 on company boards and their role in corporate governance.   Another much-discussed article directly addressed the responsibility of the Enron board in that company's collapse, *Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley,* 35 U. Conn. L. Rev. 1125 (2003) (symposium issue).   My article calling for board responsibility in reviewing and approving disclosures relating to executive compensation was cited by the Securities and Exchange Commission ("SEC") in connection with its own similar rule, *Executive Compensation:  If There is a Problem, What's the Remedy? The Case for "Compensation Discussion and Analysis,"* 30 J. Corp. Law 675 (2005).  A recent article on the governance role of controlling shareholders,  *Controlling Controlling Shareholders*, 152 U. Penn. L. Rev. 785 (2003) (with Ronald J. Gilson), also selected as a "top ten" article, has been cited and relied upon several times by the Delaware Chancery Court.  Other articles addressing other corporate law issues have also been cited by the Delaware Chancery Court.  I am also a co-author of **The Law and Finance of Corporate Acquisitions**, 3d edition (in preparation) (with Ronald J. Gilson, Bernard S. Black, John C. Coates, Jr., and Charles Whitehead), a leading casebook in the

mergers and acquisitions field, which extensively treats the standards of board behavior in business decision-making.

10.     More recently I have begun to address the governance problems of financial firms, including a recently-released working paper, *Executive Compensation and Corporate Governance in Financial Firms: The Case for Convertible Equity-Based Pay*.

11.     In the course of teaching and scholarship in the corporate law and corporate governance areas, I have become very familiar with the law of Delaware, whose courts are the most important U.S. expositor of corporate law norms, including the fiduciary duties of directors. I regularly use the Delaware corporate statutes and case law in my teaching and scholarship.

12.     I also participate in the international dialogue about corporate governance and sophisticated business transactions.  As indicated in my c.v., I have written a number of articles on international corporate governance standards and have co-edited **Convergence And Persistence In Corporate Governance** (with Mark J. Roe) (2004).  My work has been translated into German, French, and Chinese.  I am currently working as part of a multinational, interdisciplinary team to study the effect of national takeover laws on the level of cross-border mergers and acquisitions activity.  As previously noted, I am a Fellow of the European Corporate Governance Institute, a leading interdisciplinary group of economists and lawyers.

13.     On a number of occasions I have been retained by agencies of the United States government (namely, the office of the U.S. Attorney for the Southern District of New York, the office of the U.S. Attorney for the Eastern District of New York, the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System and the Internal Revenue Service) to serve as an expert witness in pending criminal or civil litigation, involving various matters of corporate and securities law, including but not limited to various questions of

corporate governance, board behavior, controlling shareholder responsibilities, corporate structure, and finance. In all cases where I was called upon to testify or submit an affidavit, and where the court permitted expert testimony, I have been accepted as an expert.

14.    I have also submitted affidavits as a corporate governance expert in recent settlements of shareholder derivative suits in connection with stock option backdating and proxy statement disclosure issues.

## Background

15.    This matter arises out of shareholder derivative litigation alleging fiduciary duty breaches by directors and officers of Pfizer in connection with conduct resulting in a 2009 criminal guilty plea and civil settlement agreement with the US Department of Justice in which the Company paid $2.3 billion and had a subsidiary plead guilty to a felony. The plea and civil settlement agreement resolved criminal and civil charges that Pfizer unlawfully marketed FDA-regulated drugs over a seven year period.

16.    In connection with the plea agreement Pfizer also entered into a Corporate Integrity Agreement (the "2009 CIA") with the Office of the Inspector General of the Department of Health and Human Services aimed at assuring Pfizer's compliance with applicable Medicare and Medicaid program requirements and applicable FDA requirements.

17.    The complaint herein alleged, among other things, the failure by the Pfizer Board to exercise appropriate vigilance over drug marketing activities in which wrong-doing had occurred previously and where internal incentives could produce continued wrong-doing, especially in "off-label" marketing of drugs. In particular, the complaint alleges that the directors had disregarded many "red flags" of wrongful conduct, notwithstanding two prior

Corporate Integrity Agreements, in 2002 and 2004, which required an enhanced level of Board vigilance.

