UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PFIZER INC. SHAREHOLDER DERIVATIVE LITIGATION | No. 09 Civ. 7822 (JSR)<br><br>ECF Case |

**DEFENDANTS' MEMORANDUM OF LAW**
**<u>IN SUPPORT OF PRELIMINARY SETTLEMENT APPROVAL</u>**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................ii-iii

PRELIMINARY STATEMENT ................................................................................ 1

I.   BACKGROUND ....................................................................................... 2

     A.   Description of the Action ..................................................... 2

     B.   Discovery Record ................................................................. 6

     C.   Terms of the Settlement ....................................................... 8

II.  ARGUMENT ............................................................................................ 10

     A.   Applicable Legal Standards................................................. 10

          1.   The Settlement of Complex Litigation, Including
               Shareholder Derivative Actions, Is Highly Favored ................... 10

          2.   The Role of the Court in Evaluating a Proposed Settlement
               of a Derivative Action ................................................................ 11

               a.   Procedural Fairness....................................................... 11

               b.   Substantive Fairness ..................................................... 12

                    i.     The Reasonableness of the Benefits
                           Achieved by the Settlement in Light of
                           Potential Recovery at Trial ................................. 12

                    ii.    In View of Plaintiffs' High Burden Under
                           Delaware Law, Their Likelihood of Success
                           is Remote ............................................................. 15

                    iii.   Likely Duration and Cost of Continued
                           Litigation is High ................................................. 20

                    iv.    Shareholder Objections to this Settlement
                           are Likely to Be Minimal..................................... 21

III. CONCLUSION ........................................................................................ 21

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

Bosch v. Meeker Coop. Light & Power Ass'n,
    257 Minn. 362 (1960) ........................................................................................ 14

City of Detroit v. Grinnell Corp.,
    495 F.2d 448 (2d. Cir. 1974) .............................................................................. 11

Clark v. Ecolab,
    Nos. 07 Civ 8623 (PAC), 04 Civ. 4488 (PAC), 06 Civ. 5672 (PAC),
    2010 WL 1948198 (S.D.N.Y. May 11, 2010) ..................................................... 11

D'Amato v. Deutsche Bank,
    236, F.3d 78 (2d. Cir. 2001) ............................................................................... 11

In re Am. Int'l Group, Inc.,
    965 A.2d 763 (Del. Ch. 2009) ............................................................................ 16

In re AOL Time Warner S'holder Deriv. Litig.,
    No. 02 Civ. 6402 (SWK), 2006 WL 2572114 (S.D.N.Y. Sep. 6, 2006) ........................passim

In re Caremark Int'l Inc. Derivative Litig.,
    698 A.2d 959 (Del. Ch. 1996) ......................................................................... 1, 15

In re Citigroup Inc. S'holder Deriv. Litig.,
    964 A.2d 106 (Del. Ch. 2009) ............................................................................ 16

In re EVCI Career Colls. Holding Corp. Sec. Litig.,
    No. 05 Civ. 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2010) ...................... 11

In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,
    55 F.3d 768 (3d Cir. 1995) ................................................................................. 10

In re Global Crossing Sec. and ERISA Litig.,
    225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................ 20

In re Healthsouth Corp. S'holders Litig.,
    845 A.2d 1096 (Del. Ch. 2003) .......................................................................... 17

In re Metropolitan Life Deriv. Litig.,
    935 F. Supp. 286 (S.D.N.Y. 1996) ...............................................................passim

In re Walt Disney Co. Deriv. Litig.,
    906 A.2d 27 (Del. 2006) ..................................................................................... 16

Lyondell Chem. Co. v. Ryan,
  970 A.2d 235 (Del. 2009) ................................................................. 16

Mathes v. Roberts,
  85 F.R.D. 710 (S.D.N.Y. 1980)......................................................... 10

Mautner v. Hirsch,
  No. 91 Civ. 4928, 1992 WL 106318 (S.D.N.Y. May 4, 1992) ............ 15

Mills v. Electric Auto-Lite Co.,
  396 U.S. 375 (1970).......................................................................... 14

Newman v. Stein,
  464 F.2d 689 (2d. Cir. 1972) ............................................................ 13

Republic Nat'l Life Ins. Co. v. Beasley,
  73 F.R.D. 658 (S.D.N.Y. 1977)......................................................... 11

Stone ex rel. Amsouth Bancorp. v. Ritter,
  911 A.2d 362 (Del. 2006) ................................................................. 16

TBK Partners, Ltd. v. Visa U.S.A. Inc.,
  675 F.2d 456 (2d. 1982) ................................................................... 20

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,
  396 F.3d 96 (2d Cir. 2005) ............................................................... 20

Weinberger v. Kendrick,
  698 F.2d 61 (2d Cir. 1982) ............................................................... 10

Weisberg v. Coastal States Gas Corp.,
  No. 78 civ. 5942, 1982 WL 1311 (S.D.N.Y. June 16, 1982)............... 15

Zimmerman v. Bell,
  800 F.2d 386 (4th Cir. 1986)........................................................... 15

## **STATUES**

8 Del. C. § 141(e) ................................................................................... 16

Defendants[1] respectfully submit this memorandum in support of the preliminary approval of the proposed settlement (the "Settlement") of derivative litigation against certain current and former directors and officers of Pfizer, as set forth in the accompanying Proposed Stipulation of Settlement.

## PRELIMINARY STATEMENT

This action involves claims that the Individual Defendants breached their duty of loyalty regarding the alleged sales and marketing activities of non-management personnel who – within an organization of approximately 100,000 employees – had no reporting lines to any of the Defendants.   By alleging duty of loyalty violations against the Individual Defendants, Plaintiffs' claims involve "possibly the most difficult theory in corporation law upon which a Plaintiff might hope to win a judgment."   In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996).   After extensive discovery encompassing the production of approximately 12 million pages of documents and over thirty depositions, Defendants' view is that the record squarely refutes Plaintiffs' claims.   Defendants, however, are amenable to resolve the case by settlement in recognition of the burdens and risks inherent in continuing to litigate.

