# EXHIBIT A

United States District Court
Southern District of New York

-------------------------------------------------x
:
In re Pfizer Inc.                                :   No. 09-CV-7822
Shareholder Derivative Litigation                :
:
:
-------------------------------------------------x

# DECLARATION OF HARVEY L. PITT

Harvey L. Pitt, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. §1746:

1.  This is a Declaration in support of the proposed settlement between the parties in the civil action In re Pfizer Inc. Shareholder Derivative Litigation, United States District Court for the Southern District of New York, No. 09-CV-7822 (JSR).

2.  I was previously retained by Cadwalader, Wickersham & Taft, LLP ("CWT"), counsel to the defendant independent directors (collectively, the "Directors") of the Board of Pfizer, Inc. ("Pfizer") in this litigation, as an expert witness regarding corporate governance matters, and in that capacity reviewed the relevant record.

3.  Throughout the period relevant to plaintiffs' claims, I believe the Pfizer Directors were diligent and attentive in the exercise of their oversight duties and, in many instances took pro-active steps to enhance Pfizer's compliance function beyond those recommended or previously implemented by management. The Directors' belief that they were acting consistent with their fiduciary duties was reasonable because, among other things, the processes that the Pfizer Board and Audit Committee employed were consistent with best practices in corporate governance.

4.  I now have been asked to express my opinion whether the terms of the proposed settlement of this action—which include, among other things, the proposed creation of a

Regulatory and Compliance Committee (the "Regulatory Committee") with a significant five year budget dedicated to oversight of Pfizer's compliance with applicable healthcare law requirements—would provide Pfizer and its shareholders with significant additional benefits. For the reasons discussed herein, I believe that the terms of the proposed settlement, including creation of a Regulatory Committee, will materially enhance Pfizer's already sound corporate governance and compliance functions.

5.     The views expressed in this Declaration are solely my own, based upon my work over the past four decades with boards of directors, audit committees and corporate compliance personnel. This Declaration has been drafted by me, with assistance from certain of my colleagues who work under my supervision.

I.     **Experience and Background**

6.     I am currently (and for the past seven years have been) the Chief Executive Officer of Kalorama Partners, LLC, a global consulting firm, and its law firm affiliate, Kalorama Legal Services, PLLC (together, "Kalorama"). Over the past forty-two years, I have worked with many public companies and their boards of directors, as a practicing attorney, as a government regulator, and most recently as a corporate governance consultant.

7.     I am an attorney at law, admitted to practice in the State of New York and the District of Columbia. I am currently the Chief Executive Officer and founder of Kalorama Partners, LLC, a global strategic business consulting firm, specializing in corporate governance, regulatory, accounting, economic and risk/crisis issues. I am also currently the Chief Executive Officer of Kalorama Legal Services, PLLC, the law firm affiliate of Kalorama Partners.

8.     I graduated with a Bachelor of Arts degree in 1965 from the City University of New York (Brooklyn College), and received my J.D. degree from St. John's University Law School in 1968. In 2002, I was awarded an LL.D. (Hon.) from St. John's and in 2003, I was awarded the Brooklyn College President's Medal of Distinction. I have been admitted in, and have argued before, all the federal appellate courts as well as the U.S. Supreme Court.

2

9.      In addition to my position as CEO of both Kalorama firms, I am currently a director of GWU Medical Faculty Associates, Inc. ("MFA"), a not-for-profit corporation organized pursuant to §501(c)(3) of the Internal Revenue Code, that provides comprehensive health care to patients in the Washington, D.C. metropolitan area. I am also an advisor to the Global Advisory Forum for CQS (UK) LLP and CQS Investment Management Limited, an international group of alternative asset management funds principally operating out of London, England. Further, I am an independent director of the hedge fund firm Paulson & Co, Inc., and I am a member of the Advisory Forum for the hedge fund firm Millennium Management.

