# EXHIBIT B

# Affidavit in Support of Proposed Settlement

of

# RICHARD C. BREEDEN

*In Re Pfizer Inc. Shareholder Derivative Litigation*

United States District Court
Southern District of New York
No. 09-CV-7822 (JSR)

December 2, 2010

# AFFIDAVIT OF RICHARD C. BREEDEN

Richard C. Breeden, being duly sworn, deposes and says as follows:

## Introduction

1.      This is an Affidavit in support of the proposed settlement between the parties in the civil action In Re Pfizer Inc. Shareholder Derivative Litigation, United States District Court for the Southern District of New York, No. 09-CV-7822 (JSR) (the "Pfizer Litigation").

2.      I was previously engaged to provide an expert opinion on behalf of the independent director-defendants of Pfizer Inc. ("Pfizer" or the "Company") concerning the manner in which they discharged their fiduciary duties relating to their stewardship of compliance matters during a prolonged period from 2001-2009.[1]  As reflected more fully in this Affidavit, in my opinion the proposed settlement is a fair and reasonable resolution of the Pfizer Litigation and will benefit the Company and its shareholders in several important respects.

## Experience

3.      I graduated from Stanford University in 1972 and from the Harvard Law School in 1975.  During my career I have been a legal or strategic advisor to many companies and boards of directors.  I have also consulted with companies on corporate governance practices, internal controls, financial reporting, risk management, ethics and compliance training and controls, and many similar issues.  For approximately four years I served as a senior economic,

---

[1]    My Affidavit concerning the terms of the proposed settlement of the Pfizer Litigation is submitted on behalf of the individual director defendants.  I have had access to the entire discovery record in this case, and I have reviewed extensive documentary materials in the record, including those listed on Appendix I hereto.  In formulating this Affidavit, I have carefully reviewed the claims of the plaintiffs regarding asserted deficiencies in the overall governance practices at Pfizer, and in particular alleged failures by the directors to respond adequately to Pfizer's compliance obligations.  In evaluating these claims, I have considered both the record of this case and my personal experience with matters of corporate governance as a legal counsel, regulator, corporate monitor, advisor, director and shareholder over a period of more than 30 years.

1

financial and policy advisor to George H.W. Bush during his tenure as both Vice President and President of the United States. From 1989-1993, I served as Chairman of the U.S. Securities and Exchange Commission following unanimous confirmation by the United States Senate. During my tenure at the Commission we initiated more than 1,200 individual enforcement actions for violations of the federal securities laws.[2] Following government service I have consulted widely with companies, as well as serving as a corporate monitor in three companies that experienced serious legal and ethical issues.[3] I currently manage more than $1 billion in assets invested in equity securities on behalf of major institutional investors.

4.     Of particular relevance to this case, over the past 15 years I have been a director of a dozen companies in both the U.S. and Europe. These companies have been both large and small, with up to 123,000 employees and operations in more than 60 countries. Several of these companies (both domestic and foreign) have had significant regulatory compliance obligations, including, in different companies, rules of the Securities and Exchange Commission, Federal Reserve Board, Office of Thrift Supervision, the Bank of Spain, and the U.S. Food and Drug

---

[2]   In my former capacity as Chairman of the U.S. Securities and Exchange Commission I had extensive experience evaluating the compliance record of many companies, senior executives and corporate directors. In scores of litigated enforcement cases or matters under investigation, the Commission had to decide whether the actions or inactions of senior corporate officials made it appropriate for charges to be brought against senior management or the corporate entity in addition to charges against individuals who had initially violated the law. Among the sanctions the SEC can impose are lifetime bars on individuals serving as an officer or director of any publicly traded company (or participation in the securities business), and such cases frequently require evaluation of the conduct of individuals in the face of known or potential violations of law. On the facts I have seen, I would never have even considered an SEC enforcement action against the Pfizer directors as a result of the Bextra matter.

[3]   In these three assignments spanning a total of seven years, I reviewed the actions of hundreds of officers, directors or partners at firms where major compliance failures took place. In each of these assignments, I was required to evaluate both corporate and individual conduct under a wide variety of compliance standards. These included various statutory requirements as well as the U.S. Sentencing Guidelines, a Deferred Prosecution Agreement, several Temporary or Permanent Injunctions, Enforcement Orders and Delaware fiduciary standards. In two of these situations the conduct of directors was far more questionable than anything in the Pfizer Litigation. The Pfizer directors may not have perceived weaknesses in the compliance system that allowed the Bextra situation to develop, but they devoted enormous time, business skill and manifest good faith to their work. This was not a group willing to play a compliance version of Russian roulette.

