UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PFIZER INC. SHAREHOLDER
DERIVATIVE LITIGATION

No. 09-CV-7822 (JSR)

ECF CASE

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF DERIVATIVE LITIGATION SETTLEMENT AND AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

**BERNSTEIN LITOWITZ BERGER &
     GROSSMANN LLP**
Mark Lebovitch, Esq.
David L. Wales, Esq.
Beata Gocyk Farber, Esq.
Jeroen van Kwawegen, Esq.
Jonathan D. Uslaner, Esq.
Kristin Ann Meister, Esq.
1285 Avenue of the Americas
New York, NY  10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444

*Court-Appointed Lead Derivative Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

I.      INTRODUCTION ........................................................................ 1

II.     BACKGROUND OF THE LITIGATION ......................................... 6

     A.      Events Leading to the Action and the Motion to Dismiss ..................... 6

     B.      The Vigorously Contested Discovery Phase and Summary Judgment
           Briefing ............................................................................ 8

     C.      The Settlement Negotiations .................................................. 11

III.    TERMS OF THE PROPOSED SETTLEMENT ................................. 12

     A.      The Creation of a New, Independently Funded Regulatory Committee
           with a Broad Mandate ........................................................ 12

           1.      The Regulatory Committee Will Review Critical Information That
                 the Board Was Alleged To Have Failed to Adequately Consider ........... 12

           2.      The Regulatory Committee Will  Review Pfizer's Compensation
                 Policies ....................................................................... 16

           3.      The Committee Will Have Adequate Resources to Carry out Its
                 Mandate ....................................................................... 17

           4.      The Regulatory Committee's  Composition and Reporting
                 Responsibilities ............................................................. 17

           5.      The Creation of an Ombudsman and Other New Measures to
                 Address Plaintiffs' Allegations about Widespread Retaliation ............... 19

IV.    LEGAL ARGUMENT ............................................................... 19

     A.      The Legal Standard Governing Final Approval ............................... 19

     B.      The Settlement Resulted From an Adversarial and Arms-Length Process ........... 20

     C.      The Settlement Should Be Approved As Fair, Reasonable and Adequate ........... 22

           1.      The Significant Benefits Achieved Favor Final Approval ....................... 22

           2.      The Risks of Continuing Litigation Favor Final Approval ....................... 25

3.      Continued Litigation Would Be Lengthy and Complex, and
        Require Substantial Resources.................................................................. 27

4.      The Reaction of Pfizer's Shareholders Favors Final Approval ................ 28

V.      THE REQUESTED FEE AWARD IS FAIR AND SHOULD BE APPROVED ........... 28

A.      The Legal Standard Governing Fee Applications.................................................. 29

1.      The Benefits Achieved Support Counsel's Fee Request .......................... 30

2.      The Requested Fee is Reasonable Considering the Time and
        Efforts of Plaintiffs' Counsel .................................................................. 32

3.      The Contingent Nature of Counsel's Work, the Complexity of this
        Case, and Counsel's Experience All Support the Requested Fee ............. 34

4.      Public Policy Considerations Support the Requested Fee Award ........... 35

B.      The Requested Expenses Are Reasonable .......................................................... 35

VI.     CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ......................................................................................7

*Chan v. Diamond*,
No. 03 Civ. 8494(WHP), 2005 WL 941477 (S.D.N.Y. April 20, 2005) .................................29

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).....................................................................................22

*Clark v. Ecolab Inc.*,
Nos. 07 Civ. 8623(PAC), 04 Civ. 4488(PAC), 06 Civ. 5672(PAC),
2010 WL 1948198 (S.D.N.Y. May 11, 2010) ......................................................20

*Goldberger v. Integrated Resources, Inc.*,
209 F.3d 43 (2d Cir. 2000)......................................................................................29

*In re Abbott Labratories Derivative Shareholders Litigation*,
325 F.3d 795 (7th Cir. 2003) ...................................................................................7

*In re Adelphia Communications Corp. Sec. & Derivative Litigigation*,
No. 03 MDL 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006)..........................34

*In re American Express Financial Advisors Securities Litigation*,
No. 04 Civ. 1773 (DAB), slip op. (S.D.N.Y. July 18, 2007)..................................32

*In re AOL Time Warner Shareholder Derivative Litigation*,
No. 02 Civ. 6302(SWK), 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ........................ *passim*

*In re Caremark International, Inc. Derivative Litigation*,
698 A.2d 959 (Del. Ch. 1996).......................................................................1, 7, 33

*In re Comverse Tech., Inc. Securities Litigation*,
No. 06-CV-1825 (NGG)(RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ...................34

*In re Deutsche Telekom AG Securities Litigation*,
No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798 (S.D.N.Y. June 9, 2005)...........32, 34

*In re Marsh & McLennan Cos., Inc. Securities Litigation*,
04 Civ 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)....................................21, 33

*In re Metro. Life Derivative Litigation,*
    935 F. Supp. 286 (S.D.N.Y. 1996)............................................................................19, 22, 28

*In re Monster Worldwide, Inc. Securities Litigation,*
    No. 07-cv-02237 (JSR), slip op. (S.D.N.Y. Nov. 25, 2008)......................................32

*In re NASDAQ Market-Makers Antitrust Litigation,*
    187 F.R.D. 465 (S.D.N.Y. 1998) ..............................................................................34

*In re Oxford Health Plans, Inc. Securities Litigation,*
    MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003) ................32

*In re Pfizer, Inc. Shareholder Derivative Litigation,*
    722 F. Supp. 2d 453 (S.D.N.Y. 2010).......................................................................8

*In re Philip Servs. Corp. Securities Litigation,*
    No. 98 Civ. 835 (AKH), 2007 WL 959299 (S.D.N.Y. March 28, 2007) ..............................32

*In re Priceline.com, Inc. Securities Litigation,*
    No. 3:00-CV-1884 (AVC), 2007 WL 2115592 (D. Conn. July, 20, 2007) ............................32

*In re Walt Disney Co. Derivative Litigation,*
    907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)..............................34

*In re WorldCom, Inc. Securities Litigation,*
    388 F. Supp. 2d 319 (S.D.N.Y. 2005).......................................................................34

*Kamen v. Kemper Financial Services, Inc.,*
    500 U.S. 90 (1991)..................................................................................................35

*Louisiana Municipal Police Employees Retirement System v. Crawford,*
    C.A. No. 2635-CC (Del. Ch. June 8, 2007) ............................................................34

*Marie Raymond Revocable Trust v. MAT Five, LLC,*
    980 A.2d 388 (Del. Ch. 2008)...................................................................................32

*McDaniel v. County of Schenectady,*
    595 F.3d 411 (2d Cir. 2010).....................................................................................29

*McReynolds v. Richards-Cantave,*
    588 F.3d 790 (2d Cir. 2009).....................................................................................20

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993) ........................................................................................7

*San Antonio Fire & Police Pension Fund v. Bradbury,*
    C.A. No. 4446-VCN, 2010 WL 4273171 (Del. Ch. Oct. 28, 2010) ........................29

*Steiner v. Williams*,
  No. 99 CIV. 10186 (JSM), 2001 WL 604035 (S.D.N.Y. May 31, 2001)................................34

*Stone ex. rel. AmSouth Bancorp. v. Ritter*,
  911 A.2d 362 (Del. 2006) ..........................................................................................7

*Strougo v. Bassinni*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003)..........................................................................19, 20

*Tandycrafts, Inc. v. Initio Partners*,
  562 A.2d 1162 (Del. 1989) ........................................................................................29

*Velez v. Novartis Pharmaceuticals Corp.*,
  04 Civ. 9194 (CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .............................. *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)......................................................................................20, 33

*West Virginia v. Chas. Pfizer & Co.*,
  314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ...............................25

**STATUTES**

Section 102(b)(7) of the Delaware General Corporation Law.......................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23.1 ...................................................................................................19

Lead Plaintiffs Louisiana Sheriffs' Pension and Relief Fund ("LSPRF") and Skandia Life

Insurance Company Ltd. ("Skandia" and, together with LSPRF, "Lead Plaintiffs") and additional

Plaintiffs Port Authority of Allegheny County Retirement and Disability Allowance Plan for

Employees represented by Local 85 of Amalgamated Transit Union and Ms. Henrietta Klein

(together with Lead Plaintiffs, "Plaintiffs") respectfully submit this memorandum of law in

support of final approval of the Stipulation of Settlement (the "Settlement") that this Court

preliminarily approved on December 14, 2010, and approval of Plaintiffs' application for an

award of attorneys' fees and expenses.

## I.      INTRODUCTION

The proposed settlement of this derivative action provides substantial benefits to Pfizer,

Inc. ("Pfizer" or the "Company") and its shareholders, is the product of contentious arms-length

negotiations, and was achieved after vigorous litigation through Plaintiffs' service of their

opposition to Defendants' summary judgment motion.  Plaintiffs prosecuted this action with a

constant focus on establishing liability at trial.  Plaintiffs faced a formidable challenge: pursuing

a legal theory that has been recognized as "possibly the most difficult theory in corporation law

upon which a plaintiff might hope to win a judgment," *In re Caremark International, Inc.*

*Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996), Plaintiffs sought to hold senior

management and the Board of one of the largest pharmaceutical companies in the world liable

for bad faith in failing to monitor and oversee the company's business operations.

