UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PFIZER INC. SHAREHOLDER DERIVATIVE LITIGATION | No. 09-CV-7822 (JSR)<br><br>ECF CASE |

**JOINT DECLARATION OF MARK LEBOVITCH AND DAVID WALES
IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF DERIVATIVE
LITIGATION SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND
REIMBURSEMENT OF EXPENSES**

MARK LEBOVITCH and DAVID WALES declare pursuant to 28 U.S.C § 1746 as

follows:

1.      We are partners of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or

"Lead Counsel"), counsel for Co-Lead Plaintiff Louisiana Sheriffs' Pension and Relief Fund

("LSPRF") and Court-appointed Lead Derivative Counsel ("Lead Counsel") in this action (the

"Action"). We have personal knowledge of the matters set forth herein. One or both of us was

directly involved in, and responsible for, every key aspect of prosecuting this case. Specifically,

Mark Lebovitch was the lead prosecuting partner on the case from its outset and David Wales

joined the team in June 2010 and has shared lead responsibilities through today.

2.      We submit this declaration in support of: (a) Plaintiffs' motion for final approval

of the proposed settlement resolving all claims in this derivative action against defendants

Dennis A. Ausiello, Michael S. Brown, M. Anthony Burns, Robert N. Burt, W. Don Cornwell,

William H. Gray III, Constance J. Horner, James M. Kilts, Jeffrey B. Kindler, George A. Lorch,

Dana G. Mead, Suzanne Nora Johnson, William C. Steere, Jr., Henry A. McKinnell, Joseph

Feczko, Doulgas M. Lankler, Ian Read, Frank D'Amelio, and Allen P. Waxman ("Settling Defendants"); and (b) Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses.

## I.     INTRODUCTION AND OVERVIEW

3.      After more than a year of contentious litigation, Plaintiffs have achieved an exceptional result for Pfizer and its shareholders.  We believe this case is an example of the significant benefits that a derivative action, initiated by committed institutional plaintiffs and prosecuted by experienced and dedicated counsel, can confer upon a company and its shareholders.

4.      The core theory of this case was that the blue-chip and highly regarded board of directors (the "Board") of Pfizer, Inc. ("Pfizer" or the "Company") breached its fiduciary duties in allowing systemic misconduct that required Pfizer to have a subsidiary plead guilty to a felony and Pfizer to pay the largest criminal fine in United States history and the largest civil settlement in the history of the pharmaceutical industry.

5.      A central aim of this derivative action was to make Pfizer's directors and senior managers accountable for the Company's prior misconduct and to assume responsibility for preventing future, widespread violations of drug marketing laws.  Plaintiffs and their counsel were determined to confront Pfizer's directors and executives with the record of events leading to Pfizer's previous problems and to ensure that all Pfizer directors and senior managers will assume heightened ownership over compliance with drug marketing laws going forward.

6.      We respectfully submit that the prosecution of this litigation and the arms'-length and very well informed negotiation of the resulting Settlement – including significant corporate governance and compliance improvements, and a $75 million fund dedicated to supporting the implementation of these changes – accomplished those goals.  The term sheet setting forth the

corporate governance and compliance improvements as well as the monetary requirements of the Settlement is attached hereto as Exhibit A.

7.      In crafting our specific corporate governance demands, we called upon corporate governance expert and Columbia Law School Professor Jeffrey N. Gordon to ensure that we obtained the most meaningful protections for Pfizer and its shareholders. The corporate governance changes set forth in the Settlement include, among other things:

- The creation of a new and independently funded Regulatory and Compliance Committee of the Board, with oversight responsibility and authority over a broad range of Pfizer's compliance responsibilities;

- The creation of an Ombudsman Program designed as an alternative channel for employees to express work-related concerns, including those related to marketing-practices, without fear of retaliation, providing a direct channel to the Regulatory and Compliance Committee;

- A required Board-level procedure for considering potential perverse compensation incentives for employees and consultants marketing Pfizer's drugs;

- A required Board-level procedure for determining whether to obtain compensation clawback for corporate officials involved in marketing misconduct or with direct supervision over those employees engaged in the misconduct; and

- A dedicated fund of $75 million, less awarded expenses and fees associated with the Action, to fund the activities of the Regulatory and Compliance Committee.

8.      We respectfully refer the Court to the affidavit of Professor Gordon filed herewith for a detailed analysis of these significant governance and compliance improvements.

9.      Two of Defendants' corporate governance experts – former SEC Chairmen Harvey Pitt and Richard Breeden – submitted declarations in support of preliminary approval of the Settlement. ECF No. 91 (Attachments 1 and 2), setting forth why they believe the governance and compliance improvements will provide substantial benefits to Pfizer and will also provide a model for pharmaceutical companies and other companies in highly regulated industries.

10.     On behalf of Plaintiffs, we and the other law firms who supported our efforts, vigorously pursued this Action since its commencement. From the moment we first filed a complaint on behalf of co-lead plaintiff LSPRF in late September 2009 until the day defendants agreed to the terms of the Settlement, Plaintiffs' team of lawyers, working entirely on a contingency basis, devoted themselves to achieving the best possible result in this matter.

11.     We appreciated from the outset that, under Delaware law, we were prosecuting a case that is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *In re Caremark International Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996). Meeting this high burden of liability was further complicated because Plaintiffs were confronted with difficult evidence – including Board materials that seemed to be prepared with an eye towards "papering the record" and skilled and particularly well-prepared witnesses. Plaintiffs' counsel also had to overcome the seemingly endless resources of Defendants, their well-qualified experts, and three major defense firms that pursued every available angle to thwart our own litigation strategies.

12.     Every aspect of this Action was hotly contested. The parties reached the Settlement only after the Court denied Defendants' motion to dismiss, after extensive expedited discovery – including the production of over 12 million pages of documents, constant adversarial discovery-related meet and confers, more than two dozen fact depositions, the exchange of expert reports and depositions of Defendants' experts – and when summary judgment briefing was nearly complete.

13.     While confident in the record that we developed during the course of discovery, we were also cognizant of the risks of proceeding. Plaintiffs faced serious risks in prosecuting the litigation, with Defendants aggressively arguing that, among other things, (i) Defendants

4

fulfilled their fiduciary obligations; (ii) Plaintiffs' action was barred by the exculpatory provisions permitted under Section 102(b)(7) of Delaware General Corporation Law; and (iii) Plaintiffs' action was time-barred.

