# EXHIBIT A

# EXHIBIT A

## SETTLEMENT TERM SHEET

### In re Pfizer Inc. Shareholder Derivative Litigation, Case No. 09 Civ. 7822 (JSR)

This Settlement Term Sheet ("Term Sheet") sets forth the principal terms of a proposed settlement (the "Settlement") between Plaintiffs and Defendants in the civil action, *In re Pfizer Inc. Shareholder Derivative Litigation*, No. 09 Civ. 7822 (JSR), and is intended to form the basis for drafting a settlement agreement containing the terms set forth herein as well as such other terms as are agreed upon by the parties to this term sheet.

1. <u>Creation of Regulatory Committee</u>. Pfizer shall establish and operate a Regulatory Committee of the Board of Directors consistent with the terms set forth in Exhibit A hereto. Defendants' insurers shall create a fund of $75 million, which shall be used to pay any fees and expenses awarded to Plaintiffs' counsel within thirty (30) days, or as promptly thereafter as feasible, after entry of a non-appealable final order/judgment approving this Settlement. The balance of the $75 million fund shall be payable into escrow at Pfizer and subject to the control of the Regulatory Committee, which shall be the source of funding for the activities of the Regulatory Committee for its initial five (5) year term, with any unused funds reverting to the insurers at the end of the period. Defendants shall take no position with respect to Plaintiffs counsels' application for fees and expenses.

2. <u>Implementation of Recent Compliance Enhancements</u>: Pfizer has taken into account the existence of this litigation while continuing to enhance its compliance programs. A description of certain enhancements to Pfizer's compliance programs implemented since the commencement of this litigation are identified in Exhibit B hereto.

3. <u>Release</u>. The Settlement will contain mutual releases, in the form satisfactory to the parties, providing that the plaintiffs and all current and former directors, officers employees and agents of Pfizer, and their respective counsel and advisors, shall be released from all claims arising out, relating to or subject to this litigation, or claims that were or could have been alleged in the action.

4. <u>No admission</u>. Neither this agreement nor any of the terms of the settlement shall be deemed to constitute an admission of wrongdoing by the Defendants, and they shall not be admissible in any proceeding for any purpose (other than to enforce the terms of the Settlement).

5. <u>Documentation</u>. The Settlement is subject to the negotiation, drafting and execution of a formal settlement agreement and related documents satisfactory to the parties to this term sheet.

6. <u>Timing</u>. Plaintiffs shall file a motion for preliminary approval of the Settlement no later than December 10, 2010, unless the Court orders otherwise. Appropriate notice shall be provided to plaintiffs in pending matters asserting overlapping or related claims.

7.   <u>Court approval</u>.  The consummation of the Settlement as provided herein shall be subject to court approval of the Settlement in the form substantially submitted by the parties, including the entry of a final order approving the Settlement by the District Court and there being no appeal successfully challenging such orders.

8.   <u>Termination</u>.  No party shall be obligated to proceed with the Settlement if the Court modifies or alters its terms in a way detrimental to that party, which then would render the Settlement without further force and effect.

**BERNSTEIN LITOWITZ BERGER**
**LLP & GROSSMAN LLP**
Max Berger, Esq.
Mark Lebovitch, Esq.
David Wales, Esq.
1285 Sixth Avenue
New York, NY 10019

_____

**CADWALADER, WICKERSHAM & TAFT**

Dennis J. Block, Esq.
Hal S. Shaftel, Esq.
One World Financial Center
New York, NY 10281

_____

**DAVIS POLK & WARDWELL LLP**
Robert B. Fiske, Jr., Esq.
450 Lexington Avenue
New York, NY 10017

_____

**DLA PIPER LLP (U.S.)**
Loren Brown, Esq.
1251 Avenue of the Americas
New York, NY 10020

_____

**BERNSTEIN LITOWITZ BERGER LLP & GROSSMAN LLP**
Max Berger, Esq.
Mark Lebovitch, Esq.
David Wales, Esq.
1285 Sixth Avenue
New York, NY 10019

_____

**CADWALADER, WICKERSHAM & TAFT**

Dennis J. Block, Esq.
Hal S. Shaftel, Esq.
One World Financial Center
New York, NY 10281

