# EXHIBIT C

# EXHIBIT C

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITE NATIONAL RETIREMENT FUND and PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND, Derivatively on Behalf of ROYAL DUTCH PETROLEUM COMPANY and THE "SHELL" TRANSPORT AND TRADING COMPANY, PLC,**<br><br>            Plaintiffs,<br><br>v.<br><br>**PHILIP WATTS, JUDY BOYNTON, WALTER VAN DE VIJVER, FRANK COOPMAN, JEROEN VAN DER VEER, PAUL SKINNER, MARTEN VAN DER BERGH, ROBERT J. ROUTS, MALCOLM BRINDED, MARK MOODY-STUART, HENNY DE RUITER, LUIS GIUSTI, RONALD OXBURGH, AAD JACOBS, LAWRENCE RICCIARDI, PETER BURT, MARY (NINA) HENDERSON, TEYMOUR ALIREZA, EILEEN BUTTLE, PETER JOB, JOHN KERR, WIM KOK, JONKHEER AARNOUT LOUDON, HUBERT MARKL, JAN TIMMER, ROBBERT VAN DER LIST, PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED, PRICEWATERHOUSECOOPERS LLP (U.S.), PRICEWATERHOUSECOOPERS LLP (U.K.), KPMG LLP, KPMG INTERNATIONAL, and KPMG ACCOUNTANTS NV**<br><br>            Defendants,<br><br>      and<br><br>**THE "SHELL" TRANSPORT AND TRADING COMPANY, PLC and THE ROYAL DUTCH PETROLEUM COMPANY,**<br><br>            Nominal Defendants. | Civil Action No.  2:04-cv-03603 (DMC-MF) |

**STIPULATION OF SETTLEMENT**

IT IS HEREBY STIPULATED AND AGREED, by, between and among

Plaintiffs UNITE National Retirement Fund and Plumbers and Pipefitters National

Pension Fund (who have sued derivatively on behalf of Royal Dutch Petroleum Company

and The "Shell" Transport and Trading Company, plc) and Nominal Defendants Royal

Dutch Petroleum Company and The "Shell" Transport and Trading Company, plc,

through their respective duly authorized counsel, that the lawsuit captioned *UNITE*

*National Retirement Fund, Plumbers and Pipefitters National Pension Fund, derivatively*

*on behalf of Royal Dutch Petroleum Company and The "Shell" Transport and Trading*

*Company, plc v. Watts, et. al*, Civil Action No. 2:04-cv-03603 (DMC-MF) (United

States District Court for the District of New Jersey), and all matters that were raised or

could have been raised in that lawsuit against (i) Nominal Defendants Royal Dutch

Petroleum Company, The "Shell" Transport and Trading Company, plc, their affiliates or

subsidiaries, (ii) Defendants Philip Watts, Judy Boynton, Walter Van De Vijver, Frank

Coopman, Jeroen Van Der Veer, Paul Skinner, Marten Van Der Bergh, Robert J. Routs,

Malcolm Brinded, Mark Moody-Stuart, Henny De Ruiter, Luis Giusti, Ronald Oxburgh,

Aad Jacobs, Lawrence Ricciardi, Peter Burt, Mary (Nina) Henderson, Teymour Alireza,

Eileen Buttle, Peter Job, John Kerr, Wim Kok, Jonkheer Aarnout Loudon, Hubert Markl,

Jan Timmer, and Robbert Van Der List ; and (3) any other current or former directors,

officers or employees of Nominal Defendants Royal Dutch Petroleum Company, The

"Shell" Transport and Trading Company, plc, or their affiliates or subsidiaries are settled,

2

compromised and dismissed on the merits and with prejudice on the terms and conditions

set forth in this Settlement Agreement and the Release set forth herein, subject to the

approval of the Court.

## I.   DEFINITIONS

    A.   As used in this Agreement, the following capitalized terms have the

following meanings, unless a Section or Subsection of this Agreement provides

otherwise:

    1.   "Action" means the lawsuit captioned *UNITE National Retirement*

*Fund, Plumbers and Pipefitters National Pension Fund, derivatively on behalf of Royal*

*Dutch Petroleum Company and The "Shell" Transport and Trading Company, plc v.*

*Watts, et. al.*, Civil Action No. 2:04-cv-03603 (DMC-MF) (United States District Court

for the District of New Jersey).

    2.   "Agreement" or "Settlement Agreement" means this Stipulation of

Settlement and the Exhibits hereto, including any subsequent amendments thereto.

    3.   "Approval Date" means the date on which the Final Judgment and

Order Approving Settlement are entered in this Action.

    4.   "Attorneys' Fees and Expenses" means such funds as the

Companies have agreed to pay to Plaintiffs' Counsel to compensate them (and any other

Counsel representing Plaintiffs) for their fees and expenses in connection with this

Action.

5.      "Auditor Defendants" means PricewaterhouseCoopers International Limited, PricewaterhouseCoopers LLP (U.S.), PricewaterhouseCoopers LLP (U.K.), KPMG LLP, KPMG International, and KPMG Accountants NV.

6.      "Boards" means the Boards of Directors of the Companies.

7.      "Class Actions" means any putative class actions filed prior to the Action and currently pending against the Companies or their affiliates, including the consolidated securities class action captioned *In re Royal Dutch/Shell Transport Securities Litigation*, Civil Action No. 04-374 (JWB) (Consolidated Cases), currently pending in the United States District Court for the District of New Jersey.

8.      "Companies" or "Shell" means Royal Dutch Petroleum Company ("RD") and The "Shell" Transport and Trading Company, plc ("STT"), their successors, predecessors, and their present and former subsidiaries and affiliates. "Royal Dutch Shell" means the successor to the Companies to be formed from the proposed unification announced by the Companies on October 28, 2004.

9.      "Companies' Counsel" or "Defendants' Counsel" means the law firms of Debevoise & Plimpton LLP and LeBoeuf, Lamb, Greene & MacRae LLP.

10.      "Complaint" means the Amended Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Unjust Enrichment and Constructive Fraud filed in this Action by Plaintiffs on or about September 30, 2004.

11.      "Court" means the United States District Court for the District of New Jersey.

4

12. "Derivative Final Settlement Date" means the date on which the Final Judgment and Order Approving Settlement in this Action become final. For purposes of this definition, the Final Judgment and Order Approving Settlement in this Action shall become final:

a. if no appeal is taken therefrom, on the date on which the time to appeal therefrom has expired;

b. if any appeal is taken therefrom, on the date on which all appeals therefrom, including petitions for rehearing or reargument, petitions for rehearing *en banc* and petitions for *certiorari* or any other form of review, have been finally disposed of in a manner that does not result in any alteration of the Final Judgment and Order Approving Settlement in this Action; or

c. on a date after entry of the Final Judgment and Order Approving Settlement in this Action, which date counsel for the Parties agree to in writing.

13. "Fairness Hearing" means the hearing at or after which the Court will make a final decision whether to approve this Agreement as fair, reasonable and adequate and in the best interests of the Company and its Stockholders.

14. "Final Judgment" means the judgment entered pursuant to the Final Judgment, as contemplated in Section X of this Agreement. A copy of the proposed Final Judgment is attached hereto as Exhibit D.

15. "Hearing Order" means the order to be entered by the Court concerning notice, administration and the Fairness Hearing, as contemplated in Section

5

IX of this Agreement.  A copy of the proposed Hearing Order is attached hereto as Exhibit B.

16.    "Individual Defendants" means Philip Watts, Judy Boynton, Walter Van De Vijver, Frank Coopman, Jeroen Van Der Veer, Paul Skinner, Marten Van Der Bergh, Robert J. Routs, Malcolm Brinded, Mark Moody-Stuart, Henny De Ruiter, Luis Giusti, Ronald Oxburgh, Aad Jacobs, Lawrence Ricciardi, Peter Burt, Mary (Nina) Henderson, Teymour Alireza, Eileen Buttle, Peter Job, John Kerr, Wim Kok, Jonkheer Aarnout Loudon, Hubert Markl, Jan Timmer, and Robbert Van Der List.

17.    "Interest Rate" means interest calculated on a simple interest basis based upon the 90-day Treasury bill rate on the first (1st) day of each month, as published in *The Wall Street Journal* under the description of "Money Rates."

18.    "Notice" means the legal notice of the terms of the proposed settlement to be provided to Stockholders, as approved in form and content by Plaintiffs' Counsel and Companies' Counsel.  A copy of the proposed Notice is attached hereto as Exhibit C.

19.    "Order Approving Settlement" means the order approving the settlement and this Agreement as contemplated in Section X of this Agreement.  A copy of the proposed Order Approving Settlement is attached hereto as Exhibit E.

20.    "Parties" means Plaintiffs and the Companies, collectively, and, where applicable, their respective counsel.

21.    "Plaintiffs" means UNITE National Retirement Fund and Plumbers and Pipefitters National Pension Fund.

