UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
IN RE:                              :
                                    :
PFIZER INC. SHAREHOLDER DERIVATIVE  :
LITIGATION                          :
------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

Master File No.:
09 Civ. 7822 (JSR)

ORDER AND JUDGMENT
APPROVING CLASS ACTION
SETTLEMENT

JED S. RAKOFF, U.S.D.J.

By Order dated December 14, 2010, the Court granted preliminary approval of the parties' proposed settlement in the above-captioned consolidated shareholder derivative action. The Court's December 14 Order also set forth certain procedures for notifying potential settlement class members, as well as for allowing those class members to object to the settlement's terms. On February 18, 2011, Nora Vides filed a timely objection. After full briefing, the Court held, on March 7, 2011, a "fairness hearing" on the settlement, as well oral argument on plaintiffs' counsel's application for an award of attorneys' fees. After careful consideration, the Court, for the reasons specified below, hereby approves the proposed settlement in all respects and grants plaintiffs' motion for attorneys' fees in its entirety.

The pertinent facts are as follows. On September 2, 2009, Pfizer, Inc. ("Pfizer") and its subsidiary Pharmacia & Upjohn Company, Inc. ("Pharmacia") agreed to pay $2.3 billion in penalties and fines to the United States arising from their illegal promotion

1

and marketing of "off-label" uses of several regulated drugs.
Pharmacia also pled guilty to violating various sections of the
Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., by, inter
alia, intentionally introducing misbranded pharmaceutical drugs into
interstate commerce.  Between September 10, 2009 and October 7,
2009, nine separate complaints were filed by Pfizer shareholders in
this Court alleging that the individual defendants, who are current
and former Pfizer directors and senior executives, harmed the
corporation by causing or permitting this illegal activity to occur.
By Order dated October 22, 2009, the Court consolidated these nine
complaints into the above-captioned derivative action, and,
following a hearing on November 4, 2009, appointed Bernstein
Litowitz Berger & Grossman as lead plaintiffs' counsel.

The consolidated plaintiffs then filed an Amended Verified
Derivative Complaint (the "Complaint") asserting claims on behalf of
Pfizer for breach of fiduciary duty, violation of federal proxy
rules, and unjust enrichment.  Defendants moved to dismiss the
Complaint on December 16, 2010.  Following motion practice and oral
argument, the Court, by Order dated March 17, 2010, dismissed the
proxy and unjust enrichment claims, but denied the motion with
respect to the breach of fiduciary duty claim.  See In re Pfizer,
Inc. S'holder Derivative Litig., 722 F. Supp. 2d 453, 462-63
(S.D.N.Y. 2010).  In so doing, the Court noted that the allegations

2

in the Complaint "evidence misconduct of pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and prevent such misconduct ...." Id. at 462.

In the months following the Court's March 17 Order, the parties engaged in extensive document, deposition, and expert discovery. See Joint Declaration of Mark Lebovich and David Wales, dated February 7, 2011 ("Lebovich & Wales Decl.") at ¶¶ 33-58. After contentious disputes over the scope of discovery -- which several times necessitated Court intervention -- the defendants produced more than 12 million pages of documents to the plaintiffs. Id. ¶¶ 35-42.  In addition, the parties took thirty fact depositions and four expert depositions.  Id. ¶¶ 53, 58.  Finally, the parties collectively retained seven highly-qualified testifying experts, each of whom prepared and served a detailed expert report.  Id. ¶¶ 56-57.

Over the course of October and November, 2010, the parties engaged in summary judgment motion practice while, at the same time, entering into extensive settlement negotiations.  Id. ¶¶ 64-68.  On November 15, 2010, the day that plaintiffs' opposition papers to Pfizer's summary judgment motion were due to be filed, the parties informed the Court that they had reached a proposed settlement

3

agreement, which, after an in-court hearing, the Court preliminarily approved by Order dated December 14, 2010.