18.     As I will further detail in my subsequent affidavit, the plaintiffs argued that the Pfizer Board in general did not adequately inform themselves and take action regarding problematic conduct identified through the "red flags" brought to the Board's attention. Plaintiffs specifically argued that the Board did not consider, or failed to critically consider, a variety of information sources that indicated the wrongful conduct giving rise to the 2009 fines and settlement, including for example, drug-specific marketing plans and drug usage data, *qui tam* whistleblower and civil complaints, presentations to the government in response to various investigations and inquiries, and compensation incentives for Pfizer's sales force.

19.     The Proposed Settlement is aimed specifically at the alleged corporate governance failures of the Pfizer Board.  It contains four important substantive corporate governance provisions ("the Corporate Governance Reforms"):

- first, the creation of a new and independently funded Board committee, the Regulatory and Compliance Committee, with oversight responsibility and authority over a broad range of the Company's compliance duties;

- second, the creation of an Ombudsman Program designed as an alternative channel for employees to express work-related concerns, including those related to marketing-practices, with a direct channel to the Regulatory and Compliance Committee;

- third, a required Board-level procedure for considering potential perverse compensation incentives for employees marketing Pfizer's drugs; and

- fourth, in instances of significant compliance wrong-doing, a required Board-level procedure for determining whether to obtain compensation clawback for corporate officials involved in the conduct or with direct supervision over those employees engaged in the conduct.

20.  The Reforms also provide that the Regulatory and Compliance Committee can draw on a dedicated fund created in connection with the Proposed Settlement, $75 million less

attorney's fees and expenses as awarded by the Court, that the Committee can use in fulfilling its responsibilities, including the retention of outside counsel and experts as it deems appropriate. Since this fund will not be subject to diversion for other corporate purposes and its use will not be subject to management or Board authorization, its existence will enhance the Committee's independence-in-fact.

21.     I also believe that the creation of a Regulatory and Compliance Committee by a prominent company like Pfizer will encourage other companies that operate in complex regulatory environments to create such committees as well.  In this respect the Proposed Settlement may catalyze a significant corporate governance reform initiative.

### Process

22.     I was retained on November 3, 2010 by Bernstein Litowitz Berger & Grossmann LLP, the plaintiffs' lead counsel, as a corporate governance expert in connection with a possible settlement of the matter herein.  To familiarize myself with the underlying dispute, I have read, among other things, the complaint, reports filed by various of plaintiffs' and defendants' experts, Pfizer's plea agreement with the Justice Department, and the Corporate Integrity Agreements of 2009, 2004, and 2002.

23.     I participated in formulating the Corporate Governance Reforms that are reflected in the Proposed Settlement.  In particular, I strongly urged the formation of a new Board committee, later designated the Regulatory and Compliance Committee, given specific oversight powers and responsibility for the drug marketing and other compliance areas addressed by this Litigation.  Later in this affidavit I explain why I think this is a particularly important element of governance reform.

25.     Plaintiffs' lead counsel directly negotiated the Proposed Settlement, including the Corporate Governance Reforms, with defendants' counsel.  At various stages in the negotiations, plaintiffs' lead counsel consulted with me regarding defendants' various positions in response to plaintiffs' proposals.   In this regard, I advised plaintiffs' lead counsel about elements of the proposals that I thought were critical to a meaningful settlement and resisted changes that I regarded as unjustified by the concerns raised by defendants' counsel.  In my opinion, the final agreement embodies the essential elements of the initial proposal; most of the modifications addressed credible business or legal concerns raised by defendants that seemed sound from a shareholder point of view.

26.     Without meaning to overstate my role in the negotiations, this is not a case in which counsel has negotiated a settlement that includes corporate governance reforms and then brings in an expert to opine on their value.