Based on the extensive discovery, both Plaintiffs and Defendants are well-positioned to evaluate the prospects of the case and reach agreement on terms clearly satisfying the requisite standard of "fair, reasonable and adequate."   In re AOL Time Warner S'holder Deriv. Litig., No. 02 Civ. 6302 (SWK), 2006 WL 2572114 at *6 (S.D.N.Y. Sep. 6, 2006).   Under the proposed Settlement, the Individual Defendants' insurers will provide substantial funding for

---

[1] Pfizer Inc. ("Pfizer") and Dennis A. Ausiello, Michael S. Brown, M. Anthony Burns, Robert N. Burt, W. Don Cornwell, William H. Gray III, Constance J. Horner, James M. Kilts, Jeffrey B. Kindler, George A. Lorch, Suzanne Nora Johnson, Dana G. Mead, William C. Steere, Jr., Henry A. McKinnell, Joseph M. Feczko, Douglas M. Lankler and Ian Read (collectively, "Individual Defendants," and collectively with Pfizer, "Defendants.")

1

five years for certain healthcare law and regulatory compliance enhancements to Pfizer's already robust procedures, including, among other things, the creation of a new Regulatory and Compliance Committee of the Board of Directors.  As further addressed below, these initiatives will facilitate Pfizer's continuing efforts to optimize the Company's compliance procedures and will thereby bestow a substantial benefit on the Company and its stockholders.  The corporate benefit from the Settlement is also explained in the accompanying declarations of two former Chairmen of the U.S. Securities and Exchange Commission, Harvey L. Pitt ("Pitt Declaration" attached as Exhibit "A") and Richard C. Breeden ("Breeden Declaration" attached as Exhibit "B"), who each have assessed the relief agreed to in the Settlement.

I.      **Background**

    A.      **Description of the Action**

On September 2, 2009, Pfizer announced that it had finalized a previously disclosed agreement in principle with the Department of Justice to resolve certain government investigations regarding the marketing and promotion of Bextra, Geodon, Zyvox and Lyrica, as well as certain other medicines.  Despite an extensive government investigation dating back over five years, none of the charges related to any of the Individual Defendants.  As part of the resolution, Pfizer agreed to pay a criminal fine, and a Pfizer subsidiary, Pharmacia & Upjohn Company, Inc., agreed to plead guilty to one count of violating the U.S. Food, Drug, and Cosmetic Act related to off-label promotion of Bextra.  Pfizer also entered into a civil settlement agreement, in which it expressly denied all allegations of wrongdoing, and only acknowledged certain facts related to Zyvox.

Beginning on September 10, 2009, nine shareholder derivative actions, purportedly brought on behalf of Pfizer and asserting essentially the same causes of action, were commenced against certain present and former Pfizer directors and officers.  These actions were

consolidated and Plaintiffs filed a consolidated, amended complaint (the "Complaint").[2]   The Complaint asserted breach of fiduciary duty claims against the Individual Defendants for their alleged failure to prevent Pfizer from promoting certain drugs for off-label use and/or engaging in other allegedly improper marketing activities, a Section 14(a) claim against present and former directors, and an unjust enrichment claim.

The Pfizer Board consists of a diverse group of experienced, highly-credentialed individuals, who were all – with the exception of the current and former Chief Executive Officer – independent of Company management throughout the relevant time period.   The Board defendants include:

- Dennis A. Ausiello, M.D. [Pfizer Board 2006-present]:  Jackson Professor of Clinical Medicine at Harvard Medical School and Chief of Medicine at Massachusetts General Hospital.

- Michael S. Brown, M.D. [Pfizer Board 1996-present]:  Co-recipient of the Nobel Prize in Physiology or Medicine, a Distinguished Chair in Biomedical Sciences and Regental Professor since 1985 at the University of Texas Southwestern Medical Center at Dallas.  Dr. Brown is also the recipient of the Lasker Award,

---

[2] Other related litigation has been filed in both Delaware and New York state courts (the "Related Actions"), including a shareholder derivative action captioned Donald Golden ex rel. Pfizer, Inc. v. Dennis A. Ausiello, et al., Index No. 650616/2009E (N.Y. Sup. Ct.) pending in the Supreme Court of New York and two shareholder derivative actions captioned Bricklayers Local 8 & Plasterers Local 233 Pension Fund ex rel. Pfizer, Inc. v. Dennis A. Ausiello, et al., C.A. No. 5631-VCL (Del. Ch.) and Nora Vides ex rel. Pfizer, Inc. v. Dennis A. Ausiello, et al., C.A. No. 5690-VCN (Del. Ch.), which were filed in the Delaware Court of Chancery. These actions assert claims for breach of fiduciary duty that are based upon the same underlying factual allegations as those asserted here. In addition, three actions pursuant to Section 220 of the Delaware General Corporation Law styled James Groen v. Pfizer, Inc., C.A. No. 4351-VCN (Del. Ch.), James Groen v. Pfizer, Inc., C.A. No. 4924-VCN (Del. Ch.), and Nora Vides v. Pfizer, Inc., C.A. No. 5134-VCN (Del. Ch.) were filed in the Delaware Court seeking to inspect certain books and records of Pfizer for the purpose of investigating potential wrongdoing, mismanagement and breaches of fiduciary duty by members of the Board and others in connection with, among other things, the same underlying factual allegations as those asserted in the Derivative Action.  In recognition of the overlapping allegations, each of the derivative actions has been stayed pending the outcome of this action. As the court found in the New York state action, the "action should be stayed, based on the substantial identity between the instant action and the consolidated federal action as to the parties, the claims, the relief sought, and the common questions of law and fact."  See Golden July 1, 2010 Order Granting Motion to Stay.

the National Medal of Science and the Woodrow Wilson Award for Public Service.