10.     I previously served for three years (2006-2009) on the National Cathedral School's ("NCS") Board of Trustees, and was, at various times, Board Vice-Chair, Co-Chair of the NCS Board's Governance Committee and Chair of the NCS Audit and Compensation Committees. I also previously served for four years (2004-2008) on the Board of Directors of Approva Corporation, a manufacturer of software solutions that assist corporations in improving their internal controls and compliance with the requirements of the Sarbanes-Oxley Act of 2002 ("S-Ox"). I was a member of Approva's Audit and Strategic Planning Committees.

11.     Upon graduating from law school, I served on the Staff of the Securities and Exchange Commission ("SEC") from 1968 until 1978, the last three years of which I served as General Counsel, the Agency's Chief Legal Officer. In my role as General Counsel, I provided advice to the Commission, its senior Staff and to federal and state courts as *amicus curiae*, on a broad scope of securities, corporate and administrative legal and policy issues. A significant part of my responsibilities involved the fiduciary and compliance obligations of public companies, like Pfizer, and their boards, managers and outside advisors.

12.     After concluding my tenure as General Counsel of the SEC, for nearly a quarter of a century (1978-2001), I was a senior corporate partner at the international law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"). From 1998-2001, I was Co-Chairman of Fried Frank, responsible for all facets of the administration of a global law

firm. Prior to 2001, I chaired Fried Frank's Washington, D.C. office, headed the Firm's securities and regulatory practice group, and served as Chair of the Firm's Policy Planning Committee.

13. In my second tour of duty with the SEC, from 2001 to 2003, I was privileged to serve as the Agency's 26th Chairman. During my tenure as Chairman, among other things, I oversaw the SEC's response to market disruptions resulting from the terrorist attacks of 9/11, I created the SEC's "real time enforcement" program, a policy geared towards making the SEC's enforcement initiatives more timely, efficient and effective for the benefit of investors, and I also led the SEC's adoption of dozens of rules affecting corporate governance in response to the corporate and accounting crises generated by the excesses of the 1990s.

## II. The Terms of the Proposed Settlement Will Confer a Significant Benefit on Pfizer and Its Shareholders

14. I understand that the parties to this action have recently reached a preliminary agreement to settle this action. I have read the corporate governance-related settlement terms. A key term of the proposed settlement is the establishment and funding of a new Regulatory Committee that would assume oversight responsibilities with respect to healthcare marketing law compliance that are currently borne by the Audit Committee.

15. I believe that the record in this case is replete with evidence that the Directors acted diligently, consistent with well-established principles of corporate governance, and in good faith in exercising their responsibilities. However, it is always possible to do better. It is my opinion that establishing a Regulatory Committee will provide Pfizer and its various constituencies with significant and enduring benefits, and will place Pfizer at the cutting edge of corporate governance practices. In stating this opinion, I do not suggest that the Directors breached their duties by not having such a committee in place during the time period relevant to plaintiffs' claims.

16. I have long recommended, as a regulator, in my professional private practice matters, and in lectures and articles, that corporate boards consider establishing committees, separate and apart from their audit committees, dedicated to the oversight

4

of legal and regulatory issues. The proposal for the creation of a Regulatory Committee embodied in the corporate governance-related settlement terms contains all the significant features that I have recommended over the years. In my opinion, the establishment of the proposed Regulatory Committee, as set forth in the settlement terms, will confer a significant benefit on Pfizer and its shareholders, especially in light of the provision of a segregated source of funding for the committee's activities over the next five years.

        a.    **Establishment of a Regulatory Committee and Creation of a Corporate Ombudsman**

17. The corporate governance-related settlement terms provide that Pfizer will establish and operate a Regulatory Committee of the Board. The Regulatory Committee would consist of at least five members "who will exercise oversight responsibility on significant healthcare related regulatory and compliance issues, based on criteria to be developed by the Regulatory Committee. . . ." The Regulatory Committee must be comprised of at least a majority of independent directors, and may include senior Pfizer employees ex-officio. The Chair of the Regulatory Committee must not only be an independent director, he or she must have first been elected to the Pfizer Board since January 1, 2007, possess relevant experience in law, corporate compliance, regulatory or government affairs, academia or service on the board of a healthcare institution or other highly regulated company. At least one member of the Regulatory Committee will have a significant background in healthcare, and at least one member must also be a member of the Audit Committee.