2

Administration ("FDA"), as well as the Department of Justice and the IRS.[4]  I have chaired or served as a member of several audit committees, and I have on numerous occasions had to evaluate compliance matters or material litigation as a director, including an enforcement proceeding involving the FDA.

### Evaluation of the Terms of the Proposed Settlement

5.      One strong factor in the reasonableness of the proposed settlement is the fact that this was a highly responsible board that took its compliance responsibilities seriously.  Indeed, the Pfizer Audit Committee devoted as many meetings each year, and as much aggregate time to presentations and discussions on compliance matters, as any Audit Committee I have seen.  The Audit Committee and the full Board routinely received extensive written reports devoted to healthcare law compliance matters, regular briefings from the legal, compliance and internal and external auditor, and had at its disposal a wealth of information that would have given them a reasonable basis to conclude that Pfizer's management was taking concrete and affirmative steps to create a culture of compliance, to prevent and detect healthcare compliance issues and to respond vigorously, through investigation, remediation and most notably by self-reporting to its regulators incidents of compliance violations.  In short, it was my opinion that Pfizer's board and senior management faithfully executed their respective roles in overseeing, implementing and continuously enhancing Pfizer's healthcare compliance system, and that the record does not support a conclusion that either management or the board consciously disregarded their respective duties.

6.      The proposed settlement calls for the creation of a new Regulatory and Compliance Committee (the "Regulatory Committee") of the Pfizer board.   The Audit

---

[4]     Obviously these are only the federal or other national regulators for such companies.  In virtually every case, the companies on whose boards I served also had compliance obligations to one or more state regulatory bodies.

Committee would cease to have responsibility for compliance matters, all of which will be transferred to the new Regulatory Committee. The new committee would specialize in reviewing all compliance matters, without the need to spend substantial time worried about the myriad accounting issues (including, for example, changes in accounting policies, reserve assumptions, and depreciation methodologies) that audit committees must focus on continuously.

7.     Under the Settlement, the Regulatory Committee would have a mandate to review an extremely broad spectrum of issues including Medicare/Medicaid rules, drug marketing rules and company programs, Foreign Corrupt Practices Act issues for non-U.S. marketing, manufacturing quality control, clinical studies quality control and drug safety reporting. Beyond these issues of substantive regulatory obligations, the Regulatory Committee would be charged with oversight of Pfizer's review and evaluation of external complaints or criticisms. This would include reviewing FDA warning letters, *qui tam* suits, government investigations and similar matters, as well as reviewing data on drug usage to determine if further management analysis is appropriate. In performing work in these areas, the Regulatory Committee would receive reports from Internal Audit, the Chief Compliance Officer, the Executive Compliance Committee, and others. The Regulatory Committee would also reviewing "internal messaging" to employees about compliance, and the oversight of acquired companies and bringing them into line with Pfizer compliance policies.

8.     Separating the current Audit Committee into two committees will produce several immediate benefits for Pfizer and its shareholders. First, the Regulatory Committee will focus exclusively on monitoring compliance activities, including efforts to improve the overall system as well as reviewing regulatory or compliance cases and individual issues. This will further enhance attention on compliance matters, particularly at times of the year when the attention of

the former Audit Committee will need to be focused on completing the annual independent audit and related financial disclosures.

9.     While the Audit Committee formerly devoted one meeting per year exclusively to compliance issues, in the future the Regulatory Committee will devote every meeting exclusively to compliance issues. This is no small change, and it will produce even greater focus within the board on compliance questions. It will also allow a significant expansion of board time devoted to reviewing compliance matters, as the committee members will focus solely on these issues. Committee reports at board meetings will also be free to go into greater depth, as they will not also be covering audit and compliance issues in the same report.

10.    By expanding the time and focus of the board on compliance matters, the settlement will also enhance the internal focus on such issues within management even though such issues already command a very high priority. Each board committee develops its own staff, effectively, within management to support its operations. Audit committees rely heavily on corporate controllers, treasurers and CFOs, for example, in doing the work to prepare for meetings. The new Regulatory Committee will foster an even more focused and dedicated staff support function embracing a wider group of internal experts such as compliance, General Counsel, human resources, Internal Audit, sales and marketing and perhaps others.