The Settlement, which we submit is historic in numerous ways, addresses the core

concerns raised in this case.  First, the Settlement creates a new Regulatory Committee of the

Board (the "Regulatory Committee" or "Committee") with a broad mandate to review the

positioning of Pfizer drugs and related promotional strategies.  By fulfilling its mandate, which is

set forth in considerable detail in the Settlement documentation, the Committee will necessarily

educate itself about and take action to address the types of problematic conduct that gave rise to this Action.  The Settlement also creates one of the largest cash payments ever in a shareholder derivative suit – $75 million.  The Settlement segregates those funds in a unique (we believe unprecedented) trust structure that will ensure this significant sum of money is used solely to support the valuable corporate governance changes required by the Settlement, thus insulating the Committee and its activities from internal budgetary or other pressures.

The substantial benefits of the Settlement are further detailed in the accompanying affidavit of Columbia Law Professor Jeffrey Gordon, a noted expert on corporate governance and an architect of the corporate governance program in the Settlement.[1]  The unique nature of the Settlement is also highlighted in the affidavits in support of preliminary approval of the Settlement submitted by Harvey Pitt and Richard Breeden, two former Chairmen of the United States Securities and Exchange Commission ("SEC"), and testifying experts for the Defendants.

Plaintiffs alleged in the Amended Verified Derivative Complaint (the "Complaint") that the Company's board of directors (the "Board") and certain senior officers (the "Executive Defendants") breached their fiduciary duties over a period of years by disregarding, if not fostering, widespread unlawful drug promotional practices.  The action originated with the September 2009 announcement that Pfizer agreed to have a subsidiary plead guilty to a felony, and to pay the largest criminal fine in U.S. history and the largest civil fraud settlement involving any pharmaceutical company to resolve investigations into alleged improper marketing practices with respect to numerous drugs over a period of years.

Plaintiffs were concerned that future violations of drug promotion laws could result in federal debarment of Pfizer.  This would wipe out a substantial percentage of Pfizer's revenues

---

[1]    The Affidavit of Jeffrey Gordon dated February 7, 2011 is cited herein as "Gordon Aff."

and would be ruinous for Pfizer's shareholders.  One of Plaintiffs' core objectives in this Action was to ensure that the Defendants (and future Pfizer directors and officers) would never consider Pfizer's payment of criminal fines as a mere cost of doing business but, instead, would take the appropriate steps to prevent similar drug marketing violations from occurring in the future.

Defendants fought Plaintiffs every step of the way.  Defendants were represented by two of the best known defense attorneys in the United States – Robert Fiske, Jr., a senior partner of Davis Polk & Wardwell and Dennis Block, a senior partner of Cadwalader Wickersham & Taft, both of whom were deeply involved in the case on a day-to-day basis.  Defendants – a blue chip Board that includes a Nobel laureate, the chief of medical services at Massachusetts General Hospital, a former majority whip in Congress and numerous chief executives of other prominent public companies – used every tool at their formidable disposal to oppose Plaintiffs' efforts.

The parties to this day dispute which version of events is the truth, as this Court witnessed at the preliminary approval hearing.  Plaintiffs insisted that Defendants willfully ignored a stream of "red flags," including internal healthcare compliance audit reports, whistleblower complaints, and letters from the FDA warning of widespread illegal marketing of Pfizer pharmaceuticals.   Meanwhile, Defendants insisted that they always acted in good faith and took appropriate actions to address allegations of off-label marketing of Pfizer's drugs, and that any misconduct was the work of rogue employees.  They further insisted that the Board reasonably relied on the Audit Committee, the General Counsel and Chief Compliance Officer to address isolated instances of wrongdoing, and that certain admitted problems were mere "legacy matters" – instances of misconduct by subsidiaries that occurred before Pfizer acquired them.

Besides litigating on a demanding schedule and under the shadow of a rarely, if ever, satisfied Delaware legal standard for proving disloyalty claims, Plaintiffs fought to overcome

Defendants' steadfast denials of any systemic illegal drug promotion or retaliation practices, insistence that they had no motive for allowing misconduct to occur, and mantra that "everyone" at Pfizer was collectively responsible for compliance.  Instead of trying to justify their response to signs of systemic illegal conduct, Defendants disputed that any took place.  Although Plaintiffs used this "rose-colored glasses" view of the world as support for their claim of conscious disregard, Defendants' strategy also raised the evidentiary burden on Plaintiffs.

The Settlement provides substantial benefits to Pfizer and its shareholders.  In prosecuting the case, Plaintiffs developed a detailed record supporting their position that corporate governance failures permitted the illegal drug marketing giving rise to the $2.3 billion fine.  Through the Settlement, Plaintiffs achieved numerous significant changes to Pfizer's corporate governance structure and compliance processes, which are directly tailored towards avoiding a repeat of its past problems.  Moreover, instead of an unfunded mandate, which is the norm when derivative suits result in corporate governance changes, Plaintiffs created a $75 million fund to be paid by the Individual Defendants' insurance carriers and to be set aside in a trust to be used for the sole purpose of furthering the activities mandated by the Settlement.  This fund is designed to give the Committee both the resources and the independence needed to fully and properly exercise its duties and responsibilities.  Under the terms of the Settlement:

- Defendants will create the Regulatory Committee, which has a broad mandate to oversee and monitor Pfizer's compliance and drug promotion practices, to draw on internal and external experts to look for patterns of systemic misconduct, and to review and assess detailed drug usage information, health care compliance audits, FDA warning letters, health care and marketing related *qui tam* complaints, and other information that will assist the Committee fulfill its responsibilities;

- The Regulatory Committee will review whether Pfizer's compensation policies and sales incentives for its employees and for outside consultants (including speakers at medical education seminars) are aligned with Pfizer's compliance incentives;

- The Regulatory Committee will issue a written recommendation to the compensation committee of the Board on whether previously awarded incentive compensation should be clawed back from any executive, senior manager, compliance officer or attorney that is involved in, or has direct oversight over, employees involved in violative marketing activities;

- The Regulatory Committee will monitor the swift adoption of Pfizer's compliance policies by newly-acquired companies;

- Each Regulatory Committee member will sign an annual report of its activities for inclusion in Pfizer's annual report to shareholders; and

- Defendants will create a new Ombudsman program to give Pfizer employees an alternative channel to voice compliance concerns without fear of retaliation.

One of Plaintiffs' primary concerns was that the Board did not sufficiently inquire into allegations of misconduct in the way Pfizer marketed its drugs.  This Court saw examples of this, having reviewed Board minutes providing only superficial information.  The Board's oversight of legal compliance will improve going forward, as the Settlement requires that the Committee receive detailed reports and presentations, including copies of key documentation and analyses that will identify any systemic problem with Pfizer's marketing of its drugs.  This information will educate the Committee on how Pfizer markets its drugs, problems being raised, and responses that are implemented.  The Settlement provides the Board with the information, mandate and resources needed to prevent any repeat of prior problems.  It will also likely eliminate any future ignorance defense in the event systemic misconduct puts Pfizer and its shareholders at risk.

The Settlement was achieved only *after* Plaintiffs served their opposition to Defendants' motion for summary judgment, which detailed the evidentiary record supporting Plaintiffs' positions.  Plaintiffs believe that this Settlement was only achieved after Defendants recognized not only that the Plaintiffs were fully prepared to litigate this matter to the end, but also that Plaintiffs would not settle for a resolution that did not meet their firm monetary and corporate

governance demands.  This result could not have been achieved without Plaintiffs' counsel's investment, dedication and determination, despite the high risk of pursuing this case on a fully contingent basis.  Indeed, Plaintiffs' counsel invested over $16 million in hourly time and $1.6 million in expenses in prosecuting this case.

Based on the scope and nature of this litigation, the arms-length negotiations of the Settlement and, most importantly, the substantial benefits of the Settlement, Plaintiffs respectfully submit that the Court should approve the Settlement and award Plaintiffs' counsel their requested attorneys' fees of $22 million plus reimbursement of expenses.

## II.    BACKGROUND OF THE LITIGATION

The procedural background of this Action is detailed in the Joint Declaration in Support of Final Approval of the Proposed Settlement of Mark Lebovitch and David Wales, dated February 7, 2011 (the "Leb. Decl."), which is submitted with this memorandum of law.  Plaintiffs summarize the key events below.

### A.    Events Leading to the Action and the Motion to Dismiss

In September 2009, Pfizer announced that one of its subsidiaries would plead guilty to a felony and that Pfizer would pay $2.3 billion to resolve criminal and civil allegations regarding illegal sales and marketing practices concerning some of Pfizer's most important drugs, including Bextra, Geodon, Zyvox, and Lyrica.  Pfizer also announced that it would enter into a "corporate integrity agreement" with the Office of the Inspector General of the United States Department of Health and Human Services ("OIG") requiring Pfizer to undertake detailed compliance obligations (the "2009 CIA").  Leb. Decl. ¶19.

Following this announcement, Plaintiffs' counsel sought a better understanding of the government's allegations and the role of Pfizer's Board and senior executives.  Counsel reviewed numerous whistleblower complaints, public documents from product, securities and commercial

litigation against Pfizer throughout the country, publicly available information from the Food

and Drug Administration ("FDA") (including warning letters, violation notices and responses to

new drug applications by Pfizer), and public filings with the SEC.  Leb. Decl. ¶20.