14.     Compounding these matters, we faced the practical reality that, even if Plaintiffs were successful in obtaining a money judgment exceeding the $75 million amount attained through the Settlement detailed below, Pfizer likely would not be able to collect the judgment for some time, if ever. While all Defendants are professionally accomplished and many are wealthy by relative measures, they could not personally fund a judgment in the hundreds of millions of dollars. In light of the bad faith/disloyalty standard needed to overcome Pfizer's exculpatory provision, any post-trial judgment could potentially trigger exclusions in Defendants' insurance policies, which in all events would lose significant recoverable value by the time a judgment were granted, appealed and confirmed. In addition, and perhaps most importantly, it is unclear whether any jury (or an equitable bench ruling after trial) could produce the very specifically tailored, transformational corporate governance requirements that Plaintiffs obtained in the Settlement in order to achieve the goals of the litigation.

15.     The Settlement was truly the product of intense and hard-nosed negotiations. During the course of discovery, settlement discussions quickly fizzled, mainly because the parties had fundamentally opposing views of the merits of the case, hence, divergent views of the framework for any consensual resolution.

16.     There were some settlement discussions in early of November 2010, but the parties remained far apart. Hours before Plaintiffs were to serve their opposition to Defendants' summary judgment motion on November 12, a telephone call between Dennis Block and Robert Fiske, Jr. for the Defendants and Max Berger for the Plaintiffs increased the possibility of

reaching a settlement. After this call, Plaintiffs' litigation team finalized and served Plaintiffs' opposition papers to Defendants' summary judgment motion, and Max Berger and David Wales engaged in intense settlement negotiations with Mr. Block and Mr. Fiske over the weekend, conferring regularly with Professor Gordon. The negotiations were tense and continued throughout the weekend and Monday November 15 – the day that Plaintiffs' previously served opposition to summary judgment was due to be filed with the Court. At about 5 p.m. that day, we provided the Court with the term sheet and a request to adjourn the remaining dates of the case management plan.

17. The Court preliminarily approved the Settlement on December 14, 2010. Defendants had responsibility for providing notice. Consistent with the Court's Order, the Notice of Pendency and Proposed Settlement of Shareholder Derivative Suit was included with a Form 8-K on December 17, 2010; the Notice of Pendency and Proposed Settlement of Shareholder Derivative Suit was published on Pfizer's website and on Plaintiffs' counsel's dedicated "Pfizer Derivative Litigation" webpage, and a summary notice was published in the Wall Street Journal (on December 20, 2010) and USA Today (on December 20, 2010), as well as over the Business Wire (on December 17, 2010). The notices advised all recipients of, among other things, the background of the Action and the Settlement, as well as their right to object to any aspect of the Settlement, including Lead Counsel's request for attorneys' fees and reimbursement of expenses.

18. The Court-ordered deadline for filing objections to the Settlement is February 21, 2011. To date, Lead Counsel has not received any objections to the Settlement. Should there be any objections, they will be addressed by Lead Counsel in a reply brief on February 28, 2011.

## II.    HISTORY OF THE LITIGATION

### A.    The Commencement of the Litigation

19.    In September 2009, Pfizer and the federal government announced that a Pfizer subsidiary would be pleading guilty to a felony of marketing one drug, Bextra, for uses and dosages that were not approved by the Food and Drug Administration ("FDA"), and that it would pay a criminal fine and civil settlement of $2.3 billion in connection with that guilty plea and claims relating to alleged improper marketing and payment of kickbacks concerning numerous other drugs, including Geodon, Zyvox, and Lyrica.  Pfizer also agreed to enter into a "corporate integrity agreement" with the Office of the Inspector General of the United States Department of Health and Human Services ("OIG") requiring Pfizer to undertake detailed compliance obligations (the "2009 CIA").

20.    Following these announcements, BLB&G, acting on behalf of clients with sizable positions in Pfizer stock, began investigating the nature of the allegations and the potential responsibility of Pfizer's Board and senior executives.  Counsel reviewed numerous whistleblower complaints, public documents from product, securities and commercial litigations against Pfizer throughout the country, publicly available FDA information (including Warning Letters, violation notices and responses to new drug applications by Pfizer), and public filings with the Securities and Exchange Commission ("SEC").

21.    Our investigation revealed, among other things, that this was not the first time that Pfizer agreed to pay criminal fines and have a subsidiary plead guilty after marketing drugs for uses and dosages that were not approved by the FDA.  Previously, Pfizer paid almost half a billion dollars in connection with criminal and civil settlements with the government concerning allegations of illegal sales and marketing practices with respect to other drugs, including Neurontin and Genotropin.

22.     Our investigation further revealed that Pfizer had entered into two prior corporate integrity agreements with the federal government, which increased the responsibility of the Board to oversee Pfizer's marketing practices (the "2002 CIA" and the "2004 CIA"). After entering into the 2004 CIA, Pfizer received what we considered to be a flood of "red flags" strongly suggesting widespread illegal marketing practices, alleging similar illegal marketing and retaliation practices throughout the Company.

23.     We also discovered that Pfizer had previously marketed the painkiller "Bextra" for uses and dosages for which the FDA expressly refused to grant permission because of safety concerns, and that the FDA requested that Pfizer remove Bextra from the market in April 2005 because of safety concerns, even when used for approved uses and at approved dosages.

24.     Following our investigation and client retention, BLB&G filed complaints on behalf of LSPRF and on behalf of Amalgamated Bank as trustee for the LongView Largecap 500 Index VEBA Fund, LongView Largecap 500 Index Fund and LongView Quantitative Largecap Fund ("Amalgamated"). A number of other Pfizer shareholders filed actions of their own.

25.     On October 22, 2009, the Court consolidated our clients' actions with the other actions filed in this Court stemming from Pfizer's illegal drug marketing.

26.     On November 4, 2009, following an evidentiary hearing with live witness testimony and argument by BLB&G partner Gerald Silk, the Court appointed Amalgamated as "Lead Plaintiff" and BLB&G as "Lead Counsel" in the Action. The law firms Kirbny McInerney LLP, Barrack Rodos & Bacine and The Weiser Law Firm, P.C. agreed to work cooperatively to support Lead Counsel's prosecution efforts.