_____

**DAVIS POLK & WARDWELL LLP**
Robert B. Fiske, Jr., Esq.
450 Lexington Avenue
New York, NY 10017

_____

**DLA PIPER LLP (U.S.)**
Loren Brown, Esq.
1251 Avenue of the Americas
New York, NY 10020

_____

**BERNSTEIN LITOWITZ BERGER LLP & GROSSMAN LLP**
Max Berger, Esq.
Mark Lebovitch, Esq.
David Wales, Esq.
1285 Sixth Avenue
New York, NY 10019

_____

**CADWALADER, WICKERSHAM & TAFT**

Dennis J. Block, Esq.
Hal S. Shaftel, Esq.
One World Financial Center
New York, NY 10281

_Dennis J. Block_

**DAVIS POLK & WARDWELL LLP**
Robert B. Fiske, Jr., Esq.
450 Lexington Avenue
New York, NY 10017

_____

**DLA PIPER LLP (U.S.)**
Loren Brown, Esq.
1251 Avenue of the Americas
New York, NY 10020

_____

**BERNSTEIN LITOWITZ BERGER LLP & GROSSMAN LLP**
Max Berger, Esq.
Mark Lebovitch, Esq.
David Wales, Esq.
1285 Sixth Avenue
New York, NY 10019

_____

**DAVIS POLK & WARDWELL LLP**
Robert B. Fiske, Jr., Esq.
450 Lexington Avenue
New York, NY 10017

_____

**CADWALADER,  WICKERSHAM  &  TAFT**

Dennis J. Block, Esq.
Hal S. Shaftel, Esq.
One World Financial Center
New York, NY 10281

_____

**DLA PIPER LLP (U.S.)**
~~Loren Brown, Esq.~~   John C. Dougherty, Esq.
1251 Avenue of the Americas
New York, NY 10020

_John C. Dougherty_

**EXHIBIT "A"**

**Corporate Governance Proposal Regarding Pfizer Compliance**

I.      **Establish a Regulatory and Compliance Committee of the Board of Directors to be operative for, at a minimum, five (5) years from implementation, to be continued thereafter at the discretion of the full Board.**

      The Regulatory and Compliance Committee ("Regulatory Committee"), consisting of at least five (5) members who will exercise oversight responsibility on significant healthcare related regulatory and compliance issues, based on criteria to be developed by the Regulatory Committee designed to identify matters falling within its scope.  The charter of such a committee will include:

      a.      the scope of the committee's oversight responsibility;

      b.      the means by which such oversight may be accomplished;

      c.      the committee's internal and external reporting obligations; and

      d.      the composition of the committee.

      Below is a Term Sheet for such a charter.  However, the Regulatory Committee can take all other actions they deem proper and consistent with the charter of the Regulatory Committee.

      Charter for Pfizer Board Committee on Regulatory and Compliance

      **A.      Scope of responsibility:**

      In general, the Regulatory and Compliance Committee would have oversight responsibility with respect to:

      (i)      Pfizer's substantive regulatory, and /or compliance obligations:

          1.      compliance with Medicare/Medicaid regulations in the US

          2.      compliance with US and ex-US drug marketing rules, including restrictions on "off-label" and other marketing activities, including:

               ☐      unapproved uses;

               ☐      providing fair balance;

               ☐      making appropriate safety claims; and

               ☐      making appropriate superiority or efficacy claims.

3.    compliance with US constraints (Foreign Corrupt Practices Act) on non-US "marketing activity";

4.    drug manufacturing quality control;

5.    clinical studies quality control; and

6.    required reporting to the FDA of drug safety.

(ii)    <u>Pfizer's review and evaluation of external complaints alleging significant concerns in Pfizer's regulatory and/or compliance behavior based on criteria to be developed by the Committee</u>

1.    Review, on an annual basis, a report from the Chief Compliance Officer or the product attorney of those products that are assigned "high" risk following a RAMP analysis, as well as any new marketed products internally developed and launched, and the steps being taken to mitigate the promotional – and off-label usage – related risks for those products. The presentation must include an analysis of the marketing of the drugs in compliance with the FDA approved label;

2.    Review data on drug usages – can use the same data Pfizer is currently using for market research and compensation purposes.  If the data on drug usage indicates either that the usage is above a significant threshold amount that might not be for indications on the label, or there is a trend indicating increased significant usage that might not be for indications on the label, then the Committee will require an analysis and explanation for this from management; and the Committee will evaluate the implications for Pfizer's compliance with regulatory and legal requirements;