22.    "Plaintiffs' Counsel" means the law firms of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Weiss & Lurie,  Robbins Umeda and Fink, LLP, and Greenberg Dauber Epstein & Tucker.

23.    "Release" means the release set forth in Section VII.A of this Agreement.

24.    "Releasees" means (*i*) the Individual Defendants and each of their heirs, executors, administrators and assigns, (*ii*) the Companies and each of their past present and future parents, subsidiaries, predecessors, successors and assigns and affiliates, and each of their respective past, present and future officers, directors, employees, agents, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors, and assigns, or any of them, including any person or entity controlled by, controlling or under common control with any of them.  Releasees does not include any auditor, accountant and/or accountant consultant who presently provides or has at any time provided accounting, auditing and/or consulting services to the Companies, whether directly or indirectly, other than as an employee of the Companies, including without limitation, the Auditor Defendants, and each of their past, present and future parents, subsidiaries, predecessors, successors, assigns and affiliates, and each of their respective past, present and future officers, directors, partners, principals, employees, agents, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors, and assigns, or any of them, including any person or entity controlled by, controlling, or under common control with any of them.

7

25.     "Related Derivative Actions" means *Soojian v. Jacobs, et. al,* Civil

Action No. 04 CV-4160 (filed June 2, 2004 in the United States District Court for the

Southern District of New York) ("*Soojian*"); *Epstein v. Oxburgh, et. al,* Case No.

04168560 (filed June 8, 2004 in the Supreme Court of the State of New York in the

County of New York) ("*Epstein*"); and *Staehr v. Van Der Veer, et. al,* Case No.

04112723 (filed September 2, 2004 in the Supreme Court of the State of New York in the

County of New York) ("*Staehr*").

26.     "Stockholders" means all individuals or entities who hold or

beneficially own, directly or indirectly, common stock, ADRs or other equity securities

of the Companies as of the date of the Hearing Order.

B.      Capitalized terms used in this Agreement but not defined above shall have

the meanings ascribed to them in this Agreement.

## II.     BACKGROUND

### A.      Shell's Recategorization of Proved Hydrocarbon Reserves

1.      On January 9, 2004, Shell announced that, based on the results of

an internal review, it would recategorize approximately 3.9 billion barrels of oil

equivalent ("boe") of proved reserves.  Following completion of the internal review and

subsequent efforts on the recategorization, Shell ultimately recategorized 4.47 billion

boe, or approximately 23%, of the proved reserves it reported as of year-end 2002,

because they did not comply with the applicable definitions of "proved" reserves for

Securities and Exchange Commission hydrocarbon reserve reporting (the "Reserves

Recategorization").  On October 28, 2004, Shell announced that it was considering

8

potential additional recategorizations as a result of the detailed audit processes put in place following the Reserves Recategorization.

2.      On February 5, 2004, Shell announced that its Group Audit Committee ("GAC") was conducting an internal inquiry into the processes surrounding past reserves bookings.  On March 3, 2004, following a preliminary report to the GAC on the independent review, two senior executives of the Company resigned, Sir Philip Watts, Chairman of Shell's Committee of Managing Directors, and Walter van de Vijver, CEO of the Exploration and Production business.

3.      On April 19, 2004, Shell reported that the GAC's independent investigation into the circumstances surrounding the Reserves Recategorization had been completed and that the almost 500-page report of the investigation (the "GAC Report") had been accepted by the Boards.  Consistent with its earlier commitment to make public the main conclusions of the GAC investigation, Shell released the Executive Summary and the Remedial Action sections of the GAC Report to the public.

B.      **The Derivative Actions**

1.      On June 2, 2004, *Soojian* was filed in the United States District Court for the Southern District of New York on behalf of RD shareholders claiming that the individual defendants in that action had breached their fiduciary duties to RD and should be liable for indemnification to RD for the losses they had caused.  The *Soojian* Complaint also seeks an order from the court requiring the defendants to "implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence."

9

2.     On June 8, 2004, *Epstein* was filed in the Supreme Court of the State of New York for the County of New York on behalf of STT shareholders claiming that the individual defendants in that action had breached their fiduciary duties to STT and should be liable for indemnification to STT for the losses they had caused. The *Epstein* Complaint also seeks an order from the court requiring the defendants to "implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence."

3.     On June 25, 2004, this Action was filed in the Superior Court of New Jersey for Middlesex County. On July 28, 2004, Auditor Defendants KPMG LLP and PricewaterhouseCoopers LLP (U.S.) removed this Action to the Court. On September 30, 2004 the Complaint was filed. The Action includes claims against the Individual Defendants for breach of fiduciary duties or aiding and abetting breaches by others, abuse of their control over the Companies, gross mismanagement, constructive fraud and unjust enrichment. The Action further alleges professional negligence and accounting malpractice against the Auditor Defendants. The Action seeks monetary damages, an accounting by all defendants of the damages they caused to the Companies and "special benefits and unjust enrichment" the defendants have obtained and an order directing the Companies "to take all necessary actions to reform and improve their corporate governance and internal control procedures to comply with Sarbanes-Oxley." The Complaint specifies a list of corporate governance policies that the Companies would need to adopt, including policies relating to the "unification of the two Boards" and "a proposal to simplify the corporate structure."

4.      On September 2, 2004, *Staehr* was filed in the Supreme Court of

the State of New York for the County of New York on behalf of shareholders of RD

claiming that the individual defendants in that action had breached their fiduciary duties

and engaged in other misconduct and should be liable to RD for the losses they caused to

RD as well as disgorge to RD any unjust profits they realized.

C.      **Initial Discussions**

1.      On September 24, 2004, Plaintiffs' Counsel and representatives of

Plaintiffs met with the Companies' Counsel and senior in-house legal counsel for Shell.

The Parties discussed the various jurisdictional, venue and service issues arising out of

the Action and the Related Actions.  The Parties also discussed the proposed corporate

governance relief that Plaintiffs had included in the Complaint and agreed that Plaintiffs'

Counsel, together with an expert in corporate governance matters, would provide Shell

with a more detailed set of proposed governance terms that could be evaluated by the

Companies' Counsel.  Plaintiffs' Counsel provided a more detailed list of such terms in

early October 2004 (the "Corporate Governance Terms").

2.      On October 8, 2004, Plaintiffs' Counsel made a 21-page demand

on the Companies setting forth in detail Plaintiffs' proposed corporate governance

enhancements.

D.      **Shell's Unification Announcement**

1.      On October 28, 2004, Shell announced that "[t]he Boards of RD

and ST&T have unanimously agreed to propose to their shareholders the unification of

the Royal Dutch / Shell Group of Companies under a single parent company, Royal

Dutch Shell plc. Real reforms in management and governance structure are also planned." Under the terms of the proposed unification transaction, the Royal Dutch/Shell Group of Companies will have a single parent company, Royal Dutch Shell, with a single board of directors and a Chief Executive Officer. Shell further announced that it expected the transaction to be completed in May 2005.

2.     The October 28 Unification announcement was a product of a Governance Review and resulted from a Steering and Working Group's consideration of the views expressed by a number of shareholders, including the positions advanced by Plaintiffs through the Complaint in this Action and in the Related Derivative Actions.

E.     **Settlement Discussions**

1.     On December 1, 2004, the Companies' Counsel, senior counsel from Shell, Plaintiffs' Counsel, representatives from Plaintiffs and Plaintiffs' corporate governance expert met at Shell's offices in London, England. In that meeting, the Parties held extensive discussions on the Corporate Governance Terms, including a discussion of provisions that the Companies' Counsel would be willing to recommend that Shell adopt as part of a potential resolution of the Action and the Related Actions. The Parties also discussed the prospects of a potential resolution and the timing of such a resolution given the progress of the Unification announced on October 28, 2004. At the end of the meeting and as a next step in the Parties' consideration of a potential resolution, the Companies' Counsel agreed to provide Plaintiffs with revised Corporate Governance Terms that the Companies' Counsel would be prepared to present and recommend to the Companies and the Boards.

2.      Between December 1, 2004 and May 11, 2005, the Parties, their counsel and plaintiffs' expert continued to negotiate corporate governance enhancements. A definitive set of corporate governance changes was agreed to on May 11, 2005, which is incorporated herein by reference and attached hereto as Exhibit A.

### III.   SETTLEMENT RELIEF

As a direct result of the pendency and prosecution of the Action and the extensive negotiations between the Parties, a proposed settlement has been reached that includes the following:

A.      Within 30 days after the Approval Date or such other time as the parties may agree, the Boards or, as appropriate, the Board of Directors of Royal Dutch Shell will take such steps as are necessary to adopt and implement the Corporate Governance Principles in Exhibit A (the "Corporate Governance Principles"), to the extent such Corporate Governance Principles are consistent with applicable laws, as policies, standards, procedures and/or guidelines of Royal Dutch Shell.  The Company believes that the Corporate Governance Principles can be implemented in a manner consistent with applicable laws.