The centerpiece of the settlement agreement is its requirement that Pfizer establish and fund a Regulatory Committee, which will have a broad mandate to oversee the company's drug promotion and marketing practices and compliance with regulatory requirements applicable to same. See id. at Ex. A ("Settlement Term Sheet") at 1. To assist it in serving this oversight role, Pfizer must grant the Committee access to a wide range of information -- including drug usage information, health care compliance audits, FDA warning letters, and health care and marketing-related qui tam complaints. See id. at Ex. A ("Corporate Governance Proposal") at 2. The Committee is to have broad investigative powers, including the authority to require Pfizer management to conduct compliance audits and to commission physician surveys to determine whether Pfizer employees are illegally promoting the company's drugs for off-label purposes. Id. at 4. Further, the Committee must biannually commission an external review of Pfizer's compliance with its regulatory obligations, to be conducted by independent experts, outside counsel, and consultants. Id. Separately, the Committee is to be charged with overseeing the swift adoption of Pfizer's compliance policies by any newly-acquired company. See id. at 3-4.

4

In addition, the Regulatory Committee is to evaluate whether Pfizer's compensation policies -- including the manner in which it structures its employees' sales incentives -- are aligned with the company's compliance obligations.  See id. at 7.  If the Committee encounters serious misconduct in this regard on the part of the company's senior management, compliance personnel, or attorneys, the Committee is required to make written recommendations to Pfizer's Compensation Committee regarding potential "clawback" of previously-awarded incentive compensation.  Id. at 7-8.

Structurally, the Regulatory Committee is to consist of at least five members, one of whom should be a member of the Audit Committee,[1] and a majority of whom must be independent directors. Id. at 5.  The Chair of the Committee must be an independent director and have relevant experience in law, compliance, regulatory affairs, academia, or service on the board of a health care or other highly regulated company.  Id.  At least one member of the Committee must have a significant background in the healthcare industry.  Id. The Committee is to meet quarterly and must provide a full report of its activities to the Board at least annually.  Id.  In addition, so that shareholders are informed of its activities, the Committee must prepare a report on its activities, signed by each of the

---

[1] If there is no membership overlap between the Regulatory and Audit Committees, then the chairpersons of the two Committees are required to meet at least twice a year.  See Gordon Aff. ¶¶ 61, 64

Committee's members, for inclusion in Pfizer's annual report or
proxy statement.  Id.

      To accomplish the foregoing, the proposed settlement requires
defendants' insurers to fund a $75 million fund that -- after a
reduction to satisfy an award of attorneys' fees and expenses in
connection with this action, see infra -- will be used for the sole
purpose of funding the Regulatory Committee's activities.  Lebovitch
& Wales Decl. ¶ 81.  A substantial percentage of the Committee's
expenditures will likely be devoted to retaining independent experts
to conduct the mandatory biannual external compliance review of
Pfizer's activities.  See Affidavit of Jeffrey N. Gordon, dated
February 7, 2011 ("Gordon Aff.") ¶ 35.  If any funds are remaining
after the Committee's initial five-year term, they are to be
returned to the insurers, so there is no possibility of Pfizer
receiving the money back.  Id. ¶ 40.  Moreover, if the fund is
exhausted before the Committee's initial five-year term is complete,
additional funding must be provided by Pfizer upon the Committee's
request.  Id.

      Separately, the proposed settlement requires Pfizer to create
an Ombudsman program so as to provide the company's employees with
an alternative, confidential means for bringing work-related
concerns to the attention of senior management without fear of
reprisal.  See Corporate Governance Proposal at 6.  The Ombudsman

6

will operate a stand-alone office under the direction of Pfizer's
Chief Compliance Officer, and is authorized to report his or her
concerns directly to the Regulatory Committee. Id. All
conversations with the Ombudsman will remain confidential, except
where the employee raises an issue that risks harm to an individual
or the company or where disclosure is required by law. Id.