### The Corporate Governance Reforms

### Reform I: Formation of a Regulatory and Compliance Committee

26.     The first reform is the formation of a new Board committee, the "Regulatory and Compliance Committee," charged with specific oversight of Pfizer's substantive regulatory and compliance obligations, including but not limited to compliance with US and ex-US drug marketing rules and Medicare/Medicaid regulations.  These two areas were at the core of the Justice Department's actions against Pfizer.

27.     The Committee will meet quarterly and provide a full report to the Board at least annually, and is charged with reviewing and evaluating external complaints that allege potentially significant issues in Pfizer's regulatory or compliance behavior, as well as internal data that could point to marketing compliance concerns.  The Board's alleged failure to observe

9

and take appropriate note of such complaints and such data is one of the key claims in the Litigation.

28.     The Committee will also receive various other relevant internal reports and information, the goal of which is to lead the Committee to evaluate Pfizer's oversight mechanisms with respect to various complaints of regulatory and compliance issues and to assure an adequate flow of information to the board from Pfizer senior legal and other compliance officers regarding serious complaints and internal audits.   This reform also goes to the gravamen of the Litigation.

29.     The Committee will also have specific oversight responsibility with respect to the actions of the Compliance and Legal Departments in assuring that newly acquired companies address any regulatory or compliance issues that may have been discovered, within specific milestones.  In some instances, the marketing misconduct that was the subject of the Justice Department action initially arose in acquired firms though plaintiffs alleged that the problematic activity continued during the period of Pfizer ownership.  This reform addresses that concern.

30.     The Committee will have broad authority to pursue these tasks, including the power to initiate internal reviews as well as external reviews.  For example, the Committee can compel management to conduct special audits on compliance, regulatory, and other legal concerns (and to determine to whom such audit results should be reported) and can meet privately with any Pfizer senior manager or any other Pfizer employee.  On the external side, the Committee has power to commission surveys of doctors who use Pfizer products and to commission registries of the use of such products to determine the extent of off-label use.  This information can be used to evaluate marketing and compensation programs.  This particular Reform provision derives from conduct observed in this Litigation.  Pfizer commissioned

10

market surveys, the results of which raised concerns about improper marketing practices.  These surveys  played an important role in the government investigations as well  in this Litigation; plaintiffs argued that these surveys should have been but were not shared with the Board.  The Committee's independent power to commission such surveys will augment its oversight capabilities.

31.    The Committee is specifically charged with commissioning at least bi-annually an external review by counsel or other professionals of Pfizer's policies for significant healthcare-related compliance, regulatory and/or other legal issues.

32.    The Committee will also have the authority to retain independent counsel and other experts and consultants, as it deems necessary.

33.    The initial term of the Committee is five years.  Thereafter, after receiving a required written recommendation of the Committee, the Board will determine whether to extend the Committee's term.  This decision will be reported to the shareholders in the proxy statement or annual report.  The duration of the Committee's initial term was a significant issue in the negotiations.  A five year term entails a significant commitment by the directors who will staff it. Assuming the Committee performs its duties in good faith, there is a high likelihood that an expectation of such focused Board oversight of critical regulatory and compliance issues will become institutionalized.  Such a Regulatory and Compliance Committee is likely to become such an obvious improvement in corporate governance for Pfizer that its origins will be irrelevant.  On the other hand, because of circumstances that cannot now be imagined, what is now a positive reform may in the future require modification.  A five year term, with a subsequent decision on continuation to be made by a fully-informed future Board that will be somewhat removed from this Litigation, therefore seems appropriate.

34.     The Committee will be composed of at least a majority of independent directors, but may also include some inside directors and other Pfizer officers ex-officio.  The Chair of the Committee must be an independent director who was first elected to the full Board after January 1, 2007.  The rationale for such a "mixed" committee, which was proposed in plaintiffs' initial offer, is two-fold:  the first goal is to include the Committee in the information flow and conversation about possible compliance issues with senior managers; this will increase the Committee's effectiveness in overseeing compliance and regulatory concerns.  The second goal is to communicate and reinforce the importance of regulatory and compliance concerns by regularly exposing managers to Committee (and thus Board) level concern and inquiries; this will enhance buy-in to those objectives in managerial ranks.   The independent directors can meet in executive session as necessary, but a mixed committee should facilitate a two-way information flow.