- M. Anthony Burns [Pfizer Board 1988-present]:  Former Chairman of the Board and Chief Executive Officer of Ryder System, Inc., former director of Stanley Black & Decker, Inc. and the Black & Decker Corporation.  Mr. Burns currently sits on the boards of Huntsman Corporation and J.C. Penney Company.

- Robert N. Burt [Pfizer Board 2000-present]:  Former Chairman and Chief Executive Officer of FMC Corporation and FMC Technologies, Inc.  Mr. Burt previously served as a director of Phelps Dodge Corporation and Janus Capital Group Inc.

- W. Don Cornwell [Pfizer Board 1997-present]:  After graduating from Harvard Business School, Mr. Cornwell joined Goldman Sachs, where he eventually became Vice President of the corporate finance department.  Mr. Cornwell then formed Granite Broadcasting Corporation, where he was the Chairman and CEO from 1988 until 2009.  He is also a director of Avon Products, Inc. and the Wallace Foundation and former director of CVS Caremark Corporation.

- William H. Gray, III [Pfizer Board 2000-present]:  Practicing minister for many years, served as a U.S. Congressman for the Second District of Pennsylvania from 1979 to 1991, including service at various times as Budget Committee Chair and House Majority Whip.  He is a director of Dell Inc., J.P. Morgan Chase & Co., and Prudential Financial, Inc. and former director of Union Pacific, Scott Paper, CBS, Viacom and Rockwell International.

- Constance J. Horner [Pfizer Board 1993-present]:  Former Commissioner of the U.S. Commission on Civil Rights and a former Deputy Secretary of the U.S. Department of Health and Human Services.  Ms. Horner formerly served at the White House as Assistant to President George H. W. Bush and as Director of Presidential Personnel.  Ms. Horner sits on the Boards of Ingersoll-Rand Company Limited and Prudential Financial, Inc.

- James M. Kilts [Pfizer Board 2007-present]:  Founding Partner of Centerview Partners Management, LLC, Chairman of The Nielson Company Supervisory Board, director of Meadwestvaco Corporation and MetLife, Inc., and formerly served as Chairman and Chief Executive Officer of The Gillette Company and President and Chief Executive Officer of Nabisco Group Holdings Corporation.

- George A. Lorch [Pfizer Board 2000-present]:  Chairman Emeritus and former Chairman and CEO of Armstrong Holdings, Inc. and its predecessor, Armstrong World Industries, Inc.  He is a director of Autoliv, Inc., Masonite, International, Inc., The Williams Companies, Inc., and HSBC Finance Co., HSBC North America Holding Company and is a former director of The Stanley Works, Household International and RR Donnelly.

- Suzanne Nora Johnson [Pfizer Board 2007-present]:  After graduating Harvard Law School, Ms. Johnson served as a law clerk for the United States Court of Appeals for the Fourth Circuit and later worked as an attorney at Simpson, Thatcher & Bartlett.  Ms. Johnson formerly was the Vice Chairman at Goldman Sachs Group, Inc., and during her 21-year tenure with Goldman Sachs, served in various leadership roles.  Ms. Johnson now devotes her time to philanthropic activities.

- Dana G. Mead [Pfizer Board 1998-2010]:  Former Chairman of the Massachusetts Institute of Technology Corporation and a former Chairman and CEO of Tenneco, Inc.  Dr. Mead is a director of the Boys and Girls Club of America, the Pardee Rand Graduate School, the School of Public Affairs and Environmental Sciences at the University of Indiana and the MIT Corporation.  Dr. Mead retired from Pfizer's Board in April 2010.

- William C. Steere [Pfizer Board 1987-present]:  Chairman Emeritus of Pfizer Inc. He was Chairman of Pfizer's Board from 1992 until 2001 and the CEO from 1991 until 2000.  He is also a board member of Health Management Associates, Inc., New York University Medical Center, and Memorial Sloan-Kettering Cancer Center and a former director of Dow Jones & Co., Inc. and MetLife, Inc.

The senior management defendants include:[3]

- Jeffrey B. Kindler:  Mr. Kindler joined Pfizer in 2002 as General Counsel and Chief Compliance Officer.  He then became the Chief Executive Officer in 2006 and became the Chairman of the Board in December 2006.  Mr. Kindler comes from a strong law compliance background:  after serving as a law clerk to U.S. Supreme Court Justice William J. Brennan, Jr., Mr. Kindler was a partner at Williams & Connolly, Vice-President of Litigation and Legal Policy at General Electric, and Executive Vice-President, General Counsel and later the President of Partner Brands at McDonald's Corporation.

- Douglas Lankler:  Mr. Lankler, a former Assistant U.S. Attorney in the Southern District of New York, joined Pfizer in late 1999 as Corporate Counsel. In 2002 Mr. Kindler promoted him to Deputy Compliance Officer and in 2006, he became Chief Compliance Officer.  Mr. Lankler has overseen the development and enhancement of Pfizer's compliance program whose budget has increased from approximately $4.8 million in 2002 to approximately $70 million in 2009.

---

[3] Plaintiffs also name as defendants Frank D'Amelio and Joseph M. Feczko, neither of whom had any direct responsibility for overseeing drug marketing or promotional activities.  Mr. D'Amelio became the Chief Financial Officer in 2007, which postdates any of the alleged conduct at issue.  The record demonstrates that Dr. Feczko, formerly the Chief Medical Officer until 2009, did not have any responsibility for monitoring or enforcing compliance within the sales force of the Company.

- Ian Read: Mr: Read joined Pfizer in 1978 and later became President of Worldwide Pharmaceuticals Operations in mid-2006, after holding positions responsible solely for Europe, Canada, Latin America and Africa/Middle East Operations.