18. The corporate governance-related settlement terms provide for the establishment of a $75 million fund that, after payment of Court-approved fees and expenses of plaintiffs' counsel in connection with this action, would be placed in escrow and subject to the control of the Regulatory Committee as a source of additional funding for its activities during its initial five year term.

19. The Regulatory Committee would meet at least quarterly, and the scope of its oversight responsibilities would include:

- Substantive regulatory and compliance obligations, including

    * Medicare/Medicaid funding regulations;

    * drug marketing, including off-label marketing restrictions, and safety, superiority and efficacy claims;

    * FCPA compliance;

    * Clinical studies and drug manufacturing quality control; and

    * Required reporting to the FDA of drug safety;

- Review and evaluation of significant external complaints, including *qui tam* suits, government investigations, FDA warning letters and retaliation claims, concerning regulatory or compliance behavior; and

- Internal messaging to and training of Pfizer employees concerning compliance.

20. The Regulatory Committee would have the authority, in its discretion, to require management to conduct audits on compliance, regulatory or legal concerns, to commission external reviews, and to retain its own outside counsel, consultants or experts.

21. The Regulatory Committee will be authorized to report to the full Board on the adequacy of compliance staffing. In addition, in consultation with the Compensation Committee, the Regulatory Committee will be authorized to review and discuss with management such compensation practices, including sales incentives, as might not be aligned with compliance incentives; as appropriate, the Regulatory Committee will also be authorized to recommend clawbacks of compensation to the Compensation Committee.

22. The settlement terms also provide for the appointment of an Ombudsman, operating under the direction of the Chief Compliance Officer, to provide an alternative channel for employees to address work-related concerns, including conduct believed to be inconsistent with Pfizer's policies, practices, standards or values. The Ombudsman would be an independent party, with confidentiality obligations to those who bring concerns to him or her, although he or she would also be subject to applicable

corporate disclosure requirements. The Ombudsman would report directly to the Compliance Group and would also report directly to the Regulatory Committee.

### b. Benefits of Establishing the Regulatory Committee

23. The development of audit committees was a truly inspired idea. And, over the years, the idea has been honed and massaged to the point where audit committees perform critical functions and provide a measure of protection for public shareholders that every corporation requires and deserves. After starting out as a best practice of corporate governance, audit committees are now statutorily mandated by federal law for all public companies.

24. But, the very success of audit committees has led many companies to assign them functions in addition to overseeing public company financial reporting and related accounting practices. In addition to oversight of the corporation's financial reporting and systems of internal control—responsibilities that have grown more complex and time consuming, especially since the adoption of S-Ox and the recent Dodd-Frank Act—audit committees have often also been given responsibility for risk management, disclosure obligations and corporate legal and regulatory compliance. The attributes that define audit committee members make them well-suited for many of these responsibilities. However, in light of the many functions that audit committees are now required to perform, for corporations with a sufficient number of directors, it would be optimal to create a separate committee to devote exclusive focus and energy on legal and regulatory compliance matters. I have therefore long advocated the creation of such a separate committee in addition to the audit committee.

25. I acknowledge and believe that an audit committee can shoulder both responsibilities and, indeed, in my estimation the Pfizer Audit Committee did so quite adroitly, and with diligence and good faith.

26. Going forward, however, in my experience there are real benefits to creating a separate board committee with primary responsibility for legal and regulatory oversight. This is especially true where a corporation, like Pfizer, operates in a highly regulated industry. By taking responsibility for some of the oversight responsibilities currently

borne by the Audit Committee, the creation of a separate Regulatory Committee would further enhance both the Board's ability to exercise its oversight responsibilities with respect to healthcare law compliance and its ability to oversee Pfizer's financial reporting and financial controls.