11.    Beyond the greater availability of time, the fact that a board committee exists solely for compliance matters will give greater importance and stature internally to the compliance function and its associated career path. This will be an intangible but not

insubstantial boost for compliance personnel and will reinforce the stature they will have within the organization.[5]

12.     Another benefit of the new structure should be an improved Audit Committee. While the members of the Audit Committee have been indefatigable in terms of workload in the past, the separation of the two committees will allow the Audit Committee to focus exclusively on audit issues.  This should allow the Audit Committee to focus in even more depth on accounting and audit issues that might have had lesser attention in the past to make room for compliance and regulatory issues.

13.     Separating the two committees will also allow the board to staff each committee with members with relevant backgrounds.  It is noteworthy that the proposed settlement requires that the Chair of the Regulatory Committee should have "relevant experience in law, corporate compliance, regulatory or governmental affairs, academia or service on the Board of a healthcare institution or highly regulated company."  In my opinion, defining the criteria for the Chair of this committee in this way is an important step.

14.     I serve on the board of a medical device manufacturer that has a dedicated compliance committee that is separate from the audit committee.  The committee is chaired by an experienced healthcare executive who understands the company's overall compliance environment extremely well from her own company's experiences.  The dedicated committee has built tracking systems for regulatory issues that are sophisticated, and that help the board focus on areas of regulatory risk as well as simple compliance questions.  In my experience, the compliance committee of this board has added enormously to the depth and quality of board

---

[5]     Of course when the board promoted Jeffrey B. Kindler, former head of compliance, to be the Company's CEO they sent a ringing message about the critical importance of compliance within Pfizer, and its support within the board.  The new committee will reinforce that message every time it meets.

oversight of compliance and regulatory questions.  It has allowed a far more robust interaction between the committee members and management than could possibly occur within an audit committee.  Having seen such a committee at work for more than two years, in my experience this is a far, far more important change than the simple description of two committees rather than one.  Having a dedicated compliance committee unquestionably elevates the importance of compliance questions, and has many other positive attributes.[6]

15.    The establishment of the new Regulatory Committee should prove beneficial to Pfizer.  Moreover, based on a review of the proxy statements of all U.S. pharmaceutical companies, it is evident that the proposed settlement will also help advance compliance initiatives within the broader industry.  The proposed Pfizer committee has a far more extensive mandate than any other pharmaceutical company currently provides for similar board committees. I have reviewed recent proxy statements and other governance materials relating to Pfizer's major U.S. competitors, including Abbott Laboratories, Amgen Inc., Bristol-Myers Squibb Co., Eli Lilly & Co., Johnson & Johnson, and Merck.  Based on this review, it appears that the governance improvements resulting from both the formation of the Regulatory Committee and the proposed scope of its oversight responsibilities will cause Pfizer to be an industry leader with respect to board oversight of regulatory, legal and compliance matters.

16.    As an initial matter, only two of Pfizer's competitors (Amgen and Eli Lilly) have a board committee that is charged solely with oversight of regulatory and compliance matters.  A third company, Abbott Labs, has a board-level Public Policy Committee that is also charged with

---

[6]    Another positive aspect is that such a committee results in several members of the board becoming experts in appreciating regulatory risks.  Having sat in on hundreds of audit committee meetings, I have found the discussions of this compliance committee refreshingly different.  There is a much closer business focus, and less time wasted on relatively trivial questions of accounting process.  That frees up the time to track and evaluate regulatory inspections and their related reports in far more detail.

compliance oversight. Pfizer's other U.S. competitors include compliance oversight among the responsibilities of the Audit Committee, as Pfizer does at present.

17.    In addition, none of the three companies that vest compliance oversight in committees other than the Audit Committee describes the committee's responsibilities with the level of breadth, detail and focus that is reflected in the proposed scope of responsibility of Pfizer's Regulatory Committee. For example, the charter of Amgen's Corporate Responsibility and Compliance Committee Charter describes the committee's responsibilities in mostly general terms and with a focus almost exclusively on oversight of management's implementation of the company's compliance program. Unlike the proposed Regulatory Committee charter, it does not list specific areas of law and regulation to which the committee's oversight responsibility extends, nor does it require committee members to review external regulatory and compliance complaints or the company's internal messaging relating to compliance matters. It also does not require the committee to oversee the integration of acquired companies into Amgen's compliance program, a role specifically assigned to the Pfizer Regulatory Committee.

18.    The formation of a Regulatory Committee of the Pfizer board with a detailed scope of responsibility and relevant qualification requirements should also provide a benefit to shareholders in other companies who choose to emulate Pfizer's system, and also to the public. It could also prove beneficial to Pfizer shareholders if the end result of this process is for Pfizer to build a regulatory/compliance control process that proves to be a positive differentiator in terms of having reduced regulatory event risks compared with peer companies. It will help every company justify enhanced compliance costs if investors place greater importance on control of regulatory/compliance risks, and Pfizer's example in this regard could provide a catalyst for others.