Counsel continued its factual and legal investigation after the Court appointed Bernstein

Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as "Lead Counsel" on November 4,

2009, and Plaintiffs filed an Amended Verified Derivative Complaint on November 18, 2009.

The Complaint asserted breach of fiduciary duty claims, federal proxy claims, and unjust

enrichment claims based on allegations that Defendants had been informed about a flood of red

flags suggesting widespread illegal promotion practices and systemic retaliation, but decided not

to stop the ongoing criminal misconduct.  Leb. Decl. ¶¶26-27.

On December 16, 2009, Defendants moved to dismiss the derivative action, arguing that

the Board was not conflicted, and that demand was not excused because the Complaint failed

adequately to allege a "sustained or systematic failure of the board to exercise oversight" as

required by *In re Caremark International Derivative Litigation,* 698 A.2d 959 (Del. Ch. 1996),

and *Stone ex. rel. AmSouth Bancorp. v. Ritter,* 911 A.2d 362, 364 (Del. 2006).  Defendants also

moved to dismiss the proxy claims and unjust enrichment claim.  ECF Nos. 35-38.

On January 8, 2010, Plaintiffs filed opposition papers, arguing that the Complaint

adequately alleged conscious disregard of Pfizer's widespread unlawful promotion practices, and

that it met the demand futility standards of *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *Rales v.*

*Blasband*, 634 A.2d 927 (Del. 1993), *Stone v. Ritter*, 911 A.2d 362 (Del. 2006), and *In re Abbott*

*Labratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003).   ECF Nos. 41-42.

On February 5, 2010, the Court heard more than three hours of oral argument.  Reflecting

the difficulty to adequately plead a breach of loyalty claim under Delaware law, it appeared

during parts of the argument that despite the powerful factual allegations, the Court was seriously considering dismissing the Action.  In the end, the Court dismissed the proxy and unjust enrichment claims (which eliminated some of the relief sought in the Complaint), but denied Defendants' motion to dismiss with respect to the breach of fiduciary duty claims.  The Court later held that the Complaint met the applicable standard based on allegations of "misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board [was] entirely reasonable."  *In re Pfizer, Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 462 (S.D.N.Y. 2010).

### B.      The Vigorously Contested Discovery Phase and Summary Judgment Briefing

After the Court decided Defendants' motion to dismiss, the parties negotiated the production of more than 12 million pages of documents.  These negotiations involved numerous meet-and-confer sessions involving senior lawyers representing both Plaintiffs and Defendants. The negotiations were adversarial, in particular with respect to Plaintiffs' objections to the Defendants' decision to significantly redact Board presentation materials and Board minutes, and required Court intervention on multiple occasions.  Leb. Decl. ¶¶35-41.

Plaintiffs served interrogatories and requests for admission, responded to Defendants' document requests and contention interrogatories, and took 27 fact depositions, including depositions of the CEO and Chairman of the Board, Jeffrey Kindler (who resigned shortly after the parties reached the Settlement), two former CEOs and Chairmen of the Board, Pfizer's Chief Compliance Officer, Pfizer's head of internal audit, almost the entire Board, 30b6 witnesses and third-parties.  Leb. Decl. ¶¶53-54.  Defendants deposed each plaintiff.  Leb. Decl. ¶55.

Plaintiffs retained three experts who served expert reports in this Action:

- <u>Richard Guarino, M.D.</u>, a former clinical research and medical director of various pharmaceutical companies, described the FDA approval and labeling process, the applicable rules and regulations on drug marketing, and the approved and unapproved uses of various Pfizer drugs.

- <u>John Abramson, M.D.</u>, a Harvard lecturer and medical marketing expert, analyzed Pfizer operating plans, sales force training materials, and sales materials.  Dr. Abramson concluded in a 140-page expert report that Pfizer's illegal sales and marketing practices were the result of a deliberate corporate strategy to position Pfizer drugs for uses that were not approved by the FDA.

- <u>Bernard M. Black</u>, a professor at Northwestern Law School and corporate governance expert, analyzed the Defendants' response to the numerous red flags of misconduct that resulted from the implementation of Pfizer's corporate strategy to position drugs for uses and dosages that were not approved by the FDA.  Professor Black concluded in a 76-page expert report that the Board had either consciously endorsed Pfizer's improper corporate strategy, or had kept itself willfully ignorant of the fact that Pfizer was implementing such a strategy.

Leb. Decl. ¶56.

Defendants served rebuttal reports from four testifying experts:

- <u>Harvey L. Pitt</u>, a former Chairman of the SEC reviewed Pfizer's corporate governance practices in an 88-page report and opined that the Board acted reasonably in relying on senior management's reports regarding legal and regulatory compliance and that it would not be proper to hold the Board personally accountable for any of the misconduct that resulted in the criminal fines and civil settlements.

- <u>Richard C. Breeden</u>, a former Chairman of the SEC, submitted a 141-page report reviewing the purported "red flags" brought to the attention of the Board and opined that many of those warnings were routine occurrences in a large and highly regulated company, that a reasonable director would not view this information as a "red flag" of systemic illegality, and that the Board reasonably relied on management to address such warnings by implementing an effective compliance program.

- <u>Lucian A. Bebchuck</u>, a professor at Harvard Law School, analyzed Board attendance and incentives in an 81-page report, and concluded that the Defendants dedicated adequate time to compliance related issues and were incentivized to promote the interests of Pfizer's shareholders.

- <u>Lori S. Richardson Pelliccioni</u>, a former federal prosecutor and partner at PricewaterhouseCoopers, submitted a 76-page report concluding that Pfizer had a comprehensive and effective compliance function, that key members of Pfizer's senior management and Board promptly and effectively addressed any compliance issues that inevitably arose at a company with approximately 100,000 employees, and

that the size of Pfizer's payment of $2.3 billion in 2009 did not reflect the relative
scope of misconduct at Pfizer.

Leb. Decl. ¶57.  Plaintiffs deposed each of the Defendants' experts.  Leb. Decl. ¶58.

On October 22, 2010, the Defendants served a motion for summary judgment, arguing
that the case should be dismissed because the evidence showed that Defendants had responded in
good faith to warnings of potential wrongdoing, and had in good faith relied on the Audit
Committee and senior management, including Pfizer's then-CEO and former Chief Compliance
Officer, Jeffrey Kindler, to address instances of misconduct.  According to Defendants, any
wrongdoing was isolated and initiated by lower level employees and "[t]he question was not
whether their response was ideal, but whether it was undertaken in good faith."  ECF No. 82 at p.
30-31.  Defendants asserted that there was no breach of duty, that any breach did not amount to
disloyalty and therefore was exculpated under Section 102(b)(7) of the Delaware General
Corporation Law, and that Plaintiffs' claims were time barred.  Defendants' motion posed
substantial defenses and risks to the case.  Leb. Decl. ¶¶59-60.

On a tight briefing schedule, Plaintiffs prepared and served on defense counsel on
November 12, 2010 a memorandum of law opposing summary judgment, a 118-page response to
Defendants' statement of undisputed facts, a 136-page counterstatement of additional material
facts, and a declaration with 352 exhibits.  Plaintiffs argued that the Defendants ignored Dr.
Abramson's report, which opined that Pfizer's illegal sales and marketing practices stemmed
from a corporate strategy tailored to position some of Pfizer's most important drugs for uses that
were not approved by the FDA.  Plaintiffs also argued that Defendants failed to address the
expert report of Professor Black, and the evidence cited therein, which opined that Defendants in
bad faith turned a blind eye to the numerous FDA Warning Letters, retaliation claims from
former employees, government investigations, *qui tams* and other red flags that resulted from

Pfizer's drug marketing strategies.  Plaintiffs also argued that Defendants' state of mind in relying on others to oversee Pfizer's compliance efforts was, under the circumstances, a question for the jury to assess.  Plaintiffs refuted any statute of limitations defense.  Leb. Decl. ¶¶61-62.

### C. The Settlement Negotiations

During discovery, there were periodic preliminary settlement discussions, but the parties were too far apart to start serious discussions.  Each side believed that the other had a fundamentally flawed view of the facts and deeply unrealistic expectations about the outcome of this Action.  Plaintiffs' counsel emphasized Plaintiffs' willingness to pursue this action through a verdict at trial.  Leb. Decl. ¶64.  Defendants firmly stood their ground until Plaintiffs' service of their opposition to the summary judgment motion was imminent.

In fact, Plaintiffs were committed to take this case to trial from the day they filed the Complaint.  This mindset informed every strategic decision, including the decision to keep Plaintiffs' testifying corporate governance expert – Professor Black – focused on summary judgment and trial, while retaining another renowned corporate governance expert – Professor Gordon – to help craft corporate governance improvements addressing Plaintiffs' concerns when the tenor of the discussions with Defendants' counsel finally suggested in late October 2010 that a compromise could perhaps be reached.  Leb. Decl. ¶65.