27.     BLB&G continued its factual and legal investigation into the Action and on November 18, 2009, Plaintiffs filed a Consolidated, Amended and Verified Shareholder

Derivative Complaint (the "Complaint"), alleging that the Board and Executive Defendants had heightened obligations to oversee Pfizer's marketing practices under the 2004 CIA, that they had breached their fiduciary duties to Pfizer and its shareholders by ignoring a flood of "red flags" (including government investigations, whistleblower complaints, FDA Warning Letters, etc.) putting them on notice of systemic and widespread unlawful marketing practices and retaliation throughout the Company and that they consciously disregarded and failed to properly address the ongoing criminal conduct (the "Fiduciary Duty Claims"). The Complaint (ECF No. 34) also alleged that the Board violated Section 14(a) of the Securities Exchange Act (the "Proxy Claim") and that Defendants were unjustly enriched by receiving compensation and bonuses notwithstanding their wrongful conduct (the "Unjust Enrichment Claim").

### B.  Defendants' Motion to Dismiss

28.    On December 16, 2009, Defendants moved to dismiss the Action, arguing that the Board was not conflicted and demand was not excused, because the Complaint failed to allege with sufficient specificity that there had been a "sustained or systematic failure of the board to exercise oversight" as required by *Caremark,* 698 A.2d 959 at 971, and *Stone ex. rel. AmSouth Bancorp. v. Ritter,* 911 A.2d 362 (Del. 2006). Defendants also moved to dismiss the Proxy and Unjust Enrichment Claims. *See* ECF Nos. 35, 36 and 38.

29.    Plaintiffs filed opposition papers on January 8, 2010, arguing that the Board was conflicted, and demand was excused, because Defendants were allegedly informed of Pfizer's widespread unlawful marketing practices but deliberately decided to allow this conduct to continue, thereby placing illegal short term profits ahead of the long term interests of Pfizer, its shareholders, and the patients taking Pfizer drugs. *See* ECF Nos.42-42. According to Plaintiffs, the Complaint met the standards for demand futility that were articulated in *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984), *Rales v. Blasband,* 634 A.2d 927 (Del. 1993), *Stone v. Ritter,* 911

A.2d 362 (Del. 2006), and *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003).

30.     After Defendants filed reply papers on January 22, 2010, the Court heard oral argument on February 5, 2010. *See* ECF No.49 (Transcript of Proceedings). Mark Lebovitch argued for Plaintiffs and Dennis Block argued for Defendants. During the oral argument, which lasted for over three hours, the Court asked probing questions of counsel for both Plaintiffs and Defendants, in particular with respect to the Fiduciary Duty Claims. The Court broadly explored the bases for Plaintiffs' theories of liability.

31.     On March 17, 2010, the Court issued an Order dismissing the Proxy and Unjust Enrichment Claims, but denying the motion to dismiss with respect to the Fiduciary Duty Claims. *See* ECF No. 50. In a subsequent Memorandum Opinion, the Court explained that the Complaint met both the *Rales* test and the *Aronson* test by alleging "misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board [was] entirely reasonable." *In re Pfizer Inc. S'holder Derivative Litig.*, 09-cv-7822, 2010 WL 2747447, at *7 (S.D.N.Y. July 13, 2010).

32.     Following the Court's March 17 Order, Lead Counsel submitted a Proposed Order to substitute Lead Plaintiff Amalgamated with LSPRF and Skandia, to ensure that the Court would have diversity jurisdiction after dismissal of the Proxy Claims. The Court exercised supplemental jurisdiction to hear this proposal and, on April 5, 2010, appointed LSPRF and Skandia as Lead Plaintiffs and reappointed BLB&G as Lead Counsel.

## C.  The Hard-Fought Discovery Process

33.     The discovery process was contentious.  Disagreements about document production were constant, often requiring multiple "meet-and-confer" conferences, and in many instances were resolved only when we requested a time to call the Court for intervention.

### 1.  Document Requests

34.     On March 31, 2010, we served a first set of document requests on Defendants. Plaintiffs requested documents concerning Pfizer's drug marketing plans and practices, board and audit committee minutes, and board meeting pre-reading materials.  We later issued third party subpoenas for documents from (i) Pfizer's outside auditor, KPMG; (ii) the independent review organization PricewaterhouseCoopers; and (iii) Pfizer's legal advisors at Ropes & Gray LLP, Morgan Lewis & Bockius LLP, Epstein Becker & Green P.C., Davis Polk & Wardwell LLP, and Covington & Burling LLP.

35.     Between April 2010 and the end of May 2010, we engaged in extensive meet-and-confer conferences and in-person meetings with counsel for Defendants and third parties to determine the proper scope of discovery and the appropriate document redactions for this Action. These negotiations, which involved senior lawyers representing both Plaintiffs and Defendants, were quite adversarial, in particular with respect to Defendants' decision to significantly redact Board minutes and presentation materials.  Based on our review of certain of Defendants' redactions based on their determination of relevance, we believed that Defendants were tailoring the record in their favor with an unduly narrow view of the Action.

36.     Upon request of the parties, the Court held telephonic conferences to discuss discovery related issues on April 26, May 4, May 14, May 26, and June 1, 2010.

37.     On June 2, 2010, the Court held a hearing and heard oral argument about the parties' various discovery disputes, including the propriety of Defendants' relevance redactions

and the speed (or lack thereof) at which documents were being produced. *See* ECF No. 62 (Transcript). During the hearing, the Court initially expressed skepticism about the need for Plaintiffs to review documents concerning Pfizer's marketing practices that were not, on their face, shared with the Board. During an extended argument, we urged the Court to rule that the scope of production should not be so limited. This issue was critical, because an overly narrow scope of discovery could materially impair our ability to present a compelling record at summary judgment.

38. During the course of oral argument, we also identified certain materials that we believed had been improperly redacted on the basis of privilege. After some questioning of defense counsel, the Court ordered a continuance of the hearing until June 11.

39. On June 11, 2010, the Court held two hearings. First, the Court held a closed hearing in which it heard testimony of Pfizer's Chief Compliance Officer to determine whether Defendants' redactions of certain information on the basis of the attorney-client privilege and attorney work product doctrine were proper. After the closed-door hearing, the Court informed us that it had been satisfied that Defendants were appropriately defining the scope of attorney work-product.

40. Second, the Court continued the June 2, 2010 hearing in open court concerning the scope and speed of discovery. The Court ultimately granted a number of Plaintiffs' requests for broader discovery and set firm deadlines for Defendants and certain of Pfizer's outside advisors to produce documents. The Court also modified the discovery schedule to allow adequate time for these productions to proceed.