3.    Review all FDA warning letters and the responses to such letters, as well as report[s] on the steps taken to implement the responses and an evaluation if it raises a drug marketing issue;

4.    Review Qui Tam lawsuits unsealed by the government and/or made known to Pfizer, and receive an analysis of the factual allegations of the claims, a review of any potential legal exposure they present for the Company, and whether it reflects a regulatory or compliance problem;

5.    Government investigation — receive details and factual reports on the investigation, the conduct at issue, and whether it reflects a regulatory or compliance issue at the Company;

6.    Receive an annual report from the Chief Compliance Officer or Product attorneys for any three (3) drugs with more than $500 million annual sales, explaining compliance with RAMP for each drug;

7.      Compliance Group shall provide, at least annually, a report of significant compliance investigations;

8.      Internal Audit shall provide, at least annually, a cumulative report on internal audit health care compliance audits undertaken that year. This report will include an analysis of healthcare compliance risks associated with each audit with an unsatisfactory rating;

9.      The Executive Compliance Committee will provide a report, at least annually, on the key compliance issues facing the company and the steps taken to address them;

10.     Retaliation – receive a report, at least annually, on retaliation claims, lawsuits alleging retaliation, settlements of retaliation claims, reports to compliance and/or the ombudsman of alleged retaliation; and

11.     The overriding purpose of this process and, specifically, items 1-10 above, is to evaluate, at a high level, whether with respect to the above mentioned regulatory, legal or compliance issues, a pattern of problems exists with respect to the:

☐       Oversight of the mechanism for collection, aggregation and assessment of such complaints, whether from federal or state officials, Pfizer employees, or members of the public, by appropriate Pfizer compliance personnel; and

☐       Receiving reports from Pfizer senior legal and other compliance officers regarding serious complaints and internal audits.

(iii)    Pfizer's internal messaging to employees regarding the company's commitment to behavior and practices that comply with law; as well as its efforts to promote a compliant culture.

(iv)    Compliance and Supervision of Acquired Companies

As Pfizer has acquired other companies, it is the goal of Pfizer to act expeditiously to adopt appropriate healthcare related compliance and regulatory policies for each acquired company. For each acquired company, the Compliance and Legal Departments will report to the Regulatory Committee on the following:

1.      Any compliance, regulatory or criminal problems or investigations, qui tam actions, or pending FDA warning letters of which the Company becomes aware that are significant in the view of the Compliance or Legal Departments, and the status of each;

2.      A specific timetable for:

- training compliance, regulatory and legal personnel at the acquired company of the policies, procedures and reporting requirements of Pfizer;

- training employees at the acquired company of the policies, procedures and reporting requirements of Pfizer; and

- having the compliance, regulatory and Legal Departments merged or otherwise included in the respective departments at Pfizer.

3.   Regular reports on the status and compliance with the timetables and training set forth in paragraph (b.) above.

(v)   Mandate that all Pfizer policies and procedures, including those related to compliance, regulatory and legal, that in the view of the Compliance or Legal Departments warrant application to the acquired company, are implemented within nine (9) months after each company is acquired. The Committee may waive the nine (9) month requirement and give three (3) months extensions based on a presentation from management with a showing of demonstrated need to do so.

**B.   Authority**

(a)   The Committee can in its discretion require management to conduct audits on compliance, regulatory and/or legal concerns;

(b)   The Committee can in its discretion direct whether it should be the direct recipient of the results of such an audit;

(c)   The Committee shall commission an external review by counsel or other professionals of Pfizer's policies for significant healthcare related compliance, regulatory and/or legal issues at least bi-annually;

(d)   The Committee can in its discretion commission surveys of doctors who use Pfizer products or commission the creation of registries of the use of such products to determine the extent to which Pfizer products are used for off-label use. The results may be used, among other purposes, to make appropriate adjustment in compensation programs or marketing programs;

(e)   The Committee will receive reports of the results of such a study or survey, which are also provided to management as part of the RAMP analysis; and

(f)   The Committee can in its discretion retain outside counsel with appropriate expertise, and that counsel shall not be counsel to the company or senior management, and, at its discretion, can retain experts and consultants in the discharge of its responsibilities; and

(g) The Committee may request and meet privately with any member of the Pfizer senior management team or any other Pfizer employee.