B.      The Parties agree that the Corporate Governance Principles as adopted will be reflected in the appropriate corporate governance and other policy documents of Royal Dutch Shell and constitute a substantial benefit to Royal Dutch Shell. Accordingly, the Parties agree that the Company may, in good faith and in the reasonable exercise of judgment, alter or modify as necessary the specific language of the Corporate Governance Principles to facilitate such implementation, *provided however,* that no

13

material change to the substance of the Corporate Governance Principles shall be made
absent approval of the Plaintiffs unless such change is made pursuant to Section III.C.
The Parties further agree that reasonable interpretation of the Corporate Governance
Principles shall be within the sole discretion of the Company.

      C.    The Corporate Governance Principles, as adopted, shall be subject to
amendment by the Board, in whole or in part, so long as such amendment: (i) is made to
reflect consistency with applicable laws; or (ii) is determined in good faith to be in the
best interest of Royal Dutch Shell by a majority of the independent members of the Board
of Directors or the shareholders. Shareholders will be advised of any such changes.

## IV.    DISCOVERY

      A.    Subject to the provisions of a mutually-acceptable confidentiality
agreement which includes, among other things, a provision that provides that the
discovery contemplated by this Settlement Agreement shall be used only in connection
with the settlement of this Action, Plaintiffs' Counsel will continue to conduct reasonable
discovery into the facts underlying the claims in the Complaint to confirm that the
underlying facts are consistent with their understanding, as supported by their review of
materials, including the Companies' public filings and the Executive Summary of the
GAC Report, and that the proposed Settlement Agreement is fair, reasonable and
adequate.

      B.    Plaintiffs' Counsel has stated that such additional discovery will consist of
a review of relevant Shell documents, including the full GAC Report and supporting
materials and testimony of Shell employees before the United States Securities and

Exchange Commission and the United Kingdom Financial Services Authority, which additional discovery will be undertaken pursuant to the terms of the confidentiality agreement to be negotiated pursuant to Section IV.A above.

C.      The discovery contemplated by this Section shall be conducted as soon as practicable after the execution of this Settlement Agreement, but in any case shall be completed no later than August 31, 2005.

D.      If, as a result of concluding the additional discovery contemplated by this Section, Plaintiffs and Plaintiffs' Counsel continue to believe that the Settlement Agreement is fair, reasonable and adequate, the Parties shall execute an amendment to this Settlement Agreement indicating that the discovery contemplated by the Settlement Agreement has been completed and setting out Plaintiffs' and Plaintiffs' Counsel's finding that the Settlement Agreement is fair, reasonable and adequate.

E.      If, as a result of concluding the additional discovery contemplated by this Section, Plaintiffs and Plaintiffs' Counsel reasonably and in good faith do not believe that the proposed Settlement Agreement is fair, reasonable and adequate, they will have the right to terminate or to renegotiate this Settlement Agreement within 10 days of the conclusion of the discovery contemplated by this Section.

## V.      NOTICE TO STOCKHOLDERS AND RIGHT OF COMMUNICATION

A.      **Notice**

1.      Subject to the requirements of the Hearing Order and no later than 45 calendar days before the Fairness Hearing, the Companies shall cause the Notice to be published in the two national newspapers with the largest reported circulation in the

15

United States, the Netherlands and the United Kingdom and the international editions of two newspapers. In addition, the Companies will post the Notice on the www.shell.com website beginning 45 calendar days before the Fairness Hearing and continuing through the date of the Fairness Hearing. The Companies will pay for the costs associated with producing and publishing the Notice.

    2.     The Notice shall: (*i*) contain a short and plain statement of the background of the Action and the proposed settlement; (*ii*) generally describe the nature of the relief provided; (*iii*) state that any relief is contingent on the Court's final approval of the proposed settlement; (*iv*) inform Stockholders of the date of the Fairness Hearing and of their right to object to the Settlement Agreement; (*v*) conform to the requirements of the United States Federal Rules of Civil Procedure, including but not limited to, Fed. R. Civ. Pro. 23.1, the United States Constitution (including the Due Process Clause), the Rules of the Court, and any other applicable law; and (*vi*) otherwise be in a manner and form agreed upon by the Parties to this Settlement Agreement and approved by the Court.

    3.     A copy of the proposed Notice is attached hereto as Exhibit C.

    B.    **Right of Communication with Stockholders**

    1.     The Companies expressly reserve the right to communicate with and respond to inquiries by Stockholders with respect to matters unrelated to this Settlement Agreement, including but not limited to the Unification, and may do so through any appropriate agency.

    2.     The Companies may undertake such efforts to communicate with Stockholders regarding the Notice and terms of this Settlement as the Companies deem

necessary or appropriate, including telephone communications.  Any written

communication to the Companies by any Stockholder regarding the Settlement

Agreement, or any written communication to a Stockholder by the Companies regarding

the Settlement Agreement, shall be provided to Plaintiffs' Counsel as soon as practical

after the communication is received or generated, as the case may be.

    C.    **Media Communications**

        1.    Plaintiffs' Counsel and Companies' Counsel agree to cooperate in

good faith to ensure that (*i*) any comments about or descriptions of the proposed

settlement in the media or any other public forum are balanced, fair and accurate and (*ii*)

any press releases announcing the proposed settlement are provided in advance to

Plaintiffs' Counsel and Companies' Counsel before dissemination or publication;

*provided however*, that the Companies shall be able to make, without notification to or

prior review or approval by Plaintiffs' Counsel, any and all disclosures regarding the

Settlement Agreement that the Companies believe may be required or appropriate under

applicable law or by the rules of any securities exchange on which the Companies'

securities trade, or as required in connection with a judicial or regulatory proceeding.

**VI.    OBJECTIONS TO SETTLEMENT**

    A.    Any Stockholder who wishes to object to the fairness, reasonableness or

adequacy of this Settlement Agreement or the proposed settlement, must deliver to

Plaintiffs' Counsel and Defendants' Counsel, and file with the Court, no later than 14

calendar days before the Fairness Hearing or as the Court may otherwise direct, a

statement of his, her or its objection, as well as the specific reason(s), if any, for each

objection, including any legal support the Stockholder wishes to bring to the Court's attention and any evidence the Stockholder wishes to introduce in support of the objection.  Stockholders may so object either on their own or through an attorney hired at their own expense.

   B.  If a Stockholder hires an attorney to represent him, her or it, the attorney must (*i*) file a notice of appearance with the Clerk of the Court no later than 14 calendar days before the Fairness Hearing, or as the Court otherwise may direct, and (*ii*) deliver to Plaintiffs' Counsel and Defendants' Counsel no later than 14 calendar days before the Settlement Hearing a copy of the same.

   C.  Any Stockholder who files and serves a written objection, as described in this Section, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Stockholder's expense, to object to the fairness, reasonableness or adequacy of this Agreement or the proposed settlement.  Stockholders or their attorneys who intend to make an appearance at the Fairness Hearing must deliver to Plaintiffs' Counsel and Defendants' Counsel no later than 14 calendar days before the Fairness Hearing, or as the Court may otherwise direct, a notice of intention to appear.

   D.  Any Stockholder who fails to comply with the provisions of this Section shall waive and forfeit any and all rights he, she or it may have to appear separately and/or object.

## VII.    RELEASE AND WAIVER, AND ORDER OF DISMISSAL

### A.    Release and Waiver

1.    Plaintiffs and the Companies agree to the following release and waiver, which shall take effect upon the Derivative Final Settlement Date:

a.    Subject to Sections VII.A.2, VII.A.3, VII.A.6 and VII.A.7 below, Plaintiffs and the Companies hereby release and discharge the Releasees from, and shall not now or hereafter institute, participate in, maintain, maintain a right to, or assert against the Releasees, either directly or indirectly, derivatively, on their own behalf, or on behalf of any other person or entity, any and all causes of action, claims, damages, awards, equitable, legal and administrative relief, interest, demands or rights, including, without limitation, claims for rescission, restitution, unjust enrichment or all damages of any kind, including those in excess of actual damages, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been or might hereafter be alleged or asserted by Plaintiffs or the Companies against the Releasees or any of them in this Action, the Related Derivative Actions, or in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicatory body that relate in any way, directly or indirectly, to the allegations contained in the Complaint or in any of the complaints filed in the Related Derivative Actions, including, without limitation:

(1)    any or all of the acts, omissions, nondisclosures, facts, matters, transactions, occurrences, or oral or written statements or representations

that have been, may be or could be directly or indirectly alleged, asserted, described, set

forth or referred to in this Action or the Related Derivative Actions;

(2)      any SEC filing by any of the Releasees for the

period 1997 through the date of this Agreement;

(3)      any forward-looking statement made by any of the

Releasees for the period 1997 through the date of this Agreement;

(4)      any disclosures of any sort made by any of the

Releasees for the period 1997 through the date of this Agreement;

(5)      the Companies' hydrocarbon reserve and financial

reporting and/or accounting practices for the period 1997 through the date of this