The Court now turns to determining whether to grant final
approval of the proposed settlement. See Fed. R. Civ. P. 23.1
(shareholder derivative action may only be settled with the Court's
approval). Here, as elsewhere, "[t]he central question is whether
the compromise is fair, reasonable and adequate." Weinberger v.
Kendrick, 698 F.2d 61, 73 (2d Cir. 1982). But in the context of a
derivative action settled on behalf of the class of all
shareholders, this requires consideration, in particular, of whether
the settlement is the result of arm's-length negotiations in which
plaintiffs' counsel has effectively represented the interests of the
shareholder class, id. at 74, and whether the substantive terms of
the settlement are in the interests of Pfizer and its shareholders
relative to "the likely rewards of litigation," id. at 73-74.

Here, plaintiffs, like defendants, were represented
throughout by able and experienced counsel, who engaged in vigorous
motion practice and very full discovery that included production of
over 12 million documents, dozens of fact and expert depositions,

7

and the exchange of detailed expert reports from highly-qualified experts.  Only after the motion practice and discovery had revealed the parties' relative strengths and weaknesses did plaintiffs enter into serious settlement negotiations, even while summary judgment motion practice was also underway.  The arduous settlement negotiations were hard-fought and conducted with the benefit of advice from still more well-qualified experts.  Moreover, it took full account of the needs of the settlement class, which, as the Court had already preliminarily determined when it tentatively approved the settlement, was a class that met the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) in that: (a) the members of the settlement class were so numerous that their joinder would be impracticable; (b) there were questions of law and fact common to the settlement class that predominated over any individual questions; (c) the claims of lead plaintiffs in this action were typical of the claims of the settlement class; and (d) a class action was superior to other available methods for the fair and efficient adjudication of the controversy.  As the Court's own observations confirm, moreover, lead plaintiffs and their counsel have fairly and adequately represented and protected the interests of all members of the settlement class.

As to the substantive terms of the settlement, the Court's analysis is guided by (though not limited to) the four factors

identified by the Second Circuit in City of Detroit v. Grinnell

Corp., 495 F.2d 448 (2d Cir. 1974): "(1) the reasonableness of the

benefits achieved by the settlement in light of the potential

recovery at trial; (2) the likelihood of success in light of the

risks posed by continued litigation; (3) the likely duration and

cost of continued litigation; and (4) any shareholder objections to

the settlement." In re AOL Time Warner, 2006 WL 2572114 at *3; see

also Grinnell, 495 F.2d at 663. As to the first Grinnell factor,

the several corporate governance experts retained by the parties

unanimously praise the benefits achieved by the proposed settlement.

For example, according to plaintiffs' corporate governance expert,

Prof. Jeffrey N. Gordon of Columbia Law School:

> ... the Reforms embodied in the Proposed Settlement will
> significantly strengthen Board oversight of Pfizer's compliance
> with the FDA's drug marketing regime and related compliance
> mandates and will produce other improvements to internal
> compliance and accountability. In particular, the [Regulatory
> Committee] will significantly add to the Board's capacity to
> oversee Pfizer's compliance process and to the Board's capacity
> to act should a problem appear.

Gordon Aff. ¶ 2. Similarly, Pfizer's experts Richard C. Breeden and

Harvey L. Pitt, both former Chairs of the Securities and Exchange

Commission, strongly endorse the proposed settlement as likely to

materially enhance Pfizer's corporate governance and compliance

functions. Among the advantages, as Mr. Breeden notes, is that the

proposed settlement will lead to an improved Audit Committee,

because the Regulatory Committee will take over compliance oversight

and thereby "allow the Audit Committee to focus . . . on the accounting and audit issues that might have had lesser attention in the past to make room for compliance and regulatory issues." Affidavit of Richard C. Breeden, dated December 2, 2010 ("Breeden Aff.") ¶ 11.  Still another advantage, as Mr. Pitt suggests, is the message the creation of the special committee will send to all Pfizer employees as to how seriously the company takes compliance in the area of healthcare regulations.  Affidavit of Harvey L. Pitt, December 2, 2010 ("Pitt Aff.") ¶ 16.  Both plaintiffs' and defendants' experts also point to the Ombudsman program, as well as to the Regulatory Committee's authority to recommend the "clawback" of compensation from employees who violate Pfizer's compliance obligations, as likely to materially enhance the Company's ability to meet its compliance obligations.  See Gordon Aff. ¶¶ 77-78; Pitt Aff. ¶ 31.