35.     The Committee's activities will be adequately and independently funded.  The Proposed Settlement allocates a fund of $75 million less attorney's fees and expenses to support the Committee's activities, over an initial term of five years.   Since this money is not otherwise available for other Pfizer activities (it reverts to an insurer if not spent), such independent funding will encourage the Committee to develop a practice of aggressive pursuit of matters in its domain.  For example, the Committee will have the resources and discretion to retain outside counsel or other advisors, or to initiate a wide range of compliance specific activities or inquiries.  If the fund is exhausted during the Committee's initial five-year term, additional funding will be provided by Pfizer upon the Committee's request.

36.     The Committee's mission and authority were conceived of as a direct response to the allegations in the Litigation, in particular as addressing the alleged failures of Board

oversight with respect to the Company's marketing plans and the Company's response to internal and external "red flags" of non-compliance with the FDA marketing regime. The value of this Corporate Governance Reform is underscored by a lesson drawn from the financial crisis: the importance of a board committee specifically tasked with oversight of an area of "bet the business" concern. The board's duties are so broad, particularly in a large, complicated business, that the full board may be unable to develop a detailed understanding of critical business elements, including receiving and assimilating a flow of current information about emerging risks. Thus a board committee, appropriately tasked and selected, can add an important level of oversight. Many financial firms have already moved to institute "risk management committees" in anticipation of governance reform proposals that would mandate such committees for financial firms.

37. The same principle applies to a pharmaceutical company like Pfizer. The critical risk is not financial but the failure to adhere to regulatory and compliance mandates, which could result in the company's disqualification from receipt of federal government reimbursements. For Pfizer, federal debarment is a critical risk that, if materialized, would have devastating consequences.

38. For a company like Pfizer, delegating regulatory and compliance oversight to the Audit Committee is inadequate. After the Sarbanes Oxley Act, an audit committee of a large public company is fully engaged with oversight of the company's financial disclosure. The importance and singularity of this responsibility is reflected by the requirement of qualifications for audit committee membership that focus on financial literacy and experience.

39. Thus the creation of a Regulatory and Compliance Committee by Pfizer responds to the specific allegations in the complaint with a Corporate Governance Reform that is rooted in

13

our deepening understanding of how the board might be effectively fashioned so as to serve the interests of the corporation and its shareholders.

## Reform II: Ombudsman Program

40.     The second Governance Reform is an Ombudsman Program, an alternative channel for employees to express and have addressed work-related concerns, including concerns related to Pfizer's drug marketing programs.  Although the Ombudsman Program is to be managed by the Chief Compliance Officer, the Ombudsman will work out of a stand-alone office and will report directly to the "Compliance Group," a council of senior Pfizer managers.  The Ombudsman will also have direct reporting rights to the Regulatory and Compliance Committee.

41.     The capacity of the board or a committee to monitor is dependent on the quality of the information that it receives. One important source of information is the observation of rank-and-file employees, who may feel disempowered or exposed if they complain of wrongful behavior.  An Ombudsman Program can guard against that by providing a protected channel for employees to express work-related concerns, including concerns about the kind of wrongful conduct that produced the Government's enforcement actions.

42.     The effectiveness of an Ombudsman Program in this regard depends upon the Ombudsman's self-perception of independence and the relevant audience's perception of that independence.   The Corporate Governance Reforms add force on both dimensions.  A reporting relationship with a designated Board committee and with a senior management group should enhance the Ombudsman's sense of independence and also signal to Pfizer's internal constituency that the Ombudsman office is a credible recipient of information about corporate misconduct.

14

**Reform III: Compensation Review**

43.    The Regulatory and Compliance Committee, in conjunction with the

Compensation Committee, is charged with consulting with management over the appropriate

design of compensation practices for Pfizer sales and marketing employees and for speakers and

advisory board members, who may also be involved in the promotion of Pfizer products.