In response to the Complaint, the Defendants brought a motion to dismiss. Following briefing and oral argument, the Court issued an order dated March 17, 2010, granting the motion to dismiss claims alleging that Pfizer disseminated materially inaccurate and incomplete proxy statements in violation of federal and Delaware law and a claim alleging the Defendants were unjustly enriched. The Court denied the motion with respect to the breach of fiduciary duty claims. The Individual Defendants moved for summary judgment on October 22, 2010 to dismiss all remaining claims before trial.

**B.     Discovery Record**

The parties engaged in extensive fact and expert discovery over a six month period. Over 12 million pages of documents were produced by the parties and various third parties. The parties took over 30 depositions of the Individual Defendants, Rule 30(b)(6) witnesses, current and former Pfizer employees, third parties, and the named Plaintiffs. The Defendants additionally produced extensive interrogatory responses. Plaintiffs served three expert reports in support of their claims. Defendants served four expert reports in opposition to Plaintiffs' claims, and depositions were taken of each of the Defendants' experts.

The discovery record demonstrates that Pfizer's Board and senior management were responsibly engaged in compliance matters at the Company, and did not breach their fiduciary duties. Rather, the Board and senior management were actively involved in continually enhancing the Company's compliance programs, proactively implementing precautions and promptly responding to any compliance issues. The Audit Committee – which exercised oversight responsibility for regulatory compliance matters generally – typically met 10-12 times

per year during the relevant period.  (See Shaftel Decl. Ex. 47 at 15; 48 at 15; 49 at 12; 50 at 12; and 1 at 16.)  At virtually every meeting, the Board and the Audit Committee, in conjunction with management, discussed healthcare compliance efforts.  (See Shaftel Decl. Ex 1 at 10-11, 16-17; Ex. 1 annex 2 at iii – v; Ex. 25-45.)  In advance of Board and Audit meetings, directors received detailed pre-read packages containing detailed information regarding compliance issues. (See Shaftel Decl. Ex. 18 – 22; Ex. 24 at 63:23 – 65:15.)  Further, at nearly every meeting of the Audit Committee, the members received compliance related reports from the General Counsel and Pfizer's legal team, members of the Internal Audit Group, and the Chief Compliance Officer. (See Shaftel Decl. Ex 1 at 10-11, 16-17; Ex. 1 annex 2 at iii – v; Ex. 25 - 45.)  Every year, the Chief Compliance Officer also submitted to the Audit Committee a comprehensive overview of the state of the Company's compliance program. (See Shaftel Decl. Ex. 18 – 22.)  This certification provided a review of current key matters, the structure and organization of the compliance group, proactive measures implemented, and investigatory steps.  Id.  Further, the Chief Compliance Officer confirmed the sufficiency of resources made available to the compliance program and his assessment of the state of the program.  Id.

The evidence further demonstrates that management promptly notified the Audit Committee of any significant compliance investigations and that the Audit Committee reasonably relied on that information.  For example, management devised a threshold to ascertain which compliance matters should be reported to the Audit Committee.  Further, the Audit Committee continued to receive updates of ongoing matters through tracking charts.  (See Shaftel Decl. Ex. 2.)  The Audit Committee and management also were regularly involved in the discussions regarding enhancements to existing compliance programs and policies, as well as the implementation of remedial and disciplinary measures.  (See Shaftel Decl. Ex. 36 – 45.)

John Chapman of KPMG, acting as the Company's external auditor, described the Audit Committee – in rebuttal testimony – as "extremely engaged" and "demanding" and noted that "you did not want to go into that Audit Committee room without being prepared . . . [because of] the very high standard that that Audit Committee put forth." (See Shaftel Decl. Ex. 51 at 118, 211.)

In addition, the Audit Committee and management promptly notified the full Board of internal and government investigations. (See Shaftel Decl. Ex. 36 – 45.) The Board was kept apprised of the Company's response to these issues, including the Company's prompt retention of counsel to oversee investigations. (See Shaftel Decl. Ex. 6 at 37:7 – 37-14, 70:10 – 71:10, 179:18 – 181:9, 218:10 – 221:13, 270:15 – 272:11; 13 at 52:2 – 53:16, 70:4 – 70:15, 351:9 – 351:13, 381:7 – 381:15.) The Board directed that corrective measures be implemented even before certain investigations were complete. (See Shaftel Decl. Ex. 3; 8; 28; 45; 46 and 51 at 127:4 – 127:17.) The Board, through management and the Audit Committee, was actively involved in disciplinary measures for any violations of Pfizer policies and procedures. (See Shaftel Decl. Ex. 51 at 118:8 – 118:19, 210:12 – 211:17.) In addition, the Company's compliance programs were regularly reviewed by internal and external auditors. The discovery record also reflects that the Board, Audit Committee and management responded to all concerns raised by auditors. (See Shaftel Decl. Ex. 51 at 118:8 – 118:19, 210:12 – 211:17, 127:4 – 127:17; 23 at 38:13 – 39:13.)

 C. **Terms of the Settlement**

The principle terms of the Settlement include:

- Pfizer shall establish and operate for a term of at least five (5) years from the date of implementation, a Regulatory Committee of the Board of Directors (the "Regulatory Committee").

- The Regulatory Committee will exercise oversight responsibility on significant healthcare related regulatory and compliance issues based on criteria to be developed by the Regulatory Committee, including: (a) oversight with respect to law and regulatory compliance; (b) oversight with respect to external complaints alleging significant concerns regarding Pfizer's regulatory and compliance related activities; (c) oversight with respect to internal messaging to employees regarding Pfizer's commitment to law and regulatory compliant conduct; and (d) oversight with respect to supervision of compliance programs implemented in newly acquired companies. To that end, the Regulatory Committee may take all actions it deems consistent with its charter, including, among other things, the retention of outside advisors and other professionals, commissioning of internal or external reviews, studies and audits, and consultation with management.