27.   The terms outlined in the corporate governance-related settlement terms are, in my experience, well-designed to achieve the benefits of having a separate legal and regulatory oversight committee. The settlement terms provide for something that I have long recommended: the wisdom of having at least one member of the Audit Committee also sit on the Regulatory Committee, in order to promote coordination between the two committees and avoid the risk of matters "falling through cracks." Legal and regulatory matters can have an impact on the corporation's financial statements, and it is therefore important that the Regulatory Committee not function in a vacuum.

28.   The corporate governance-related settlement terms also envision coordination between the Regulatory and Audit Committees, to delineate the division of responsibilities between them, as well as reporting lines between external and internal auditors and the committees. This is especially important given that the 2009 CIA currently allocates certain responsibilities to the Audit Committee which might more logically be assumed by the Regulatory Committee. The settlement terms provide that the two committees, either through their chairs or otherwise at the committees' discretion, shall confer to assign such responsibilities under the 2009 CIA as annual certifications and annual reporting to the full Board on the state of compliance functions, compliance problems that have come to light, pending investigations and disciplinary actions touching on compliance matters, and any other issues that may potentially reflect systemic or widespread compliance issues exposing Pfizer to substantial compliance risk.

29.   The corporate governance-related settlement terms envision a number of matters on which the Regulatory and Compensation Committees will work jointly. With its focus on legal and regulatory matters, the Regulatory Committee will be able to assist the

Compensation Committee by bringing more focused compliance expertise to all compensation decisions.

30. When Rule 205 of S-Ox, was promulgated, I envisioned that the safe-harbor provisions for attorney reporting would create a significant incentive for boards to create QLCCs. Fewer corporations than I had expected have done so, however. The most frequently cited reasons have been an insufficient number of directors—a concern that does not apply to Pfizer—and the financial costs of establishing a separate committee with significant oversight responsibilities. The proposed settlement not only commits but segregates a significant sum of money to fund the Regulatory Committee's activities for up to five years, eliminating at the outset any concerns about the committee's ability to conduct whatever operations, including the retention of outside counsel or other experts and advisors, as it sees fit.

31. While Pfizer already maintains confidential channels for employees to report compliance-related concerns, providing for the appointment of an Ombudsman will also provide significant benefits to Pfizer and its shareholders. As proposed, the Ombudsman would provide an alternative channel of reporting for employees that goes directly to the Regulatory Committee. This should increase employee confidence in all of Pfizer's internal reporting mechanisms. One unfortunate consequence of recently-enacted whistle-blowing statutes is that they create incentives for employees to report externally without seriously considering reporting internally, regardless of the actual receptivity of the corporation to employee reports. When employees are persuaded that their company really does care about ethical and lawful behavior, they will buy into the process and will take their concerns, in the all-important first instance, to internal mechanisms rather than feeling compelled to take their concerns to external bodies. Companies that encourage their employees to raise problems internally give themselves that all important critical step — finding out about a problem before it has become a crisis—and demonstrating to all their constituencies that they are committed to effective compliance, and discourage any departure from their policies, procedures and high ethical standards.

## III. Conclusion

32. In my experience, both as a regulator and as a corporate advisor, shareholders fare the best when boards exercise independent judgment, insist on learning all the significant facts pertaining to important issues, and exercise good faith business judgment in deciding how to respond to the matters of which they become aware. In my opinion, Pfizer's shareholders received the benefit of those efforts in the matters at issue in this case.

33. That does not mean that benefits cannot be achieved by continuing to enhance Pfizer's compliance-related programs. In my opinion, the terms of the proposed settlement will provide Pfizer and its shareholders with significant benefits that further enhance its legal and regulatory compliance programs.

December 2, 2010

                                                                       /s/ Harvey L. Pitt