8

19.    The proposed settlement also provides for a $75 million payment from Pfizer's insurers to create a fund that will pay for fees awarded to counsel for plaintiffs, with the net remaining balance to be devoted to the establishment and operation of the Regulatory Committee for a five-year period.  This is in addition to the ongoing compliance expenditures at Pfizer, which run in the tens of millions of dollars annually.

20.    The escrow fund to be established under the proposed settlement will provide meaningful resources to fund the work of the Regulatory Committee over the first five years of its existence.  This is especially so in view of the fact that the proposed settlement terms do not indicate that the escrow fund will be the sole source of funding available to the Committee.  In other words, it appears that Pfizer's resources will be available to fund any initiatives of the Regulatory Committee that may require additional resources in the event that the escrow fund is fully expended.

21.    Based on a consideration of all the facts and circumstances presented to me, I believe that the terms of the proposed settlement – and in particular the establishment of a $75 million escrow fund (net of fee reductions) for the use of a newly established Regulatory Committee of the board – are fair and reasonable, especially when considered in view of what I believe to be the many significant weaknesses of plaintiffs' case in light of all relevant facts and the governing provisions of Delaware law.

_____
                                                  Richard C. Breeden

DISTRICT OF COLUMBIA:ss:

Sworn and subscribed to before me this _2nd_ day of _December_, 2010.

_____
                                Notary public

My commission expires:

PAULA R. MARTIN
COMMISSION EXPIRES
MARCH 14, 2015

9

*In re Pfizer Inc. Shareholder Derivative Litigation*
Affidavit of Richard C. Breeden in Support of Proposed Settlement
Appendix I – Documents Reviewed in Preparation of Affidavit

1. Amended Consolidated Shareholder Derivative Complaint and related pleadings and transcripts.

2. Select civil and criminal settlements by Pfizer subsidiaries and court filings in connection with these settlements (i.e. Criminal Information, Sentencing Memoranda, Settlement Agreements, etc.) for the period from 2000-2009.

3. Portions of Minutes of the Board and Audit Committee Meetings and the materials provided to the Board and Audit Committee in connection with these meetings (i.e. pre-reads, presentations, etc.) for the period from 2000-2009.

4. All or portions of depositions (and exhibits) or summaries thereof of the following individuals:

   a. Dennis Ausiello;
   b. Anthony Burns;
   c. Robert Burt;
   d. John Chapman;
   e. Donald Cornwell;
   f. Hugh Donnelly;
   g. Joseph Feczko;
   h. Margaret Foran;
   i. Constance Horner;
   j. William Howell;
   k. Suzanne Nora Johnson;
   l. Karen Katen;
   m. James Kilts;
   n. Jeffrey Kindler;
   o. Douglas Lankler;
   p. Hank McKinnell;
   q. Ian Read;
   r. William Steere;
   s. Allan Waxman.

5. Pfizer Corporate Integrity Agreements for 2002, 2004 and 2009, and 2007 Deferred Prosecution Agreement.

6. FDA warning letters and violation notices received by Pfizer during the period from 2000-2009.

7. *Qui tam* complaints referenced in the Consolidated Complaint and Congress of California Seniors complaint.

1

*In re Pfizer Inc. Shareholder Derivative Litigation*
Affidavit of Richard C. Breeden in Support of Proposed Settlement
Appendix I – Documents Reviewed in Preparation of Affidavit

8.  Pfizer Annual Reports to the HHS Office of Inspector General under the 2002 and 2004 CIAs and Reports of the Independent Review Organization (PwC) under the 2004 CIA.

9.  Selected Pfizer Internal Audit Reports and documents relating to KPMG financial statement and SOX 404 audits.

10. Selected Pfizer Presentations to the Department of Justice relating to investigations of conduct surrounding Bextra, Geodon, Zyvox, and Lyrica, as well as other compliance-related initiatives pursued by Pfizer during the relevant period.

11. GAO Report – FDA's Oversight of the Promotion of Drugs for Off-Label Uses (July 2008).

12. Other discovery and compliance-related materials provided by defense counsel.

13. The expert reports submitted by Professor Bernard S. Black and John Abramson.

14. Certain Pfizer Inc. background materials (i.e. SEC filings, Board member profiles, Company Charters, press articles, etc.).