While the majority of Plaintiffs' counsel's litigation team focused on finalizing their summary judgment opposition brief and related submissions, Max Berger, co-founder of Bernstein Litowitz, personally engaged in intense settlement negotiations with the senior lawyers representing defendants.  The negotiations, which broke off and restarted even as the summary judgment papers were being served, were tense and came down to the wire, with the parties finalizing an acceptable term sheet during the afternoon of Monday, November 15 – the day that Plaintiffs' previously served opposition to summary judgment was due to be filed with the

Court.[2]  At about 5 p.m. that day, the parties provided the Court with the term sheet and a request

to adjourn the remaining dates of the case management plan.  Leb. Decl. ¶¶67-69.

## III.    TERMS OF THE PROPOSED SETTLEMENT

### A.    The Creation of a New, Independently Funded Regulatory Committee with a Broad Mandate

Plaintiffs believe that it is essential to improve the Board's engagement and competence

in overseeing Pfizer's drug marketing strategies and execution.  The Settlement is aimed at

accomplishing that goal by providing for the creation of a new Regulatory Committee, consisting

of at least five members, with a clearly and broadly defined mandate to oversee health care-

related compliance and regulatory issues.

#### 1.    The Regulatory Committee Will Review Critical Information That the Board Was Alleged To Have Failed to Adequately Consider

The core purpose of the new Regulatory Committee is to identify and evaluate potential

patterns of problems with Pfizer's compliance with regulatory, legal or compliance obligations.

Below is a summary of information that must be provided to the Committee, along with a brief

summary of why Plaintiffs believe this information will avoid the problems identified through

this litigation.

**Information Provided:  Annual reports concerning Pfizer drugs that are at a "high risk" of being marketed for uses or dosages that are not approved by the FDA.**

**Purpose:**  Plaintiffs believe that the Board did not assess available information about Pfizer's marketing activities that identified drugs at high risk of being illegally marketed. Plaintiffs believe that through this information, Defendants could have addressed problematic marketing plans that contributed to the problems underlying this Action. The annual reports will cause the Committee to develop an understanding of the signs that drugs may be marketed off-label.

---

[2]    Due to an unresolved dispute about confidentiality of evidence, the Court allowed Defendants to receive the summary judgment papers on Friday, November 12 and to file a redacted version of those papers at the close of business on Monday, November 15.

**Information Provided**:  **Data reflecting off-label use of Pfizer drugs, including appropriate analyses and explanation from management.**

**Purpose:** Plaintiffs argued that the Board ignored market usage data showing that significant percentages of prescriptions were for off-label use.  The Committee's specific awareness of high or increasing off-label use of drugs will enable it to better evaluate whether there are signals of off-label marketing of drugs.

**Information Provided**:  **All FDA warning letters and the Company's responses and evaluations of whether the letter raises a systemic marketing issue.**

**Purpose:**  Pfizer received warning letters concerning drugs in the 2009 settlement with the government.  Plaintiffs believe that the Board was generally advised of FDA warning letters, but were not shown the actual letters, the response to the letters, or provided any analyses of whether the letters raised broader drug marketing issues.  Ensuring that the Committee learns of the details of FDA letters and evaluates the issues raised by them will both increase the likelihood that there is proper follow up and also inform the Committee so that it can exercise proper oversight of drug marketing.

**Information Provided**:  **All *qui tam* lawsuits that are disclosed to the Company and analysis of the factual allegations in such lawsuits.**

**Purpose:**  Pfizer learned of *qui tams* concerning drugs in the 2009 settlement with the government.  Plaintiffs believe that in the past the Board was generally advised of *qui tam* lawsuits but was not provided sufficiently detailed reports or analyses of the *qui tam* allegations.  This requirement ensures that the Committee learns the details and implications of *qui tam* lawsuits, which can lead to major government investigations.

**Information Provided**:  **Reports about government investigations into marketing practices and whether they reflect a regulatory or compliance issue at Pfizer.**

**Purpose:**  Plaintiffs believe that the Board was informed of government investigations generally, but was not given details of the investigations and were not shown the presentations that Pfizer or its counsel made to the government about their own findings of the alleged conduct.  This requirement ensures that the Committee is informed of details of the investigations and can pursue proper oversight and corrective action.

**Information Provided**:  **Annual marketing reports concerning top drugs with more than $500 million in annual sales.**

**Purpose:**  Plaintiffs believe that the Board generally lacked sufficient knowledge of how Pfizer actually marketed its drugs and the risks associated with the marketing of specific drugs.  This requirement is designed to give the Committee detailed knowledge and information on the marketing and risks of three major drugs each year.

**Information Provided**:  **Annual reports by Pfizer's Compliance Group of significant compliance investigations.**

**Purpose:**  Pfizer has a compliance department that conducts investigations, including for health care compliance issues.  While the Board relied on the Compliance group to do so, it did not actually learn about investigations that served as "red flags" of broader issues. The purpose of this requirement is to ensure that the Committee understands the significant compliance investigations and can pursue corrective action when needed.

**Information Provided:  Annual reports by Internal Audit on internal audit health care compliance audits, including health care compliance risks.**

**Purpose:**  Pfizer has an internal audit department that conducts healthcare compliance audits.  Plaintiffs believe that the internal audit department reported to the Audit Committee about many healthcare compliance issues at the core of Pfizer's problems, but the Board's understanding and follow-up to these findings was inadequate.  This requirement is designed to ensure the Committee understands the specific weaknesses and problems in Pfizer's systems so it can take corrective action.

**Information Provided:  Annual reports about retaliation claims, lawsuits alleging retaliation, and settlements of retaliation claims.**

**Purpose:**  Plaintiffs believe the Board was not advised of claims of retaliation against employees for resisting or reporting improper or unlawful conduct.  Even the perception of a culture of retaliation can inhibit employees from reporting about activities that put Pfizer at risk.  The purpose of this requirement is to advise the Committee so it can ensure that claims of retaliation are properly addressed and prevent systemic retaliation.

**Information Provided:  Annual reports by the Executive Compliance Committee (chaired by the CEO) on the key compliance issues facing the Company.**

**Purpose:**  This Executive Compliance Committee was implemented as the 2009 settlement with the government was being negotiated.  This requirement helps to ensure that key compliance issues identified by Pfizer's senior managers are formally shared with the Committee rather than slipping through the cracks of Pfizer's internal reporting.

As both Professor Gordon and Mr. Pitt state in their respective affidavits in support of the Settlement, these numerous and overlapping sources of information are well-designed to ensure the Committee has the tools and information needed to fully and effectively perform its role. Gordon Aff. ¶¶20-34; Declaration of Harvey L. Pitt, dated Dec. 2, 2010 ("Pitt Aff.") at ¶27.

The Committee's broad and detailed mandate is a sharp contrast with the general, if not vague, oversight responsibilities previously given to the Audit Committee under its charter. Throughout this Action (including during the hearing on preliminary approval), Defendants

insisted that the Audit Committee was adequately overseeing Pfizer's compliance efforts. Without rehashing the underlying factual disputes, we note that the Audit Committee charter lists 16 responsibilities, mostly dealing with protecting the integrity of Pfizer's financial reporting. *See* Leb. Decl. Ex. B.  Gordon Aff. ¶¶46-61.  The only aspects of the Audit Committee's charter that actually relate to legal compliance are the following:

> (a)  the status of compliance with laws, regulations, and internal procedures; and
>
> (b)  the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures, through review of reports from management, legal counsel and third parties as determined by the Audit Committee.

*Id.*  The Audit Committee clearly faced significant financial oversight responsibilities and in light of Pfizer's global financial operations, necessarily could not devote the same time to healthcare regulatory issues as will the Committee.  As Messrs. Pitt and Breeden explained, even if the Audit Committee had done its utmost best to perform a regulatory oversight role – another contested point – there can be no doubt that the Regulatory Committee will be better equipped to focus on drug marketing and promotional issues.  Pitt Aff. ¶26; Affidavit of Richard C. Breeden ("Breeden Aff.") at ¶8.  In sum, the information and analysis required by the Settlement are the type of oversight that Plaintiffs and their corporate governance expert believe Pfizer needs to comply with the drug marketing laws.  The benefit of the Committee is precisely its focus and dedication to these issues.

Besides receiving information, the Committee also has broad authority to pursue analyses and inquiries to fulfill its mandate.  For example, the Committee has the authority to require management to conduct compliance, legal and regulatory audits.  Gordon Aff. ¶¶34-35.  The Regulatory Committee also can commission doctor surveys to determine whether Pfizer's promotional messages are interpreted by doctors as supporting off-label uses of Pfizer drugs.

Plaintiffs believe that such surveys, which Pfizer has previously used solely for marketing

purposes, indicating whether its sales staff are actively promoting Pfizer drugs for off-label uses,

will provide a valuable resource for the Committee in carrying out its oversight tasks.  Gordon

Aff. ¶¶35-38.[3]

2.      <u>The Regulatory Committee Will Review Compensation Policies</u>

Under the terms of the Settlement, the Regulatory Committee must evaluate and discuss

with management whether Pfizer's compensation policies and sales incentives for its employees

and for Pfizer-paid speakers and advisory boards are aligned with Pfizer's compliance

incentives.  Gordon Aff. ¶¶68-70.  The Settlement also requires the Regulatory Committee to

make written recommendations to the Compensation Committee regarding potential "clawbacks"

of previously awarded incentive compensation of any executive, senior management, compliance

personnel or attorney in case of serious allegations of future misconduct.  Gordon Aff. ¶¶75-76.