41. Between May 2010 and November 2010, Defendants produced approximately 12 million pages of documents, including voluminous databases of documents previously made

available to the DOJ, as well as a wide range of additional materials. KPMG and PricewaterhouseCoopers produced an additional 20,000 pages of documents. For their part, Plaintiffs produced about 20,000 pages of documents. All of these documents were processed and included in an electronic document review database.

42. The vast bulk of the document production was made between June and August 2010. Reviewing this volume of document production, particularly in light of the timing applicable to the discovery process, presented challenges. The 12 million pages of discovery were placed on an electronic management review system, coded and segregated for relevance and by subject matter with respect to different aspects of this Action, and promptly provided to attorneys who were taking depositions. Specifically, BLB&G and the four law firms whose clients had agreed to support our efforts, devoted a team of 25 attorneys who worked full time on reviewing documents the moment they came in and to quickly identify the most generally relevant documents, requiring constant late nights and weekends.

43. By necessity, the general review of documents took place at the same time as the witness specific reviews for each of the 27 witnesses Plaintiffs deposed. In addition, we had to run numerous reviews of documents for pertinent people in order to determine whether we should ask for their depositions. Often, a useful document would be identified and instantly printed and inserted into a collection of documents for use at a deposition the following day.

44. This process required extensive resources and organization. On the one hand, the massive volume of document production required a significant allocation of legal resources among the various Plaintiffs' counsel. On the other hand, the overlap of document review and the deposition schedule (and the generally narrow timeframe for depositions) required a significant focus on ensuring that the entire team was conversant in our prosecution strategies.

As a result, one or more of the BLB&G litigators at the heart of the prosecuting the case held regular meetings with the entire document review team, and the lawyers taking specific depositions spent significant time with the sub-team assigned to pull witness-specific documents. The attorneys who were reviewing the documents were well-positioned to carefully evaluate and understand documents whose importance to the overall case was not always obvious at first glance.

45.     Ultimately, through the effort of numerous committed lawyers, we were able to identify and organize the wheat – a world of several hundred important documents – from the chaff – over 12 million pages of often confusing or irrelevant documents.

**2.     Requests for Admission and Interrogatories**

46.     On July 16, 2010, Plaintiffs served a first set of interrogatories on Defendant Pfizer, to which Defendants responded on August 23, 2010.

47.     On July 27, 2010, Defendants served a first set of interrogatories on Plaintiffs, to which Plaintiffs responded on August 26, 2010.

48.     On August 23, 2010, Defendant Pfizer served a second set of interrogatories on Plaintiffs.  On August 24, 2010, Defendants served a third set of interrogatories on Plaintiffs.

49.     On August 24, 2010, Plaintiffs served a first set of interrogatories on Individual Defendants, and a second set of interrogatories on Defendant Pfizer.

50.     We sought to use both our initial factual interrogatories and our subsequent contention interrogatories as tools to define and narrow the contested issues.  While we received voluminous responses from Defendants, we challenged the responses to a number of interrogatories because the answers provided did not actually answer the questions raised.  In addition, Defendants initially refused to provide any responses to certain of our fact and

contention interrogatories. We devoted considerable time and resources to negotiating for more substantive and meaningful responses.

51. On August 30, 2010, Plaintiffs served approximately 350 requests for admission on each of the Defendants. While voluminous, we sought to use the requests for admission as a tool to narrow the scope and substance of the factual disputes in the case. On October 11, 2010, Defendants responded with extensive denials, sometimes of facts we did not think could reasonably be disputed. We determined for strategic reasons that holding Defendants to their denials (rather than pressing for admissions) could actually help Plaintiffs at trial.

52. Three categories of Defendants' responses to Plaintiffs' written discovery and requests for witnesses pursuant to Fed. R. Civ. P. 30(b)(6) raised particularly contentious issues: (i) the presentations and negotiations between counsel for Defendants and the federal government that led to the 2009 guilty plea, criminal fine and civil settlement; (ii) Pfizer's compensation and bonus policies for Pfizer sales employees; and (iii) the identity of senior managers (if any) who had been subjected to disciplinary measures for illegal sales practices or violations of Pfizer marketing policies. Following extensive meet and confers, between September 18 and November 12, 2010, Pfizer supplemented depositions by providing several rounds of supplemental written responses regarding these important issues.

**3.** Depositions and Expert Discovery

53. From July 2010 through November 2010, Plaintiffs took 27 fact depositions, including, almost all of the current Board members and numerous former Pfizer directors, a number of current and former senior executives, pertinent Rule 30(b)(6) witnesses, and third-parties, including:

     i.    Chairman and CEO, Jeffrey Kindler (who retired shortly after the parties reached Settlement);

ii.  Former Chairman and CEO, Henry A. McKinnell;

iii.  Former Chairman and CEO, William C. Steere;

iv.  Chief Compliance Officer, Douglas Lankler;

v.  Head of Global Pharmaceuticals (and current CEO), Ian Read;

vi.  Former Vice-Chair and head of Global Pharmaceuticals, Karen Katen;

vii.  Former Chief Medical Officer, Joseph Feczko;

viii.  Former SVP of Sales, Rick Burch;

ix.  Rule 30(b)(6) witness concerning Pfizer's negotiations to resolve the criminal and civil allegations related to Pfizer's unlawful sales practices;

x.  Rule 30(b)(6) witness concerning Pfizer's compensation of sales representatives; and

xi.  The engagement partner at Pfizer's outside auditor, KPMG.

54.  We personally took responsibility for the most important of these depositions. Specifically, Mark Lebovitch took the depositions of Pfizer's Chairman and CEO, Jeffrey Kindler; Pfizer's former Chairman and CEO, Hank McKinnell; Chief Compliance Officer Douglas Lankler; Defendant directors Suzanne Nora Johnson, George Lorch and W. Don Cornwell; and former SEC Chairman Harvey Pitt (testifying as one of four defense experts). David Wales deposed Pfizer's former head of global operations and current CEO Ian Read; Chief Internal Auditor Hugh Donnelly; Chief Medical Officer Joe Feczko; Defendant directors Dennis Ausiello, W.R. Howell, Michael Brown (Nobel Prize recipient) and William Gray, III; and Pfizer's Rule 30(b)(6) witness regarding negotiations with the government, Ropes & Gray partner Brien O'Connor.

55.  At the same time we were taking some of the last, and most important, depositions in the case, Defendants deposed each one of the representative Plaintiffs.