**C.    Reporting Responsibilities**

(a) The Committee should meet at least quarterly and should provide a full report to the Board at least annually; and

(b) The Committee shall prepare a yearly overview of its activities generally for inclusion in Pfizer's Annual Report (or Proxy Statement). The report shall be signed by the Committee chairperson and all Committee members.

**D.    Composition Of The Committee**

(a) The Committee should be comprised of at least a majority of independent directors, and may include senior Pfizer employees ex-officio, and others;

(b) The independent directors on the Committee may meet in executive session;

(c) The Chair of the Committee shall be an independent director elected since January 1, 2007, who has relevant experience in law, corporate compliance, regulatory or governmental affairs, academia or service on the Board of a healthcare institution or highly regulated company;

(d) Its membership should include a person with significant background in healthcare; and

(e) It should include at least one member of the Audit Committee at the discretion of the Board, but the majority of the committee should not be members of the Audit Committee. If a member of the Audit Committee is not a member of the Regulatory Committee, then the Chair persons of the two committees must meet at least twice each year to update each other on the work and issues of their respective committees.

**II.    Responsibilities As Between The Audit Committee And Regulatory Committee -- Pfizer's internal compliance organization:**

As the Audit Committee has certain compliance functions and obligations under the Corporate Integrity Agreement, the allocation of responsibilities between the Audit Committee and Regulatory Committee will need to be delineated and then implemented in an orderly manner. Both internal and external auditors will continue to report consistent with current practices to the Audit Committee, except solely to the extent that either is required to report to the Regulatory Committee by the provisions and procedures set forth herein.

a. The Regulatory Committee shall evaluate and report to the Board on the adequacy of compliance staffing of functional units;

b.     The Regulatory Committee shall review reporting chains for compliance personnel that seek to provide a protected channel against retaliation that is provided to the Audit Committee;

c.     The Regulatory Committee shall review the means to provide protection against retaliation of compliance or other personnel in the human healthcare sales units;

d.     Management shall report to the Audit Committee and Regulatory Committee if there is any significant disciplinary action against any compliance personnel or internal audit personnel, including the nature of the conduct that lead to the disciplinary action, the disciplinary action and the reason for it, and an analysis of whether the underlying conduct reflects any compliance or regulatory problems or issues; and

e.     As between the Audit Committee or Regulatory Committee, whichever is charged in the future with certification responsibilities under the 2009 Corporate Integrity Agreement, will report at least annually to the full Board on (i) the state of the compliance functions, (ii) compliance problems or issues it has learned about, (iii) a detailed summary of nature and scope of compliance investigations, to assist the Regulatory Committee in identifying any patterns of compliance, or regulatory issues at the Company; (iv) any significant disciplinary actions against any compliance or internal audit personnel; and (v) any other issues that may reflect any systemic or widespread problems in compliance or regulatory matters exposing the Company to substantial compliance risk.

f.     In advance of the report set forth above in subsection (e), the Audit Committee and Regulatory Committee, either through their Chairs or otherwise, shall confer on any matters of mutual interest in light of their respective responsibilities.

## III. Ombudsman:

An Ombudsman Program, managed by or under the direction of the Chief Compliance Officer, providing an alternative channel for employees to address work-related concerns, including conduct inconsistent with Pfizer's policies, practices, values and standards. The Program will be available to all employees and is designed to provide a "safe haven" where concerns can be addressed in confidence and without fear of reprisal. All conversations with the Ombudsman are kept confidential unless they raise issues of potential harm to an individual or the Company. The Ombudsman will be a neutral party and listen to and review concerns as an advocate for the Company's values and standards. Although the program shall provide confidentiality procedures, the Ombudsman will be subject to laws applicable to corporate disclosure requirements and will provide to the Company all information related to its disclosure obligations, including any information requested by the Chief Compliance Officer with respect to issues that may require disclosure or that represent any employee misconduct. The Ombudsman has a stand-alone office that will report to Compliance Group and has the right to report directly to the Regulatory Committee.

A.    **Regulatory and Compensation Committees to Address Jointly [IV and V]**

IV.    **The Regulatory Committee in consultation with the Compensation Committee will discuss with management the following:**

   a.    An evaluation of whether compensation practices, including sales incentives, for sales and marketing personnel may not be aligned with compliance incentives;

   b.    An evaluation of whether compensation practices for speakers and advisory board members may not be aligned with compliance incentives; and

   c.    Any compensation practices evaluation prepared as a result of subsections (a) or (b) above can either be first reported to the Regulatory Committee, or to the Compensation Committee, which will then report the results to the Regulatory Committee.