Agreement, including without limitation any or all acts, omissions, nondisclosures, facts,

matters, transactions, occurrences, or oral or written statements or representations made

or allegedly made in connection with or directly or indirectly relating to the Companies'

financial statements, supplemental hydrocarbon reserve disclosures and/or internal

financial controls, record-keeping or reporting mechanisms;

(6)      the salaries, bonuses, and termination or other

payments paid to the Companies' present and former executives and/or directors (*i*) at

any time before the date on which this Release becomes effective or (*ii*) if paid pursuant

to an obligation entered into by the Companies before the date on which this Release

becomes effective, then at any future time;

(7)    the Boards' supervision and oversight of the

Companies' management and affairs during the period of 1997 through the date of this

Agreement;

(8)    all claims relating in any way, directly or indirectly,

to any or all acts, omissions, nondisclosures, facts, matters, transactions, occurrences or

oral or written statements or representations in connection with the Settlement Agreement

or the settlement of this Action (including, without limitation, all claims respecting the

negotiation and execution of this Agreement);

(9)    except as provided in this Agreement, any and all

claims for attorneys' fees, expert witness fees and/or other costs or disbursements

incurred by Plaintiffs' Counsel or any other counsel representing Plaintiffs in this Action

or in the Related Derivative Actions, or by Plaintiffs in this Action, or any of them, in

connection with or in any way related to this Action and/or the settlement of this Action;

and/or

(10)    any breaches of fiduciary duty (or other duty placed

upon corporate directors and officers by common law or statute) and/or obligations under

federal or state law, including the United States securities laws.

2.    Notwithstanding any other provision of this Section, nothing in this

Release shall be deemed to release the claims currently pending in the Class Actions or

preclude Plaintiffs or Stockholders who are members of any certified class in the Class

Actions from participating in any relief awarded in the Class Actions.

3.      Notwithstanding any other provision of this Section, nothing in this Release shall be deemed to release claims, if any, that the Companies may have against any Releasee who files, commences, prosecutes, intervenes in, or otherwise participates in, any action or proceeding against the Companies, or who asserts any claims (including for contribution or indemnity) against the Companies in any action or proceeding.

4.      Plaintiffs and the Companies expressly understand that principles of law in some jurisdictions, such as Section 1542 of the Civil Code of the State of California, provide that a general release does not extend to claims that a creditor does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, must have materially affected his settlement with the debtor. To the extent that, as a result of or notwithstanding the choice of law provisions in the Settlement Agreement, California or other law may be applicable, Plaintiffs and the Companies expressly waive with respect to Releasees all rights afforded by Section 1542 and all similar federal, state or foreign laws, rights, rules, or legal principles which may be applicable herein, and Plaintiffs and the Companies hereby agree and acknowledge that this is an essential term of this Release.  Section 1542 states as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Notwithstanding the provisions of Section 1542 and all similar federal, state or foreign laws, rights, rules, or legal principles which may be applicable herein, and for the purpose of implementing a full and complete release, Plaintiffs and the Companies understand

22

and agree that this Release is intended to include all claims, if any, which Plaintiffs

and/or the Companies may have and which Plaintiffs and/or the Companies do not now

know or suspect to exist in their favor against the Releasees, and that this Release

extinguishes those claims.

      5.    In connection with this Release, Plaintiffs and the Companies

acknowledge that they are aware that they may hereafter discover claims presently

unknown or unsuspected, or facts in addition to or different from those that they now

know or believe to be true with respect to the matters released herein.  Nevertheless, it is

the intention of Plaintiffs and the Companies in executing this Release fully, finally and

forever to settle and release all such matters, and all claims relating thereto, that exist,

hereafter may exist, or might have existed (whether or not previously or currently

asserted in any action or proceeding) with respect to the matters released.

      6.    Nothing in this Release shall preclude any action to enforce the

terms of this Agreement.

      7.    Notwithstanding any other provision of this Section, nothing in this

Release shall preclude any action by the Companies against any of the Individual

Defendants or other Releasees to:  (i) enforce the provisions of any severance or related

compromise agreement between the Companies or any affiliates and an Individual

Defendant that require the Individual Defendant to cooperate with the Companies and

relevant governmental authorities; or (ii) to recover attorney's fees and other expenses

advanced to an Individual Defendant if that Individual Defendant is ultimately

23

determined not to have met the applicable standards for indemnification under relevant law.

        8.      Plaintiffs and the Companies hereby agree and acknowledge that the provisions of this Release together constitute an essential term of the Settlement Agreement.

      **B.**    **Order of Dismissal and Release**

        1.      The Parties will seek and obtain from the Court a Final Judgment and an Order Approving Settlement as further described below in Section X.  The Final Judgment and the Order Approving Settlement shall, among other things, (*i*) approve the Settlement Agreement as fair, reasonable and adequate pursuant to Federal Rule of Civil Procedure 23.1; (*ii*) dismiss the Action as to the Companies and the Individual Defendants with prejudice and on the merits; (*iii*) incorporate the terms of the Release; (*iv*) incorporate the agreed upon Attorneys' Fees and Expenses set forth in Section VIII. A copy of the proposed Final Judgment and the proposed Order Approving Settlement are attached hereto as Exhibits D and E, respectively.

**VIII.   ATTORNEYS' FEES AND LITIGATION EXPENSES**

      **A.**    As a unitary part of the settlement, set forth herein and in recognition of the benefits provided to the Companies as a result of the prosecution and settlement of this Action, the Companies agree to pay Plaintiffs an award of Attorneys' Fees and Expenses in this Action in the amount of nine million, two hundred thousand dollars ($9,200,000).  The Attorneys' Fees and Expenses will be paid by the Companies, subject to the conditions below, within ten (10) business days of the Approval Date.

B.      If (*i*) the Final Judgment and Order Approving Settlement approving this

Action are reversed, vacated, modified and/or remanded for further proceedings or

otherwise disposed of in any manner other than one resulting in an affirmance of such

Final Judgment and Order Approving Settlement *and* the Companies or Plaintiffs

properly and timely terminate the Settlement Agreement in accordance with Section XI.B

of this Settlement Agreement or (*ii*) the Derivative Final Settlement Date does not occur

for any reason, then Plaintiffs' Counsel shall within 10 business days return to the

Companies the amount of Attorneys' Fees and Expenses paid by the Companies with

interest at the Interest Rate.

C.      Plaintiffs' Counsel's obligation to return any of the Attorneys' Fees and

Expenses, as described in Section VIII.B above, shall be evidenced by a promissory note,

which note shall be executed individually and on behalf of the firms.  A copy of the

promissory note is attached hereto as Exhibit F.  In addition, Plaintiffs' Counsel, as a

condition of receiving Attorneys' Fees and Expenses, on behalf of itself and each partner

and/or shareholder of it, agrees that their respective law firms and their partners and/or

shareholders are subject to the jurisdiction of the Court for the purpose of enforcing this

Section VIII of the Settlement Agreement.  Without limitation, the law firms and their

partners and/or shareholders agree that the Court may, upon application of the

Companies, on notice to the law firms, summarily issue orders, including, but not limited

to, judgments and attachment orders, and may make appropriate findings of or sanctions

for contempt, against them or any of them should the law firms fail timely to repay any

amounts pursuant to this Section VIII of the Settlement Agreement.

D.     Neither the Companies nor Individual Defendants, nor any of their respective past, present and future parents, subsidiaries, predecessors, successors and assigns, nor any of their respective past, present and future officers, directors, partners, principals, employees, agents, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, shall be liable for or obligated to pay any fees, expenses, costs or disbursements to, or incur any expense on behalf of, any person, either directly or indirectly, in connection with this Action, this Settlement Agreement, or the proposed settlement, other than as expressly provided for in this Settlement Agreement.