Turning next to the fourth Grinnell factor, after full notice to the shareholders (in a form approved by the Court), only one shareholder, Nora Vides, filed objections to the proposed settlement; nevertheless, her objections, which were also argued by her counsel at the fairness hearing, deserve the full attention of the Court.  See Objection of Nora Vides to Settlement, dated January 31, 2011 ("Vides Objections").  First, Vides complains that the proposed settlement contains "no monetary recovery" for the

10

shareholders.  Id.  This is not correct, because the $75 million to

pay for the Regulatory Committee and other expenses comes from the

defendants' insurers.  More importantly, if the allegation of the

complaint are true, the real cause of the misconduct that has

already caused the company (and thus its shareholders) to pay a fine

of $2.3 billion is inadequate regulatory compliance, which is

precisely what the settlement is directed at preventing in the

future.  Thus, if the mechanisms of the settlement are what they are

touted to be, the savings to the company in avoiding such huge fines

in the future will be substantial.

This leads to Vides' second objection, which is to the fact

that the settlement limits the Regulatory Committee's initial term

to five years, leaving it to the Board to determine if the Committee

will continue thereafter.  See id. ¶ 7(b).  The objection to the

Committee's potentially short life is not without force; but it

ignores the fact that the proposed settlement is somewhat in the

nature of an experiment and therefore ought not be writ in stone.

The premise of the settlement is that Pfizer's Audit Committee,

while generally capable of evaluating the company's accounting and

financial compliance practices, is poorly suited to oversee

compliance with the company's drug-related regulatory requirements,

so that it makes sense to create a separate Regulatory Committee for

this purpose.  Whether the new Committee will be as effective a tool

11

as the parties have predicted remains to be seen, and therefore its
continuation should not be prescribed in perpetuity.  However, under
the terms of the settlement, the Board is required to report its
decision as to whether to continue the Regulatory Committee to the
company's shareholders, thereby subjecting the Board's decision to
shareholder, regulatory, and public scrutiny.

    Vides' final objection relates to the so-called "clawback"
provision.  Under the proposed settlement, the Regulatory Committee
is merely empowered to make recommendations to Pfizer's existing
Compensation Committee as to "the extent, if any, the incentive
compensation" of those who hereinafter violate company directives
relating to regulatory compliance should be reduced or recovered.
Corporate Governance Proposal at 7.  Vides argues that the only sure
mechanism for deterring future misconduct is to give the Regulatory
Committee the final say over such "clawbacks."  See id.; see also
tr. 3/7/2011 at *8-9.  The Court, however, does not agree that the
Board should not have a final say on compensation, a matter uniquely
within its authority.  As a practical matter, moreover,
recommendations of the Regulatory Committee in this regard are
likely to carry great weight at a company that is now under such
scrutiny as Pfizer.

    Moreover, Pfizer is currently subject to certain reporting
obligations to federal regulatory authorities.  See Declaration of

Hal Shafter, dated Dec. 2, 2010, at Ex. 7. Specifically, in connection with its civil settlement of allegations, similar to those alleged here, that were brought by the United States Department of Justice, Pfizer entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the Department of Health and Human Services ("HHS"). See id. Under the terms of the CIA, Pfizer is obligated to report all compliance-related impropriety occurring within its ranks to HHS until December 31, 2013. See id.; see also tr. 3/7/2011 at *27. Accordingly, at least through 2013, federal regulatory authorities will be fully apprised of the underlying misconduct that would prompt a clawback recommendation on the part of the Regulatory Committee. This partial regulatory oversight provides at least some assurance that the Committee's recommendations will not be lightly disregarded by the Board.

On balance, the Court concludes that the settlement is likely to provide considerable corporate benefits to Pfizer and its shareholders, in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company.