44.    Commissions and other sales-related incentives are commonly part of the

compensation package of sales and marketing employees.  Speakers and advisory board

members may be recruited because of their willingness to tout the benefits of Pfizer drugs.  In

both cases compensation terms may be in tension with regulatory and compliance imperatives.

45.    The Proposed Settlement calls for a specific "evaluation" of Pfizer's practices in

these two domains.  The evaluation will initially be undertaken by management after consulting

with the two relevant Board Committees as to the scope and depth of the evaluation.  The two

Committees will coordinate among themselves over how to handle the evaluation review.

46.    As with other areas of its responsibility, the Regulatory and Compliance

Committee will have authority and dedicated resources to retain independent counsel and experts

as it deems necessary in connection with any analysis of compensation issues.

47.    This Corporate Governance Reform addresses one of the chronic issues in a firm

like Pfizer: the boundary between legal and illegal product promotion may be effaced by a

poorly designed compensation system that fails to protect or blurs that boundary.

48.    Marketing activities are carried out by sales and marketing personnel, who often

are compensated with incentive-based tools – bonuses, for example.  One lesson of the financial

crisis is that poorly-structured compensation incentives can produce perverse results for the firm.

As a result, boards of financial firms, in particular compensation committees, will be given new

responsibilities in reviewing and monitoring compensation schemes within firms, not just the compensation of senior officers.

49.     Applying a comparable "lesson learned" to Pfizer, the Corporate Governance Reforms include Board-level review of compensation schemes for sales and marketing personnel to assure the alignment of incentives with compliance objectives.  Such Board review will also include the compensation of speakers and advisory board members, who are not fulltime Pfizer employees.  This Board review will be addressed through collaboration between the Compensation Committee, which has general responsibility for compensation oversight within the firm, and the Regulatory and Compliance Committee, with its focus on compliance.

### Reform IV: Compensation Clawback

50.     Incentives are designed to affect behavior ex ante.  But incentives may have perverse effects or may be incomplete.  Thus an ex post mechanism like compensation clawback may be necessary to assure that employees do not retain the fruits of wrongful conduct and also to heighten the overall pro-compliance incentive effects of a compensation scheme.  The Corporate Governance Reforms include a procedure by which the Regulatory and Compliance Committee initiates a Board decision to claw back incentive-based compensation from a manager who engaged in significant wrongful conduct in the regulatory or compliance area or who supervised an employee who engaged in such behavior.

51.     The Reforms detail the circumstances that trigger a Committee response: criminal or civil charges by the government that lead to conviction or a civil settlement, a *qui tam* action in which the government intervenes, and any other government or regulatory action that the Board decides has caused "significant regulatory, financial, or reputation damage to the Company."  In such a case the Regulatory and Compliance Committee must make a written

recommendation to the Compensation Committee with respect to the clawback of incentive-based compensation.

52.     This mandate will require familiarity with the facts and invites a deeper digging into the circumstances.  Thus, not only will the threat of a clawback serve the interests of deterrence, but the Committee's particular fact-finding responsibility will add to the other information flows coming to the Regulatory and Compliance Committee about compliance issues in the firm.

53.     The two step procedure, entailing involvement of the Compensation Committee as well as the Regulatory and Compliance Committee, will give responsibility and ownership to two differently-tasked Board committees.  This will further underline within the Board as a whole the importance of oversight of drug marketing regulatory compliance.

**Conclusion**

54.  Based on the above, and as I will further detail in connection with any final approval motion, it is therefore my opinion that the Corporate Governance Reforms reflected in the Settlement Term Sheet will create significant value for Pfizer and its shareholders by reducing the risk of recurrent wrong-doing in the regulatory and compliance area.  I also believe that the Corporate Governance Reforms will generally serve as an important model of corporate governance reform for a firm that operates in a compliance-intensive environment.

December 1, 2010

New York, New York                         Jeffrey N. Gordon

17