- The Individual Defendants' insurers will create a fund of $75 million, which will be the source of funding for the activities of the Regulatory Committee for its initial five (5) year term (the "Regulatory Committee Fund"). If such funds are exhausted during the five (5) year term, funding as requested by the Regulatory Committee shall be provided by Pfizer. Any unused portion of the Regulatory Committee Fund at the end of the initial five (5) year term shall revert to the insurers. For the avoidance of any doubt, no monetary liability shall be imposed on any of the Individual Defendants with respect to the Regulatory Committee Fund.

- The Regulatory Committee will meet at least quarterly and provide a full report to the Board of Directors at least annually. The Committee will prepare a yearly overview of its activities generally for inclusion in Pfizer's Annual Report (or Proxy Statement).

- The Regulatory Committee will be comprised of at least a majority of independent directors, and may include senior Pfizer employees ex-officio, and others. The independent directors on the Committee may meet in executive session. The Chair of the Committee shall be an independent director elected since January 1, 2007, who has relevant experience in law, corporate compliance, regulatory or governmental affairs, academia or service on the Board of a healthcare institution or highly regulated company.

- The Regulatory Committee will make a written recommendation to the Compensation Committee of the Board of Directors concerning the extent, if any, that the incentive based compensation should be reduced or extinguished of any executive, senior manager, compliance personnel and/or attorney involved in regulatory or compliance related misconduct. In addition, the Regulatory Committee, in consultation with the Compensation Committee, will discuss with management an evaluation of compensation procedures in relation to alignment with compliance incentives.

- Pfizer will implement an Ombudsman Program managed by and under the direction of the Chief Compliance Officer, providing an additional channel for

employees to address work-related concerns, including conduct inconsistent with Pfizer's policies, practices and standards. The Program will be available to all employees and is designed to provide an additional "safe haven" where concerns can be addressed in confidence. Although the program will provide confidentiality procedures, the Ombudsman will be subject to laws applicable to corporate disclosure requirements, and will provide to the Company all information related to its disclosure obligations, including any information requested by the Chief Compliance Officer with respect to issues that may require disclosure or that may represent any employee misconduct.

- The Settlement terms do not expand the liabilities of any officers or directors beyond any liabilities otherwise imposed by law.

Under the Settlement, appropriate notice of the terms of the Settlement shall be provided to Pfizer stockholders and to counsel in the Related Actions.

## II.    Argument

### A.    Applicable Legal Standards

#### 1.    The Settlement of Complex Litigation, Including Shareholder Derivative Actions, Is Highly Favored

Although Rule 23.1 of the Federal Rules of Civil Procedure makes the settlement of a derivative claim subject to judicial approval, "[p]ublic policy, of course, favors settlement." In re Metropolitan Life Deriv. Litig., 935 F. Supp. 286, 291 (S.D.N.Y. 1996). The Second Circuit has recognized that "[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general public policy favoring the settlement of litigation." Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982). This policy is especially true in the derivative litigation context "because shareholder derivative actions are 'notoriously difficult and unpredictable [and therefore] settlements are favored.'" AOL Time Warner, 2006 WL 2572114 at *3 (quoting Mathes v. Roberts, 85 F.R.D. 710, 713 (S.D.N.Y. 1980)); see also In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

2.      **The Role of the Court in Evaluating a Proposed Settlement of a Derivative Action**

In evaluating a settlement, the court must consider whether it "'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'"  Mathes, 85 F.R.D. at 713 (quoting Republic Nat'l Life Ins. Co. v. Beasley, 73 F.R.D. 658, 667 (S.D.N.Y. 1977)).  The trial court should approve a derivative settlement if it is fair, reasonable, and adequate.  AOL Time Warner, 2006 WL 2572114 at *6-7.  However, while "a court should not engage in mere 'rubber stamp' approval of the settlement, [] it must 'stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'"  Id. at *2 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d. Cir. 1974)).

In assessing whether the settlement is fair, reasonable, and adequate, the trial court should consider both procedural and substantive fairness.  AOL Time Warner, 2006 WL 2572114 at *3-4.  As shown below, both prongs are clearly met.

a.      **Procedural Fairness**

When considering procedural fairness, a court "must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations'" and that the parties "'have engaged in the discovery necessary to effective representation of the [plaintiffs'] interests.'"  AOL Time Warner, 2006 WL 2572114 at *3 (quoting D'Amato v. Deutsche Bank, 236, F.3d 78, 85 (2d. Cir. 2001)).  "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment, for that of the parties who negotiated the settlement."  Clark v. Ecolab, Nos. 07 Civ. 8623 (PAC), 04 Civ. 4488 (PAC), 06 Civ. 5672 (PAC), 2010 WL 1948198 at *4 (S.D.N.Y. May 11, 2010) (quoting In re EVCI Career Colls. Holding Corp. Sec. Litig., No. 05 Civ. 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2010)).

Here, in reaching the Settlement, the parties engaged in arms-length negotiations following an exhaustive fact witness discovery process, which involved the production of many millions of pages of documents and 30 depositions (over 100 hours of deposition testimony). During this time, all parties have developed a realistic view of the case.  Under the circumstances here, there is no basis to challenge the procedural fairness of the Settlement.  Nor is there any suggestion of collusion:  (1) the parties reached Settlement only after extensive discovery, which gave all parties a substantive factual basis to assess the merits of the case and the Settlement; (2) Plaintiffs' counsel included multiple firms, including Lead Counsel as designated by the Court on April 6, 2010; (3) the Defendants fall into three separate groups (director Defendants, officer Defendants and the Company), each of which is represented by its own law firm; and (4) the parties engaged in a lengthy, arms-length negotiation of the terms of the Settlement.  In this context, the procedural posture of the case reflects that the Settlement was reached by knowledgeable and experienced counsel only after vigorous litigation and good-faith negotiation.