These compliance incentive and enforcement changes are new.  The Charter of the

Compensation Committee does not mention the need for aligning Pfizer's compensation policies

with compliance imperatives.  *See* Leb. Decl. Ex. L.  The Compensation Committee also does

not have the authority to claw back previously awarded incentive compensation in case of

serious misconduct.  *Id.*

These compliance improvements address Plaintiffs' allegations and concerns that Pfizer's

compensation policies reinforced Pfizer's marketing strategy of positioning its drugs off label.

Plaintiffs believe that these compliance enhancements to Pfizer's compensation policies will

---

3       In connection with the Settlement, Defendants acknowledged making improvements to
        Pfizer's compliance processes based what they learned from Plaintiffs' pleadings and during
        discovery.  These improvements are listed in Exhibit B to the Settlement.  Plaintiffs' counsel
        and Professor Gordon met with Pfizer's Chief Compliance Officer and Defendants' counsel
        on November 29, 2010 to gain a better understanding of these improvements.

provide a powerful incentive for Pfizer's management to ensure the sales force's compliance with drug marketing laws.  Gordon ¶¶72-74.

       3.      <u>The Committee Will Have Adequate Resources To Carry Out Its Mandate</u>

As part of the Settlement, Defendants are causing their insurers to finance a $75 million fund that, after the payment of any fee and expense award, will be used for the sole purpose of funding the Regulatory Committee's activities.  If any funds are remaining after the Committee's initial five-year term, they will be returned to the insurers; if the fund is exhausted, additional funding will be provided by Pfizer upon the Committee's request.  Gordon Aff. ¶¶40.  Plaintiffs expect that the Regulatory Committee will take its broad mandate seriously and use all available resources to their fullest extent to ensure that systemic drug marketing problems are detected and stopped, thus protecting Pfizer and its shareholders.  Gordon Aff. ¶¶40-45.

The independent funding provided by the Settlement allows the Committee to retain independent outside counsel, experts and consultants to help carry out the Committee's mandate of overseeing Pfizer's marketing and compliance practices.  The Settlement provides, for example, that the Committee must at least biannually commission an external expert review of Pfizer's policies for significant compliance, regulatory and/or legal issues.  Gordon Aff. ¶35. This review will help ensure that Pfizer's marketing and operating policies will be tested by external experts to make sure they are consistent with Pfizer's compliance imperatives.  The funding mechanism is unique, has been the subject of articles in the industry, and gives the Committee the resources and independence to fully implement its mandate.

       4.      <u>The Committee's Composition and Reporting Responsibilities</u>

The Settlement requires that a majority of the Regulatory Committee's members are independent directors, and may include senior Pfizer employees *ex-officio*.  The Committee

Chair must be an independent director and have relevant experience in law, compliance, regulatory affairs, academia, or service on the board of a health care or other highly regulated company. At least one member of the Committee must have a significant background in the healthcare industry. The experts agree that requiring this experience – which is not a prerequisite for membership on the Audit Committee – will enhance the Regulatory Committee's depth of analysis. Gordon Aff. ¶¶24, 43; Breeden Aff. ¶¶10, 13 and 14. The Settlement also provides that the Committee should include at least one member of the Audit Committee, and if there is no overlap, then the chairpersons of the Regulatory and Audit Committees are required to meet at least twice a year to ensure that critical information is shared between both committees. *See* Gordon ¶¶61, 64.

The Regulatory Committee will meet quarterly and must provide a full report of its activities to the Board at least annually. Leb. Decl. Ex. A. In addition, the Settlement creates new reporting responsibilities to Pfizer's shareholders. The Regulatory Committee must prepare a yearly overview of the Committee's activities for inclusion in Pfizer's annual report or proxy statement. Importantly, this report must be signed by all Committee members. This certification requirement was included in the Settlement to address Plaintiffs' concerns that at Pfizer "everyone" was responsible for compliance and yet no one was accountable for systemic marketing violations. If the Settlement is approved, direct and public accountability will be ensured.[4]

---

[4]  Experience with the certification requirements of the Sarbanes-Oxley Act suggests that requiring the Committee members to sign an annual report that will be disclosed to Pfizer's shareholders and the general public (including the government), is likely to cause the Regulatory Committee to require internal certifications from senior management to ensure that their statements about compliance are accurate, which would also substantially increase the individual accountability of Pfizer's senior management.

5.   The Creation of an Ombudsman and Other New Measures to
Address Plaintiffs' Allegations about Widespread Retaliation

The Settlement further addresses allegations by the Government, whistleblowers and others, of retaliation against employees who objected to Pfizer's illegal marketing.  Defendants must create an Ombudsman program that will provide Pfizer employees with an alternative, confidential channel to bring work-related concerns without fear of reprisal.  In the future, employees who feel pressured into violating Pfizer policies by marketing drugs for uses or dosages that are not approved by the FDA may discuss these concerns in confidence with the new Ombudsman.  Gordon Aff. ¶66.

The Ombudsman is expressly authorized to report concerns directly to the Regulatory Committee.  This reporting structure allows senior management and the Board to swiftly address misconduct that is brought to their attention.  Moreover, the Ombudsman is in a position to detect patterns of misconduct suggesting that one or more Pfizer division is engaged in systemic misconduct that could lead to massive fines and potential federal debarment.  Gordon ¶66.

## IV.   LEGAL ARGUMENT

### A.   The Legal Standard Governing Final Approval

Rule 23.1 provides that this Action may only be settled with the Court's approval.  The determination as to whether a settlement should be approved is left to the sound discretion of this Court.  *See Strougo v. Bassinni*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003).[5]  In this regard, "[t]he central question is whether the compromise is fair, reasonable and adequate."  *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996).  This evaluation necessarily includes consideration of whether "the compromise fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted."  *In re AOL Time Warner*

---

[5]   Unless otherwise noted, citations and internal quotes are omitted and emphasis is added.

*S'holder Derivative Litig.*, No. 02 Civ. 6302(SWK), 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006) (citation omitted).   There is a "strong initial presumption" that a proposed settlement negotiated during the course of litigation is fair and reasonable.  *See Strougo*, 258 F. Supp. 2d at 257.

Courts considering the fairness and adequacy of settlements look to the substantive terms of the agreement and the negotiation process that produced the settlement.  *In re AOL*, 2006 WL 2572114, at *2.  Here, both the adversarial arms-length negotiation process and terms of the settlement strongly support a finding that the Settlement is fair and reasonable.

**B.**      **The Settlement Resulted From an Adversarial and Arms-Length Process**

Courts in this circuit examining a proposed settlement's procedural fairness "pay close attention to the negotiating processes, to ensure that the settlement resulted from arm's-length negotiations, and that plaintiffs' counsel possessed the necessary experience and ability, and have engaged in the discovery, necessary to effective representation of the [absent plaintiffs'] interests."  *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009); *see In re AOL Time Warner*, 2006 WL 2572114, at *3 (same).  Settlements that are reached in "arm's-length negotiations between experienced, capable counsel after meaningful discovery" are presumed to be fair, adequate and reasonable.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (*citing* Manual for Complex Litigation, Third, § 30.42 (1995).  "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement."  *Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623(PAC), 04 Civ. 4488(PAC), 06 Civ. 5672(PAC), 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010).

This Action was intensely litigated by leading practitioners from the corporate defense and shareholder plaintiff bars.  The Settlement was reached through adversarial negotiations

between counsel zealously representing their clients' interests.  *See* Leb. Decl. ¶¶64-70.

Moreover, the main thrust of these negotiations took place after the end of discovery, and after

service of the parties' summary judgment papers.  *See* Leb. Decl. ¶12.  Plaintiffs had inspected,

reviewed and analyzed millions of pages of documents produced by Defendants and third parties,

exchanged opening and rebuttal expert reports, taken and defended more than 30 fact and expert

depositions,  researched the applicable law concerning Plaintiffs' claims and potential defenses,

and briefed summary judgment.  *See* Leb. Decl. ¶¶53-54, 61-63.  Counsel was, therefore,

intimately familiar with the strengths and weaknesses of each side's position, and used this

knowledge to the advantage of their respective clients.  Leb. Decl. ¶¶68-70.  *See In re Marsh &*

*McLennan Cos., Inc. Sec. Litig.*, 04 Civ 8144 (CM), 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23,

2009) (finding that "[t]he advanced stage of the litigation and extensive amount of discovery

completed weigh[ed] heavily in favor of approval" because the parties could "realistically

evaluate the strengths and weaknesses of the claims and to evaluate the fairness of the proposed

Settlement").

The settlement process was neither short nor simple.  There were informal settlement

discussions and meetings over a period of months.  These discussions failed because the parties

sharply disagreed about the merits of the claims and requirements for a settlement.  Leb. Decl.

¶64-66.  When the settlement negotiations advanced, Max Berger, co-founder of Bernstein

Litowitz, took the lead for the Plaintiffs, while Messrs. Fiske and Block teamed up for their

respective clients.  Mr. Berger led settlement discussions so that Plaintiffs' litigation team could

focus on prosecuting the case and ensuring that the Company received the best possible outcome.