56.  Plaintiffs served opinions and supporting reports from three experts:

i.     Richard Guarino, a former clinical research and medical director of various pharmaceutical companies and current chief executive officer of a consulting firm providing clinical and regulatory services to pharmaceutical companies in connection with the FDA drug approval process, described the FDA approval and labeling process, the applicable rules and regulations on drug marketing, and the approved and unapproved uses of various Pfizer drugs.

ii.    John Abramson, M.D., a Harvard lecturer who has written peer reviewed articles in medical journals and a leading book about drug company marketing practices, analyzed Pfizer's strategic and sales force materials, including drug operating plans and sales force training materials and sales materials that purportedly reflected a deliberate strategy of positioning Pfizer drugs in ways not limited to FDA approved indications. Dr. Abramson concluded in his 140 page report that Pfizer's illegal sales and marketing practices were the result of a deliberate corporate strategy to position Pfizer drugs for uses that were not approved by the FDA.

iii.   Professor Bernard M. Black, a professor at Northwestern Law School and corporate governance expert, described the expectations of a board, analyzed the Defendants' response to the numerous "red flags" of misconduct that resulted from the implementation of Pfizer's corporate strategy to position drugs for uses and dosages that were not approved by the FDA, and concluded in his 76 page report that the Board had either consciously endorsed Pfizer's improper corporate strategy or had kept itself willfully ignorant of the fact that Pfizer implemented such a strategy.

57.    Defendants served four rebuttal expert reports:

i.     Former SEC Chairman Harvey Pitt reviewed Pfizer's corporate governance structure in an 88 page report and concluded that the Board reasonably believed that they received adequate information to permit the Board to exercise its oversight responsibilities over Pfizer's operations by relying on Pfizer's corporate governance structure and senior management.

ii.    Former SEC Chairman Richard Breeden submitted a 141 page report reviewing the "red flags" that were brought to the attention of the Board and concluded that many of those warnings were routine occurrences in a large and highly regulated company, and that the Board had reasonably relied on management to address such warnings by designing and implementing an effective compliance program.

iii.   Professor Lucien Bebchuk from Harvard Law School analyzed Board attendance and Board incentives in an 81 page report, and concluded that the Defendants dedicated adequate time to compliance and were incentivized to promote the interests of Pfizer's shareholders in that they

had strong incentives to avoid, rather than allow, compliance-related violations.

iv.   Former Assistant U.S. Attorney Lori S. Pelliccioni, currently a partner at Pricewaterhouse Coopers, submitted a 76 page report concluding that Pfizer had a comprehensive and effective compliance function, that key members of Pfizer's senior management and Board promptly and effectively addressed any compliance issues that inevitably came up at a company with approximately 100,000 employees, and that the size of Pfizer's payment of $2.3 billion in 2009 did not reflect the relative scope of misconduct at Pfizer.

58.   Plaintiffs deposed each of Defendants' experts. Rather than focus our efforts on admissions of disputed fact that could help us defeat Defendants' pending summary judgment motion but would thereafter be of limited use, we made the deliberate decision to depose each expert with an eye towards limiting their opinions, establishing what support (if any) these experts had for their opinions, and effective cross-examination before a jury.

**D.   Summary Judgment**

59.   On October 22, 2010, Defendants served a motion for summary judgment, a supporting memorandum of law, a declaration with exhibits by James P. Rouhandeh, and a Rule 56.1 statement with material undisputed facts.

60.   Defendants' motion argued that the Court should grant summary judgment because Defendants responded in good faith to warnings of potential wrongdoing – in many cases involving "legacy matters" at newly acquired subsidiaries – and investigated and addressed each instance of misconduct that was brought to their attention. Defendants argued that "[t]he question was not whether their response was ideal, but whether it was undertaken in good faith." *See* ECF Nos. 81-83. Defendants also argued that any breaches by Defendants were in any event exculpated pursuant to a Pfizer Charter provision permitted under Section 102(b)(7) of the Delaware General Corporation Law. Finally, Defendants asserted for the first time that Plaintiffs' claims were time barred.

61.     On November 12 and 13, 2010, Plaintiffs served their opposition papers to Defendants' motion for summary judgment, which included a memorandum of law, a 118 page response to Defendants' Rule 56.1 statement of undisputed facts, a 136 page Rule 56.1 counterstatement of additional material facts, and Mark Lebovitch's supporting declaration, including 352 accompanying exhibits.

62.     Among other things, Plaintiffs argued that Defendants ignored Dr. Abramson's report and the evidence cited therein, which opined that Pfizer's illegal sales and marketing practices were the result of a deliberate corporate strategy to position some of Pfizer's most important drugs for uses that were not approved by the FDA. Plaintiffs also argued that Defendants failed to address the expert report of Professor Black, and the evidence cited therein, describing how Defendants turned a blind eye to the numerous FDA Warning Letters, retaliation claims from conscientious employees, and other "red flags" that showcased Pfizer's strategies. Plaintiffs further argued that, at a minimum, Defendants' good or bad faith state of mind in addressing reports of marketing violations and relying on others to ensure Pfizer's systemic compliance with drug marketing laws was a question for the trier of fact. Finally, we cited case law that we believed undermined the statute of limitations defense.

63.     While we believed our responses were substantial and would persuade the Court that Defendants' summary judgment motion should be denied, we were well aware of the demanding Delaware standards for liability under the theories we pursued. As such, we could not fully discount the persuasive force of Defendants' summary judgment briefs and submissions.

## III.     THE SETTLEMENT NEGOTIATIONS

64.     During discovery, there were a number of preliminary settlement discussions between the parties, but we were too far apart to start serious discussions. Each side believed

that the other had a fundamentally mistaken view of the facts and deeply unrealistic expectations about the appropriate outcome of this Action. The informal preliminary discussions showed us that it would be critically important to make Defendants understand that Plaintiffs and Plaintiffs' counsel were fully prepared to bear the risk of pursuing the case to the end, win or lose.

65. Plaintiffs were, in fact, committed to take this case to trial from the day they filed the complaint. This commitment informed every strategic decision. For example, when settlement discussions first became serious in late October 2010, we decided to keep Plaintiffs' testifying corporate governance expert – Professor Bernard Black – focused on summary judgment and trial. Therefore, we retained another renowned corporate governance expert – Professor Jeffrey Gordon – to assist us in crafting the most effective set of corporate governance improvements attainable in any potential settlement.