V.    **Compensation Claw-Back:**

If there is a (i) government criminal charge or civil complaint indicating a significant compliance or regulatory problem that results in a criminal conviction or a civil settlement with the Department of Justice, (ii) qui tam action in which the government intervenes, or (iii) such other government or regulatory action that, in the judgment of the Board, has caused significant regulatory, financial or reputation damage to the Company, then the Regulatory Committee must consider recommending to the Compensation Committee taking actions consistent with those provisions described below with respect to compensation:

   a.    The Regulatory Committee will make a written recommendation to the Compensation Committee concerning the extent, if any, that the incentive based compensation of any executive, senior manager, compliance personnel and/or attorney involved in the conduct described above or with direct supervision over an employee that engaged in the conduct described above should be reduced or extinguished.

   b.    The incentive based compensation of any executive, senior manager, compliance personnel and/or attorney will not be impacted if they were not involved in the misconduct or engaged in the direct or indirect supervision of the employee involved in the misconduct.

   c.    If, prior to any regulatory or government investigation of the conduct, any person engaged in the supervision of the employee involved in the misconduct discovers and discloses the misconduct, takes steps to have the matter investigated, remedied and reports the conduct to the appropriate legal, compliance and if required Board committees, then the Regulatory Committee can in its discretion recommend to the Compensation Committee that no reduction of compensation is required for anyone not involved in the misconduct consistent with the intent of U.S.S.G. 8C2.5(g)(1).

       d.      Nothing in this section is designed to limit or restrict the Company or the Board from taking any disciplinary action they deem appropriate.

**VI.**     **Rotation of Regulatory Committee Assignments:**

To the extent in its discretion the Board continues the Regulatory Committee for a period longer than five (5) years, the Board shall consider whether a formal rotation policy for membership on the Regulatory Committee is appropriate.

**VII.**    All funding for the Regulatory Committee, and its related activities as set forth above, shall first come from the fund established through the settlement of *In re Pfizer Inc. Shareholder Derivative Litigation*, and, if such funds are exhausted during the five year term, funding, as requested by the Regulatory Committee, shall be provided by the Company.

**VIII.**   Nothing herein shall expand the liabilities of any Company directors or officers beyond any liabilities otherwise imposed by law.

**IX.**     Prior to the end of the Regulatory Committee's term, the Board, after receiving the written recommendation of the Committee, will determine whether to extend the Committee's term. The decision of the Board shall be reported to the shareholders in the Company's Annual Report or Proxy Statement.

# EXHIBIT "B"

A.  Formation and operation of the Promotional Quality Assurance group, a state-of-the-art promotional compliance monitoring function

B.  Enhancement and re-launch of RAMP, an industry-leading risk assessment and mitigation planning software and process

C.  Assessment and update of several promotional practices and policies to address compliance risks (e.g., incentive compensation, speaker program policies, etc.)

D.  Development and implementation of In-Context Training, a cutting edge product-specific promotional message compliance training approach

E.  Execution of multiple product and business process "deep dive" assessments for both Pfizer and legacy-Wyeth operations

F.  Development and launch of the Compliance Diagnostic approach, a risk-based control environment assessment tied to the Company's Enterprise Risk Management approach, with a particularized focus on product promotion

G.  Rollout of culture-focused initiatives and communications, including the "It's Mine" campaign

H.  Development and launch of new compliance reporting communications, including the "Reporting Compliance Concerns" brochure and wallet card, and an online issue reporting system

I.  Establishment of a tiered compliance committee structure at the business unit and divisional levels

J.  Establishment of Executive Compliance Committee (chaired by CEO)

K.  Creation and staffing of embedded compliance counsel positions for all business units

L.  Execution of leadership compliance workshops

M.  Separation of Compliance and Legal Divisions

N.  Formation of position of Deputy Compliance Officer, Corrective Action

O.  Integration of compliance-related controls into Pfizer's Tablet PC detailing system. Controls address medical information requests, sampling, and promotional messaging

P.  Annual review and risk assessment by Compensation Committee of incentive and commission plans for Pfizer executive compensation program and policies, and employee programs and policies.

Q.  Comprehensive Enterprise Risk Management program, which is part of the Company's strategic planning process and is operated under sponsorship of the General Counsel and Chief Financial Officer, subject to oversight by the Board Audit Committee.