**IX.     ORDER OF NOTICE, FAIRNESS HEARING AND ADMINISTRATION**

A.     Within 30 days of execution of this Settlement Agreement, the Parties shall submit the Agreement to the Court, and seek and obtain from the Court a Hearing Order, unless otherwise agreed to by the Parties:

1.     finding that the proposed settlement is sufficient to warrant publishing Notice to Stockholders;

2.     scheduling the Fairness Hearing, to be held on such date as the Court may direct, to consider the fairness, reasonableness and adequacy of all aspects of the proposed settlement and whether its provisions should be approved by the Court;

3.     approving the proposed Notice and notice methodology described in this Agreement;

4.     directing the Companies or their designee(s) to cause the Notice to be published no later than 45 days before the Settlement Hearing;

26

5.    determining that the Notice to be provided to the Companies' Stockholders in this Action and the manner in which the Notice is to be published pursuant to this Agreement, constitute the best practicable notice and satisfy the requirements of the United States Federal Rules of Civil Procedure (including Rule 23.1), the United States Constitution (including the Due Process Clause) and any other applicable law, and constitute due and sufficient notice of the Settlement Agreement and Fairness Hearing to all persons or entities entitled to receive such notice;

6.    requiring the Companies to file proof of the publishing of the Notice at or before the Fairness Hearing;

7.    authorizing the Companies to communicate with Stockholders about the Action and the terms of the proposed settlement, subject to the terms of Section V.B of this Agreement, and to engage in any other communications within the normal course of the Companies' business, including but not limited to communications in connection with the Unification;

8.    preliminarily enjoining Plaintiffs, the Stockholders and the Companies (whether acting on their own behalf or by and through their Stockholders, or any of them), or any of their respective representatives, trustees, successors, heirs and assigns, from filing, commencing, prosecuting, intervening in, participating in (as a nominal defendant or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order against the Releasees in any jurisdiction based on or relating to the claims and causes of action that are released by this Agreement pending the final ruling of the Court on the Settlement

27

Agreement; provided however, that nothing in this Settlement Agreement shall preclude shareholders or members of the alleged class in the Class Actions from participating in the Class Actions or receiving any relief awarded in the Class Actions;

      9.    requiring each Stockholder who wishes to object to the fairness, reasonableness or adequacy of this Settlement Agreement or the proposed settlement, to deliver to Plaintiffs' Counsel and Defendants' Counsel and to file with the Court, no later than 14 calendar days before the Fairness Hearing, or at such other time as the Court may direct, a statement of his or her objection, as well as the specific reasons, if any, for each objection, including any legal support the Stockholder wishes to bring to the Court's attention and any evidence the Stockholder wishes to introduce in support of his or her objection, or be forever barred from separately objecting;

      10.    requiring any attorney hired by a Stockholder at the Stockholder's expense for the purpose of objecting to this Agreement, the proposed settlement, or the award of Attorneys' Fees and Expenses, to file with the Clerk of the Court and deliver to Plaintiffs' Counsel and Defendants' Counsel no later than 14 calendar days before the Fairness Hearing, or as the Court may otherwise direct, a notice of appearance;

      11.    requiring any Stockholder who files and serves a written objection and who intends to make an appearance at the Fairness Hearing, either in person or through personal counsel hired at the Stockholder's expense, to file with the Court and deliver to Plaintiffs' Counsel and Defendants' Counsel no later than 14 calendar days before the Fairness Hearing, or as the Court may otherwise direct, a notice of intention to appear;

28

12.     directing Plaintiffs' Counsel and Defendants' Counsel promptly to furnish each other with copies of any and all objections that might come into their possession; and

13.     containing any additional provisions that might be necessary to implement and administer the terms of this Agreement and the proposed settlement.

B.     None of the Plaintiffs will object to the proposed settlement, file an appeal therefrom or otherwise seek review of any order approving the proposed settlement.

C.     A copy of the proposed Hearing Order is attached hereto as Exhibit B.

## X.     FINAL APPROVAL, FINAL JUDGMENT AND ORDER APPROVING SETTLEMENT

A.     At or after the Fairness Hearing, and upon the Court's approval of this Agreement, the Parties shall seek and obtain from the Court a Final Judgment and Order Approving Settlement.  The Final Judgment and/or the Order Approving Settlement shall, among other things, and taking into consideration all the facts and circumstances outlined in this Agreement:

1.     find that Plaintiffs have stock in one or both of the Companies continuously since the commencement of this Action and otherwise have standing to prosecute this Action on behalf of the Companies and their Stockholders;

2.     find that the Court has jurisdiction to approve the Settlement Agreement and exhibits thereto;

3.     approve the Settlement Agreement and the proposed settlement as fair, reasonable and adequate, consistent and in compliance with all applicable

requirements of United States law, including the United States Constitution (including the Due Process Clause), the Federal Rules of Civil Procedure, the Rules of the Court, and any other applicable law, and in the best interests of the Companies and their Stockholders;

4.    direct the Parties and their counsel to implement and consummate this Agreement according to its terms and provisions;

5.    declare this Agreement to be binding on – and, as to all claims and issues that have or could have been raised in this Action, to have *res judicata* and other preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of – the Parties, as well as their past, present and future parents, subsidiaries, predecessors, successors and assigns and affiliates and each of their respective past, present and future officers, directors, employees, agents, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors, and assigns, or any of them, including any person or entity controlled by or controlling or under the control of any of them;

6.    find that the Notice provided to the Companies' Stockholders in this Action and the manner in which the Notice was published, constituted the best practicable notice and satisfied the requirements of the Federal Rules of Civil Procedure (including Rule 23.1), the United States Constitution (including the Due Process Clause) and any other applicable law, and constituted due and sufficient notice of the Settlement Agreement and Fairness Hearing to all persons or entities entitled to receive such notice;

7.    find that Plaintiffs' Counsel and Plaintiffs brought the Action and the Related Derivative Actions in good faith and have adequately represented the interests of the Companies and their Stockholders for purposes of entering into and implementing the settlement;

8.    dismiss the Action as to the Companies and the Individual Defendants on the merits and with prejudice, without fees or costs to any party except as provided in this Agreement;

9.    incorporate the Release set forth above in Section VII.A, make the Release effective as of the date of the Derivative Final Settlement Date, and forever discharge the Releasees from any claims or liabilities arising from or related to the matters covered by the Release;

10.    permanently bar and enjoin Plaintiffs, the Companies' shareholders and the Companies (whether acting on their own behalf or by and through their shareholders, or any of them), or any of their respective representatives, trustees, successors, heirs and assigns, from filing, commencing, prosecuting, intervening in, participating in (as a nominal defendant or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order against the Releasees in any jurisdiction based on or relating to the claims and causes of action that are released by this Agreement; *provided however,* that nothing in this Settlement Agreement shall preclude shareholders or members of the alleged class in the Class Actions from participating in the Class Actions or receiving or participating in relief, if any, awarded in the Class Actions;

31

11.     authorize the Parties, without further approval from the Court, to

agree to and adopt such amendments, modifications and expansions of this Agreement as

(*i*) are consistent with the Final Judgment and Order Approving Settlement and (*ii*) do not

limit the rights of Plaintiffs, the Companies and/or their Stockholders under the

Settlement Agreement;

12.     without affecting the finality of the Final Judgment and the Order

Approving Settlement for purposes of appeal, retain jurisdiction as to all matters relating

to the administration, consummation, enforcement and interpretation of this Agreement,

the Final Judgment and the Order Approving Settlement, and for any other necessary

purpose; *provided however*, that nothing in this subsection shall restrict the ability of the

Parties to exercise their rights under Section XI.A below; and

13.     incorporate any other provisions that the Court deems necessary

and just.

B.     Copies of the proposed Final Judgment and the Order Approving

Settlement are attached hereto as Exhibits D and E, respectively.

## XI.     MODIFICATION OR TERMINATION OF THE SETTLEMENT AGREEMENT

A.     The terms and provisions of this Agreement may be amended, modified or

expanded by agreement of the Parties and approval of the Court; *provided however*, that

after entry of the Final Judgment and Order Approving Settlement the Parties may by

agreement effect such amendments, modifications or expansions of this Agreement and

its implementing documents (including all exhibits thereto) without notice to or approval

by the Court if such changes are consistent with the Court's Final Judgment and Order

Approving Settlement and do not limit the rights of Plaintiffs, the Companies and/or their

Stockholders under the Settlement Agreement.

      B.     This Agreement will terminate at the sole option and discretion of

Plaintiffs or the Companies if (*i*) the Court, or any appellate court(s), rejects, modifies or

denies approval of any portion of the Settlement Agreement or the proposed settlement

that the terminating party in its (or their) sole judgment and discretion reasonably

determine(s) is material, including, without limitation, the terms of relief, the findings of

the Court, the provisions relating to notice and/or the terms of the Release, or (*ii*) the

Court, or any appellate court(s), does not enter or completely affirm, or alters or expands,

any portion of the Final Judgment or Order Approving Settlement, that the terminating

party in its (or their) sole judgment and discretion reasonably believe(s) to be material.

The terminating party must exercise the option to withdraw from and terminate this

Agreement, as provided in this Subsection, no later than 20 days after receiving notice of

the event giving rise to the grounds for the termination.

      C.     If an option to withdraw from and terminate this Agreement arises under

Section XI.B of this Agreement, (*i*) neither Plaintiffs nor the Companies will be required

for any reason or under any circumstance to exercise that option and (*ii*) any

determination to exercise that option shall be made in good faith.