Turning to the remaining Grinnell factors, the aforementioned benefits need to be assessed in the context of the considerable risks to plaintiffs of continued costly litigation. See Grinnell,

13

495 F.2d at 663. Given the daunting legal standard applicable to plaintiffs' sole remaining claim under Delaware law, plaintiffs would have faced very substantial risks in continuing to prosecute this action. As the Delaware Court of Chancery has noted, a claim against the Board for failure of oversight, as alleged here, is "possibly the most difficult theory in corporation law upon which a Plaintiff might hope to win a judgment." In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996); see also Stone ex rel. AmSouth Bancorp. v. Ritter, 911 A.2d 362, 370 (Del. 2006) (same). At a minimum, any judgment ordered on that basis would be subject to extended appeals. Under these circumstances, the benefits achieved by plaintiffs in the proposed settlement loom large when compared with the substantial possibilities that plaintiffs would have lost their case altogether, either at trial or on appeal.

In addition to its assessment of the issues raised by the parties and the objector, the Court has also made its own analysis of whether the proposed settlement is fair, adequate, and reasonable, and in the best interests of the settlement class, and concludes that it is. The Court therefore approves the settlement.

As for plaintiffs' counsel's application for $22 million in attorneys' fees and for reimbursement for more than $1.6 million ($1,616,650.69) in related expenses, Lebovitch & Wales Decl. at ¶¶

14

96-97, it is well-established that plaintiffs who confer a corporate benefit may be awarded attorneys' fees and expenses under Delaware law. See Tandycrafts, Inc. v. Initio Partners, 562 A.2d 1162, 1165 (Del. 1989) (also noting that "the benefit need not be measurable in economic terms"). Given the corporate benefits described above, the Court's determination of whether plaintiffs' counsel's requested fee award is reasonable is guided by the factors set forth by the Second Circuit in Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000). These factors are: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Id. (internal quotations omitted). In addition, Courts in this Circuit may, in their discretion, assess the reasonableness of fee awards in relation to both plaintiffs' counsel's lodestar and the total amount recovered. See id.

Having considered all the factors described above in light of the circumstances applicable to this action, the Court concludes that plaintiffs' counsel's requested fee award is fair and reasonable. First, the Court notes that, were it to look solely to the $75 million recovered for the benefit of Pfizer, the $22 million in requested fees would fall within the accepted range of common fund fee awards in this District. In re Monster Worldwide, Inc.

15

Sec. Litig. 07-cv-02237, slip op. at 2 (S.D.N.Y. Nov. 25, 2008)

(awarding 25% of $45 million settlement in fees and expenses);

Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini, 258

F.Supp.2d 254, 262 (S.D.N.Y. 2003) (awarding fees equivalent to

roughly 33% of the amount recovered).  Moreover, the Court notes

that the requested fee award compares favorably with plaintiffs'

counsel's lodestar, given the 38,720 hours they report having spent

prosecuting this action.  Lebovitch & Wales Decl. at Ex. I.  Though

mindful of the "temptation for lawyers to run up the number of hours

for which they could be paid," Goldberger, 209 F.3d at 48, the Court

finds plaintiffs' counsel's reported hours reasonable in light of

the complexity and scale of the instant litigation.  Further,

separate and apart from any monetary award, the settlement, as

described supra, will provide significant corporate benefits for

Pfizer and its shareholders.  Moreover, it was achieved despite

plaintiffs' considerable legal and practical hurdles in prosecuting

this action, risks that were accentuated by the fact that

plaintiffs' counsel pursued the action on a fully contingent basis.

See Steiner v. Williams, 2001 WL 604035, at *7 (S.D.N.Y. 2001)

(taking into account, in approving 30% of a $20 million recovery

that "[i]n undertaking this litigation, counsel took a tremendous

risk that, in the end, nothing would be recovered").

In sum, the Court hereby enters final judgment approving the proposed settlement and motion for attorneys' fees in all respects. However, the Court will retain jurisdiction for the limited purpose of enforcing the terms of the settlement agreement.

SO ORDERED.


Dated: New York, NY
       April 29, 2010                    JED S. RAKOFF U.S.D.J.


17