### b.      **Substantive Fairness**

To assess the substantive fairness, a court should consider:  "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to the proposed settlement."  AOL Time Warner, 2006 WL 2572114 at *3 (citing Metropolitan Life, 935 F. Supp. at 292).  Each of these considerations is clearly met.

### i.     **The Reasonableness of the Benefits Achieved by the Settlement in Light of Potential Recovery at Trial**

"When considering the benefits achieved by a settlement, courts must keep in mind that 'there is a range of reasonableness with respect to a settlement – a range which

recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" <u>AOL Time Warner</u>, 2006 WL 2572114 at *4 (quoting <u>Newman v. Stein</u>, 464 F.2d 689, 693 (2d. Cir. 1972)).  Even though Plaintiffs have a high burden to meet and further litigation may yield little or no relief, the Individual Defendants' insurers are providing funds that will provide a meaningful benefit to the Company and its shareholders.  <u>See</u> <u>infra</u> Section C.

   The Settlement contains many governance enhancements which will benefit the Company and its shareholders.  As set forth in the accompanying Breeden and Pitt declarations, the contemplated compliance enhancements, including the new Regulatory and Compliance Committee, constitute a meaningful benefit for the Company.  <u>See</u> Exs. A and B.  Specifically, Mr. Pitt strongly believes that the creation of the Regulatory Committee, with a significant five year budget dedicated to oversight of Pfizer's compliance with applicable healthcare law requirements, will provide Pfizer and its shareholders with significant additional benefits.  <u>See</u> Ex. A at 1-2, 4-10.  Likewise, Mr. Breeden concurs that "the proposed settlement is a fair and reasonable resolution of the Pfizer Litigation and will benefit the Company and its shareholders in several important respects."  <u>See</u> Ex. B at 1, 3-9.

   In addition, the Settlement provides for a substantial monetary fund that is to be used to support these compliance enhancements.  These policies and procedures will not only enhance Pfizer's already robust compliance program, but will aid in preventing and detecting any potential compliance issues in the future.

   Thus, the Settlement provides for the Company to receive the benefit of substantial insurance proceeds to fund meaningful and further governance enhancements to oversee an already well-funded compliance program.  Even if the governance enhancements are considered non-monetary (although funds to support the enhancements are being provided to the

Company), courts have recognized that "a corporation may receive a substantial benefit from a derivative suit . . . regardless of whether the benefit is pecuniary in nature." <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. 375, 395 (1970); <u>see</u> <u>also</u> <u>AOL Time Warner</u>, 2006 WL 2572114 at *4 (holding that non-monetary benefits alone can be "substantial enough to merit approval" of a settlement). When analyzing whether a non-monetary benefit may be "substantial" enough to be considered fair and reasonable, a court should to look to see if it is "something more than technical in its consequence and . . . that [it] accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to stockholder's interest." <u>Mills</u>, 396 U.S. at 396 (1970) (quoting <u>Bosch v. Meeker Coop. Light & Power Ass'n</u> 257 Minn. 362, 366-67 (1960)).

Were this case to be litigated further, it would not only impose burdens on the parties, but could involve a lengthy process subject to one or more appeals, thus further delaying a resolution. Moreover, even if Plaintiffs were to prevail in whole or in part at trial, that outcome would not necessarily produce the enhanced corporate governance and internal control reforms set forth in the Settlement. By contrast, the Settlement will ensure that the Company receives these benefits. These factors favor approval of the Settlement.

Accordingly, Defendants submit that both the immediate and long-term value of the Settlement, and the corresponding elimination of the risks associated with protracted litigation, unequivocally warrant this Court's approval of the Settlement. <u>See</u>, <u>e.g.</u> <u>AOL Time Warner.</u>, 2006 WL 2572114 at *4 (finding substantial benefit where instituting direct board involvement with compliance and internal controls provides for greater management accountability in the case of future misconduct).

**ii.    In View of Plaintiffs' High Burden Under Delaware Law, Their Likelihood of Success is Remote**

In evaluating the fairness, reasonableness and adequacy of the Settlement, the Court must weigh the Plaintiffs' likelihood of success, and consider the various difficulties Plaintiffs would have had in establishing liability against Defendants.  See Zimmerman v. Bell, 800 F.2d 386, 392 (4th Cir. 1986) (finding that a court should "assess[] the derivative plaintiffs' prospects of prevailing at trial . . ."); Mautner v. Hirsch, No. 91 Civ. 4928, 1992 WL 106318, at *3 S.D.N.Y. May 4, 1992) (court approving a derivative settlement should consider "the likelihood of the claimant's success after trial against the amount offered the claimant in settlement"); Metropolitan Life, 935 F. Supp. at 292.

Where, as here, a plaintiff's derivative claim faces substantial defenses and other hurdles, the approval of settlement is favored.  See AOL Time Warner, 2006 WL 2572114, at *5 (finding settlement was appropriate where there were "considerable barriers to any potential recovery at trial"); Metropolitan Life, 935 F. Supp. at 292-93; Weisberg v. Coastal States Gas Corp., No. 78 Civ. 5942, 1982 WL 1311, at *1 (S.D.N.Y. June 16, 1982) (settlement approved in light of "plaintiffs' rather remote likelihood of success").  Here, the burden on Plaintiffs is exceptionally high.

Plaintiffs' central allegation, that Defendants breached their duty of loyalty, is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  In re Caremark, 698 A.2d at 967.  Under Delaware law, in order to plead a claim for breach of fiduciary duty based on an alleged failure of oversight, a plaintiff must allege that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their

attention." Stone ex rel. Amsouth Bancorp. v. Ritter, 911 A.2d 362, 370 (Del. 2006).  Under either scenario, Plaintiffs must prove – as an essential element of their claim – that Defendants acted with knowledge that their action or non-action was wrongful.  Moreover, in a case premised upon conscious disregard such as this one, where Plaintiffs do not claim either that Defendants utterly failed to implement a reporting system or that they intentionally disabled the system to prevent learning of issues, Plaintiffs must show that the Defendants completely and entirely disregarded issues once they came to their attention; evidence that the response to the issues was inadequate is insufficient.  See Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 242-44 (Del. 2009).