Leb. Decl. ¶16.  It was only after obtaining both the corporate governance reforms and the $75

million fund that Plaintiffs were prepared to settle this hard-fought litigation.  In sum, the process

leading to the Settlement was fair to Pfizer and its shareholders, and supports final approval.

> **C.**     **The Settlement Should Be Approved As Fair, Reasonable and Adequate**

In *City of Detroit v. Grinnell Corp.*, the Second Circuit discussed factors that courts in

this Circuit consider in evaluating whether class action settlements are fair, reasonable and

adequate.  495 F.2d 448 (2d Cir. 1974).  In evaluating the fairness of derivative action

settlements, courts in this District frequently distill the *Grinnell* analysis into four factors: "(1)

the reasonableness of the benefits achieved by the settlement in light of the potential recovery at

trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely

duration and cost of continued litigation; and (4) any shareholder objections to the settlement."

*In re AOL Time Warner*, 2006 WL 2572114, at *3; *see also In re Metro. Life*, 935 F. Supp. at

292 (same).  Each of these substantive factors favors approval of the Settlement.

> **1.**     The Significant Benefits Achieved Favor Final Approval

Plaintiffs' and Defendants' corporate governance experts unanimously praise the benefits

achieved by the Settlement.  Creation of the Regulatory Committee will provide significant,

extensive, and long-lasting value.  As explained by Professor Gordon (Aff. ¶2):

> In my opinion, the Reforms embodied in the Proposed Settlement will
> significantly strengthen Board oversight of Pfizer's compliance with the FDA's
> drug marketing regime and related compliance mandates and will produce other
> improvements to internal compliance and accountability.  In particular, the new
> Board committee, the "Regulaory and Compliance Committee" (the "Regulatory
> Committee") will significantly add to the Board's capacity to oversee Pfizer's
> compliance process and to the Board's capacity to act should a problem appear.

Defendants' expert and former SEC Chairman Harvey Pitt similarly noted, that the

corporate governance changes will "materially enhance" Pfizer's corporate governance and

compliance functions, "provide Pfizer and its various constituents with significant and enduring

benefits, and will place Pfizer at the cutting edge of corporate governance practices." Pitt Aff. at ¶¶4 and 15; *see Velez v. Novartis Pharms. Corp.*, 04 Civ. 9194 (CM), 2010 WL 4877852, at *15 (S.D.N.Y. Nov. 30, 2010) (finding that value of the settlement exceeded the norm because plaintiffs obtained "significant, extensive, and long-lasting programmatic relief").

Defendants' additional corporate governance expert, former SEC Chairman Richard Breeden, agrees. Based on a review of the proxy statements of all U.S. pharmaceutical companies, Mr. Breeden concluded that "the governance improvements resulting from both the formation of the Regulatory Committee and the proposed scope of its oversight responsibilities will cause Pfizer to be an industry leader with respect to board oversight of regulatory, legal and compliance matters." Breeden Aff. ¶15. According to Mr. Breeden, the Settlement's requirement that the Chair of the Regulatory Committee is an independent director with relevant experience in law, corporate compliance, regulatory or governmental affairs, will likely add "enormously to the depth and quality of board oversight of compliance and regulatory questions." *Id.* ¶14. Moreover, Mr. Breeden believes that the Settlement will lead to an improved Audit Committee, because the Regulatory Committee will take over compliance oversight and thereby "allow the Audit Committee to focus in even more depth on the accounting and audit issues that might have had lesser attention in the past to make room for compliance and regulatory issues." *Id.* ¶11.

The Committee's independent funding to pay for its activities and outside experts further enhances the effectiveness of the Committee, both by reducing competition for general corporate funding, and, importantly, by communicating to Pfizer employees that the Board can and will take compliance very seriously. *See* Pitt Aff. ¶16 (concluding that "the establishment of the proposed Regulatory Committee, as set forth in the settlement terms, will confer a significant

benefit on Pfizer and its shareholders, especially in light of the provision of a segregated source of funding for the committee's activities over the next five years").

The amount recovered for the benefit of Pfizer is also historic.  If the Settlement is approved, Defendants' insurers will pay $75 million into a fund that is for the exclusive use of the new Regulatory Committee and the payment of any fee award.  Plaintiffs' counsel is aware of only five settlements of derivative actions involving a larger nominal recovery.[6]  Moreover, each of these cases involved executive compensation or self-interested fraudulent conduct.  We believe that this Settlement includes, by far, the largest monetary recovery in any oversight/*Caremark* case in history.  Moreover, unlike the few derivative settlements that are nominally larger, the Settlement provides cash to the Company to fund corporate and compliance changes, (as opposed to, for example, cancelling previously awarded backdated stock options).  Leb. Decl. ¶¶76-80.

The new Ombudsman program achieved by the Settlement also provides significant and enduring benefits.  As explained by Mr. Pitt, the Ombudsman will provide an alternative reporting channel to the new Regulatory Committee, which "should increase employee confidence in all of Pfizer's internal reporting mechanisms."  Pitt Aff. ¶31.  "Companies that encourage their employees to raise problems internally give themselves that all important critical

---

[6]   In the UnitedHealth Group derivative action, plaintiffs' recovery of $920 million in connection with an options backdating scheme consisted of the return and repricing of options and did not result in a cash benefit to the company.  In the Oracle derivative action, plaintiffs' recovery of $121 million in connection with an insider trading scheme included a $100 million payment to charity and did not result in any cash benefit to the company.  In the Broadcom derivative action, plaintiffs recovered $118 million from D&O liability insurance policies, which appears to have been used strictly to offset company litigation expenses in connection with various investigations and the litigation itself.  In the AIG derivative actions, plaintiffs recovered $115 million in 2008 and $90 million in 2010 in connection with sham transactions by, and for the benefit of, AIG's CEO and other insiders, with the $90 million recovery apparently entirely used to offset legal expenses of the former CEO.

step – finding out about a problem before it has become a crisis – and demonstrating to all their constituencies that they are committed to effective compliance, and discourage any departure from their policies, procedures and high ethical standards." *Id.* As Professor Gordon further explains, the reporting by the Ombudsman to the Committee will also assist the Committee in finding patterns of misconduct/retaliation. Gordon Aff. ¶66.

The Committee's mandated review of compensation policies to ensure they are aligned with compliance incentives also benefits the Company. As Professor Gordon, one of the lessons learned from the financial crisis is that poorly structured compensation incentives can cause widespread misbehavior at a company by sending the wrong economic message. Gordon Aff. ¶¶73-74. The Settlement is designed to improve Pfizer's economic message it its sales personnel, as well as speakers and advisory board members, used for marketing Pfizer drugs.

The authority granted to the Committee, for the first time, to claw back compensation also benefits the Company. First, it gives the Committee a powerful tool to send a message to executives, senior managers, compliance personnel and attorneys that they can and will be held accountable for turning a blind eye toward marketing misconduct. The requirement that the Committee make a written recommendation is also important. As Professor Gordon explains, this mandate will require "deeper digging [by the Committee] into the circumstances" and will not only serve the interest of deterrence, but the Committee's fact finding will add to the information the Committee learns about compliance issues. Gordon Aff. ¶¶77-78.

Each of the corporate governance and compliance changes directly address Plaintiffs' core allegations at the heart of this Action, and plainly support approval.

2.     The Risks of Continuing Litigation Favor Final Approval

One important purpose of settlement is to avoid the inherent uncertainty in proceeding with the litigation. *See Novartis Pharms.*, 2010 WL 4877852, at *14; *see also West Virginia v.*

*Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("[I]t is known from past experience that no matter how confident one may be of the outcome of the litigation, such confidence is often misplaced.").  Indeed, courts in this District generally favor settlements of derivative actions because they are "notoriously difficult and unpredictable."  *In re AOL Time Warner*, 2006 WL 2572114, at *3.  The Settlement achieved here provides investors substantial benefits without the risks of continued litigation.

Plaintiffs prevailed on a sharply contested motion to dismiss and worked tirelessly to develop a strong evidentiary record.  Absent the Settlement, however, Plaintiffs would face a long and uncertain road towards a recovery for Pfizer, including resolution of the Defendants' summary judgment motion, pretrial challenges to experts and other pretrial motions, a lengthy trial with many fact and expert witnesses to establish liability and damages, post-trial motions, and likely appeals.  Leb. Decl. ¶¶84-88.  In light of the demanding Delaware law standards governing this case, nobody could predict with confidence how the Court may rule on summary judgment, much less what a jury would do at trial or the Second Circuit on appeal.

Plaintiffs also doubt that the benefits of the Settlement could have been achieved even if they were completely victorious at all stages of the litigation.  It is unclear whether, following a jury verdict in favor of Plaintiffs, the Court could have ordered Defendants to implement the governance and compliance changes achieved by the Settlement.  The amount of any recovery at trial was also uncertain.  Any monetary recovery would be based on proportionate liability, and defendants would certainly argue, with some force, that the lower level employees who committed the misconduct were partly responsible for the harm to the Company.  In this regard, the Defendants could likely point to many dozens (or hundreds) of members of Pfizer's sales force, leaving Defendants with a minority, or a even modest fraction, of recoverable damages.