66. As we were preparing Plaintiffs' opposition to Defendants' summary judgment motion, arms'-length and adversarial settlement negotiations developed. On October 29, counsel for Plaintiffs met in person with counsel for Defendants. In attendance on behalf of Plaintiffs were Max Berger, Mark Lebovitch and David Wales. Defendants were represented by Robert Fiske, Jr., James Rouhandeh, and Dennis Block. It became clear that the parties' diametrically opposing views of the merits of the action were still informing each side's position with respect to the scope of any corporate governance changes and the possibility of any financial recovery for the Company, and still presented tremendous obstacles to any settlement. The meeting ended with no plans to reconvene. The parties re-engaged late the following week, but progress in negotiations remained elusive.

67. Throughout the course of the Action there had consistently been a question as to what should be kept confidential under the terms of the confidentiality agreement. At this

juncture, Plaintiffs were unsure of the exact portions of their opposition to summary judgment Defendants thought needed to be kept confidential. As such, with Plaintiffs preparing to serve their opposition papers to Defendants' summary judgment motion on Friday, November 12, 2010, Defendants requested that they be given from Friday night to close of business on Monday, November 15 to review and redact portions of Plaintiffs' opposition papers before filing them with the Court. Plaintiffs agreed, and the Court authorized the service of Plaintiffs' opposition papers on Defendants as planned, and the filing of the papers on November 15, 2010.

68.    Meanwhile, the parties were coming closer to common ground on a framework for a settlement. During the weekend of November 13 and 14, counsel for Plaintiffs and Defendants re-engaged in intense settlement negotiations, exchanging multiple drafts of term sheets and settlement proposals. Counsel had numerous telephone conferences on Saturday, Sunday and Monday, in which we drew firm lines on certain of our demands and made compromises on certain issues, specifically when Defendants cogently convinced us and Professor Gordon that they could offer alternatives that achieved our stated objectives without creating unintended business execution risks for Pfizer and its shareholders. Negotiations were tense and came down to the wire, with the parties finalizing an acceptable term sheet during the afternoon of Monday, November 15 with corporate governance changes and a financial recovery acceptable to all parties.

69.    On November 15, 2010, at about 5 p.m., the parties provided the Court with the term sheet and a request to adjourn the remaining dates of the case management plan.

70.    On November 16, 2010, the Court entered an Order suspending the remaining dates of the case management plan and set a preliminary approval hearing for December 6, 2010.

71.     Even with agreement reached on the material terms of the settlement, the parties continued to test each others' will at every step of preparing the formal stipulation of settlement. These negotiations were further complicated by Defendants' insurers. The parties were unable to execute the stipulation of settlement in time to file it by the December 1 deadline the Court had previously set. After obtaining a one-day extension from the Court, on December 2, 2010, Plaintiffs filed a motion requesting preliminary approval of the Settlement, a memorandum of law in support of preliminary approval, ECF No. 89, an affidavit in support of preliminary approval by Professor Jeffrey N. Gordon, ECF No. 90, the stipulation of settlement with referenced exhibits, ECF No. 88, Ex. 1, a proposed long-form notice of pendency and proposed settlement of the Action, and a summary notice of pendency and proposed settlement of the Action.

72.     Also On December 2, 2010, Defendants filed a memorandum of law in support of preliminary approval ECF No. 91, a declaration of Hal S. Shaftel with exhibits in support of preliminary approval ECF No. 92 and affidavits in support of preliminary approval by former SEC Chairmen Harvey L. Pitt and Richard C. Breeden ECF No. 91 (Attachments 1 & 2). Plaintiffs did not know in advance that these papers would be filed.

73.     On December 6, 2010, the Court held a preliminary approval hearing. During the hearing, the Court requested that the parties agree to modifications of the Settlement and proposed long-form notice. The parties immediately agreed and submitted a revised long-form notice for the Court's approval.

74.     On December 14, 2010, the Court granted preliminary approval of the Settlement and proposed notice of settlement, which was promptly provided to Pfizer's shareholders, as described in paragraph 17 above.

## IV.    THE TERMS OF THE SETTLEMENT

75.     The terms of the Settlement, and especially the significant corporate governance changes resulting from it, are discussed in detail in the affidavit of Jeffrey N. Gordon in support of final approval of settlement, dated February 7, 2011, submitted herewith.

### B.    The Regulatory and Compliance Committee, Ombudsman and Related Corporate Governance Improvements

76.     The very detailed corporate governance requirements of the Settlement are set forth in Exhibit A of the term sheet.  The Compliance changes that Defendants implemented during the pendency of this Action and which Defendants attributed, at least in part, to Plaintiffs' efforts, are set forth in Exhibit B of the term sheet. The term sheet with exhibits is attached hereto as Exhibit A.

77.     Professor Gordon details in his affidavit why and how the new Regulatory Committee will be a significant corporate governance advance at the Company.  Professor Gordon also details the benefits to Pfizer from the terms of the Settlement.

78.     Attached as Exhibit B hereto is the Pfizer Audit Committee Charter, which is referenced in Plaintiffs' memorandum of law in support of final approval and in Professor Gordon's affidavit.  Attached hereto is Exhibit L is the Pfizer Compensation Committee Charter, which is referenced in Plaintiffs' memorandum of law in support of final approval and in Professor Gordon's affidavit.

79.     Attached hereto as Exhibit C is a true and correct copy of the settlement stipulation in *Unite National Retirement Fund v. Watts* No. 04-cv-3603 (D.N.J. Oct. 27, 2005) (the Shell derivative litigation), discussing the corporate governance changes achieved in that action, which are referenced in Plaintiffs' memorandum of law in support of final approval. Attached hereto as Exhibit D is a true and correct copy of the settlement stipulation in *Lambrecht*

*v. Taurel*, 08 cv-0068 (WTL) (S.D. Ind. July 27, 2010) (the Eli Lilly derivative litigation) discussing the corporate governance changes achieved in that action, which are referenced in Plaintiffs' memorandum of law in support of final approval.

80.     Attached hereto as Exhibit K is the stipulation of settlement in *City of Pontiac General Employees' Retirement System v. Langone and the Home Depot, Inc.*, C.A. 2006-cv-122302 (Sup. Ct. Ga. June 20, 2008) (the Home Depot derivative ligation) discussing the results achieved in that action).

**C.     The $75 Million Fund**

81.     Stated briefly, if the Settlement is approved, Defendants' insurers will pay $75 million into a fund for the exclusive use of a newly created Regulatory and Compliance Committee (the "Committee") and the payment of any fee award and reimbursement of expenses. The financial recovery achieved by Plaintiffs for the benefit of Pfizer in this Settlement is significant; it is one of the largest financial recoveries in any derivative action. We respectfully submit that this recovery is even better than the few known derivative settlements that are nominally larger because the Settlement provides actual cash to fund corporate and compliance changes at the Company (as opposed to, for example, cancelling previously awarded options that were backdated).