      D.     If this Agreement is terminated pursuant to its terms, then:

33

1.      this Agreement shall be null and void and shall have no force or effect, and no party to this Agreement shall be bound by any of its terms, except for the terms of this subsection;

2.      this Agreement, all of its provisions, and all negotiations, statements and proceedings relating to it shall be without prejudice to the rights of Plaintiffs and the Companies, all of whom shall be restored to their respective positions existing immediately before the execution of this Agreement;

3.      the Companies, and their current and former parents, subsidiaries, predecessors, successors, heirs, agents, assigns, officers, directors, employees, partners, principals, attorneys and representatives expressly and affirmatively reserve all defenses, arguments and motions as to all claims that have been or might later be asserted in this Action;

4.      Plaintiffs and the Companies and their current and former parents, subsidiaries, predecessors, successors, heirs, agents, assigns, officers, directors, employees, partners, principals, attorneys and representatives expressly and affirmatively reserve all motions as to, and arguments in support of, all claims that have been or might later be asserted in this Action;

5.      neither this Agreement, nor the fact of its having been made, shall be admissible or entered into evidence for any purpose whatsoever;

6.      any order or judgment entered after the date of this Agreement will be deemed vacated and will be without any force and effect;

34

7.      if required, any Attorneys' Fees and Expenses paid by the

Companies will be returned to the Companies pursuant to in Section VIII.B. above; and

8.      any confidentiality agreement executed with respect to the

discovery contemplated by Section IV above shall remain in full force and effect.

## XII.   GENERAL MATTERS AND RESERVATIONS

A.      The obligation, though not the ability, of the Parties to conclude the

proposed settlement is and will be contingent on each of the following:

1.      acceptance of this Settlement Agreement by the Boards;

2.      compliance by the Companies with Section III.A. of this

Agreement;

3.      occurrence of the Derivative Final Settlement Date;

4.      dismissal with prejudice of the Related Derivative Actions;

5.      payment of the Attorneys' Fees and Expenses as required by

Section VII; and

6.      any other conditions stated in this Agreement.

B.      The Parties and their counsel agree to keep the existence and contents of

this Agreement and all related negotiations confidential until the date of the first public

announcement by the Companies, which shall occur at the Companies' discretion;

*provided however*, that this Section shall not prevent earlier disclosure of such

information (*i*) by the Companies to the Boards, to their employees, auditors or rating

agencies, or to its Directors and Officers or general liability insurers or (*ii*) by the

Companies or Plaintiffs to any person or entity (such as experts and/or courts) to whom

35

the Parties agree disclosure must be made to effectuate the terms and conditions of this Agreement; *provided however*, that the Companies shall be able to make, without notification to, or prior review or approval by, Plaintiffs' Counsel, any and all disclosures regarding the Settlement Agreement that the Companies believe may be required or appropriate under applicable law or by the rules of any securities exchange on which securities of the Companies are traded, or as required in connection with a judicial or regulatory proceeding.

C.       By execution of this Agreement, neither the Individual Defendants nor the Companies intend to release any claim against any insurer for any cost or expense hereunder, including attorneys' fees and costs.

D.       Plaintiffs' Counsel represents that (*i*) it is authorized to enter into this Agreement on behalf of Plaintiffs and any other Plaintiffs' counsel with respect to all claims released herein and (*ii*) it is seeking to protect the interests of the Companies and their Stockholders.

E.       Ralph C. Ferrara represents that he is authorized to enter into this Agreement on behalf of the Companies.

F.       This Agreement sets forth the entire agreement among the Parties with respect to its subject matter, and it may not be altered or modified except by written instrument executed by the Parties or their counsel.  The Parties expressly warrant and represent and do hereby state that no promise or agreement that is not herein expressed has been made in executing this Agreement.  There are no warranties between the parties of any kind other than those embodied in this Agreement.

G.      In entering into this Agreement, no party has relied upon any

representation, statement or warranty that is not set forth expressly herein.

H.      This Agreement shall be governed by and interpreted according to the

laws of New Jersey, excluding its conflict-of-law provisions.

I.      Any action to enforce this Agreement shall be commenced and maintained

only in the Court.

J.      Whenever this Agreement requires or contemplates that one party shall or

may give notice to another, notice shall be provided by facsimile and/or next-day

(excluding Sunday) express delivery service as follows:

1.      If to Defendants' Counsel, then to:

Ralph C. Ferrara, Esq.
LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Ave, N.W.
Washington, D.C. 20009
Facsimile : 202-986-8102

Jonathan R. Tuttle, Esq.
Debevoise & Plimpton LLP
555 Thirteenth Street N.W.
Washington, DC 20004
Facsimile: 202-383-8118

2.      If to Plaintiffs, then to:

Joy Ann Bull, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
Facsimile: 619-231-7423

K.      All time periods set forth herein shall be computed in calendar days unless

otherwise expressly provided.  In computing any period of time prescribed or allowed by

this Agreement or by order of Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday or a legal holiday, or, when the act to be done is the filing of a paper in Court, a day on which weather or other conditions have made the office of the Clerk of the Court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days. As used in this subsection, "legal holiday" includes New Year's Day, Birthday of Martin Luther King, Jr., Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day and any other day appointed as a federal holiday.

L.    The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Agreement.

M.    All Parties agree that this Agreement was drafted at arm's length, and that no parol or other evidence may be offered to explain, construe, contradict or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which the Agreement was made or executed; *provided*, that there shall be no presumption for or against any Party that drafted all or any portion of this Settlement Agreement.

N.    In no event shall this Agreement, any of its provisions, or any negotiations, statements or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as or deemed to be evidence of any kind in this Action, any other action, or any judicial, administrative, regulatory or other proceeding,

38

except a proceeding to enforce this Agreement.  Without limiting the foregoing, neither

this Agreement nor any related negotiations, statements or court proceedings shall be

construed as, offered as, received as, used as or deemed to be evidence or an admission or

concession of any liability or wrongdoing whatsoever on the part of any person or entity,

including but not limited to the Companies and the Individual Defendants, or as a waiver

by the Companies and/or the Individual Defendants of any applicable defense, or as a

waiver by Plaintiffs or the Companies of any claims, causes of action or remedies.

     O.     The Companies expressly deny any wrongdoing alleged in the pleadings

and do not admit or concede any actual or potential fault, wrongdoing or liability in

connection with any facts or claims that have been or could have been alleged in this

Action, but consider it desirable for this Action to be settled and dismissed because this

settlement will (*i*) provide substantial benefits to the Companies and their Stockholders,

(*ii*) avoid the substantial expense and further disruption of the management and operation

of the Companies' business due to the Action and (*iii*) finally put Plaintiffs' claims and

the underlying matters to rest.

     P.     Plaintiffs' Counsel expressly represent that the allegations contained in the

Complaint were made in good faith and have a substantial basis in fact.  They

nevertheless consider it desirable for the Action to be settled and dismissed in light of the

risks of this litigation and because of the substantial benefits provided to the Companies

and their Stockholders under the proposed settlement.

Q.      The Parties to this Agreement, their successors and assigns, and their attorneys undertake to implement the terms of this Agreement in good faith, and to use good faith in resolving any disputes that may arise in the implementation of its terms.

R.      The Parties, their successors and assigns, and their attorneys agree to cooperate fully with one another in seeking court approval of this Agreement and to use their best efforts to effect the prompt consummation of this Agreement and the proposed settlement.

S.      This Agreement may be signed in counterparts, each of which shall constitute a duplicate original.  Execution by facsimile shall be fully and legally binding on a Party, and the Party so executing shall promptly provide a fully executed counterpart to each of the other Parties.

T.     All Releasees who are not parties to this Agreement are intended third-party beneficiaries entitled to enforce the terms of the Release set forth herein.

Agreed to as of this 22nd day of July, 2005.

_____          _____
William S. Lerach, Esq.                     Ralph C. Ferrara, Esq.
Joy Ann Bull, Esq.                          LeBoeuf, Lamb,
Lerach Coughlin Stoia Geller                Greene & MacRae LLP
  Rudman & Robbins LLP                      1875 Connecticut Ave, N.W.
401 B Street, Suite 1600                    Washington, D.C. 20009
San Diego, CA 92101

                                            Jonathan R. Tuttle, Esq.
                                            Debevoise & Plimpton LLP
                                            555 Thirteenth Street, N.W.
                                            Washington, D.C.  20004


Counsel for Plaintiffs Suing Derivatively   On behalf of the Companies
On Behalf of Royal Dutch Petroleum
Company and The "Shell" Transport
and Trading Co., plc

T.      All Releasees who are not parties to this Agreement are intended third-

party beneficiaries entitled to enforce the terms of the Release set forth herein.

Agreed to as of this 22nd day of July, 2005.


_____          _____
William S. Lerach, Esq.                      Ralph C. Ferrara, Esq.
Joy Ann Bull, Esq.                           LeBoeuf, Lamb,
Lerach Coughlin Stoia Geller                 Greene & MacRae LLP
  Rudman & Robbins LLP                        1875 Connecticut Ave, N.W.
401 B Street, Suite 1600                      Washington, D.C. 20009
San Diego, CA 92101
                                             Jonathan R. Tuttle, Esq.
                                             Debevoise & Plimpton LLP
                                             555 Thirteenth Street, N.W.
                                             Washington, D.C.  20004


Counsel for Plaintiffs Suing Derivatively    On behalf of the Companies
On Behalf of Royal Dutch Petroleum
Company and The "Shell" Transport
and Trading Co., plc


41

**EXHIBIT A**

**ROYAL DUTCH SHELL[1] CORPORATE GOVERNANCE PRINCIPLES**

**A.      The Board of Royal Dutch Shell plc (the "Board")**

1.      With respect to the Board:

(a)      The CEO and other Senior Management of the Company [2] will not take on more than one non-executive directorship in a FTSE 100 company nor the chairmanship of such a company.[3]

(b)      A majority of the Board, including the Chairman, shall be non-executive directors determined by the Board to be "independent directors," as defined below.