Î In addition to the high legal threshold for any breach of loyalty claim, Plaintiffs also confront an absolute defense based on the Individual Defendants' reasonable reliance on those reporting to them.  In light of the allocation of responsibilities, the full board was entitled to rely on the reports it received from the Audit Committee and other recommendations from senior management, and senior management was entitled to rely on persons within the organization with direct responsibilities for managing the sales, marketing and other activities at issue.  See In re Citigroup Inc. S'holder Deriv. Litig., 964 A.2d 106, 132 (Del. Ch. 2009) ("directors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts").  Under the Delaware Code:  "A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors . . ." 8 Del. C. § 141(e); see also In re Walt Disney Co. Deriv. Litig. 906 A.2d  27, 59 (Del. 2006) (applied protections of § 141(e) based on reliance upon advice); In re Am. Int'l Group, Inc., 965 A.2d

763, 828 n.246 (Del. Ch. 2009) (reliance on auditors); <u>In re Healthsouth Corp. S'holders Litig.</u>, 845 A.2d 1096, 1106 (Del. Ch. 2003) (reliance on reports and recommendations of the CEO).

        In their Complaint, Plaintiffs concede (and Pfizer's proxy statements make clear) that Pfizer had extensive reporting systems and controls.   <u>See</u> Plaintiffs' Consolidated and Amended Complaint at ¶ 151 ("The 2002 and 2004 CIAs contained extensive reporting requirements to make senior management and the Board aware of non-compliance . . ."); <u>see also id.</u> ¶¶ 131, 181.   That admission leaves Plaintiffs to argue that Defendants consciously disregarded or affirmatively encouraged violations of the law, and that they did so both intentionally and in bad faith.   However, Plaintiffs have failed to adduce proof of conscious disregard; in fact, the direct evidence is to the contrary.   As clear − indeed, uncontroverted − evidence demonstrates, the Individual Defendants vigorously and faithfully discharged their oversight responsibilities:

- The Board of Directors and Audit Committee, which had responsibilities for compliance matters, frequently met and regularly addressed compliance issues. (<u>See</u> Shaftel Decl. Ex 1 at 10-11, 16-17; Ex. 1 annex 2 at iii − v; Ex. 25 - 45.)   The Chief Compliance Officer, General Counsel and internal and external auditors provided reports at nearly every Audit Committee meeting.   (<u>See</u> Shaftel Decl. Ex. 18 − 22; 26 − 35.)   Indeed, each year, the Audit Committee insisted that the Chief Compliance Officer certify that the compliance group had adequate resources to keep the Board and management updated on the operations and effectiveness of the compliance program.   (<u>See</u> Shaftel Decl. Ex. 18 − 22.) Further, the Board received reports discussing significant legal matters in advance of each meeting.

- The Audit Committee was promptly advised of compliance matters warranting investigations, including <u>qui tam</u> actions, and required that it regularly be provided with a "tracking chart" to monitor the progress of these matters.  (<u>See</u> Shaftel Decl. Ex. 2; 23 at 38:13 − 39:13; 51 at 127:4 − 127:17.)

- As soon as compliance-related concerns arose with respect to the relevant products, the Board and senior management promptly initiated thorough, diligent investigations which included the retainer of competent, outside counsel in connection with investigations, as well as Pfizer's in-house lawyers. (<u>See</u> Shaftel Decl. Ex. 6 at 37:7 − 37-14, 70:10 − 71:10, 179:18 − 181:9, 218:10 − 221:13,

270:15 – 272:11; 13 at 52:2 – 53:16, 70:4 – 70:15, 351:9 – 351:13, 381:7 – 381:15; 6 at 178:12 – 178:17; 9 at EOUSA 1442; 10 at 2; 12 at PFE DERIV A 00007159; 46 at PFE DERIV A 00000538; 54 at PFE DERIV A 0008321.)

- As the investigations proceeded, the Board and senior management regularly monitored outside counsel's investigation. (See Shaftel Decl. Ex. 51 at 118:8 – 118:19, 210:12 – 211:17, 127:4 – 127:17; 23 at 38:13 – 39:13; 2; 26 – 45.)  After an issue was raised, the status of the pending matter was raised regularly at subsequent meetings.  (See Shaftel Decl. Ex. 6 at 53:22 – 54:22.)

- Pfizer also self-reported alleged compliance violations as soon as they came to light, including upon learning of alleged conduct related to the medicines at issue. (See Shaftel Decl. Ex. 11 at BEX004352721; 17.)

- Together with the commencement of investigations, the Board and senior management promptly implemented corrective actions even before investigations ran course. (See Shaftel Decl. Ex. 3; 8; 28; 45; 46 and 51 at 127:4 – 127:17.).  For example, the Board and Audit Committee oversaw improvements to Pfizer's monitoring and prevention of off-label promotion during the course of the Genotropin investigation.  (See Shaftel Decl. Ex. 5 at PFE DERIV 00077301 – 11; 46 at PFE DERIV A 00000538; 52 at PFE DERIV A 00010111; 53 at PFE DERIV A 00008794; 55 at PFE DERIV A 00006626.)   Further, numerous communications and retraining was conducted for the Bextra sales force shortly after Pfizer learned of the qui tam allegations.  (See Shaftel Decl. Ex. 15; 16 at PFE DERIV 00072995, 97-98.)

- Board members requested, and were provided with information related to discipline for non-compliant conduct.  (See Shaftel Decl. Ex. 51 at 118:8 – 118:19, 210:12 – 211:17.)  Whenever warranted, strict disciplinary measures were implemented.