Taking this case through trial would also have created a substantial risk that one or more insurance carriers would have invoked a policy exclusion to deny coverage. Such a denial of coverage would have resulted in protracted insurance litigation without any payments to Pfizer. Leb. Decl. ¶87. Moreover, the Defendants are all individuals and likely would not have been able to personally satisfy a judgment of $75 million or larger. By contrast, the Settlement immediately offers the significant benefits discussed above and in the declarations of Professor Gordon and Messrs. Pitt and Breeden. A risk-benefit analysis strongly supports the Settlement.

> 3.  Continued Litigation Would Be Lengthy and Complex, and Require Substantial Resources

Plaintiffs' allegations go back almost a decade and involve various ways in which numerous drugs were promoted for uses not approved by the FDA. Assuming the Court would have denied Defendants' summary judgment motion, resolving these issues would first involve pre-trial and in limine motions, and then require a lengthy trial with numerous fact and expert witnesses, first to explain the Company's complicated marketing activities and then to explain Defendants' role in fostering and permitting illegal conduct. Following trial, there would be post-trial briefing and a likely appeal. During this time, Pfizer would not enjoy the significant corporate governance changes and monetary recovery that Plaintiffs achieved in this Settlement. This "strongly militates in favor of the Settlement." *Novartis Pharms.*, 2010 WL 4877852, at *13 ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of post-trial motions and appeals.") (citation omitted).

To continue these proceedings would also require additional effort and expense by all parties, including Pfizer, Pfizer's current CEO, Pfizer's current chairman, and a majority of the Board. Plaintiffs have no insight in the expenses incurred by the Defendants, who were represented by senior lawyers at three renowned defense firms. Plaintiffs' counsel has, however,

already incurred more than $16 million in attorney time and almost $2 million in expenses to prosecute this Action.  It is therefore safe to assume that the parties would incur millions of dollars in additional expenses to take this case through trial and appellate review.  *See In re AOL Time Warner*, 2006 WL 2572114, at *6 (noting that "the prosecution of this action would require the Company to incur substantial costs" and that approving the settlement "will allow the Company to direct its full attention to its substantive business"); and *In re Metro. Life*, 935 F. Supp. at 294 ("In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties ….").

4.    The Reaction of Pfizer's Shareholders Favors Final Approval

The time for shareholders to object to the proposed Settlement has not yet been reached.  However, as of this time, counsel has not heard from any shareholder or representative of a shareholder indicating they are not satisfied with this Settlement.  This factor will be further addressed in Plaintiffs' reply papers in support of the proposed Settlement.

*       *       *

As detailed above, all of the factors strongly favor approval of this Settlement.

## V.    THE REQUESTED FEE AWARD IS FAIR AND SHOULD BE APPROVED

Plaintiffs' counsel achieved governance and compliance improvements that will provide significant value to Pfizer and its shareholders for years to come, while also securing a payment of $75 million – one of the largest cash recoveries in any derivative action. Leb. Decl. ¶¶81-83.  Plaintiffs' counsel vigorously prosecuted this action on a truncated schedule, facing daunting factual challenges and legal standards, as well as determined and skilled adversaries.  Achieving the substantial benefits created by the Settlement required counsel to invest over $16 million in time on a fully contingent basis and spend $1.6 million in expenses.  Plaintiff's counsel respectfully request an award of $22 million in attorneys' fees plus reimbursement of expenses.

28

A.     **The Legal Standard Governing Fee Applications**

Courts in this District exercising diversity jurisdiction will look to the governing state law to determine whether plaintiffs can recover attorneys' fees and expenses. *See Chan v. Diamond*, No. 03 Civ. 8494(WHP), 2005 WL 941477, at *3 (S.D.N.Y. April 20, 2005) ("Since this action raises claims under Delaware law, that state's law governs the question of attorneys' fees and expenses") (citation omitted).  Here, Plaintiffs assert breach of fiduciary duty claims under Delaware law, and it is well established in Delaware that plaintiffs who confer a corporate benefit may be awarded attorneys' fees and expenses. *See Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989) ("Changes in corporate policy or, as here, a heightened level of corporate disclosure, if attributable to the filing of a meritorious suit, may justify an award of counsel fees") (*citing Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966) and *Allied Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980)).  Moreover, Delaware law is clear that "the benefit need not be measurable in economic terms." *Id.  See also San Antonio Fire & Police Pension Fund v. Bradbury*, C.A. No. 4446-VCN, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010) (explaining that "results need not be pecuniary, so long as the litigation produces a substantial benefit to the corporation or its stockholders.").

If attorneys' fees and expenses are recoverable, as they are here, courts in this Circuit apply the so-called "*Goldberger* factors" to determine whether a requested fee award is reasonable given the specifics of the action: (1) the benefit achieved in relation to the settlement; (2) the litigation's magnitude and complexity; (3) the risk of the litigation; (4) the quality of the representation; (5) counsel's time and labor; and (6) public policy considerations. *See McDaniel v. County of Schenectady*, 595 F.3d 411, 423 (2d Cir. 2010); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  In addition, when a settlement consists solely of a monetary fund, courts will review whether the requested fee is reasonable as a percentage of the

total recovery (the "percentage method") and in light of counsel's lodestar. The trend in this Circuit is to use the percentage method while using the lodestar as a cross-check. *See Novartis Pharms.*, 2010 WL 4877852, at *20.

       1.       <u>The Benefits Achieved Support Counsel's Fee Request</u>

As discussed above, Plaintiffs' counsel achieved significant governance and compliance benefits that place Pfizer at the forefront of good governance in America. Gordon Aff. ¶¶2, 79-86; Breeden Aff. ¶15. These changes will dramatically improve Board oversight over Pfizer's marketing practices and significantly benefit Pfizer and its shareholders, including by reducing the risk of future multi-billion dollar fines and potential federal debarment. Gordon Aff. ¶¶79-85. In addition to the governance improvements, counsel obtained one of the largest cash recoveries in any derivative action. Leb. Decl. ¶¶81-83.

The governance and compliance improvements achieved in the Settlement alone support counsel's fee request. Courts have often approved significant fee awards in derivative settlements achieving more modest corporate governance changes without a financial recovery. For example:

- In the *Home Depot* derivative action, the court awarded $14.5 million in attorneys' fees and approved a settlement resolving challenged executive compensation.[7] According to the settlement notice, plaintiffs' counsel reviewed "tens of thousands of pages of documents" and took the depositions of "certain of the Defendants." In the settlement, Home Depot adopted corporate governance provisions, including: new charters and independence requirements for the Audit Committee, the Nominating and Corporate Governance Committee, the Leadership Development Committee and the Compensation Committee; altering compensation practices; and enhancing shareholder access to the CEO.

---

[7]    The stipulation of settlement in *City of Pontiac General Employees' Retirement System v. Langone and the Home Depot, Inc.*, C.A. 2006-cv-122302 (Sup. Ct. Ga. June 20, 2008) is attached to Leb. Decl. at Ex. K.

- In the *Shell* derivative litigation, the court awarded $9.2 million in attorneys' fees and approved a settlement resolving breach of fiduciary duty allegations in connection with improper oil reserve classifications. The settlement gave institutional investors an opportunity to be involved in the nomination of directors, strengthened independence and stock ownership standards for the board, and expressed a commitment to comply with generally accepted accounting principles.[8]

- In the *Eli Lilly* derivative action, the court awarded a fee of $8.75 million and approved a settlement resolving allegations that the board breached its duties in connection with certain safety related issues affecting (as well as off label marketing of) a number of drugs. The settlement, reached before a decision on the motion to dismiss, expanded the role of preexisting board and management committees over Eli Lilly's compliance systems and required enhanced training of directors and management.[9]

Although commendable, these governance improvements are not nearly as significant as the benefits achieved by the Settlement here. Unlike the *Home Depot* and *Eli Lilly* settlements, for example, the Settlement requires Defendants to create a brand new, independently funded Board committee with a broad mandate to review the company's marketing practices and a new Ombudsman program. In sum, the requested fee award would be reasonable if the Court focused solely on the corporate governance benefits at issue. At the least, based on the above precedents, a significant percentage of the requested fee award would be supported by the non-monetary terms of the Settlement.

The requested fee award would also be fair and reasonable if the Court would consider only the $75 million recovery achieved by the Settlement, and give no credit for the significant governance and compliance changes. In that case, Plaintiffs' request for $22 million amounts to 29.3% of the recovered amount and falls within the accepted range for common fund fee awards in this District. *See Novartis Pharms.*, 2010 WL 4877852, at *21 (observing that "federal courts

---

[8]   The stipulation of settlement in *Unite National Retirement Fund v. Watts*, No. 04-cv-3603 (D.N.J. Oct. 27, 2005) is attached to the Leb. Decl. as Ex. C.

[9]   The stipulation of settlement in *Lambrecht v. Taurel*, 08 cv-0068 (WTL) (S.D. Ind. July 27, 2010) is attached to the Leb. Decl. as Ex. D.

have established that a standard fee in complex class action cases…where plaintiffs have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit"). Indeed, "District Courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Id.* (collecting cases); *see In re Monster Worldwide, Inc. Sec. Litig.*, No. 07-cv-02237 (JSR), slip op. at 2 (S.D.N.Y. Nov. 25, 2008) (Rakoff, J.) (awarding 25% of $45 million settlement); *see also In re Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884 (AVC), 2007 WL 2115592, at *5 (D. Conn. July, 20, 2007) (awarding 30% of $80 million settlement); *see also In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 835 (AKH), 2007 WL 959299, at *3 (S.D.N.Y. March 28, 2007) (awarding 26% of $79.75 million settlement).[10] The same is true in Delaware.[11]

The fee request is reasonable based on either the substantial governance improvements or the financial recovery achieved for Pfizer. Plaintiffs' counsel's fee request is particularly reasonable given that the Settlement creates both significant monetary and governance benefits.