82.     We are aware of only five settlements of derivative actions where Defendants or their insurance carriers paid higher amounts than the recovery here. None of these actions involved regulatory oversight/*Caremark* claims without alleged self-interest, or was otherwise comparable to this Action:

> i.     The UnitedHealth Group derivative action arose from one of the largest option backdating schemes in history. Plaintiffs recovered $920 million in connection with an options backdating scheme. However, this recovery consisted of the return and repricing of options and did not result in a cash benefit to the company. *See* Exhibit E attached hereto.

ii. The Oracle derivative action arose from alleged insider trading by the company's CEO. Plaintiffs recovered $121 million in connection with an insider trading scheme. However, this recovery consisted of a $100 million payment to charity and a $22 million payment in attorneys' fees, and did not result in a cash benefit to the company. *See* Exhibit F attached hereto.

iii. The Broadcom derivative action arose from another massive options backdating scheme, which resulted in criminal convictions of senior corporate officers. Plaintiffs recovered $118 million under the company's directors and officers liability insurance policies. However, this recovery appears to have been entirely offset by company litigation expenses in connection with the suit and investigations. *See* Exhibit G attached hereto.

iv. and v. The two AIG derivative actions arose from billions of dollars of fraudulent and sham transactions for the benefit and at the instruction of the Company's Chairman and CEO and other senior officers. In two settlements with different groups of defendants, plaintiffs recovered $115 million in 2008 and $90 million in 2010. The $90 million recovery was apparently entirely used to cover legal expenses of the defendants. *See* Exhibit H attached hereto.

83. Although records of state court derivative suit settlements are not as readily available as records of suits that are pursued in the federal court system, based on our expansive inquiries, we believe that the $75 million monetary recovery achieved in this case is, by far, the largest financial recovery in any case that challenged the good faith of a board's exercise of its corporate oversight obligations and did not involve a CEO who was conflicted by self-interest.

**D. The Settlement Is Far Preferable to Continued Litigation**

84. As with all derivative litigation, Plaintiffs and Lead Counsel faced substantial hurdles to state a sustainable claim. From the outset, we recognized that – notwithstanding the significant criminal and civil fines paid by Pfizer – the particular legal challenges associated with bringing breach of fiduciary duty claims against a blue chip board of directors, and recovering damages from Defendants who may not have the resources to pay Pfizer's damages. Accordingly, this Action presented a very real possibility that Pfizer would be unable to obtain meaningful relief.

85.     Plaintiffs prevailed on a sharply contested motion to dismiss and fought hard to develop what we believe is a compelling evidentiary record.  Absent the Settlement, however, we have no doubt that Plaintiffs would face a long and uncertain road towards a recovery for Pfizer, including resolution of the Defendant's summary judgment motion, pretrial challenges to experts and other pretrial motions, a lengthy trial with many fact and expert witnesses to establish liability and damages, post-trial motions, and likely appeals.

86.     The absence of personal self-interest would also complicate any analysis of the potential monetary recovery that we could achieve.  Specifically, although the amount of Pfizer's criminal fines and settlements was obviously huge, we could not expect a liability verdict against Defendants of that amount.  In order to prove liability at trial in the first instance, we potentially had to detail precisely how and why hundreds if not thousands of Pfizer employees engaged in unlawful drug marketing practices.  While we believed that we could do so, we also recognized that a jury awarding damages for breach of fiduciary duty would likely be asked to apportion responsibility for the damages among all potential wrongdoers, including many unnamed third persons.  When all was said and done, we faced a very real risk that even a successful liability verdict could mean a monetary award against Defendants of 25% or less of the total potential damages.

87.     Taking this case through trial would create a substantial risk that one or more insurance carriers would invoke a policy exclusion to deny coverage, particularly because liability requires findings that could trigger insurance policy exclusions.  Any such denial of coverage would likely require protracted insurance litigation, further delaying any payments to Pfizer.

88. In short, while Lead Counsel believes that the claims asserted in the Complaint and litigated through discovery and summary judgment briefing have substantial merit, if the litigation is continued, Pfizer would bear the risk of not being able to obtain the meaningful relief provided by the Settlement. We firmly believe that this Settlement is in the best interest of Pfizer and its shareholders, and will bring sweeping and needed corporate governance changes to the Company to safeguard it and its shareholders from future compliance problems.

## V. LEAD COUNSEL'S FEE AND EXPENSE APPLICATION

89. Plaintiffs' allegations involved a sophisticated scheme to promote numerous Pfizer drugs for uses that were not approved by the FDA during an extensive period of time. Investigating, understanding, and unraveling the wrongdoing and Defendants' role and alleged culpability, as well as prosecuting this Action, required extensive research, discovery efforts, and assistance from experts.

90. Lead Counsel undertook this prosecution entirely on a contingency fee basis and assumed significant risks in bringing these claims. From the outset, Lead Counsel understood that it was embarking on a complex and expensive litigation with no guarantee of being compensated for the enormous investment of time and money the case would require.

91. Lead Counsel ensured that it dedicated sufficient resources to the prosecution of this Action and that funds were available to cover the considerable out-of-pocket expenses that a case like this Action requires, including by setting up a Litigation Fund to facilitate the sharing of expenses. BLB&G received no compensation during the course of this litigation and incurred many millions of dollars in expenses in prosecuting this Action for the benefit of Pfizer.

92. BLB&G assembled a day-to-day litigation team of experienced lawyers to properly prosecute this Action on an expedited basis and to supervise dozens of other attorneys and several other law firms to carry out specific assignments. The BLB&G litigation team

included three partners, Mark Lebovitch, David Wales and Beata Gocyk-Farber, who worked virtually full time on this case for almost one year. Two senior BLB&G partners, Max Berger and Gerald Silk, also devoted significant time in achieving the results of the Settlement. In short, BLB&G dedicated all of the resources we felt necessary and appropriate to litigate this Action.

93. Throughout this Action, BLB&G received substantial assistance from attorneys at Kirby McInerney LLP (counsel for co-lead Plaintiff Skandia), Barrack Rodos & Bacine (counsel for additional plaintiff Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees represented by Local 85 of Amalgamated Transit Union), the Weiser Law Firm, P.C. (counsel for additional plaintiff Henrietta Klein) and Pomerantz Haudek Grossman & Gross LLP (whose client had filed a books and records case and sought to intervene in the Action).