(c)      To be deemed "independent" in any calendar year, a director must satisfy the following:

(i)      Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination,[4] the

---

[1]      Hereinafter, the "Company."

[2]      "Senior Management of the Company" or "Senior Management" will include the CEO, all other executive directors of the Company, the Company's Legal Director, Controller, Secretary and such other personnel as the CEO shall designate.

[3]      To the extent this or any other of the new principles adopted by the Company contains a restriction that is inconsistent with the terms of the current employment agreement of a member of Senior Management, the new restriction will not become effective as to that member of Senior Management until his or her employment agreement is renewed or extended.  In no event will any member of Senior Management be required to resign from a directorship that he or she currently holds by reason of this requirement.

director has not been an employee of the Company or the Royal Dutch/Shell Group of Companies within the last five calendar years;

(ii)    Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director has not within the last three years: (1) had a material business relationship with the Company either directly, or as a partner, shareholder, director or senior employee of a body that has such a relationship with the Company; or (2) received additional remuneration other than director's fees or *de minimis* amounts.

(iii)    Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director has not been a director, executive officer or controlling person of a not-for-profit entity that has received contributions from the Company or from its Senior Management in the previous twelve months that are in excess of the greater of $1 million (U.S.) or 2% of the entity's gross revenues.

(iv)    Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director does not hold cross-directorships or have significant links with other Company directors through involvement in other companies or bodies.

---

[4]    Disclosure contemplated by this and other provisions shall, unless expressly noted otherwise, be made in the Company's Annual Report or in such other form of communication as the Board determines in good faith and in the best interest of the shareholders.

2

(v)    Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director does not have close family ties with any of the Company's advisers, directors or Senior Management.

(vi)    A director is deemed to have "a material business relationship with the Company" if remuneration, other than *de minimis* remuneration or director's fees, was paid by the Company, its subsidiaries, or affiliates, to the director, to any entity in which the director has a beneficial ownership interest of five percent or more, or to an entity by which the director is employed or self-employed other than as a director.  Remuneration is deemed *de minimis* remuneration if such remuneration is $50,000 or less in any calendar year, or as otherwise determined and disclosed by the Board.

(d)    No individual shall serve for more than 12 years as an independent director of the Company, and disclosure will be made for an independent director that has served on the Board for more than nine years.

(e)    Non-executive directors will undertake that they have sufficient time to meet what is expected of them.  Their other significant commitments will be disclosed to the Board before appointment, with a broad indication of time involved, and the Board will be informed of subsequent changes.  Additionally, the Chairman will not accept a second chairmanship of a FTSE 100 company.

(f)    Directors will be encouraged to invest in the Company.

2.      The Board shall be responsible for a formal and rigorous annual evaluation of its own performance as well as that of its committees and individual directors.  Individual director evaluations will aim to show whether each director continues to contribute effectively and demonstrates commitment to the role, including commitment of time for board and committee meetings and any other duties.  The Company will disclose in the annual report how the Board, its committees and its individual directors conducted performance evaluations.  Additionally, the Board will ensure that plans are in place for orderly succession of appointments to the Board and to Senior Management, so as to maintain an appropriate balance of skills and experience within the Company and on the Board.

3.      The Chairman will routinely convene meetings of the non-executive directors without the executive directors present.  The quality of the Company's financial and hydrocarbon reserve reporting and disclosure practices, the Company's system of internal controls, the integrity and performance of Senior Management of the Company, and corporate strategy shall be among the topics discussed at such meetings.  The non-executive directors will also meet without the Chairman present at least annually to appraise the Chairman's performance and as the non-executive directors determine is otherwise necessary.

4.      The Nomination and Succession, Remuneration and Audit Committees shall be composed entirely of non-executive directors.

5.      The Nomination and Succession Committee shall perform the following functions:

4

(a)  The Nomination and Succession Committee, or such other committee of independent directors as the Board shall direct, in consultation with the Chairman and CEO, shall be responsible for periodic review, interpretation, and administration of the Company's corporate governance policies, standards, procedures and/or guidelines, as well as consideration of other corporate governance issues that may, from time to time, merit consideration by the entire Board.  The Annual Report shall include a report specifically addressing whether such policies and guidelines are adequate, any recommendations for changes and the status of their implementation;

(b)  The Nomination and Succession Committee, in consultation with the Chairman and CEO, shall consider and make recommendations to the Board concerning the appropriate size and needs of the Board;

(c)  The Nomination and Succession Committee, in consultation with the Chairman and CEO, shall consider candidates to fill vacant Board positions. Candidates shall be selected for their character, judgment, business experience, time commitment, and acumen;

(d)  The Nomination and Succession Committee, in consultation with the Chairman and CEO, in the ordinary course of its communications with significant institutional shareholders and in the case of any particular vacancy, will obtain views from such institutional shareholders, including, where applicable, institutional shareholders based in each of the Netherlands, the United Kingdom, and the United States concerning Board member selection and qualifications, including such issues as the experience or expertise of candidates, in the context of evaluating candidates

proposed or identified by the Committee to fill vacant Board positions, and will consider those views; *provided however,* that this provision neither confers any right or standing under this Agreement, or otherwise, to any shareholder, nor is intended to serve as the basis for any future legal action or challenge in any form by or on behalf of any shareholder against the Company, the Board, the Nomination and Succession Committee or any member of the Board; and *further provided,* that the determination of candidates' qualifications and selection of candidates for nomination shall remain within the discretion of the Nomination and Succession Committee, in consultation with the Chairman and CEO; and

       (e)    The Nomination and Succession Committee shall consider policies relating to the Board and directors, including committee structure and size, retirement and resignation.

     6.    The Remuneration Committee shall meet at least once each calendar year in executive session, without the CEO or CFO present.  The Remuneration Committee shall set annual and long-term performance goals for the CEO and evaluate his or her performance against such goals and the performance of the Company's peer companies.

     7.    Each of the Board's Committees shall have standing authorization, on its own decision, and at the sole expense of the Company, to retain legal and/or other advisors of its choice, which advisors shall report directly to the Committee.

     8.    The Chairman of the Board and CEO shall not be the same person.  The Chairman will be appointed by the Board as a whole and the process will be led by the Nomination and Succession Committee.  The Chairman is responsible for ensuring that

the Board and its Committees function effectively.  With the CEO, he shall ensure that

members of the Board receive accurate, timely and clear information.  To this end the

Chairman of the Board shall see to it that:

        (a)      there is an adequate induction and training programme that all

directors follow;

        (b)      the development needs of individual directors are identified and

met;

        (c)      all directors receive in good time all information which is

necessary for the proper performance of their duties and have sufficient time to take

decisions;

        (d)      the performance of the CEO, the other executive directors and non-

executive directors is assessed at least once a year;

        (e)      the Board elects a Deputy Chairman; and

        (f)      the Board has proper contact with the CEO and the Executive

Committee.

     9.     The Chairman shall have the authority and discretion to retain such

counsel or consultants as the Chairman deems necessary to perform his or her

responsibilities and those of the Board;

     10.     The Chairman shall receive additional compensation for performing the

function of Chairman and will have a secretariat sufficient to allow performance of that

position.

7

**B.**     **Compensation of Directors and Senior Management**

1.     The Remuneration Committee shall use the following compensation

principles in considering compensation for directors and Senior Management:

(a)     Levels of compensation shall be sufficient to attract, retain and

motivate directors of the quality required to run the Company successfully.  A significant

proportion of executive directors' compensation shall be structured so as to link rewards

to corporate and individual performance.

(b)     In circumstances where compensation arrangements involve

Company stock, the arrangements shall promote long-term ownership of the Company's

stock to align the interests of Senior Management and stockholders.

(c)     Performance-related elements of remuneration shall form a

significant proportion of the total remuneration package of executive directors and other

members of Senior Management and should be designed to align their interests with

those of shareholders to provide performance incentives.

(d)     In approving compensation, the recent compensation history of the

executive director or other member of Senior Management, as the case may be, including

special or unusual compensation payments, shall be taken into consideration.

(e)     Cash incentive compensation plans for Senior Management shall

link pay to achievement of performance conditions set in advance by the Remuneration

Committee, but no bonuses will be based solely on levels of proved hydrocarbon

reserves.

8

(f)     The Remuneration Committee may separately retain independent experts to advise it as to compensation of executive directors and members of Senior Management, which shall provide separate, independent and comparative compensation data.

(g)     The Company will disclose the features of any equity-based compensation arrangements for executive directors.