- The Board and senior management aggressively implemented enhancements to Pfizer's compliance program to discourage violations of Pfizer's policies and procedures.  For example, it placed restrictions on payments to physicians for speaker programs and imposed limits on the content of those programs, removed sales and marketing personnel from the continuing medical education and charitable grants process, imposed limits on advisory boards, eliminated physician mentorships, restricted detailing, made changes to sales quotas and credit, and revised the process for publishing and disclosure related to medical research. (See Shaftel Decl. Ex. 4 at 77:18 – 80:18, 90:23 – 91:2; 5 at PFE DERIV 00077301 – 02; 6 at 338:14 – 339:17.)

In addition, on a review of the record, both Mr. Pitt and Mr. Breeden found that:

- Throughout the period relevant to plaintiffs' claims . . . the Pfizer Directors were diligent and attentive in the exercise of their oversight duties and, in many

instances took pro-active steps to enhance Pfizer's compliance function beyond those recommended or previously implemented by management.  Ex. A at 1.

- The Directors' belief that they were acting consistent with their fiduciary duties was reasonable because, among other things, the processes that the Pfizer Board and Audit Committee employed were consistent with best practices in corporate governance.  Ex. A at 1.

- [T]his was a highly responsible board that took its compliance responsibilities seriously. . . .  [I]t was my opinion that Pfizer's board and senior management faithfully executed their respective roles in overseeing, implementing and continuously enhancing Pfizer's healthcare compliance system, and the record does not support a conclusion that either management or the board consciously disregarded their respective duties.  Ex. B at 3.

The propriety of the Defendants' conduct is further corroborated by the fact that the government essentially continued Pfizer's existing compliance procedures and policies after reaching compliance-related Corporate Integrity Agreements ("CIAs") with the Company in 2002 and 2004 – both of which related to legacy conduct of predecessor entities and not Pfizer itself – and also in 2009.  Specifically, each of the three CIAs essentially codified existing Pfizer policies.  (See Shaftel Decl. Ex. 7; 14 at 1-2, 5, 7-10, 18; 6 at 21:22 – 22:3; 56 at 74.) Defendants' regulatory compliance expert, Lori S. Richardson Pellicioni, testified that in her experience as a former Assistant U.S. Attorney, the fact that the government "adopt[ed] and allow[ed] Pfizer to operate the compliance program they had in place [under the CIAs] . . . [demonstrated] that they were comfortable with what was in place and therefore deemed it to be an effective compliance program."  Id. at 93.  In addition, the government, despite exhaustive investigations spanning literally years, never made any charges against any of the Individual Defendants.

In light of the exceedingly high legal standard under Delaware law and Defendants' extensive record of discouraging, preventing and punishing compliance violations, Defendants contend that Plaintiffs are unlikely to prevail should this action proceed.

### iii.   Likely Duration and Cost of Continued Litigation is High

Courts are also required to consider the likely duration and cost of continued litigation in assessing whether a proposed settlement is reasonable.  See AOL Time Warner, 2006 WL 2572114 at *3.  Where, as here, the continued prosecution of an action would require the company to incur substantial costs and expenses, settlement is favored.  See id., (finding that settlement "obviates the expenditure of any future time and expense in connection with [the] action, and will allow the Company to direct its full attention to its substantive business") (internal citations omitted); Metropolitan Life, 935 F. Supp. at 293-94 (finding settlement in the best interest of all parties "[i]n view of the effort and expense that would be required to take this case to and through trial").

The continued prosecution of this action would require the parties to incur substantial costs, particularly given that the case involves 15 individual defendants, plus numerous other non-party fact and expert witnesses and a voluminous documentary record. Settlement at this point in time further benefits the Company because it would not only obviate the expenditures of any future time and expense in connection with this litigation, but it will also favorably resolve the related, overlapping matters pending in other jurisdictions, and will allow the Company to direct its full attention to substantive business.  See AOL Time Warner, 2006 WL 2572114 at *3; see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 107 (2d Cir. 2005) (quoting TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 460 (2d. 1982)) (allowing settlement of related claims, even if not asserted in the complaint, as long as they arose from the "'identical factual predicate' as the settled conduct"); In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. 436, 458 (S.D.N.Y. 2004) (same).

### iv.    Shareholder Objections to this Settlement are Likely to Be Minimal

At this point, Defendants do not foresee that a substantial number of Pfizer shareholders will object to this Settlement.  The proposal supplements the Company's program with additional oversight from a newly formed Regulatory Committee, and includes the addition of a corporate ombudsman, a neutral party charged with disclosure of any employee misconduct.  Furthermore, the terms of this settlement have created a substantial monetary fund from which the Regulatory Committee can make additional compliance enhancements, should they become necessary at some point in the future.  These structural changes can only improve Pfizer's already world-class compliance program, and thus will likely draw few objections from shareholders.

### CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court approve the Settlement in its entirety.

Dated:    New York, New York
          December 2, 2010

                              **CADWALADER, WICKERSHAM & TAFT LLP**


                              By:  /s/   Dennis J. Block_____
                                   Dennis J. Block
                                   Hal S. Shaftel
                              One World Financial Center
                              New York, New York 10281
                              Telephone: (212) 504-6000
                              Facsimile:  (212) 504-6666

                              *Counsel for Director Defendants*

**DAVIS POLK & WARDWELL LLP**


By:  /s/ Robert B. Fiske, Jr._____
     Robert B. Fiske, Jr.
     James P. Rouhandeh
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800

*Counsel for Executive Defendants*


**DLA PIPER LLP (US)**


By:  /s/  John R. Wellschlager_____
     John R. Wellschlager
     John C. Dougherty
6225 Smith Avenue
Baltimore, Maryland 21209
Telephone: (410) 580-4140
Facsimile:  (410) 580-3140

*Counsel for Nominal Defendant Pfizer Inc.*