      2.    <u>The Requested Fee is Reasonable Considering the Time and Efforts of Plaintiffs' Counsel</u>

Courts in this District look to the lodestar as a cross-check for assessing the reasonableness of a fee award. *See Novartis Pharms.*, 2010 WL 4877852, at *22. "Where [the

---

[10] *Accord In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), slip op. at 8 (S.D.N.Y. July 18, 2007) (awarding 27% of $100 million settlement); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798, at *12-*13 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement); *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million settlement).

[11] *See Marie Raymond Revocable Trust v. MAT Five, LLC*, 980 A.2d 388, 410 n. 71 (Del. Ch. 2008) (citing multiple cases where the court approved fee requests of 30% or more of the benefits of a settlement, including *In re Home Shopping Network, Inc. S'holders Litig.*, Cons. C.A. No. 12868 (Del. Ch. Jan. 24, 1995); *see also In re Corporate Software Inc. S'holders Litig.*, C.A. No. 13209 (Del. Ch. Nov. 15, 1994); *see also In re USACafes, L.P. Litig.*, Cons. C.A. No. 11146, (Del. Ch. June 22, 1994); *Wiegand v. Berry Petroleum Corp.*, C.A. No. 9316 (Del. Ch. Nov. 25, 1991)).

lodestar is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *In re Marsh & McClennan*, 2009 WL 5178546, at *20 (citation omitted).

Here, Plaintiffs' counsel worked tirelessly to build a record to support fiduciary duty liability under "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark*, 698 A.2d at 967 (Del. Ch. 1996).[12]  Counsel spent 38,720 hours on preparing an amended complaint that could withstand the strict demand requirements under Delaware law, successfully opposing Defendants' motion to dismiss, pursuing extensive factual discovery in the face of determined opposition, assisting experts with preparing extensive disclosures, pursuing expert discovery, and full summary judgment briefing. Leb. Decl. ¶97, Ex. I.  Although Lead Counsel's hourly billing rates are below the typical hourly billing rates at New York defense firms, *see id.*, Plaintiffs' counsel's lodestar still equals $16,216,702.50.

The requested fee is approximately 1.4 times Plaintiffs' counsel's lodestar.  This multiplier is well below the fees awarded in other corporate governance and securities cases and is reasonable, especially given the substantial benefits achieved and the complexity of the issues presented.  *See, e.g., Wal-Mart Stores,* 396 F.3d at 123 (affirming multiplier of 3.5); *see also Novartis Pharms.*, 2010 WL 4877852, at *23 (awarding a multiplier of 2.4 and noting that it "falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit") (collecting cases approving lodestar multipliers ranging from 2.09 to 5.5); *see*

---

[12]   In *In re Caremark International, Inc. Derivative Litigation*, the parties requested approval of a settlement pending defendants' motion to dismiss.  Chancellor Allen explained the theoretical basis for liability for "unconsidered inaction" by a corporate board and, approving the settlement, making clear that the merits of the claims "were extremely weak."  698 A.2d 959, 972  (Del. Ch. 1996).

*also In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (awarding

multiplier of 4).[13]  The same is true in Delaware.[14]

> 3.  The Contingent Nature of Counsel's Work, the Complexity of this
> Case, and Counsel's Experience All Support the Requested Fee

Plaintiffs undertook to correct years of widespread, factually complicated misconduct in

the face of a very demanding legal standard under Delaware law and determined opposition by

Defendants.  The standing of Plaintiffs' counsel is well-known to this Court, as is the standing of

Defendants' counsel.  It was only through the perseverance and skill of Plaintiffs' counsel that

the substantial benefits of the Settlement were achieved for Pfizer.

Pursuing this case on a fully contingent basis, Plaintiffs' counsel faced a serious risk of

not recovering millions of dollars in invested time and expenses.  *See, e.g., In re Walt Disney Co.*

*Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (no fee recovery

because the court entered a judgment against plaintiffs after a long breach of duty trial).  Courts

in this District take such risks into account in determining the reasonableness of a requested fee

award.  *See Steiner v. Williams*, No. 99 CIV. 10186 (JSM), 2001 WL 604035, at *7 (S.D.N.Y.

---

[13]   *Accord In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM),
2006 WL 3378705, at *2-*3 (S.D.N.Y. Nov. 16, 2006) (awarding fee representing a 2.89
multiplier); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2010 WL
2653354, at *5 (E.D.N.Y. June 24, 2010) (awarding 2.78 times lodestar, noting that "[w]here
… counsel has litigated a complex case under a contingency fee arrangement, they are
entitled to a fee in excess of the lodestar"); *In re Deutsche Telekom, AG, Sec. Litig.*, No. 00-
cv-9475, 2005 U.S. Dist. LEXIS 45798, at *13-*14 (S.D.N.Y. June 14, 2005) (awarding fee
representing a 3.96 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D.
465, 489 (S.D.N.Y. 1998) (awarding fee representing a 3.97 multiplier and noting that
multipliers between 3 and 4.5 are common).

[14]   *See Louisiana Mun. Police Empls.' Ret. Sys. v. Crawford*, C.A. No. 2635-CC (Del. Ch. June
8, 2007) (order approving fees of $20 million representing a lodestar multiplier of 6.5);  *In re*
*Digex, Inc. S'holder Litig.*, C.A. Cons. No. 18336, Tr. at 141-47 (Del. Ch. April 6, 2001)
(awarding lodestar multiplier of 9).

May 31, 2001) (finding that "[i]n undertaking this litigation, counsel took a tremendous risk that, in the end, nothing would be recovered" and awarding 30% of $20 million recovery).

### 4.    Public Policy Considerations Support the Requested Fee Award

The purpose of derivative actions is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 95 (1991). This Action, which protected the interests of Pfizer and its shareholders from alleged misfeasance by Pfizer's Board and senior management, would not have been possible if prior cases had not recognized the societal interest in providing incentives to specialized and experienced counsel to bring high-risk, high-stakes derivative actions.

### B.    **The Requested Expenses Are Reasonable**

"It is well-established that counsel who create a common fund…are entitled to the reimbursement of [all reasonable] litigation costs and expenses." *Novartis Pharms.*, 2010 WL 4877852, at *24 (citation omitted).  Here, Plaintiffs' expenses were below the national average of expenses in class action settlements of 2.8%, and should be reimbursed.  *See id.*

Plaintiffs' counsel requests reimbursement for the expenses necessarily incurred in the prosecution of this Action, in the amount of $1,616,650.69 or 2.2% of the total monetary recovery.  Leb. Decl. ¶98.  The expenses include costs for experts and consultants retained by Plaintiffs' counsel, traveling, and expenses for depositions in New York, Massachusetts, Florida, Alabama, and California (including stenographers and videographers), legal research and photocopying.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant final approval of the Settlement and award the request for attorneys' fees and expenses.

Dated: New York, New York
       February 7, 2011

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

By:    /s/ Mark Lebovitch_____
       Mark Lebovitch, Esq.
       David Wales, Esq.
       Beata Farber, Esq.
       Jeroen van Kwawegen, Esq.
       Jonathan D. Uslaner, Esq.
       Kristin Ann Meister, Esq.
1285 Avenue of the Americas
New York, New York 10019
Tel:  212-554-1400
Fax:  212-554-1444

*Court-Appointed Lead Derivative Counsel and
Counsel for Co-Lead Plaintiff Louisiana
Sheriffs' Pension and Relief Fund*

**KIRBY McINERNEY LLP**
David E. Kovel, Esq.
Edward M. Varga, Esq.
Surya Palaniappan, Esq.
825 Third Avenue
New York, New York 10022
Tel:  212-371-6600
Fax:  212-751-2540

*Counsel for Co-Lead Plaintiff Skandia Life
Insurance Company Ltd.*

**KLAUSNER & KAUFMAN, P.A.**
Robert D. Klausner, Esq.
10059 N.W. 1st Court
Plantation, FL  33324
Tel:  (954) 916-1202

*Counsel for Co-Lead Plaintiff Louisiana
Sheriffs' Pension and Relief Fund*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser, Esq.
Brett D. Stecker, Esq.
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Tel:  610-225-2677

*Counsel for Additional Plaintiff Henrietta Klein*

**POMERANTZ HAUDEK GROSSMAN
      & GROSS LLP**
Jason S. Cowart, Esq.
Marie L. Oliver, Esq.
100 Park Avenue, 26th Floor
New York, NY  10017
Tel:  (212) 661-1100

**BARRACK RODOS & BACINE**
Daniel E. Bacine, Esq.
Julie B. Palley, Esq.
Two Commerce Square
2001 Market Street – Suite 3300
Philadelphia, PA 19103
Tel:  (215) 963-0600

*Counsel for Additional Plaintiff Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees represented by Local 85 of Amalgamated Transit Union*