94. These firms generally assisted with the following tasks:

    i.    Under the leadership of David E. Kovel, lawyers from Kirby McInerney LLP participated in every phase of the litigation, including critical strategic decisions, preparing pleadings and reviewing discovery materials. Mr. Kovel also took key depositions, including the deposition of Defendants' corporate governance expert, Richard C. Breeden.

    ii.    Jason S. Cowart led lawyers from the Pomerantz law firm in assisting with the preparation of the expert reports of John Abramson, MD, and Richard Guarino. Mr. Cowart also took the deposition of Defendants' corporate governance expert Lucian E. Bebchuk.

    iii.    Robert B. Weiser led lawyers from the Weiser law firm in assisting with the preparation of requests for admissions, interrogatories, interrogatory responses and document review. Mr. Weiser also provided assistance with Plaintiffs' opposition to Defendants' motion to dismiss.

    iv.    Daniel E. Bacine led lawyers of Barrack Rodos & Bacine in assisting with discovery and document review.

95. In addition, Lead Counsel received substantial assistance from an attorney at Klausner & Kaufman P.A. with strategic decisions, pleadings and the preparation of the deposition of Co-Lead Plaintiff LSPRF.

96. Lead Counsel now seek an award of attorneys' fees equal to $22 million, plus reimbursement of litigation expenses in the amount of $1,616,650.69.

97. During the course of the prosecution of this action, Plaintiffs' counsel expended a total of 38,720 hours. Attached hereto as Exhibit I are declarations from Plaintiffs' counsel in support of the request for an award of attorneys' fees and reimbursement of expenses. Included with each declaration is a schedule that summarizes the amount of time spent by each attorney and professional support staff and the lodestar based on their billing rates, as well as the expenses incurred by category.[1] The hourly rates charged by lawyers and paraprofessionals included in the schedule are commensurate with the hourly rates charged by attorneys and paraprofessionals performing similar services in New York, New York.[2] Applying the hourly rates to the expended hours, the total value of Plaintiffs' counsel's lodestar in prosecuting this action is approximately $16 million. A fee award of $22 million would equal a multiplier of 1.375.

---

[1] The first page of Exhibit I is a summary of the fees and expenses of all of the firms.

[2] *See In re Comverse Tech.*, *Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) (noting that hourly rates of $125 to $880 were "not extraordinary for top New York law firms"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 146 (S.D.N.Y. 2010) (court was "satisfied that the lodestar [was] reasonable" where hourly rates ranged from $125 for administrative personnel to $775 for senior lawyers); *In re Telik*, *Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589-90 (S.D.N.Y. 2008) (noting that hourly rates of $750 for partners and $300 – $550 for associates were consistent with the rates charged by the defense bar for similar work, and that comparable rates have been found reasonable by other courts for class action work); *In re Gilat Satellite Networks*, *Ltd.*, No. CV-02-1510 (CPS)(SMG), 2007 WL 2743675, at *17 (E.D.N.Y. Sept. 18, 2007) (attorney rates from $325 to $725 were "not out of line with the rates of major law firms engaged in [securities class action] litigation").

98.     Plaintiffs' counsel incurred $1,616,650.69 in expenses that were either paid

directly by Lead Counsel or through the Litigation Fund.[3] This amount represents approximately

2.2 % of the monetary recovery in this case.  Below is a summary of these expenses by category:

| CATEGORY | AMOUNT |
|---|---|
| Court Fees | $2,034.40 |
| Service of Process | 1,622.20 |
| Computerized Research | 277,695.24 |
| Telephone/Faxes | 755.21 |
| Postage & Express Mail | 3,521.46 |
| Hand Delivery Charges | 1,359.40 |
| Local Transportation | 29,261.30 |
| Internal Copying | 133,058.60 |
| Outside Copying | 60,659.18 |
| Out of Town Travel | 69,824.61 |
| Working Meals | 24,461.88 |
| Court Reporting & Transcripts | 43,601.01 |
| Special Publications/Document Retrieval | 464.90 |
| Staff Overtime | 7,249.78 |
| Document Management/Temporary Litigation Support | 38,067.57 |
| Experts | 921,513.95 |
| Investigator | 1,500.00 |
| Total | **$1,616,650.69** |

99.     The foregoing expenses were reasonable and necessary for the prosecution of this

Action, and are the type of expenses that Lead Counsel typically incur in complex litigation, and

for which Lead Counsel are typically reimbursed when the litigation gives rise to a corporate

benefit or a common fund.

100.    One of the most significant litigation expenses for which reimbursement is sought

is professional expert fees.  These expert fees relate to Lead Counsel's testifying experts in the

fields of FDA approval processes, medical marketing, and corporate governance, as well as Lead

---

[3]     This amount includes $302,811.53 in outstanding expenses that are included in Lead
        Counsel's expense report.  See Exh. I.1 at Exhibit 2.  An analysis of the payments from
        the Litigation Fund is attached hereto as Exhibit J.

Counsel's corporate governance consulting expert in connection with the Settlement. In addition to consulting extensively with Lead Counsel, and reviewing voluminous documents concerning this Action, the testifying experts spent significant time preparing extensive expert reports and preparing to testify at their depositions. Lead Counsel's corporate governance consulting expert spent significant time analyzing Pfizer's preexisting governance and compliance processes, crafting improvements that would address Plaintiffs' allegations and concerns, and preparing affidavits providing background information and explaining the governance and compliance improvements achieved in the Settlement. The expertise and assistance provided by these experts were critical to the prosecution and successful resolution of this Action.

## VI.   LEAD COUNSEL'S EXPERIENCE AND QUALIFICATIONS

101.    Lead Counsel are experienced in prosecuting complex litigation and derivative actions, and worked diligently and efficiently in prosecuting this Action. As demonstrated by the firm resume of BLB&G, attached as Exhibit I at Ex. 2. Court-appointed Lead Counsel are among the most experienced and skilled law firms in the securities litigation field, with long and successful track records in prosecuting derivative actions and other securities litigation. Further, BLB&G has taken complex cases to trial, and we believe our willingness to do so in this Action added indispensable leverage to the settlement negotiations.


Dated:  February 7, 2011, at New York, New York

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP

_David L. Wales_

David Wales
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP

_/s/_ Mark Lebovitch _____

Mark Lebovitch
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400