(h)     Compensation for non-executive independent directors will not include share options.  The Company will disclose the compensation arrangements for non-executive directors.

(i)     Pay shall be increased in an amount determined from time to time by the Board and disclosed by the Company because of service as chair of one of three main committees (Audit, Remuneration, Nomination and Succession).

(j)     The Company will comply with applicable disclosure and other requirements of the Directors' Remuneration Report Regulations 2002, as amended from time to time.

(k)     The Company will disclose severance or termination payments of members of Senior Management in excess of the greater of $1 million (U.S.) or the annual target compensation of the terminated member of Senior Management.

(l)     The Company will disclose the names of any consultant(s) retained by the Remuneration Committee and the nature of any other services the consultant(s) provided to the Company.

(m)      Other than as approved by the Remuneration Committee on a case-by-case basis based on a showing of special need, no option to acquire Company stock issued to Senior Management of the Company shall be exercisable for at least two years from its grant date; provided however, that nothing in this provision shall affect the rights of option-holders with respect to options issued by any predecessor to the Company.

**C.      Annual General Meeting ("AGM")**

1.      There must be one AGM at which directors are elected, if applicable, management presents, and shareholders are given opportunity to question.

2.      There shall be an opportunity at the AGM for general question and comment following the CEO's presentation and for each item on the agenda, which may be directed to particular directors or members of Senior Management.

3.      The Chairman of the Board should arrange for the chairmen or other representatives of the Audit, Remuneration and Nomination and Succession Committees to be present at the AGM to answer questions.  The Chairman should provide that shareholder views are effectively communicated to the whole Board.  Subject to legal restrictions on selective disclosure, it is the responsibility of the Chairman, with the CEO, to discuss governance and strategy with major shareholders.

4.      The AGM shall be open to the media, subject to reasonable policies and procedures governing media coverage necessary for the orderly conduct of the AGM. The AGM shall generally be held in The Netherlands and drawing as necessary on

10

technological links to permit active two-way participation by persons physically present in both the UK and the Netherlands.

**D.    Financial Integrity, Reporting and Controls**

1.    The Company will comply with all applicable provisions of Sarbanes-Oxley as well as the Combined Code in London.  The Company will commit to provide timely disclosure of changes in its applicable Code of Ethics and of changes to material off-balance sheet transactions or obligations.

2.    The Company's CFO shall not have been employed by one of the Company's outside auditor firms during the prior two years or, if involved in the firm's audit of the Company, during the prior five years.

3.    The Company shall implement and maintain an effective internal audit function, including specific procedures concerning hydrocarbon reserve estimates and a department specifically charged with the responsibility of reviewing hydrocarbon reserve estimates.  The Chief Internal Auditor, whose appointment shall be confirmed by the Audit Committee and who will report to the Audit Committee at every regularly scheduled Audit Committee meeting, shall oversee an internal audit staff that shall audit the Company's internal control environment, including the Company's internal financial controls.  The Chief Internal Auditor shall be responsible for consolidating an Internal Audit Plan for each fiscal year which will be presented to the Audit Committee of the Board.  Reports of the Chief Internal Auditor to the Audit Committee shall provide a balanced assessment of significant risks and the effectiveness of the system of internal controls in managing these risks.  The reports shall also include discussion of any

significant control failings or weaknesses identified in the audits, including discussion of the impact of such failings or weaknesses. The Audit Committee shall discuss any remedial actions proposed or adopted with the Chief Internal Auditor and Senior Management, as appropriate.

4.      At each regularly scheduled Board meeting following quarter end, the Company's CFO shall provide a report as to the Company's financial condition and prospects, including, as applicable, but not limited to, a comparison of the Company's performance to relevant internal   financial forecasts or budgets as well as any external guidance provided by the Company to investors, significant reasons for material increases in expenses and liabilities and material decreases in revenues and earnings, including any modification or adjustment of reserve accounts or contingencies, and management plans for ameliorating or reversing any negative trends and the success or failure of any such plans presented in the past. This presentation will be reflected as appropriate in the Board minutes.

5.      The CEO and CFO shall be responsible for ensuring that the Company's accounting practices, including proved hydrocarbon reserve estimates, comply with International Financial Reporting Standards and any other applicable and mandatory reporting requirements. Significant practices shall be reviewed and discussed with the Board.

6.      With respect to estimation of proved hydrocarbon reserves, the Company shall employ, for at least five years, an outside independent consultant to assist in its proved hydrocarbon reserves auditing process and to assist in devising uniform company-

12

wide standards, which shall be disclosed on its website. Any such consultants employed will be available to the Audit Committee and Board for questions on the reported levels of proved hydrocarbon reserves.

      7.     The CEO and CFO will be responsible for assuring compliance of the Company's financial and other reporting practices with all applicable laws, rules, regulations and Company policies.

**E.    Auditing and the Audit Committee**

      1.     The Board will establish and maintain an Audit Committee consisting of at least 3 members who should all be independent, non-executive directors. Each Audit Committee member shall be financially literate as defined by the Board (or become financially literate within a reasonable period of time after appointment to the Audit Committee) and one member will be designated as the audit committee financial expert based on relevant accounting or related financial management experience.

      2.     The chairmanship of the Audit Committee shall rotate on a periodic basis. At the end of such rotation the former chairman may remain as a member of the Audit Committee, and may serve a non-consecutive term as chairman again in the future.

      3.     The Audit Committee will meet with the Company's Legal Director (or the functional equivalent of the most senior internal legal advisor to the Company) at least semi-annually to review legal and compliance issues.

      4.     The CFO's performance, the absence of any conflicts or related party transactions and his or her significant business and investment transactions shall be reviewed by the Audit Committee annually. The CFO shall be prohibited from any

profit-making business activities outside the Company that relate to activities of the
Company.

      5.     The Audit Committee shall identify and, as it determines is necessary and
appropriate in its sole discretion, retain an independent law firm, as well as any
independent analytic resources deemed beneficial to the Committee. While such
professionals need only be consulted as deemed useful by the Committee, a relationship
with an independent law firm shall be established in advance so that advice can be taken
quickly when situations warrant.

      6.     The Company shall engage independent auditing firm(s) to perform an
annual audit of its financial statements in accordance with applicable auditing standards.
The Audit Committee has primary responsibility for making recommendations on
appointment, reappointment and removal of external auditors.

      7.     The Audit Committee shall review the budget of, and the compensation of
personnel in, the internal audit department.

      8.     The Company's Auditors may not provide the following non-audit
services to the Company: (i) bookkeeping or other services related to accounting records
or financial statements of the Company or any of the Company's affiliates or
subsidiaries; (ii) design and implementation of the Company's financial systems; (iii)
appraisal or valuation of the Company's financial systems; (iv) actuarial services; (v)
internal audit outsourcing services; (vi) management functions; (vii) human resource
functions; (viii) broker-dealer, investment adviser, or investment banking services; (ix)
legal services; and (x) expert services unrelated to the audit. Further, the annual report

will explain how, if an auditor provides any other non-audit services, the auditor's objectivity and independence is safeguarded.

**F.      Insider Trading Disclosure and Controls**

1.      The Board will appoint a senior officer of the Company who will be responsible for effecting compliance with the Company's stock trading and market communications policy.  That individual will be responsible for developing (with Board involvement), presenting to the Board for approval, and implementing, monitoring and updating (with Board involvement and approval) one or more Codes of Conduct designed to ensure compliance with the Company's trading policies.  At least once yearly, the independent directors will receive a report on compliance, which report shall be reflected as appropriate in the Board minutes.

2.      Except as otherwise provided in a pre-approved written trading policy or pursuant to any exception available under applicable law, any director or officer of the Company who possesses non-public material inside information, as defined by applicable law, concerning the Company's financial results shall be prohibited from trading in the Company's securities while in possession of such information.  The Company will establish a trading period before and after issuance of financial results or the release of other material information.

3.      The Code(s) of Conduct governing trading shall prohibit directors and other members of Senior Management from entering into any securities transaction by which they would directly profit from a decline in the price of the Company's stock, including, but not limited to, "short" sales of Company stock.

G.      **Corporate Ethics, Honesty and Legal Compliance**

1.      The Company will adopt and implement an effective compliance function, including the appointment of a senior compliance officer who shall have the duty and authority to do the following:

(a)      Create, implement and oversee a system by which corporate employees, suppliers, customers and advisor professionals and the like can, on a confidential basis and without fear or reprisal, provide information concerning possible illegal or unethical conduct regarding the Company; and

(b)      Subject to the consent of the Company's Legal Director (or the functional equivalent of the most senior internal legal advisor to the Company), retain separate and independent counsel at the Company's expense to provide advice and counsel.

2.      This officer, whose identity will be disclosed on the Company's website, will also act as a neutral party for the employees to report instances of illegal behavior or other compliance-related concerns.

3.      The senior compliance officer will report directly to the Company's Legal Director (or the functional equivalent of the most senior internal legal advisor to the Company).